**DENTONS US LLP**
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: van.durrer@dentons.com

**DENTONS BINGHAM GREENEBAUM LLP**
James R. Irving (*pro hac vice* forthcoming)
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200
Facsimile: (502) 540-2215
Email: james.irving@dentons.com
*Proposed Counsel to Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>House Canary New Jersey, Inc., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-20766 (EJO)<br><br>(Jointly Administered)<br><br>**Hearing Date: October 20, 2026 at 2:00 p.m.** |

**NOTICE OF HEARING OF DEBTORS' MOTION**
**FOR ENTRY OF AN ORDER TO ESTIMATE THE SECURED CLAIMS**

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) HouseCanary New Jersey, Inc. [3712], (ii) HouseCanary, Inc. [2307], (iii) HouseCanary (CT), Inc. [1814], (iv) ComeHome, Inc. [0328], (v) HC Certified Analytics, Inc. [8523], and (vi) HouseCanary R&D, LLC [2124]. The Debtors' mailing address is 535 Mission Street, 14th Floor, San Francisco, CA 94105.

**OF LENDERS STRUCTURAL CAPITAL INVESTMENTS III, LP, SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC, AND CEOF HOLDINGS LP, WITH OCEAN II PLO LLC AS AGENT, UNDER 11 U.S.C. § 502(c)**

**PLEASE TAKE NOTICE** that on September 22, 2026 (the "Petition Date"), the above-captioned debtors and debtors-in-possession (collectively, "the Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on September 30, 2026, the Debtors' filed the Motion For Entry of an Order To Estimate The Secured Claims of Lenders Structural Capital Investments III, LP, Series Structural DCO II Series of Structural Capital DCO, LLC, and CEOF Holdings LP, With Ocean II PLO LLC as Agent, Under 11 U.S.C. § 502(C) (the "Motion"). A hearing to consider approval of the Motion is scheduled to take place before the Honorable Eamonn J. O'Hagan, U.S. Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom #2, 402 East State Street, Trenton, New Jersey 08608, on **October 20, 2026 at 2:00** or as soon thereafter as counsel may be heard:

**PLEASE TAKE FURTHER NOTICE** that, Parties wishing to observe telephonically can dial-in using the following information.

**Zoom Link:** https://njb-uscourts.zoomgov.com/j/1602913576?pwd=bad40CAgSaP1VX5JY44nEkZ5t6qQkS.1#success

Meeting ID: 160 291 3576
Passcode: 234642

**Telephone Dial-In Information:**
+1 551 285 1373 US (New Jersey)
+1 646 828 7666 US (New York)

**PLEASE TAKE FURTHER NOTICE** that objections and/or responses, if any, to the relief requested in the Motion shall be made at the hearing under D.N.J. LBR 9013-5(d).

**PLEASE TAKE FURTHER NOTICE THAT YOUR RIGHTS MAY BE AFFECTED. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one).**

*[Concluded on the following page]*

**PLEASE TAKE FURTHER NOTICE** that a copy of the Motion, and any related filings, can be viewed and/or obtained by: (i) accessing the docket through PACER, for which fees may apply, (ii) visiting the website for the Debtors' chapter 11 cases at: https://omniagentsolutions.com/HouseCanary or (iii) by contacting the Office of the Clerk of the United States Bankruptcy Court, District of New Jersey. Please note that a PACER account is required to access documents through PACER.

Dated: September 30, 2026

*/s/ Lauren Macksoud*
**DENTONS US LLP**
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: van.durrer@dentons.com

**DENTONS BINGHAM GREENEBAUM LLP**
James R. Irving (*pro hac vice* forthcoming)
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200
Facsimile: (502) 540-2215
Email: james.irving@dentons.com

*Proposed Counsel to Debtors and Debtors in Possession*

**DENTONS US LLP**
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: van.durrer@dentons.com

**DENTONS BINGHAM GREENEBAUM LLP**
James R. Irving (*pro hac vice* forthcoming)
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200
Facsimile: (502) 540-2215
Email: james.irving@dentons.com

*Proposed Counsel to Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>House Canary New Jersey, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-20766 (EJO)<br><br>(Jointly Administered)<br><br>Hearing Date: October 20, 2026 at 2:00 p.m. |

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) House Canary New Jersey, Inc. [3712], (ii) HouseCanary, Inc. [2307], (iii) HouseCanary (CT), Inc. [1814], (iv) ComeHome, Inc. [0328], (v) HC Certified Analytics, Inc. [8523], and (vi) HouseCanary R&D, LLC [2124]. The Debtors' mailing address is 535 Mission Street, 14th Floor, San Francisco, CA 94105.

**DEBTORS' MOTION
FOR ENTRY OF AN ORDER TO ESTIMATE
THE SECURED CLAIMS OF LENDERS STRUCTURAL
CAPITAL INVESTMENTS III, LP, SERIES STRUCTURAL DCO II
SERIES OF STRUCTURAL CAPITAL DCO, LLC, AND CEOF HOLDINGS LP,
WITH OCEAN II PLO LLC AS AGENT, UNDER 11 U.S.C. § 502(c)**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

House Canary New Jersey, Inc. and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors") under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in these chapter 11 cases (the "Chapter 11 Cases"), by and through their undersigned counsel, hereby move (the "Motion")[2] for entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, determining the value of the secured claims asserted by Structural Capital Investments III, LP, Series Structural DCO II series of Structural Capital DCO, LLC, and CEOF Holdings LP as lenders, and Ocean II PLO LLC as agent (collectively, "Structural") under section 502(c) of the Bankruptcy Code. In support of the Motion, the Debtors submit the *Declaration of Jeffrey C. Perea* (the "Perea Declaration"), attached to the Motion as **Exhibit B**. In further support of the Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1. Structural asserts a claim against the Debtors' bankruptcy estates in the approximate amount of $43,004,902.04. Structural's claim is secured by a first-priority security interest on only some of the Debtors' property, the "Structural Collateral" as defined below. Notably, the Structural Collateral does not include a lien on the Debtors' most valuable asset, its intellectual property, or on the claims or proceeds of the Texas Litigation (or any proceeds thereof) (defined below). Not

[2] Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration (as defined below).

surprisingly then, the amount of Structural's total claim is greatly in excess of the value of the Structural Collateral. By this Motion, the Debtors seek entry of an order estimating both the secured portion of Structural's claim (the "Secured Claim Amount") in an amount no more than $85,061.56 under section 502(c) of Bankruptcy Code, and the remaining unsecured deficiency portion in the approximate amount of $42,919,840.48 of Structural's claim (the "Unsecured Claim Amount").

2. The Debtors intend to file a full-pay plan of reorganization. In order to satisfy the requirements for feasibility, the Debtors require a determination of Structural's Secured Claim Amount.

## JURISDICTION AND VENUE

3. The United States Bankruptcy Court for the District of New Jersey (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference to the Bankruptcy Court Under Title 11*, entered July 23, 1984, and amended on June 6, 2025 (Bumb, C.J.). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The predicates for the relief requested herein are sections 502(c), 506(a) of the Bankruptcy Code and Bankruptcy Rule 3012.

## RELIEF REQUESTED

6. The Debtors seek an order, substantially in the form of the Order, determining under section 502(c) of the Bankruptcy Code that the Secured Claim Amount be fixed at no more than $85,061.56, and the Unsecured Claim Amount is approximately $42,919,840.48.

## BACKGROUND

### *A. Prior to the Petition Date the Debtors Entered Into the LSA with Structural.*

7. The Debtors develop proprietary residential real-estate valuation models, analytics platforms, and forecasting tools. Those models and the data behind them are the trade secrets at issue in the Texas Litigation described below.

8. On March 25, 2021, the Debtors entered into a Loan and Security Agreement (the "LSA") with Structural Capital Investments III, LP, Series Structural DCO II series of Structural Capital DCO, LLC, and CEOF Holdings LP as lenders, and Ocean II PLO LLC as agent, establishing a credit facility of up to $30 million. The LSA has been amended six times. The Sixth Amendment, executed December 29, 2025, extended the maturity date to January 31, 2026. A copy of the LSA, as amended, is attached as **Exhibit C**.

9. The LSA grants Structural a security interest in certain of the Debtors' assets. Specifically, Structural's collateral (the "Structural Collateral") is defined as:

> All assets and property of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to (collectively, the "Collateral"):
>
> (a) all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property and the Texas Litigation Collateral), goods (including fixtures), instruments (including promissory notes), Inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of

credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records, provided however, that (i) the Collateral shall include all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "Rights to Payment"); and (ii) if a security interest in Borrower's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Collateral shall automatically, and effective as of the date of this Agreement, include the Intellectual Property to the extent necessary to permit perfection of Agent's security interest in the Rights to Payment; and

(b) all real property interests (including leaseholds, mineral rights, timber, etc.); and

(c) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. Notwithstanding the foregoing, in no event shall the Collateral include: (a) any lease, license, contract, property rights or agreement to which Borrower is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9406, 9407, 9408 or 9409 of the Code (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); provided that the Collateral shall include and such security interest shall attach immediately (x) at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) above and (y) to any all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing such lease, licenses, contract, property right or agreement; or (b) any intent-to use Trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable law.

(Exhibit A to LSA).

10. Critically, Structural ***<u>does not</u>*** have a general security interest in the Debtors' intellectual property, but rather it has a security agreement which only extends to Intellectual Property (as defined in the LSA) to the extent necessary to realize proceeds from the sale of the

Debtors' services. The LSA excludes the claims and proceeds of the Texas Litigation (and, in each case, any proceeds thereof), as well as the litigation reserve account, and Structural's lien does not attach or encumber ownership of the technology or any of the foregoing. Structural's own recorded financing statement, a copy of which is attached as **Exhibit D**, confirms this: it excludes intellectual property, the Texas Litigation Collateral, and the Litigation Reserve Account from its collateral, reaching intellectual property only to the narrow extent necessary to perfect its interest in rights to payment and proceeds from the sale, licensing, or disposition of the Debtors' intellectual property. The intellectual property at the center of the Texas Litigation is, by contrast, claimed by another of the Debtors' lenders as its own collateral of record.

11. The Debtors are a plaintiff in two related proceedings (together, the "Texas Litigation"): *HouseCanary, Inc. v. Amrock, LLC* , No. 2016-CI-06300, in the 438th Judicial District Court, Bexar County, Texas,[3] and *HouseCanary, Inc. v. Quicken Loans Inc.*, No. 5:18-cv-00519, in the United States District Court for the Western District of Texas. Both concern the misappropriation of the Debtors' valuation models, data, and analytics.

12. On March 6, 2026, after a four-week retrial, a Bexar County, Texas jury found that Amrock misappropriated the Debtors' trade secrets and defrauded the company, and awarded the Debtors $175 million in compensatory damages. That figure excludes nearly ten years of prejudgment interest, attorney's fees, or other costs to be determined by the Court. Amrock has stated that it will appeal. A hearing to advance the jury award to a judgment is set for the first week of October, 2026.

[3] This case was formerly captioned *Title Source, Inc. v. HouseCanary, Inc.*, and referenced as such in the Notice of Disposition; Amrock, Inc. was formerly known as Title Source, Inc.

B. *Structural Sought to Foreclose Upon the Structural Collateral*.

13. The Debtors did not timely satisfy Structural's claim as of the maturity date in the LSA, and the Debtors are in default under the LSA. The Debtors do not dispute that default or Structural's security interest in the Structural Collateral.

14. On September 8, 2026, Structural served a *Notice of Disposition* (the "Notice") setting a public auction for September 22, 2026, at 1:00 p.m. at 3555 Alameda De Las Pulgas, Suite 201, Menlo Park. A copy of the Notice is attached hereto as **Exhibit E**. Exhibit A to the Notice describes the collateral as substantially all of the Debtors' assets and excludes intellectual property (other than as set forth in paragraph 10 herein) and the Texas Litigation. The Notice was the commencement of an effort by Structural to foreclose on the Structural Collateral under California's adoption of Article 9 of the Uniform Commercial Code.

15. Structural's efforts to foreclose on the Structural Collateral suffered from various deficiencies, which the Debtors' counsel identified to Structural's counsel in various correspondence. Such correspondence, and Structural's counsel's responsive letters, are attached hereto as **Exhibit F**. As set forth in that correspondence, not only was the Notice and advertisement of the foreclosure sale deficient, but the foreclosure sale itself made little sense. The Structural Collateral to be foreclosed upon consisted of computers and equipment of *de minimis* value, and contract rights which a prospective buyer could not perform upon because the prospective buyer would not be able to purchase the Debtors' intellectual property or hire all of the Debtors' employees.

16. Nevertheless, Structural insisted on proceeding with its foreclosure. As a result on September 17, 2026, Debtor HouseCanary, Inc. filed its *Verified Complaint for: (i) Declaratory Relief; (2) Tortious Interference with Contract; (3) Breach of Covenant of Good Faith and Fair*

*Dealing; and (4) Unfair Business Practices* (the "Complaint") against Structural in the Superior Court of the State of California, County of San Mateo (the "State Court"). A copy of the Complaint is attached hereto as **Exhibit G**. By filing the Complaint, Debtor HouseCanary, Inc. commenced the case pending as *HouseCanary, Inc. v. Ocean II PLO LLC et al.*, Case No. 26-CIV-07276 (the "State Court Case").

17. On September 18, 2026, Debtor HouseCanary, Inc. filed *Plaintiff's Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction* (the "TRO Motion") in the State Court Case. A copy of the TRO Motion is attached hereto as **Exhibit H**.

18. On September 21, 2026, Structural filed its objection to the TRO Motion along with a supporting *Declaration of Kai Tse* (the "Tse Declaration," and together with the Opposition, the "Structural State Court Pleadings"). A copy of the Structural State Court Pleadings is attached hereto as **Exhibit I**.

19. On September 21, 2026, the State Court denied the TRO Motion. However, it is noteworthy that the State Court commented on the record that it seemed to Her Honor that Structural's Collateral was "worthless" without a lien on the Debtors' intellectual property.

20. Debtor HouseCanary, Inc. still has outstanding claims against Structural under the Complaint which have not yet been addressed by the State Court, and those claims serve as an independent basis to reduce the amount of Structural's secured claim

C. *The Debtors Commenced the Chapter 11 Cases*.

21. On September 22, 2026 (the "Petition Date"), the Debtors each commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

22. Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Chris Rediger in Support of the Debtors' Chapter 11 Petitions and Emergency First Day Motions* [Docket No. 16] (the "First Day Declaration").

23. On September 25, 2026, the Court entered the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Use of Cash Collateral and Affording Adequate Protection; (III) Granting Liens and Providing Superpriority Administrative Expense Status; (IV) Modifying Automatic Stay; (V) Scheduling a Final Hearing; And (VI) Granting Related Relief* [Docket No. 34] (the "Interim DIP Order"). The Interim DIP Order authorizes the Debtors to obtain postpetition financing, on an interim basis, subject to the terms of the DIP Term Sheet (as that term is defined in the Interim DIP Order). The DIP Term Sheet requires the Debtors to confirm a chapter 11 plan within 60 days of the Petition Date.

24. As of the Petition Date, the value of Structural's Collateral is far less than the aggregate amount of Structural's claim. As of the Petition Date, Structural's Collateral constituted the following:

(a) Bank accounts which Structural has control over via a deposit account control agreement which had an aggregate of $55,061.56 in them;

(b) Computers and equipment, which is summarized in **Exhibit J**. The Debtors' computers and equipment includes laptops used by employees, consultants and other spares housed with a third-party who works with the Debtors. As a fully remote business, the Debtors do not own any fixed assets. What is more, the Debtors' laptops are all under the cut-off amount for capitalization, so the Debtors have historically expensed them in the month that they are purchased, and then the Debtors consider the book value as zero. The Debtors believe that the liquidation value of the computers and equipment would be *de minimis*;

(c) Accounts receivables with a value in the amount of $1,387,744.76; *provided, however*, that this number should be adjusted to $0.00 as these accounts receivable are uncollectible without the Debtors' intellectual property, which is not Structural's Collateral. Customers will not pay on accounts receivables, even if those receivables were earned before the Petition Date, if the customers are no longer receiving their contracted for services from the Debtors, which services are dependent upon the intellectual property. Indeed, certain customers even have the right to assert their own claims against the Debtors if they are not receiving the benefit of their contracts with the Debtors – which is dependent upon the intellectual property; and

(d) Contracts and the right to proceeds from license agreements, new business and other future sales that the Debtors could make. To be clear, the Debtors have no plans to license, sell or dispose of their intellectual property.

## BASIS FOR RELIEF

25. Section 502(c) of the Bankruptcy Code provides that the Court shall estimate "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). The purpose of estimation is to "help[] the court 'avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions.'" *In re Fed.-Mogul Glob., Inc.*, 330 B.R. 133, 154 (D. Del. 2005) (quoting *In re Ford*, 967 F.2d 1047, 1053 (5th Cir. 1992)); *see also In re Lionel L.L.C.*, No. 04-17324, 2007 WL 2261539, at *2 (Bankr. S.D.N.Y. Aug. 3, 2007) (noting that, without estimation, lengthy proceedings result in "delayed distributions, which in turn, greatly devalue the claims of all creditors as they cannot use the assets until they receive them"). The object of such a proceeding is to establish the estimated value of a creditor's claim for purposes of formulating a reorganization plan. *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 347 (3d Cir. 2002).

26. The Code does not provide a roadmap for how a court should estimate a claim. *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982). "The principal consideration," in an estimation proceeding, "must be an accommodation to the underlying

purposes of the Code." *Id.* The only requirement is that the value of the claim be determined in accordance with the legal rules that will govern the final amount of the claim, and "there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code." *Id.* at 136; *see also G-I Holdings*, 323 B.R. at 599 (quoting *In re Thomson McKinnon Sec., Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y. 1992) ("In estimating [a] claim, the bankruptcy court should use whatever method is best suited for the circumstances"). All claims are to be valued as of the petition date. *In re Fed.-Mogul Glob., Inc.*, 330 B.R. at 155.

27. The estimation under section 502(c) of the Bankruptcy Code of what portion of a claim is secured by collateral, and what portion of a claim is an unsecured deficiency claim, is analogous in certain respects to the use of section 506(a) of the Bankruptcy Code for the same purposes. *See e.g., In re Sneijder*, 407 B.R. 46, 55 (Bankr. S.D.N.Y. 2009) (discussing the use of estimation under section 502(c) of the Bankruptcy Code or determination under section 506(c) of the Bankruptcy Code to determine what portion of a claim is secured and what portion is unsecured).

28. Section 506(a) of the Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a). Bankruptcy Rule 3012 provides:

> The court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct.

FED. R. BANKR. P. 3012. Thus section 506(a) of the Bankruptcy Code divides allowed claims into two classes. A claim that is "secured by a lien on a debtor's property is secured 'to the extent of the value of such creditor's interest in the estate's interest in such property.'" *In re Baker*, 300 B.R. 639, 643 (Bankr. W.D.Pa. 2003). "To the extent the claim exceeds that value, it is deemed to be unsecured." *Id.* (citing *McDonald v. Master Financial, Inc.* (*In re McDonald*), 205 F.3d 606, 609 (3d Cir. 2000)); *see also Johns v. Rousseau Mortgage Corp.* (*In re Johns*), 37 F.3d 1021 (superseded by statute on other grounds). As set forth in *Baker*, "[i]f … the value of the collateral securing an obligation is less than the amount of an allowed claim, it follows by definition that the claim is unsecured in the amount of that deficiency." 300 B.R. at 643.

29. Here, the Structural Collateral is widely disbursed and of limited value in and of itself without the Debtors' intellectual property or employees. Therefore, the Secured Claim Amount is vastly lower than the full amount of Structural's claim. This was apparent in the State Court Litigation – where Structural attempted to do just that – and the State Court commented that, without connection to the Debtors' business and operations, the Structural Collateral is "worthless." The Structural Collateral consists primarily of: (a) cash in the amount of $55,061.56; (b) used computers and equipment of limited value; (c) accounts receivable which must be evaluated net of costs; (d) general intangibles - excluding intellectual property (other than as set forth in paragraph 10 herein) – of unknown value; and (e) customer contracts which cannot be serviced without the Debtors' intellectual property. Each of these categories has significantly diminished value when severed from the Debtors' core intellectual property and operational personnel.

30. With regard to the cash in the Debtors' accounts which are under the control of Structural – and thus a part of the Structural Collateral – that value is easily ascertained. The value of this portion of the Structural Collateral is the $55,061.56 in these accounts on the Petition Date.

31. With regard to the Debtors' computers and equipment, the value of these assets is de minimis. The computers and equipment are for just over 30 employees, some contractors and a vendor the Debtors work with. The computers and equipment are disbursed as the Debtors are a remote business. The Debtors ascribe zero dollars in book value to the computers and equipment. The liquidation value of these used computers and equipment is almost certainly nominal, as explained in the Debtors' counsel's prepetition correspondence to Structural in connection with the proposed UCC Article 9 foreclosure sale.

32. With regard to accounts receivable or deposit accounts, to the extent the Debtors hold receivables, the value attributable to Structural's collateral interest in these accounts receivable is effectively zero. Upon any severance from the Debtors' intellectual property, the Debtors would no longer be able to service their existing accounts, and the Debtors' customers would setoff against or refuse to pay the accounts receivable.

33. Further, the face amount of the Debtors' accounts receivable on the Petition Date should be considered net of the costs associated with generating those receivables. By analogy, Structural has a lien on milk, but not the cow. If you don't feed the cow, there is no milk. As applied to the Debtors, payroll and technology subscriptions are among the costs of the feed and care of the cow. The value of the collateral then, is at best the price of milk, minus the feed and care.

34. With regard to general intangibles, the LSA expressly carves out the Debtors' intellectual property (other than as set forth in paragraph 10 herein) and the Texas Litigation

Collateral from Structural's Collateral. The intellectual property is the Debtors' most valuable asset, the Texas Litigation Collateral is material, and what remains are residual general intangibles which are worth little on their own divorced from the Debtors' valuable intellectual property and the Texas Litigation Collateral. Structural recognized this prior to the Petition Date. Indeed, Structural made numerous efforts to negotiate an expansion of the lien to encompass the Debtors' intellectual property.

35. It is not even clear that these general intangibles can be monetized individually for Structural's benefit. Relatedly, the Debtors' customer contracts and associated revenue streams have value as part of a going concern. But that value only exists if the purchaser is able to service those contracts. The Debtors' customers pay for access to proprietary real estate valuation models, analytics, and forecasting tools. A buyer acquiring the customer contracts without the underlying intellectual property would be unable to perform under those contracts and realize value. In short, they are essentially valueless absent the Debtors' involvement and customers would have no reason to continue the relationship with any purchaser. What is more, the Debtors' business plan does not include any effort to sell, license or dispose of intellectual property. Therefore, there is no "right to payment."

36. Finally, Structural's security interest in intellectual property extends only to the narrow extent necessary to perfect its interest in "Rights to Payment." Structural does not hold a lien on the technology itself, and its financing statement expressly excludes intellectual property, the Texas Litigation Collateral, and the Litigation Reserve Account. Again, Structural's collateral does not include the one asset—the Debtors' intellectual property—that gives the Debtors' collateral value.

37. Finally, the Debtors have claims against Structural as set forth in the Complaint. These claims remain pending and should not be fully dismissed.

38. For all of the reasons set forth above, the Debtors submit that the Secured Claim Amount should be fixed at no more than $85,061.56, and the Unsecured Claim Amount is approximately $42,919,840.48.

39. The relief requested herein is immediately necessary if the Debtors are to quickly confirm a plan of reorganization as required by the milestones established in the Interim DIP Order. As a technology company, an important foundation of the Debtors' reorganization strategy is the need to exit chapter 11 promptly. Moreover, this is expressly delineated in Condor's sponsorship of the Debtors' plan and the milestones underlying the Debtors' debtor-in-possession financing. Estimation of Structural's claim as set forth in the Motion is important to the feasibility of the Debtors' plan.

## RESERVATION OF RIGHTS

40. Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any

lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

## WAIVER OF MEMORANDUM OF LAW

41. The Debtors respectfully request that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3) because the legal basis upon which the Debtors rely is set forth herein and the Motion does not raise any novel issues of law.

## NO PRIOR REQUEST

42. No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

43. Pursuant to Local Rule 9013-5(c), notice of this Motion shall be given to the following parties: (a) the Office of the United States Trustee; (b) counsel to the DIP Lender; (c) counsel to the Debtors' prepetition secured creditors; (d) counsel to Structural; (e) counsel to any statutory committee appointed in the Chapter 11 Cases, if any; and (f) the Debtors' thirty largest unsecured creditors on a consolidated basis. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of an order (i) granting the relief requested herein; and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: September 30, 2026

*<u>/s/ Lauren Macksoud</u>*
**DENTONS US LLP**
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: van.durrer@dentons.com

**DENTONS BINGHAM GREENEBAUM LLP**
James R. Irving (*pro hac vice* forthcoming)
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200
Facsimile: (502) 540-2215
Email: james.irving@dentons.com

*Proposed Counsel to Debtors and Debtors in Possession*

# EXHIBIT A

## Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>House Canary New Jersey, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-20766 (EJO)<br><br>(Jointly Administered) |

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER TO ESTIMATE THE SECURED CLAIMS OF LENDERS STRUCTURAL CAPITAL INVESTMENTS III, LP, SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC, AND CEOF HOLDINGS LP, WITH OCEAN II PLO LLC AS AGENT, UNDER 11 U.S.C. § 502(c)**

The relief set forth on the following pages, numbered three (3) through four (4), is **ORDERED**.

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) House Canary New Jersey, Inc. [3712], (ii) HouseCanary, Inc. [2307], (iii) HouseCanary (CT), Inc. [1814], (iv) ComeHome, Inc. [0328], (v) HC Certified Analytics, Inc. [8523], and (vi) HouseCanary R&D, LLC [2124]. The Debtors' mailing address is 535 Mission Street, 14th Floor, San Francisco, CA 94105.

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**DENTONS US LLP**
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: van.durrer@dentons.com

**DENTONS BINGHAM GREENEBAUM LLP**
James R. Irving (*pro hac vice* forthcoming)
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200
Facsimile: (502) 540-2215
Email: james.irving@dentons.com

*Proposed Counsel to Debtors and Debtors in Possession*

Upon consideration of the Motion[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") determining the value of the secured claims asserted by Structural Capital Investments III, LP, Series Structural DCO II series of Structural Capital DCO, LLC, and CEOF Holdings LP as lenders, and Ocean II PLO LLC as agent (collectively, "Structural") under section 502(c) of the Bankruptcy Code; and upon the First Day Declaration and Perea Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated as of September 18, 2012; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for hearing on the Motion were appropriate under the circumstances and that no other notice be provided; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing thereon establish just cause for the relief granted herein; and upon all of the proceedings before this Court; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1. The Motion is **GRANTED** as set forth herein.

2. The secured portion of Structural's claims against the Debtors' bankruptcy estates – the Secured Claim Amount – shall be fixed in the amount of $85,061.56.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3. The remaining unsecured deficiency portion of Structural's claims against the Debtors' bankruptcy estates – the Unsecured Claim Amount – shall be fixed in the amount of $42,919,840.48.

4. The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted herein.

5. The requirement set forth in Local Rule 9013-1(a)(3) that any motion or other request for relief be accompanied by a memorandum of law is hereby deemed satisfied by the contents of the Motion or is otherwise waived.

6. Notwithstanding the applicability of any of the Bankruptcy Rules, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7. This Court retains jurisdiction and power with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# EXHIBIT B

## Perea Declaration

**DENTONS US LLP**
Lauren Macksoud (admitted)
101 JFK Parkway
Short Hills, NJ 07078
Telephone: (973) 912-7100
Facsimile: (973) 912-7199
Email: lauren.macksoud@dentons.com

Van C. Durrer, II (*pro hac vice* forthcoming)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Facsimile: (213) 623-9924
Email: van.durrer@dentons.com

**DENTONS BINGHAM GREENEBAUM LLP**
James R. Irving (*pro hac vice* forthcoming)
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
Telephone: (502) 589-4200
Facsimile: (502) 540-2215
Email: james.irving@dentons.com

*Proposed Counsel to Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>House Canary New Jersey, Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-20766 (EJO)<br><br>(Jointly Administered) |

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: (i) House Canary New Jersey, Inc. [3712], (ii) HouseCanary, Inc. [2307], (iii) HouseCanary (CT), Inc. [1814], (iv) ComeHome, Inc. [0328], (v) HC Certified Analytics, Inc. [8523], and (vi) HouseCanary R&D, LLC [2124]. The Debtors' mailing address is 535 Mission Street, 14th Floor, San Francisco, CA 94105.

# DECLARATION OF JEFFREY C. PEREA

I, Jeffrey C. Perea, hereby state and declare as follows:

1. I am a Managing Director of Getzler Henrich & Associates LLC ("Getzler Henrich"). Getzler Henrich serves as financial advisor to HouseCanary, Inc. and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors"). In that capacity, I have been involved in Getzler Henrich's collaboration with the Debtors in connection with their restructuring and am familiar with their relationship with Structural Capital Investments III, LP, Series Structural DCO II series of Structural Capital DCO, LLC, and CEOF Holdings LP as lenders, and Ocean II PLO LLC as agent (collectively, "Structural").

2. I have more than 25 years of experience in corporate turnarounds, strategic consulting, financial and operational restructurings, and performance improvement. I have experience advising companies and lenders in complex debt restructurings, financings, and workouts, including in distressed and bankruptcy situations.

3. I am a Certified Turnaround Professional and Certified Insolvency and Restructuring Advisor and have served in senior executive roles and independent director roles. I have also advised boards of directors and management teams regarding strategic alternatives and restructuring matters.

4. Except as otherwise indicated herein, this declaration (the "Declaration") is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' advisors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and this industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. I submit this Declaration in support of the *Debtors' Motion for Entry of an Order to Estimate the Secured Claims of Lenders Structural Capital Investments III, LP, Series Structural*

*DCO II Series of Structural Capital DCO, LLC, and CEOF Holdings LP, With Ocean II PLO LLC as Agent, Under 11 U.S.C. §502(c)* (the "Motion").[2]

6. In my role as financial advisor and proposed Chief Restructuring Officer to the Debtors, I am familiar with the Debtors' books and records, including for the purpose of reconciling amounts owed to potential claimants against the Debtors' estates.

7. As set forth in the Tse Declaration filed in the State Court Litigation, Structural asserts a claim against the Debtors' estates in the approximate amount of $43,004,902.04.

8. Structural's claim is secured by a first-priority security interest on only some of the Debtors' property, the "Structural Collateral."

9. The Structural Collateral does not include a lien on the Debtors' intellectual property, the claims or proceeds of the Texas Litigation or any proceeds thereof.

10. As of the Petition Date, the value of Structural's Collateral is far less than the aggregate amount of Structural's claim. As of the Petition Date, Structural's Collateral constituted the following:

(a) Bank accounts which Structural has control over via a deposit account control agreement which had an aggregate of $55,061.56 in them;

(b) Computers and equipment, which is summarized in **Exhibit I** to the Motion. The Debtors' computers and equipment includes laptops used by employees, consultants and other spares housed with a third-party who works with the Debtors. As a fully remote business, the Debtors do not own any fixed assets. What is more, the Debtors laptops are all under the cut-off amount for capitalization, so the Debtors have historically expensed them in the month that

[2] Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Tse Declaration.

they are purchased, and then the Debtors' consider the book value as zero. The Debtors' believe that the value of the computers and equipment is *de minimis*;

(c) Accounts receivables with a value in the amount of $1,387,744.76; *provided, however*, that the actual value of these accounts receivable should be discounted to $0. The Debtors' intellectual property is at the core of the products and services that they offer to their customers, much of the raw data the Debtors provide to customers is publicly available but it is the Debtors' intellectual property which is the "secret sauce" that adds tremendous value. Without the Debtors' intellectual property, the Debtors could not service their customers on a go forward basis. As a result, I believe that most of the Debtors customers would refuse to pay the Debtors on open accounts, even if the accounts receivable had built up before the Debtors stopped providing service. This is in part based on my experience as a restructuring professional, but it is also because I understand that certain of the Debtors' largest customers have contractual rights to damages if the Debtors are not able to provide services dependent upon intellectual property through the term of their contracts; and

(d) Contracts and the right to proceeds from license agreements, new business and other future sales that the Debtors could make. To be clear, there would be no revenue from this category of collateral without the Debtors' intellectual property.

11. Debtor HouseCanary, Inc. still has outstanding claims against Structural under the Complaint which have not yet been addressed by the State Court.

12. It is critical that Structural's claims be estimated in order for the Debtors to propose and confirm a plan along the timeline required by the Interim DIP Order.

13. I believe that the Secured Claim Amount is $85,061.56, which considers the aggregate values of the various types of Structural Collateral. My analysis is based on the following:

a. I ascribed full value to the cash in the bank accounts which Structural has control over via a deposit account control agreement which had an aggregate of $55,061.56 in them;

b. I ascribed $10,000 in value for computers and equipment;

c. The value of the accounts receivable should take into consideration that the Structural Collateral does not include intellectual property which is necessary to service the customers and clients who owe the accounts receivable. Accordingly, I ascribed $0 to the value of the accounts receivable;

d. I believe that the Debtors' general intangibles (not including intellectual property), contracts, and the right to proceeds from license agreements, new business and other future sales that the Debtors could make has negligible value. Nevertheless, I have added $20,000 based on the most that I think a remnant asset buyer or other third-party would pay for these assets divorced from the Debtors' intellectual property.

14. The remainder of Structural's claim is the unsecured deficiency claim, the Unsecured Claim Amount. I believe that the Unsecured Claim Amount is approximately $42,919,840.48 assuming the figures in the Tse Declaration are correct.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed September 30, 2026, at Costa Mesa, California.

*/s/ Jeffrey C. Perea*
Jeffrey C. Perea
Managing Director
Getzler Henrich & Associates LLC

# EXHIBIT C

## Loan and Security Agreement

# FIRST AMENDMENT
# TO
# LOAN AND SECURITY AGREEMENT

THIS FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT (the "**First Amendment**") is dated as of December 30, 2021 (the "**Effective Date**"), and is entered into by and HouseCanary, Inc., a Delaware corporation, for itself and each of its Subsidiaries (collectively referred to as "**Borrowe**r"), Structural Capital Investments III, LP, a Delaware limited partnership ("**SCI**"), Series Structural DCO II series of Structural Capital DCO, LLC ("**DCO**"), and CEOF Holdings LP ("**CEOF**" and together with SCI and DCO, "**Lenders**" and each a "**Lender**"), and Ocean II PLO LLC, a California limited liability company, in its capacity as administrative and collateral agent ("**Agent**").

## RECITALS

WHEREAS, Borrower, Lenders and Agent are parties to that certain Loan and Security Agreement dated as of March 25, 2021 (the "**Loan Agreement**"). Capitalized terms used but not defined herein shall have the meaning provided in the Loan Agreement;

WHEREAS, Borrower seeks to modify certain provisions of the Loan Agreement in connection with its request for a subsequent Advance upon satisfying the Funding Milestone;

WHEREAS, Agent and the Lenders are willing to agree to such modifications as provided herein.

## AGREEMENT

NOW, THEREFORE, based on the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Agent and Lenders agree as follows:

1. Recitals. The recitals set forth above are true and correct and are hereby incorporated by reference.

2. Amendment to Loan Agreement.

   a. The following definitions shall be added to Section 1 of the Loan Agreement in proper alphabetical order:

      "*Initial Advance*" mean the $20,000,000 Advance made by Lenders to Borrower on the Closing Date.

      "*Initial Advance Exit Fee*" means a fee in an amount sufficient to increase the Initial Advance Minimum Return:

      (a) to 1.15:1.00 if the Initial Advance is repaid prior to the first anniversary of the Closing Date; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.15:1.00 after repayment in full of the Initial Advance;

      (b) to 1.20:1.00 if the Initial Advance is repaid on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.20:1.00 after repayment in full of the Initial Advance;

(c) to 1.25:1.00 if the Initial Advance is repaid on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.25:1.00 after repayment in full of the Initial Advance; or

(d) to 1.35:1.00 if the Initial Advance is repaid on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.35:1.00 after repayment in full of the Initial Advance;

"*Initial Advance Minimum Return*" shall mean the ratio equal to (a) the aggregate amount, without duplication, of (i) the principal and interest paid relative to the Initial Advance and (ii) the Facility Fee, in all cases actually paid in cash by the Loan Parties to Agent for the benefit of Lenders hereunder; divided by (b) the Initial Advance. For the avoidance of doubt, the foregoing clause (a) shall not include any amounts other than those listed, including, without limitation, fees paid directly to Agent for its own account, Lender Expenses and the value of any Equity Interests or Warrants or any underlying securities.

"*Subsequent Advance*" means the $10,000,000 Advance made by Lenders to Borrower on December 30, 2021.

"*Subsequent Advance Exit Fee*" means a fee in an amount sufficient to increase the Subsequent Advance Minimum Return:

(a) to 1.15:1.00 if the Subsequent Advance is repaid prior to the first anniversary of the date the Subsequent Advance is made; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent Advance Minimum Return shall be less than 1.15:1.00 after repayment in full of the Subsequent Advance;

(b) to 1.20:1.00 if the Subsequent Advance is repaid on or after the first anniversary of the date the Subsequent Advance is made but prior to the second anniversary of the date the Subsequent Advance is made; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent Advance Minimum Return shall be less than 1.20:1.00 after repayment in full of the Subsequent Advance;

(c) to 1.25:1.00 if the Subsequent Advance is repaid on or after the second anniversary of the date the Subsequent Advance is made but prior to the third anniversary of the date the Subsequent Advance is made; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent Advance Minimum Return shall be less than 1.25:1.00 after repayment in full of the Subsequent Advance; or

(d) to 1.35:1.00 if the Subsequent Advance is repaid on or after the third anniversary of the date the Subsequent Advance is made but prior to the fourth anniversary of the date the Subsequent Advance is made; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent

Advance Minimum Return shall be less than 1.35:1.00 after repayment in full of the Subsequent Advance;

"*Subsequent Advance Minimum Return*" shall mean the ratio equal to (a) the aggregate amount, without duplication, of (i) the principal and interest paid relative to the Subsequent Advance and (ii) the Facility Fee, in all cases actually paid in cash by the Loan Parties to Agent for the benefit of Lenders hereunder; divided by (b) the Subsequent Advance. For the avoidance of doubt, the foregoing clause (a) shall not include any amounts other than those listed, including, without limitation, fees paid directly to Agent for its own account, Lender Expenses and the value of any Equity Interests or Warrants or any underlying securities.

b. The following definitions in Section 1 of the Loan Agreement are hereby deleted:

Exit Fee

Minimum Return

c. Section 2.4(c) of the Loan Agreement is amended and restated in its entirety as follows:

(c) **Final Payment**. Unless an Advance is prepaid in full prior to the Maturity Date, Borrower shall pay the entire unpaid principal and accrued interest and all unpaid Obligations on the Maturity Date, including the Initial Exit Fee and the Subsequent Exit Fee. Agent shall allocate and distribute all such payments to the Lenders based on each Lender's Pro Rata Percentage.

d. Section 2.6 of the Loan Agreement is amended and restated in its entirety as follows:

**2.6 Prepayments.**

(a) **Mandatory Prepayment Upon an Acceleration**. If repayment of the Advances is either automatically or at the election of Agent pursuant to the terms hereof accelerated following the occurrence and continuance of an Event of Default, then Borrower shall immediately pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to the date of prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Initial Exit Fee, (iv) the Subsequent Exit Fee, and (v) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(b) **Mandatory Prepayment Upon a Liquidation Event**. If a Liquidation Event shall occur, then Borrower shall upon such Liquidation Event pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to such Liquidation Event, (ii) the outstanding principal amount of the Advances, (iii) the Initial Exit Fee, (iv) the Subsequent Exit Fee, and (v) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(c) **Voluntary Prepayment**. Borrower may voluntarily prepay all, but not less than all, of the Advances at any time; provided that each of the following conditions is satisfied: Borrower pays to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due up to and including the date of

prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Initial Exit Fee, (iv) the Subsequent Exit Fee, and (v) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

3. Limitation of Amendment. Except as expressly provided in Paragraph 2 hereof, the execution of this First Amendment shall not be deemed to constitute an amendment to or waiver of any provision of the Loan Agreement, and all other terms and conditions of the Loan Agreement shall remain unchanged and in full force and effect.

4. Representations and Warranties. Borrower hereby represents and warrants to Lenders and Agent as follows:

a. Borrower has all requisite power and authority to execute this First Amendment and any other agreements or instruments required hereunder and to perform all of its obligations hereunder, and this First Amendment and all such other agreements and instruments have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

b. Borrower has no Subsidiaries other than as disclosed in the Perfection Certificate.

c. The execution, delivery and performance by Borrower of this First Amendment and any other agreements or instruments required hereunder have been duly authorized by all necessary corporate action and do not (i) require any authorization, consent or approval by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) violate any provision of any law, rule or regulation or of any order, writ, injunction or decree presently in effect, having applicability to Borrower, or the articles of incorporation or by-laws of Borrower, or (iii) result in a breach of or constitute a default under any indenture or loan or Loan Agreement or any other agreement, lease or instrument to which Borrower is a party or by which it or its properties may be bound or affected.

d. No Event of Default exists under the Loan Agreement, and all of Borrower's representations and warranties contained in the Loan Agreement are correct on and as of the date hereof as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date. The Perfection Certificate remains true, accurate and complete as of the Effective Date.

5. Release of Agent/Lender.

a. Borrower, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby release Agent and Lenders and all of their Affiliates, shareholders, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, differences, liabilities and obligations arising under this Forbearance Agreement, the Loan Agreement and the other Loan Documents after the date hereof, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that Borrower or any of them may have or claim, as of the date hereof or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter related thereto, including, without limitation, the origination and servicing of the loan

made under the Loan Documents and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents (collectively, the "**Released Claims**").

b. Borrower further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the date hereof, including, without limitation, any breach of fiduciary duty or duty of fair dealing, breach of confidence, breach of loan commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander, conspiracy or any claim for wrongfully accelerating the loan made under the Loan Documents or attempting to foreclose on, or obtain a receiver for, any collateral for the loan made under the Loan Documents and all statutory claims and causes of action of every nature.

c. In connection with the release contained in this Section 5 (the "**Release**"), Borrower acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is Borrower's intention hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by Borrower against any one or more of the Released Parties. In furtherance of that intention, the Release contained in this First Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts.

d. The Release contained in this First Amendment shall be effective and irrevocable upon the execution of this First Amendment by Agent, Lenders and Borrower without any further documentation.

e. BORROWER AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR DISCLOSED TO BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT BORROWER DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE DATE HEREOF. BORROWER UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST AGENT AND ANY LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE COLLATERAL OR THE LOAN.

f. THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

g. Borrower acknowledges having read and understood and hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows (and hereby waives the benefits of any similar law of the state that may be applicable):

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release

and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

6. Miscellaneous. This First Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. The provisions of Sections 13 and 14 of the Loan Agreement shall be deemed incorporated herein by reference, *mutatis mutandis.*

(signatures provided on the next page)

IN WITNESS WHEREOF, Borrower, Agent and Lenders have duly executed and delivered this Forbearance Agreement as of the day and year first above written.

BORROWER:

**HOUSECANARY, INC.**

Signature: Greg Strawghn
Print Name: GREG STRAUGHN
Title: CFO

IN WITNESS WHEREOF, Borrower, Agent and Lenders have duly executed and delivered this Forbearance Agreement as of the day and year first above written.

AGENT:

**OCEAN II PLO LLC**
**By: Structural Capital Management Company II, LP**
Its: Manager

**By:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ____________________
Name: Lawrence Gross
Title: Managing Member

IN WITNESS WHEREOF, Borrower, Agent and Lenders have duly executed and delivered this Forbearance Agreement as of the day and year first above written.

LENDERS:

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ____________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural**
**Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ____________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ____________________
Name:
Title:

:

IN WITNESS WHEREOF, Borrower, Agent and Lenders have duly executed and delivered this Forbearance Agreement as of the day and year first above written.

LENDERS:

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural**
**Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

DocuSigned by:
By: EC77AC48D9C844B...
Name: Daniel Friedman
Title: General Counsel

:

# CONSENT AND SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT

This **CONSENT AND SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "***Amendment***") is made as of March 29, 2023 (the "***Effective Date***") by and between HouseCanary, Inc., a Delaware corporation ("***Borrower***"), Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders ("***Agent***") and the Required Lenders identified on the signature page to this Amendment. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in that certain Loan and Security Agreement, dated as of March 25, 2021, by and among Borrower, Agent and the Lenders identified therein (the "***Original LSA***"), as amended pursuant to that certain First Amendment to Loan and Security Agreement, dated as of December 30, 2021 (the "***First Amendment***"), and as amended pursuant to this Amendment, and together with the Original LSA and the First Amendment, collectively, the "***Loan Agreement***".

## RECITALS

**WHEREAS**, reference is made to that certain Litigation Funding Agreement, dated as of June 6, 2018, by and among Borrower, HC 1 LLC ("***HC 1***") and Security Finance 1 LLC, as affected by Security Finance 1 LLC assigning all of its rights and obligations under such agreement to HC 1, and as amended by Amendment No. 1 to Litigation Funding Agreement, dated as of the Effective Date (the "***HC 1 Litigation Funding Agreement***"), pursuant to which Borrower previously received Forty Million Dollars ($40,000,000) in litigation funding (the "***HC 1 Funding Amount***"), the repayment of which, comprising an agreed upon multiple thereof (as set forth in the HC 1 Litigation Funding Agreement), is secured by all proceeds arising from or relating to the Texas Litigation Collateral;

**WHEREAS**, reference is also made to that certain Litigation Funding Agreement dated of even date herewith (the "***Crane 2 Litigation Funding Agreement***"), by and among Borrower and Crane 2 FundingCo 23, LLC ("***Crane 2***"), pursuant to which Borrower will receive $5,000,000 in litigation funding (the "***Crane 2 Funding Amount***"), the repayment of which, comprising an agreed upon multiple thereof (as set forth in the Crane 2 Litigation Funding Agreement), is secured by all proceeds arising from or relating to the Texas Litigation Collateral;

**WHEREAS**, Borrower, Agent and Required Lenders desire to amend certain provisions of the Loan Agreement to provide that (i) the Crane 2 Funding Amount and the obligation of the Borrower under the Crane 2 Funding Agreement shall be Permitted Indebtedness under the Loan Documents and (ii) the subordinated lien and/or rights of Crane 2 in the Texas Litigation Collateral under the Crane 2 Funding Agreement (subject only to the first priority lien in the Texas Litigation Collateral in favor of HC 1), shall be a Permitted Lien under the Loan Documents; and

**WHEREAS**, pursuant to Section 13.4 of the Loan Agreement, any amendments, modifications, discharges or waivers of, or consents to the Loan Agreement or other Loan Documents require the written consent of the Agent, the Required Lenders and Borrower, and the undersigned constitute the requisite parties to effectuate this Amendment.

## AGREEMENT

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and agreeing to be bound by the terms hereof, the parties to this Amendment hereby agree as follows:

**1. Consent to Crane 2 Funding Agreement**. Agent acknowledges and agrees that the HC 1 Litigation Funding Agreement provides for the grant of a senior secured priority security interest and lien, and payment priority, in and to all of the Texas Litigation Collateral up to the amounts owed to HC 1 under the HC 1 Litigation Funding Agreement. In addition, Agent acknowledges and agrees that the Crane 2 Litigation Funding Agreement provides for the grant of a security interest and lien, and payment priority, in and to all of the Texas Litigation Collateral up to the amounts owed to Crane 2 under the Crane 2 Litigation Funding Agreement, which liens, security interest and payment priority are subject only to the rights of HC 1 under the HC 1 Litigation Funding Agreement. Agent expressly agrees (i) to Borrower's grant of the senior secured priority security interest and lien, and payment priority, to HC 1, (ii) to Borrower's grant of the security interest and lien, and payment priority, to Crane 2, which liens, security interest and payment priority are subject only to the rights of HC 1 under the HC 1 Litigation Funding Agreement, (iii) that neither Agent nor any Lender shall have any right to be paid any portion of the Texas Litigation Proceeds prior to HC 1 being paid all Texas Litigation Proceeds it is owed under the HC 1 Agreement and Crane 2 being paid all Texas Litigation Proceeds it is owed under the Crane 2 Litigation Funding Agreement, and (iv) that Agent shall not take any action that is in conflict with or contrary to the foregoing. Agent and the Required Lenders further hereby consent to the transactions contemplated by the Crane 2 Funding Agreement.

**2. Amendment to Loan Agreement**.

A. The following definitions are added to Section 1.1 of the Loan Agreement in proper alphabetical order as follows:

"*Crane 2*" means Crane 2 FundingCo 23, LLC.

"*Crane 2 Litigation Funding Agreement*" shall mean that certain Litigation Funding Agreement, dated as of March 29, 2023, by and between Borrower and Crane 2.

"*HC 1 Litigation Funding Agreement*" means that certain Litigation Funding Agreement, dated as of June 6, 2018, by and among Borrower, HC 1 LLC ("*HC 1*") and Security Finance 1 LLC, as affected by Security Finance 1 LLC assigning all of its rights and obligations under such agreement to HC 1, and as amended by Amendment No. 1 to Litigation Funding Agreement, dated as of the Second Amendment Effective Date.

"*Second Amendment Effective Date*" means March 29, 2023."

B. The definition of Texas Litigation Collateral in Section 1.1 of the Loan Agreement is amended and restated in its entirety as follows:

"*Texas Litigation Collateral*" means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all Proceeds of any and all of the foregoing.

C. Clause (b) of the definition of "Permitted Indebtedness" is hereby amended and restated in its entirety as follows:

(b) Indebtedness (i) existing on the Closing Date and disclosed in the Disclosure Schedules, (ii) under the Crane 2 Litigation Funding Agreement and (iii) under the HC 1 Litigation Funding Agreement;

D. Clause (a) of the definition of "Permitted Liens" is hereby amended and restated in its entirety as follows:

(a) Liens (i) existing on the Closing Date and disclosed in the Disclosure Schedules, (ii) in favor of Crane 2 arising under the Crane 2 Litigation Funding Agreement, and (iii) as specifically permitted in the definition of Permitted Indebtedness provided that such Liens are not superior to Agent's Lien on the Collateral;

E. The definition of "Texas Litigation" is hereby amended and restated in its entirety as follows:

"Texas Litigation" means, collectively, the legal proceedings in the cases captioned (a) Title Source, Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc., Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the facts and/or causes of action set forth therein, and/or (b) HouseCanary, Inc. v. Quicken Loans Inc., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable.

F. Clause (a) of Exhibit A to the Loan Agreement is hereby amended and restated in its entirety as follows:

(a) all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property, the Texas Litigation Collateral and the Litigation Reserve Account (as defined in the Crane 2 Litigation Funding Agreement)), goods (including fixtures), instruments (including promissory notes), Inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records, provided however, that (i) the Collateral shall include all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "Rights to Payment"); and (ii) if a security interest in Borrower's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Collateral shall automatically, and effective as

of the date of this Agreement, include the Intellectual Property to the extent necessary to permit perfection of Agent's security interest in the Rights to Payment; and

G. The section titled "Permitted Indebtedness" in the Disclosure Schedules is hereby amended to amend and restate paragraph 1 as follows, and to add the following paragraph 5 immediately following paragraph 4:

1. Indebtedness under the HC 1 Litigation Funding Agreement.

5. Indebtedness under the Crane 2 Litigation Funding Agreement.

H. The section titled "Permitted Liens" in the Disclosure Schedules is hereby amended and restated to read as follows:

1. A first priority lien on the Texas Litigation Collateral in favor of HC 1, LLC.

2. Subordinated liens and/or secondary rights in the Texas Litigation Collateral under the following:

a. Contingency Fee Engagement Letter dated as of January 2, 2018 (the "**Law Firms Engagement Letter**"), by and between Susman Godfrey L.L.P. ("**Susman**"), Davis, Cedillo & Mendoza, Inc. ("**DCM**", and together with Susman, the "**Law Firms**"), and the Borrower, pursuant to which the Law Firms have represented, and continue to represent, the Borrower with respect to the Texas Litigation Claims, as amended by that certain Amendment to Contingency Fee Engagement Letter dated June 6, 2018, by and among the Borrower and the Law Firms and as further amended by that certain Amendment to Contingency Fee Engagement Letter dated as of Second Amendment Effective Date by and among the Borrower and the Law Firms.

b. The ECA Letter, as amended and restated on the Second Amendment Effective Date.

c. Engagement Letter dated as of February 15, 2020, by and among the Borrower, Susman and Profile Advisors LLC, as amended by that certain Amendment No. 1 to Engagement Letter dated as of the Second Amendment Effective Date by and among the Borrower, Susman and Profile Advisors LLC (the "**Profile Letter**").

d. The Crane 2 Litigation Funding Agreement.

**3. No Other Amendments**. Except as expressly provided in Paragraph 2 hereof, the execution of this Amendment shall not be deemed to constitute an amendment to the Loan Agreement, and all other terms and conditions of the Loan Agreement are hereby ratified, confirmed and approved and shall remain in full force and effect.

**4. Financing Statement Amendment**. Within one (1) Business Day after the Effective Date, Agent shall amend its financing statement filed with the Delaware Secretary of State, filing reference number 2021 2351964, to restate (a) each debtor's address to 535 Mission St., Office #1920, San Francisco, CA 94105 and (ii) item 4 thereof "Collateral" to the following:

All assets of the Debtor (but excluding intellectual property, the Texas Litigation Collateral (defined below) and the Litigation Reserve Account (defined below)), now owned or hereafter acquired, including all products and proceeds thereof and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any of the foregoing, provided however, that (i) the Collateral shall include all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the any of the Debtor's intellectual property (the “Rights to Payment”); and (ii) if a security interest in Borrower's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Collateral shall automatically, and effective as of the date of March 25, 2021, include the Debtor's intellectual property to the extent necessary to permit perfection of Secured Party's security interest in the Rights to Payment. “Litigation Reserve Account” means a bank account established by HouseCanary, Inc. to hold funds deposited therein as provided in that certain Litigation Funding Agreement between HouseCanary, Inc. and Crane 2 FundingCo 23, LLC, as amended from time to time. “Texas Defendants” means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or their respective Affiliates. “Texas Litigation” means, collectively, the legal proceedings in the cases captioned (a) *Title Source, Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc.*, Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the facts and/or causes of action set forth therein, and/or (b) *HouseCanary, Inc. v. Quicken Loans Inc*., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable. “Texas Litigation Claims” means the claims that HouseCanary, Inc. has against each of the Texas Defendants in connection with the Texas Litigation. “Texas Litigation Collateral” means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all proceeds of any and all of the foregoing. “Texas Litigation Proceeds” means any and all consideration actually paid directly or indirectly to or for the benefit of HouseCanary, Inc. by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of HouseCanary, Inc. from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation.

**5.** **Costs and Expenses**. Borrower hereby reaffirms its agreement under the Loan Agreement to pay or reimburse Agent and Lender on demand for all Lender Expenses. Without limiting the generality of the foregoing, Borrower specifically agrees to pay the reasonable fees and disbursements of counsel to Agent or Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto. Borrower hereby agrees that Agent or Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make a loan to Borrower under the

Loan Agreement, or apply the proceeds of any loan, for the purpose of paying any such fees, disbursements, costs and expenses.

**6. Release of Agent/Lender**.

A. Borrower, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby release Agent, Lender and all of their Affiliates, shareholders, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, differences, liabilities and obligations arising under this Amendment, the Loan Agreement and the other Loan Documents after the date hereof, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that Borrower or any of them may have or claim, as of the date hereof or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter related thereto, including, without limitation, the origination and servicing of the loan made under the Loan Documents and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents (collectively, the "**Released Claims**").

B. Borrower further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the date hereof, including, without limitation, any breach of fiduciary duty or duty of fair dealing, breach of confidence, breach of loan commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander, conspiracy or any claim for wrongfully accelerating the loan made under the Loan Documents or attempting to foreclose on, or obtain a receiver for, any collateral for the loan made under the Loan Documents and all statutory claims and causes of action of every nature.

C. In connection with the release contained in this Paragraph 6 (the "**Release**"), Borrower acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is Borrower's intention hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by Borrower against any one or more of the Released Parties. In furtherance of that intention, the Release contained in this Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts.

D. The Release contained in this Amendment shall be effective and irrevocable upon the execution of this Amendment by Agent, Lender and Borrower without any further documentation.

E. BORROWER AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR

DISCLOSED TO BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT BORROWER DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE DATE HEREOF. BORROWER UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST AGENT AND LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE COLLATERAL OR THE LOAN.

F. THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

G. Borrower acknowledges having read and understood and hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows (and hereby waives the benefits of any similar law of the state that may be applicable):

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

**7.** **Miscellaneous**. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. The provisions of Sections 12 and 13 of the Loan Agreement shall be deemed incorporated herein by reference, *mutatis mutandis*.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Consent and Second Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ______________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Consent and Second Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By: Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ________________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ___________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

DocuSigned by:
By: EC77AC48D9C844B...
Name: Daniel Friedman
Title: General Counsel

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Consent and Second Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ________________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

DocuSigned by:
By: Jeremy Sicklick
C2A9BD279A0D418...
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

# WAIVER, CONSENT, FORBEARANCE AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT

This **WAIVER, CONSENT, FORBEARANCE AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "***Amendment***") is made as of July 10, 2023 (the "***Effective Date***") by and between HouseCanary, Inc., a Delaware corporation ("***Borrower***"), Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders ("***Agent***") and the Required Lenders identified on the signature page to this Amendment. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in that certain Loan and Security Agreement, dated as of March 25, 2021, by and among Borrower, Agent and the Lenders identified therein (the "***Original LSA***"), as amended pursuant to that certain First Amendment to Loan and Security Agreement, dated as of December 30, 2021 (the "***First Amendment***"), as amended pursuant to that certain Consent and Second Amendment to Loan and Security Agreement, dated as of March 29, 2023 (the "***Second Amendment***"), and as amended pursuant to this Amendment, and together with the Original LSA, the First Amendment and the Second Amendment, collectively, the "***Loan Agreement***".

## RECITALS

**WHEREAS**, Borrower desires to sell to accredited investors acceptable to the Company, including investors that are Affiliates of the Company a minimum of $11,750,000 and a maximum of $20,000,000 of notes and attached warrants for the Company's common stock in the form attached hereto as Exhibit A (the "**2023 Notes**");

**WHEREAS**, in connection with the above described financing, Borrower, Agent and Required Lenders desire to amend certain provisions of the Loan Agreement to, among other things, (i) adjust the Maturity Date, (ii) modify the Initial Advance Exit Fee and Subsequent Advance Exit Fee and include a new IRR fee, (iii) adjust the Cash Threshold of Unrestricted Cash required; and (iv) provide that the 2023 Notes and the obligation of the Borrower under the 2023 Notes shall be Permitted Indebtedness under the Loan Documents (collectively, the "***Amendments***");

**WHEREAS**, the Borrower advised Agent that it is default of the Loan Agreement for failing (a) to timely deliver its audited financial statements for fiscal 2020, 2021 and 2022 (the "***Financial Statement Default***"), (b) to provide a Control Agreement for account number 50019927529 and 50019866586 maintained at First Republic Bank (the "***DACA Default***"), and (c) to maintain Unrestricted Cash as required pursuant to Section 6.11(a) of the Loan Agreement during May 2023 and will be in default of Section 6.11(a) during June 2023 (the "***Minimum Cash Default***" and together with the Financial Statement Default and the DACA Default, the "***Defaults***");

**WHEREAS**, the Borrower desires for Agent and Required Lenders to waive the Event of Default resulting from the DACA Default, and to forbear from exercising their rights and remedies resulting from the Minimum Cash Default and the Financial Statement Default as provided herein;

**WHEREAS**, in connection with the Amendments and the other accommodations provided to Borrower in this Amendment, Agent and Required Lenders require an adjustment to the Warrants; and

**WHEREAS**, pursuant to Section 13.4 of the Loan Agreement, any amendments, modifications, discharges or waivers of, or consents to the Loan Agreement or other Loan Documents require the written consent of the Agent, the Required Lenders and Borrower, and the undersigned constitute the requisite parties to effectuate this Amendment.

**AGREEMENT**

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and agreeing to be bound by the terms hereof, the parties to this Amendment hereby agree as follows:

1. Recitals. The recitals set forth above are true and correct and are hereby incorporated by reference.

2. Definitions. Capitalized terms used but not defined herein shall have the meaning provided in the Loan Agreement, as amended by this Amendment. The following terms shall have the following meaning:

a. "*Commencement Date*" means the date that the last of the following conditions occur:

i. Borrower, Agent and Lenders shall have duly executed and delivered this Amendment;
ii. Borrower shall have received cash proceeds of not less than $10,250,000 from the sale of its Equity Interests after July 10, 2023, with evidence satisfactory to Agent have been provided no later than July 14, 2023;
iii. Agent shall have received amendments to Warrants previously issued to each Lender or its designees, in form and substance acceptable to Agent no later than July 10, 2023; and
iv. Borrower shall have paid all fees and all Lender Expenses (including all reasonable attorneys' fees and reasonable expenses) incurred as of the date hereof.

*b.* "*Forbearance Period*" means the period of time beginning on the Commencement Date and continuing through the date on which the earliest of the following occurs: (i) the occurrence of an Event of Default (other than the Defaults), (ii) Borrower's breach of any provision of this Amendment, (iii) the Maturity Date, and (iv) satisfaction of the Waiver Condition.

c. "*Waiver Condition*" means that to Agent's satisfaction (i) no Event of Default has occurred (other than the Defaults) during the Forbearance Period, (ii) Borrower is in full compliance with the terms of this Amendment, and (iii) either of the following two events occur (1) Borrower's receipt of at least $35,000,000 of cash proceeds from the sale of its capital stock after the Closing Date; or (2) all Obligations (other than inchoate indemnity obligations) have been paid in full in cash on or before the Maturity Date.

3. Amendment to Loan Agreement. From and after the Commencement Date, the Loan Agreement is hereby amended as follows:

a. The following definitions in Section 1.1 of the Loan Agreement are amended and restated or added, as applicable, in proper alphabetical order as follows:

"*2023 Notes*" shall have the meaning provided in the Third Amendment.

"*Amendment Fee*" means Four Hundred Fifty Thousand Dollars ($450,000).

"*Defaults*" shall have the meaning provided in the Third Amendment.

*"I/O Extension Conditions*" mean the satisfaction to Agent's determination that (i) no Event of Default has occurred and is continuing, and (ii) during the period beginning June 1, 2023 and ending on December 31, 2023, Borrower shall have received at least Fifteen Million Two Hundred Fifty Thousand Dollars ($15,250,000) from

the sale of Equity Interests, with evidence thereof satisfactory to Agent having been provided not later than January 31, 2024.

"*Initial Advance Exit Fee*" means a fee in an amount sufficient to increase the Initial Advance Minimum Return:

(a) to 1.35:1.00 if the Initial Advance is repaid prior to March 1, 2024; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.35:1.00 after repayment in full of the Initial Advance; or

(b) to 1.45:1.00 if the Initial Advance is repaid on or after March 1, 2024; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.45:1.00 after repayment in full of the Initial Advance.

"*IRR Fee*" means the amount, if any, needed to increase the annual internal rate of return on the principal and interest paid in cash by Borrower to Agent hereunder to 13.8% using the "XIRR" function in Mircosoft's Excel software.

"*Maturity Date*" means, with respect to all Advances, August 1, 2024, provided however, that upon the satisfaction of the I/O Extension Conditions, Maturity Date shall mean December 31, 2025.

"*Subsequent Advance Exit Fee*" means a fee in an amount sufficient to increase the Subsequent Advance Minimum Return:

(a) to 1.35:1.00 if the Subsequent Advance is repaid prior to March 1, 2024; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent Advance Minimum Return shall be less than 1.35:1.00 after repayment in full of the Subsequent Advance; or

(b) to 1.45:1.00 if the Subsequent Advance is repaid on or after March 1, 2024; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent Advance Minimum Return shall be less than 1.45:1.00 after repayment in full of the Subsequent Advance.

"*Third Amendment*" means that certain Waiver, Consent and Third Amendment to Loan And Security Agreement dated as of the Third Amendment Effective Date by and among Borrower, Agent and Lender, as such agreement may be amended.

"*Third Amendment Effective Date*" means July 10, 2023.

*"Warrant"* means the Warrant (or Warrants) in favor of a Lender or one or more Affiliates of a Lender to purchase securities of Borrower issued to such Lender or its Affiliates on the Closing Date, substantially in the form of ***Exhibit C,*** as such Warrant may be amended, together with any additional warrant subsequently issued (including amendments thereto).

b. Clause (b) of the definition of "Permitted Indebtedness" is hereby amended and restated in its entirety as follows:

(b) Indebtedness (i) existing on the Closing Date and disclosed in the Disclosure Schedules, (ii) under the Crane 2 Litigation Funding Agreement, (iii) under the HC 1 Litigation Funding Agreement and (iv) under the 2023 Notes.

c. The following definitions in Section 1.1 of the Loan Agreement are deleted:

Amortization Date

Initial Amortization Date

Interest Extension Period

Interest Only Extension

I/O Extension Milestones

d. **Section 2.4(b)** of the Loan Agreement is amended and restated as follows:

(b) Reserved.

e. **Section 2.4(c)** of the Loan Agreement is amended and restated as follows:

(c) **Final Payment**. Unless an Advance is prepaid in full prior to the Maturity Date, Borrower shall pay the entire unpaid principal and accrued interest and all unpaid Obligations on the Maturity Date, including the Initial Advance Exit Fee, the Subsequent Advance Exit Fee, the IRR Fee and the Amendment Fee. Agent shall allocate and distribute all such payments to the Lenders based on each Lender's Pro Rata Percentage.

f. **Section 2.6** of the Loan Agreement is amended and restated as follows:

**2.6 Prepayments.**

(a) **Mandatory Prepayment Upon an Acceleration**. If repayment of the Advances is either automatically or at the election of Agent pursuant to the terms hereof accelerated following the occurrence and continuance of an Event of Default, then Borrower shall immediately pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to the date of prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Initial Advance Exit Fee, (iv) the Subsequent Advance Exit Fee, (v) the IRR Fee, (vi) the Amendment Fee, and (vii) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(b) **Mandatory Prepayment Upon a Liquidation Event**. If a Liquidation Event shall occur, then Borrower shall upon such Liquidation Event pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to such Liquidation Event, (ii) the outstanding principal amount of the Advances, (iii) the Initial Advance Exit Fee, (iv) the Subsequent Advance Exit Fee, (v) the IRR FEE, (vi) the Amendment Fee, and (vii) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(c) **Voluntary Prepayment**. Borrower may voluntarily prepay all, but not less than all, of the Advances at any time; provided that each of the following conditions is satisfied: Borrower pays to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due up to and including the date of prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Initial Advance Exit Fee, (iv) the Subsequent Advance Exit Fee, (v) the IRR Fee, (vi) the Amendment Fee, and (vii) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

g. **Section 6.11** of the Loan Agreement is amended and restated as follows:

**6.11 Financial Covenants**. Borrower shall maintain at all times not less than $3,000,000 (the "**Cash Threshold**") of Unrestricted Cash, provided however, if no Event of Default (other than the Defaults) occurs from or after the Third Amendment Effective Date, Borrower shall not be required to maintain any minimum amount of Unrestricted Cash, provided further, that if Borrower receives at least

$35,000,000 of cash proceeds from the sale of its capital stock after the Closing Date and no Event of Default has occurred (other than the Defaults), then Borrower shall not be required to maintain any amount of Unrestricted Cash.

h. **Section 7.4** of the Loan Agreement is amended and restated as follows:

**7.4 Liens/Negative Pledge/Restrictive Covenants**.

(a) Create, incur, assume or suffer to exist any Lien with respect to any of Borrower's or any Subsidiary's property, including Intellectual Property and Inventory held at warehouse or fulfilment centers, or assign or otherwise convey any right to receive income, or permit any of its Subsidiaries to do so, except for Permitted Liens, or enter into any agreement with any Person other than (a) Lender or (b) the secured party in a Permitted Lien, in each case that prohibits Borrower from granting a security interest in, or otherwise encumbering, any of its property, or permit any Subsidiary to do so.

(b) Agree with any Person not to modify or amend any Loan Document.

i. **Section 7.5** of the Loan Agreement is amended and restated as follows:

7**.5 Indebtedness**.

(a) Create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness. Borrower shall not, nor shall it allow any Subsidiary to, to incur any CARES Debt without Agent's prior written consent.

(b) Make any payment on or in connection with the 2023 Notes to the holders thereof unless all Obligations (other than inchoate indemnity obligations) are simultaneously paid in full in cash.

4. **No Other Amendments**. Except as expressly provided in Paragraph 3 hereof, the execution of this Amendment shall not be deemed to constitute an amendment to the Loan Agreement, and all other terms and conditions of the Loan Agreement are hereby ratified, confirmed and approved and shall remain in full force and effect.

5. **Forbearance**.

A. Subject to the conditions contained herein, during the Forbearance Period, Agent and Lenders shall forbear from exercising any rights and remedies that they may have under any of the Loan Documents as a result of the Minimum Cash Default.

B. Agent and Lenders hereby agree to forbear from exercising any right or remedy arising from the Financial Statement Default prior to September 30, 2023, with respect to the delivery of Borrower's audited financial statements for fiscal years 2020 and 2021, and December 31, 2023 with respect to Borrower's delivery of audited financial statements for fiscal year 2022.

C. The forbearance provided in this Paragraph 5 does not constitute a waiver of the Minimum Cash Default, the Financial Statement Default or any other Event of Default, a continuing waiver, or a course of conduct of forbearing from exercising remedies.

6. **Waiver**.

A. At the request of and as an accommodation to the Loan Parties and subject to the terms and conditions set forth herein, Agent and Lenders hereby waive the Events of Default resulting from the DACA Default, and if the Borrower's audited financial statements for fiscal years 2020, 2021 and 2022 required pursuant to Section 6.3(b) are delivered to Agent by September 30, 2023, with respect to Borrower's audited financial statements for fiscal years 2020 and 2021,

and by December 31, 2023, with respect to Borrower's audited financial statements for fiscal year 2022, then Agent and Lenders shall also be deemed to waive any Events of Default resulting from the Financial Statement Default.

B. On the occurrence of the Waiver Condition, Agent and Lenders agree that the Minimum Cash Default shall be automatically fully waived and shall be deemed to no longer exist for all purposes under the Loan Agreement through the occurrence of the Waiver Condition.

C. In furtherance thereof, the waivers set forth in this Section 6 are effective solely for the purposes set forth herein and shall be limited precisely as written and shall not be deemed to except as expressly provided herein, (a) be a consent to any amendment, waiver or modification of any term or condition of the Loan Agreement or of any other Loan Document; (b) prejudice any right that Agent or the Lenders have or may have in the future under or in connection with the Loan Agreement, any Loan Document, or any other document or agreement with a Loan Party; (c) waive any other Default or Event of Default that may exist as of the date hereof; or (d) establish a custom or course of dealing among any of the Loan Parties, on the one hand, or Agent or any Lender, on the other hand.

7. **Costs and Expenses**. Borrower hereby reaffirms its agreement under the Loan Agreement to pay or reimburse Agent and Lender on demand for all Lender Expenses. Without limiting the generality of the foregoing, Borrower specifically agrees to pay the reasonable fees and disbursements of counsel to Agent or Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto. Borrower hereby agrees that Agent or Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make a loan to Borrower under the Loan Agreement, or apply the proceeds of any loan, for the purpose of paying any such fees, disbursements, costs and expenses.

8. **Release of Agent/Lender**.

A. Borrower, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby release Agent, Lender and all of their Affiliates, shareholders, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, differences, liabilities and obligations arising under this Amendment, the Loan Agreement and the other Loan Documents after the date hereof, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that Borrower or any of them may have or claim, as of the date hereof or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter related thereto, including, without limitation, the origination and servicing of the loan made under the Loan Documents and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents (collectively, the "**Released Claims**").

B. Borrower further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the date hereof, including, without limitation, any breach of fiduciary duty or duty of fair dealing, breach of confidence, breach of loan commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander, conspiracy or any claim for wrongfully accelerating the loan made under the Loan Documents or attempting to

foreclose on, or obtain a receiver for, any collateral for the loan made under the Loan Documents and all statutory claims and causes of action of every nature.

C. In connection with the release contained in this Paragraph 8 (the "**Release**"), Borrower acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is Borrower's intention hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by Borrower against any one or more of the Released Parties. In furtherance of that intention, the Release contained in this Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts.

D. The Release contained in this Amendment shall be effective and irrevocable upon the execution of this Amendment by Agent, Lender and Borrower without any further documentation.

E. BORROWER AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR DISCLOSED TO BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT BORROWER DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE DATE HEREOF. BORROWER UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST AGENT AND LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE COLLATERAL OR THE LOAN.

F. THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

G. Borrower acknowledges having read and understood and hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows (and hereby waives the benefits of any similar law of the state that may be applicable):

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

9. **Miscellaneous**. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. The provisions of Sections 12 and 13 of the Loan Agreement shall be deemed incorporated herein by reference, *mutatis mutandis*.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: __________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ________________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ___________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

DocuSigned by:
By: ______________________
EC77AC48D9C844B...
Name: Daniel Friedman
Title: General Counsel

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ________________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

DocuSigned by:
By: Jeremy Sicklick
F6448B340B83446...
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

**FORM OF 2023 NOTES**

(see attached)

# HOUSECANARY, INC.

## NOTE PURCHASE AGREEMENT

This NOTE PURCHASE AGREEMENT (this "***Agreement***") is made as of [___________], 2023 (the "***Effective Date***") by and among HouseCanary, Inc., a Delaware corporation (the "***Company***"), and the persons or entities set forth on the Schedule of Purchasers attached hereto as Schedule 1 (the "***Purchasers***").

## RECITAL

**WHEREAS**, to provide the Company with additional resources to conduct its business, the Purchasers are willing to loan to the Company in one or more disbursements up to an aggregate amount of $20,250,000, subject to the conditions specified herein (the "***Offering***").

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company and each Purchaser, intending to be legally bound, hereby agree as follows:

### 1. AMOUNT AND TERMS OF THE LOANS

Subject to the terms and conditions of this Agreement, the Company shall issue and sell to the Purchasers, and the Purchasers agree to purchase from the Company (a) one or more Convertible Promissory Notes, substantially in the form attached hereto as Exhibit A (each, a "***Note***" and collectively, the "***Notes***"), in the principal amount set forth opposite each Purchaser's name on Schedule 1 hereto, and (b) warrants to purchase such number of shares of voting common stock of the Company (the "***Common Stock***") as would equal the Loan Amount (as defined below) under the applicable Purchaser's Note divided by the Valuation Cap Price (as defined in the Notes), the exact number of which is as set forth opposite each Purchaser's name on Schedule 1 hereto (such number of shares of Common Stock, the "***Warrant Shares***"), substantially in the form attached hereto as Exhibit B (each a "***Warrant***" and collectively, the "***Warrants***", and together with the Notes and the Conversion Securities (as defined below), the "***Securities***"), at an exercise price per share as set forth in each such Warrant. Each Note shall be convertible into equity securities of the Company as provided in such Note. The original principal amount of each Note shall be equal to the purchase price paid by the Purchaser for such Note (each, a "***Loan Amount***" and collectively, the "***Loan***"). The obligations of the Purchasers to purchase Notes are several and not joint.

### 2. THE CLOSING

**2.1 Initial Closing.** The initial closing of the sale and purchase of one or more Notes having an aggregate principal amount of $10,250,000 (the "***Initial Closing***") shall be held on the date of this Agreement, or at such other time as the Company and the Purchasers participating in such closing shall agree, but in no event later than [June 7, 2023] (the "***Initial Closing Date***"). At the Initial Closing:

(a) Each Purchaser shall deliver to the Company the purchase price for the Note purchased at the Initial Closing by check or wire transfer of immediately available funds, cancellation of other indebtedness of the Company to such Purchaser, or any combination thereof, in the amount of the applicable Loan Amount; and the Company shall issue and deliver to such Purchaser (a) a Note in favor of such Purchaser payable in the principal amount of the applicable Loan Amount and (b) a Warrant to purchase the Warrant Shares, each duly executed by the Company (this Agreement, the Notes and the Warrants are referred to collectively as the "***Loan Documents***").

(b) Each outstanding Simple Agreement for Future Equity ("***SAFE***") of the Company held by each of Jeremy Sicklick, Jeffrey Somers and Christopher Stroud (each a "***Management SAFE Holder***", and each SAFE held thereby, a "***Management SAFE***") shall be cancelled and converted into (i) a Note in the principal amount equal to the purchase amount delivered in respect of the given Management SAFE, and (ii) a Warrant to purchase such number of Warrant Shares as would equal the purchase amount under the applicable Management SAFE divided by the Valuation Cap Price, and as shall be set forth opposite each Management SAFE Holder's name on Schedule 1 hereto. Upon the issuance of the Notes and Warrants to the Management SAFE Holders, each Management SAFE Holder shall acknowledge and agree that their respective Management SAFE shall be deemed terminated and that all obligations of the Company arising out of or related to their respective Management SAFE shall be cancelled and deemed satisfied in full, and each such Management SAFE Holder shall be deemed a Purchaser hereunder. For the avoidance of doubt, the conversion of the Management SAFEs shall be deemed to satisfy all Initial Closing obligations of the Management SAFE Holders.

(c) Each Purchaser's obligations at the Initial Closing are subject to the satisfaction of the following conditions (any of which may be waived by such Purchaser):

**(i)** the waiver, consent, forbearance and third amendment to the Senior Loan Agreement (as defined in the Note) ("**Third Amendment Agreement**") is duly executed and delivered by the parties thereto, and is in a form and substance satisfactory to the Lead Investor;

**(ii)** the Company having provided evidence satisfactory to the Lead Investor that the following conditions set out in the Third Amendment Agreement are fully satisfied or otherwise waived (and the waiver has not been revoked or amended) by the Senior Creditors:

(aa) Ocean II PLO LLC, (the "**Agent**") has received amendments to the warrants which were previously issued to each lender under the Senior Loan Agreement or its designees, in form and substance acceptable to the Agent no later than July [__], 2023; and

(bb) the Company has paid all fees and all Lender Expenses (as defined in the Third Amendment Agreement and including all reasonable attorneys' fees and reasonable expenses) incurred as of the date of the Third Amendment Agreement;

**(iii)** all representations and warranties of the Company in this Agreement shall be true and correct in all respects on the date of the Initial Closing as if made on such date;

**(iv)** the Company shall have complied with all covenants and agreements set forth in this Agreement and the other Loan Documents that are to be performed at or prior to the Initial Closing;

**(v)** no event, circumstance or development has occurred or arisen which would cause or is likely to cause a Material Adverse Effect (as defined below);

**(vi)** no Event of Default (as defined in the Notes) or any event or circumstance which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Loan Documents or any combination of any of the foregoing) be an Event of Default (a "***Potential Event of Default"*** *which together with an Event of Default, a* ***"Default"***) would occur or result from the proposed issue of the Notes;

**(vii)** Delivery to the Purchasers of, in each case, in the form and substance satisfactory to the Purchasers:

**(1)** copies of all necessary consents, approvals, authorisations and waivers (including but not limited to approvals by the board of directors and/or shareholders of the Company and such other approvals or waivers as may be required under the Company's Constitutional Documents (as defined below) to approve the execution of, and performance of the Company's obligations under, this Agreement and the other Loan Documents and the transactions contemplated thereunder (including but not limited to approving the issuance of the Notes and the Warrants);

**(2)** a copy of the register of shareholders of the Company, evidencing the shareholding structure of the Company immediately prior to the Initial Closing; and

**(3)** a copy of the current Constitutional Documents of the Company.

**(viii)** The Loan Documents having been executed.

**2.2 Subsequent Closing**.

(a) During the period following the Initial Closing Date until December 31,2023 (the "***Subsequent Closing Period***"), each outstanding SAFE of the Company (other than the Management SAFEs cancelled and converted pursuant to Section 2.1) having "most favored nations" rights thereunder may, at the election of the holder thereof (each, a "***SAFE Holder***"), be cancelled and converted into (i) a Note in the principal amount equal to the purchase amount delivered in respect of the given SAFE, and (ii) a Warrant to purchase such number of Warrant Shares as would equal the purchase amount under the applicable Purchaser's SAFE divided by the Valuation Cap Price, and as shall be set forth opposite each SAFE Holder's name on an amended Schedule 1 hereto. Upon the issuance of the Notes and Warrants to the SAFE Holders, each SAFE Holder shall acknowledge and agree that their respective SAFE shall be deemed terminated and that all obligations of the Company arising out of or related to their respective SAFE shall be cancelled and deemed satisfied in full, and each such SAFE Holder shall be deemed a Purchaser hereunder.

(b) Additionally, during the Subsequent Closing Period, the Company may issue and sell to one or more existing or additional Purchasers additional Notes and Warrants subject to the terms of this Agreement, provided that the aggregate Loan Amount of all Notes does not exceed $20,250,000 (including the conversion of the Management SAFEs, but expressly excluding the conversion of any other SAFEs); provided, however, if the Company (i) fails to raise at least $5,000,000 on or prior to the end of the Subsequent Closing Period (excluding any further commitment from Marbruck Investments Ltd. and its affiliates (the "***Lead Investor***") or the conversion of any SAFEs) and (ii) during the Subsequent Closing Period, has not achieved three consecutive months of positive Adjusted EBITDA (as defined below), the Company shall provide notice thereof to the Purchasers participating in the Initial Closing (other than the Lead Investor and its affiliates), which notice shall be provided not later than five (5) days following the last day of the Subsequent Closing Period, and within five (5) days of the delivery of such notice, each of the Management SAFE Holders shall purchase one or more additional Notes (and shall receive corresponding Warrants), on a pro-rata basis, in an aggregate principal amount equal to $1,500,000 Each closing of the sale and purchase of Notes pursuant to this Section 2.2 is referred to as a "***Subsequent Closing***." Each Subsequent Closing shall take place at such locations and at such times as shall be mutually agreed upon orally or in writing by the Company and the Purchasers participating in such Subsequent Closing. At each Subsequent Closing (i) each Purchaser purchasing a Note shall deliver to the Company such Purchaser's purchase price for the Note purchased at such Subsequent Closing by check or wire transfer of immediately available funds, cancellation of other indebtedness of the Company to such Purchaser, cancellation/conversion of any existing SAFE, or any combination thereof, in the amount of the applicable Loan Amount, and (ii) the Company shall issue and deliver to such Purchaser (a) a Note in favor of such Purchaser payable in the principal amount of the applicable Loan Amount, and (b) a Warrant to purchase the applicable number of Warrant Shares (calculated in the manner set forth in Section 1), each duly executed by the Company. The Initial Closing and each Subsequent Closing shall constitute a "***Closing***" and, collectively, the "***Closings***" for purposes of this Agreement. Following each Closing, the Schedule of Purchasers attached hereto as Schedule 1 (the "***Schedule of Purchasers***") will be amended (without any requirement for consent of the Purchasers to such amendment) to list the Purchasers purchasing Notes hereunder and the original principal amount of the Note and the number of Warrant Shares issued to each Purchaser hereunder at each such Closing. The Company will after each Closing and, upon request, furnish to each Purchaser copies of the amendments to the Schedule of Purchasers. For purposes of this Section 2.2, "***Adjusted EBITDA***" means, with respect to the Company for an applicable period, determined on a consolidated basis in accordance with United States generally accepted accounting principles, the net income for such period, *plus*, without duplication and to the extent deducted in determining the net income for such period, (a) an amount equal to any non-recurring or unusual loss plus any net loss realized in connection with a sale of assets outside of the ordinary course of business (and including, for the avoidance of doubt, all fees, costs and expenses arising from or in connection with the TSI Litigation (as defined in the Disclosure Schedule) (b) income taxes, (c) interest expense and (d) depreciation, amortization and other non-cash charges and expenses, *minus*, without duplication and to the extent included in determining net income for such period, (A) non-cash revenue, other than the accrual of revenue in the ordinary course of business, and (B) all extraordinary gains and all gains realized in connection with any sale of assets outside of the ordinary course of business

**2.3** The indebtedness evidenced by the Notes shall be expressly subordinated, to the extent and in the manner set forth in the Notes, in right of payment to the prior payment in full of

the Senior Indebtedness (as defined in the Notes), and each Purchaser hereby agrees to enter into such agreements and/or take such additional actions as may be reasonably requested by the Company from time to time (now or in the future) to evidence such subordination. The Company and each Purchaser agree that Senior Creditors (as defined in the Notes) are intended third party beneficiaries of this Agreement and shall be entitled to enforce the provisions thereof, and that the Company and Holder may not amend or waive any provision of this Section 2.3, Section 6.6, Section 6.12 without the prior written consent of Agent (as defined in the Notes), to be given or withheld in Agent's sole discretion.

**2.4** The Company undertakes that it shall deliver its audited financial statements for fiscal years 2020, 2021 and 2022 to the Agent in accordance with the Third Amendment Agreement (the "***Financial Statement Covenant***"); provided, however, in the event the Senior Creditors agree to a waiver or forbearance of the Financial Statement Covenant that (a) does not require any fee or payment in consideration for such waiver or forbearance, and (b) does not require the commencement of any payments of principal under the Senior Loan Agreement, then such waiver or forbearance shall not be treated as a breach of this Section 2.4.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

The Company hereby represents and warrants to the Purchasers that, except as set forth on the Disclosure Schedule attached as Exhibit C to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of this Agreement, the Initial Closing and shall be true and complete as the date of each Subsequent Closing, in each case, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections contained in this Section 3, and the disclosures in any section of the Disclosure Schedule shall qualify other sections in this Section 3 only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections.

**3.1 Organization, Good Standing and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has all requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on (a) the condition (financial or other), the properties, business, prospects or results of operations of the Company and each member of the Group or the Group as a whole whether or not arising in the ordinary course of business, (b) the ability of an Company to perform its obligations under the Notes and the Loan Documents, or (c) the validity or enforceability or priority of the obligations of the Company under Notes and the Loan Documents, subject to the subordination of the indebtedness evidenced by the Notes set out in Section 2.3, or (d) the ability of the Purchasers to enforce their rights and remedies under the Notes and the Loan Documents, subject to the subordination of the indebtedness evidenced by the Notes as set forth in Section 2.3 (each, a "***Material Adverse Effect***").

**3.2 Corporate Power**. The Company has all requisite corporate power to execute and deliver the Loan Documents, to issue each Note, each Warrant, and the Conversion Securities (as defined below) upon conversion of the Notes and/or the exercise of the Warrants in accordance with the terms thereof, and to carry out and perform its obligations under the terms of this Agreement and under the terms of each other Loan Document.

**3.3 Authorization.** All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and the performance of the Company's obligations under the Loan Documents, including the issuance and delivery of the Notes and the Warrants, and the reservation of the equity securities issuable upon conversion of the Notes and exercise of the Warrants (collectively, the "***Conversion Securities***") has been taken or will be taken prior to the issuance of such Conversion Securities. Each of the Loan Documents, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement, the Notes and the Warrants will be validly issued, fully paid and nonassessable and free of any liens or encumbrances and issued in compliance with all applicable federal and state securities laws.

**3.4 Corporate Structure; Subsidiaries.** The Company does not presently have any subsidiaries other than those listed in Section 3.4 of the Disclosure Schedule (each, a "***Subsidiary***", and collectively with the Company, the "***Group***"). Section 3.4 of the Disclosure Schedule sets forth the name, jurisdiction of incorporation or organization, and all of the security holders of each subsidiary. The information relating to each subsidiary as set out in Section 3.4 of the Disclosure Schedule is true and accurate in all respects and there is no information the omission of which might make such information misleading or inaccurate in any respect. The entire share capital or registered capital of each Subsidiary is legally and beneficially owned by its relevant security holder(s) as set out in Section 3.4 of the Disclosure Schedule, and has been fully, validly and punctually paid-up in accordance with its Constitutional Documents and all applicable laws. Except as disclosed in the Disclosure Schedule, no Group Company (as defined below) is or was a participant in any joint venture, partnership or similar arrangement. No Group Company is obligated to make any investment in or capital contribution in or on behalf of any other Person.

**3.5 Pari Passu Ranking/Status of the Notes**. Subject to Section 2.3, the obligations of the Company under the Notes shall be unsecured obligations of the Company and the payment obligations of the Company under the Notes will at all times rank equally with all its other existing and future unsecured and unsubordinated obligations, save for such obligations that may be preferred by provisions of law that are mandatory and of general application. All the Notes shall rank equally in right of repayment. Any and all repayment or prepayments of the obligations under the Notes shall be made ratably to the holders of all Notes based on the sum of the outstanding principal balance and accrued unpaid interested owed with respect to each Note.

**3.6 No Other Securities/Rights**. Save as disclosed in the Disclosure Schedule, (1) there are no and at the Closing there shall be no other authorized or outstanding securities of the Company or any entity within the Group (each, a "***Group Company***"); (2) no securities of the

Company are subject to any preemptive rights, rights of first refusal (except to the extent required by applicable laws) or other rights to purchase such equity securities or any other rights with respect to such securities, and (3) a party or subject to any contract that affects or relates to the voting or giving of written consents with respect to, or the right to cause the redemption, or repurchase of, any security of the Company. Except as disclosed in the Disclosure Schedule, the Company has not granted any registration rights to any other Person, nor is the Company obliged to list, any of the securities of any Group Companies on any securities exchange. Except as expressly contemplated under the Loan Documents, there are no voting trusts, shareholder agreements, proxies or similar agreements or understandings which relate to the voting or transfer of the share capital or registered capital of the Company.

**3.7 Valid Issuance of Securities.** The Conversion Securities and the Warrant Shares, as applicable, when issued, allotted and paid for in accordance with the terms of the Notes or Warrants (as the case may be), will be duly and validly issued, fully paid and non-assessable, free from any liens (except for any restrictions on transfer under applicable laws and under the Loan Documents). The Conversion Securities have been reserved for issuance and, upon issuance in accordance with the terms of the certificate of incorporation of the Company (as amended, the "***Certificate***"), will be duly and validly issued, free from any liens or restrictions (except for any restrictions on transfer under applicable securities laws and under the Loan Documents). The issuance of the Notes, the Warrant and the Conversion Securities is not subject to any preemptive rights, rights of first refusal or similar rights that shall have not been waived prior to the Closing.

**3.8 Intellectual Property and Technology**

(a) All IP Rights used or required by the Group in connection with its Business, are in full force and effect and are solely vested in and beneficially owned by the Group (or if not beneficially owned, the Group owns or possesses sufficient legal rights to such IP Rights) free from encumbrances and, to the Company's knowledge after due and careful enquiry, the use of such rights or any part thereof does not infringe any patent, trade mark, registered design, trade name, copyright, industrial process or any other right owned by any third party relating to intellectual property (or in the case of third party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications, without any violation or infringement known to the Group) or involves the unlicensed use of IP Rights or confidential information disclosed to the Group by any person in circumstances which might entitle that person to a claim against the Group and, to the Company's knowledge after due and careful enquiry, none of the IP Rights are being used, claimed, opposed or attacked by any third party, other than any use that is licensed by the Company in the ordinary course of business.

(b) No act has been done or has been omitted to be done to entitle any authority or person to cancel, forfeit or modify any registered IP Rights.

(c) The Group is not aware of any infringement of the Group's IP Rights by any third party.

(d) There are no outstanding claims against the Group for infringement of any intellectual property used (or which has been used) by it and no such claims have been settled by the giving of any undertakings which remain in force.

(e) For the purposes of this Agreement, **"IP Rights"** means any and all intellectual property rights (anywhere in the world, whether statutory, common law or otherwise) including patents, utility models, copyright (including future copyright), trademarks, logos and design marks, service marks, trade names, business names, brand names, designs, know how, trade secrets, domain names, other names and locators associated with the world wide web, internet addresses, semiconductor or circuit layout rights, whether arising before, on or after the date of this deed, and including all applications and rights to apply for registration of such intellectual property rights.

**3.9 Transaction Warranties**

(a) There is no limit or other restriction under the Certificate, bylaws of the Company (the "***Bylaws***", and collectively with the Certificate, the "***Constitutional Documents***"), any material agreement or other material arrangement binding on it or its assets which affects its ability to issue such number of Conversion Securities as would be required to be issued on conversion of all the Notes.

(b) The issue of the Conversion Securities and Warrant Shares, as applicable, on conversion of the Notes or exercise of the Warrants will not violate the pre-emption or similar rights of any person or any options or rights granted under any employee, contractor or director incentive scheme (whether or not in existence as at the date of this deed).

(c) Save in respect of the waiver of anti-dilution adjustments and right of first offer from certain holders of securities as set out in the Disclosure Schedule, no action or thing is required to be taken, fulfilled or done (including without limitation the obtaining of any consent or license or the making of any filing or registration) by the Company for the issue of the Notes, Warrants and the Conversion Securities and Warrant Shares, as applicable, to be issued upon conversion of the Notes and exercise of the Warrants to the Purchasers under the Loan Documents, for carrying out of the other transactions contemplated by the Notes and the Loan Documents, or for the compliance by the Company with the terms of the Notes and the Loan Documents, as the case may be.

**3.10 Licenses and approvals**

(a) Each of the Company and each member of the Group possesses all necessary certificates, authorisations, licenses, orders, consents, approvals or permits (the "***Approvals***") issued by, and has made all declarations and filings with, all appropriate national, state, local and other governmental agencies or bodies, all exchanges and all courts and other tribunals, domestic or foreign, necessary to own or lease, as the case may be, and to operate its properties and to conduct the business now operated by them.

(b) Each of the Company and its Subsidiaries is in compliance with the terms and conditions of all such Approvals.

(c) All the Approvals are valid and in full force and effect.

(d) Neither the Company nor any of its Subsidiaries has received any notice of proceedings relating to the revocation or modification of any such Approvals or is otherwise aware that any such revocation or modification is contemplated or threatened.

**3.11 Borrowings and Financing**

(a) Save for the Notes and as disclosed by the Company in the Disclosure Schedule, neither the Company nor any of its Subsidiaries has or will have any financial indebtedness outstanding.

(b) Except as disclosed by the Company in the Disclosure Schedule, none of the Company or any of its subsidiaries is in default and no waiver of default is currently in effect, in the payment of any principal, interest or premium on any indebtedness of any of the Company or its Subsidiaries and no event or condition exists with respect to any indebtedness of any of the Company or its Subsidiaries that would permit (or that with notice or the lapse of time, or both, would permit) one or more persons to cause such indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

(c) Except as disclosed by the Company in the Disclosure Schedule, each of the Company and its Subsidiaries is currently in compliance with all financial covenants in its outstanding indebtedness and is not in breach or potential breach (which shall mean an event or circumstance which could, with the giving of notice, lapse of time, issue of a certificate and/or the fulfilment of any other requirement, become a breach) of any provision of such indebtedness.

**3.12 Event of Default**. No event has occurred, or circumstance arisen which, had the Notes already been issued, would (whether or not with the giving of notice and/or the passage of time and/or the fulfilment of any other requirement) constitute a Default.

**3.13 Taxation**

(a) The Company and each other member of the Group have duly filed on time all tax returns that are required to be filed in all jurisdictions or have duly requested extensions thereof and have paid all taxes required to be paid by any of them in all jurisdictions and any related assessments, fines or penalties.

(b) The Company and each other member of the Group is not currently involved in any dispute or disagreement with any tax authority in relation to tax or regarding the availability of the Company or each other member of the Group of any relief.

**3.14 Anti-Money Laundering and Anti-Terrorism Financing**. The operations of the Company and each of its Subsidiaries are and have been conducted at all times in compliance with all applicable anti-money laundering and anti-terrorism financing laws, regulations, rules and guidelines in its jurisdiction and in each other jurisdiction in which such entity, as the case may be, conducts business (collectively, the "***AMLCFT Laws***") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any member of the Group with respect to AMLCFT Laws is pending or threatened, and the Company and every other member of the Group have instituted and maintain policies and

procedures designed to ensure continued compliance with, and prevent violation of, such AMLCFT Laws.

**3.15 No Unlawful Payments**. Neither the Company nor any other member of the Group nor any director or officer or, to the best knowledge of the Company (after due and careful enquiry), any agent, affiliate, employee or other person acting on behalf of the Company or any other member of the Group, is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "***FCPA***"), or any other applicable anti-bribery or anti-corruption law or regulation similar to the FCPA (including but not limited to the United Kingdom Bribery Act of 2010), in Hong Kong, Singapore or any other jurisdiction in which the Company or any member of the Group operates including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorisation of the payment of any money, or other property, gift, promise to give, or authorisation of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA or any other similar applicable anti-bribery or anti-corruption law or regulation of any such other jurisdiction; and the Company and every other member of the Group has conducted their businesses in compliance with FCPA and any other similar applicable anti-bribery or anti-corruption law or regulation of any such other jurisdiction and have instituted and maintain policies and procedures designed to ensure continued compliance with, and prevent violation of, such laws, rules and regulations.

**3.16 Sanctions.** Neither the Company nor any other member of the Group nor any director or officer nor, to the best knowledge of the Company (after due and careful enquiry), any agent, employee, affiliate of or other person acting on behalf of the Company or any other member of the Group:

(a) is an individual or entity (a Person) currently the subject of any U.S. sanctions administered or enforced by the United States Government, including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the U.S. Trading With the Enemy Act, the U.S. International Emergency Economic Powers Act, the U.S. United Nations Participation Act, the Iran Sanctions Act, the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Syria Accountability and Lebanese Sovereignty Act, the Iran Threat Reduction and Syria Human Rights Act, or the Iran Freedom and Counterproliferation Act, all as amended, or any of the foreign assets control regulations of the U.S. Department of the Treasury (including, without limitation, 31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, the United Nations Security Council, the European Union or Her Majesty's Treasury or other relevant sanctions authority (collectively, the "***Sanctions***");

(b) is located, organised or operating in a country or territory that is the subject of Sanctions (including, without limitation, the Crimea region of the Ukraine, Cuba, Iran, North Korea, Sudan and Syria);

(c) has engaged in, and is now engaged in any dealings or transactions with any government, person, entity or project targeted by, or located in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions;

(d) is or has been in violation of any Sanctions or subject to an investigation, action or proceeding relating to any Sanctions; and

(e) and except to the extent that the following is or would be unenforceable by reason of breach of:

(f) any provision of Council Regulation (EC) No 2271/96 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union); or

(g) Council Regulation (EC) No 2271/96 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, and

(h) neither the Company nor any other member of the Group will directly or indirectly use the proceeds of the offering of the Notes hereunder, or lend, contribute or otherwise make available all or part of such proceeds to any subsidiary, joint venture partner or other Person, for the purpose of financing the activities of or business with any Person currently subject to any Sanctions or operating in any country or territory that is the subject of Sanctions where such operations are in violation of such Sanctions or in any other manner that would result in a violation by any Person (including any Person participating in the offering, whether as underwriter, adviser, investor or otherwise) of Sanctions, and

(i) the Company and its Subsidiaries have instituted and maintained policies and procedures designed to ensure continued compliance with, and prevent violation of, such Sanctions.

**3.17 No Litigation**. Except as disclosed by the Company in the Disclosure Schedule, there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened in writing (i) against the Company or any officer, director or key employee of the Company arising out of their employment or board relationship with the Company; or (ii) to the Company's knowledge, that questions the validity of this Agreement or the Notes or the right of the Company to enter into them, or to consummate the transactions contemplated by this Agreement or the Notes. Neither the Company nor, to the Company's knowledge, any of its officers, directors or key employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or key employees, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

**3.18 Consents, No Conflicts**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority or any other persons, including but not limited to the waivers as set out in the Disclosure Schedule, required on the part of the Company in connection with the valid execution and delivery of this Agreement and the other Loan Documents, the offer, sale or issuance of the Notes, the Warrants and the Conversion Securities issuable upon conversion of the Notes, the exercise of the Warrants or the consummation of any other transaction contemplated hereby shall have been obtained and will be effective at the Closing. The execution, delivery and performance of each Loan Document by the Company do not, and the consummation by the Company of the transactions contemplated thereby will not, (i) result in any violation of, be in conflict with, or constitute a default under, require any consent under, or give any person rights of termination, amendment, acceleration or cancellation under, any governmental order, any provision of the Constitutional Documents of any Group Company, any applicable laws or any material contract to which a Group Company is a party, (ii) result in any termination, modification, cancellation, or suspension of any material right of, or any augmentation or acceleration of any material obligation of, any Group Company (including any indebtedness of such Group Company), or (iii) result in the creation of any lien upon any of the material properties or assets of any Group Company other than the liens set out in the Disclosure Schedule.

**3.19 Compliance with Laws**.

(a) The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of the Company's business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company. None of the Group Companies is under investigation with respect to a violation of any applicable law. The Company has not made any filings with, been the subject of any inquiry, investigation, or review undertaken by, or received any communication from the Committee on Foreign Investment in the United States ("**CFIUS**"). In addition, no other investor has given written or oral notice to the Company indicating that it intends to notify CFIUS of their investment in the Company.

(b) As of the date of this Agreement, the US Company is not a TID U.S. business as defined by CFIUS in 31 C.F.R. § 800.248 and no Group Company is required to provide any notice or filing or submit any information to CFIUS under 31 C.F.R § 800.401 in connection with the execution, delivery and performance of the Loan Documents.

(c) No governmental consent in connection with or incidental to the business of the Group ("**Required Governmental Consent**") contains any materially burdensome restrictions or conditions, and each Required Governmental Consent is in full force and effect and will remain in full force and effect upon the consummation of the transactions contemplated hereby. None of the Group Companies is in default under any Required Governmental Consent. There is no reason to believe that any Required Governmental Consent which is subject to periodic renewal will not be granted or renewed. None of the Group Companies has received any letter or other written communication from any governmental authority threatening or providing notice of revocation of any Required Governmental Consent issued to such Group Company or the need for compliance or remedial actions in respect of the activities carried out by such Group Company.

**3.20 Compliance with Other Instruments**. The Company is not in violation or default of any term of the Constitutional Documents, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of the Loan Documents, and the consummation of the transactions contemplated hereby or thereby, will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.

**3.21 Offering**. Assuming the accuracy of the representations and warranties of the Purchasers contained in Section 4 hereof, the offer, issue, and sale of the Notes, the Warrants and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "***Act***"), and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws. No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**") is applicable to the Company or any "Company Covered Person", except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.

**3.22 Use of Proceeds**. The proceeds of the Loan shall be used by the Company for the operations of the Company's business.

**3.23 Disclosure and Information.**

(a) All information set out in the Disclosure Schedule is accurate in all material respects and not misleading, and the opinions given in such information are honestly held and have been reached on a reasonable basis after having made all reasonable enquiries.

(b) All information supplied or disclosed in writing or orally including, without limitation, the answers and documents provided to given by or on behalf of the Company to the Purchasers or any of its officers, employees, agents or advisers during the negotiations leading to this agreement was when given and is now complete, true, accurate and not misleading in all material respects, and all forecasts and estimates supplied or disclosed or any opinions given in any information have been made after due, careful and proper consideration, are based on reasonable assumptions and represent reasonable and fair expectations honestly held based on facts known to such persons (or any of them), and no information has been withheld by the Company which might be material to a prospective purchaser of the Notes or Warrant.

## 4. REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Purchaser hereby represents and warrants to the Company, severally and not jointly, that the following representations are true and complete as of the date of the applicable Closing.

**4.1 Authorization**. Such Purchaser has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Loan

Documents to which such Purchaser is a party, when executed and delivered by such Purchaser, shall constitute valid and binding obligations of such Purchaser, enforceable in accordance with their terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

**4.2 Purchase for Own Account**. Such Purchaser is acquiring the Securities solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**4.3 Information and Sophistication**. Without lessening or obviating the representations and warranties of the Company set forth in Section 3, such Purchaser hereby, (i) represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment and (ii) acknowledges that, except as otherwise expressly set forth in the Loan Documents, such Purchaser is not relying on any statements or representations of the Company or its agents for legal, financial and tax advice with respect to this investment or the transactions contemplated by the Loan Documents.

**4.4 Ability to Bear Economic Risk**. Such Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**4.5 Restricted Securities.** Such Purchaser understands that the Securities are characterized as "restricted securities" under federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, under such laws and applicable regulations, the Securities may be resold without registration under the Act only in certain limited circumstances. Such Purchaser understands that the Securities have not been and will not be registered under the Act and have not been and will not be registered or qualified in any state in which they are offered and that such Purchaser will not be able to resell or otherwise transfer the Securities unless the Securities are registered under the Act and registered or qualified under applicable state securities laws, or an exemption from such registration or qualification is available.

**4.6 Accredited Investor Status.** Such Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

## 5. FURTHER AGREEMENTS

**5.1 Limitations on Disposition**. Without in any way limiting the representations set forth in Section 4 above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

(a) There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b) Such Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144 promulgated under the Act, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to a parent, subsidiary, an affiliated venture fund, a partner (or retired partner), member (or retired member) or other equity owners of such Purchaser in accordance with partnership, limited liability company, or other equity interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Purchaser hereunder.

**5.2 Market Stand-Off**. If requested by the Company and an underwriter of common stock, (or other securities) of the Company, each Purchaser shall not sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any common stock (or other securities) of the Company held by such Purchaser (other than those included in the registration) during the one hundred eighty (180)-day period following the effective date of the Company's initial public offering filed under the Act, *provided* that if (i) during the last seventeen (17) days of the one hundred eighty (180)-day restricted period, the Company issues an earnings release or material news or a material event relating to the Company occurs or (ii) prior to the expiration of the one hundred eighty (180)-day restricted period, the Company announces that it will release earnings results during the seventeen (17)-day period beginning on the last day of the one hundred eighty (180)-day period, then the restrictions imposed by this market stand-off provision shall continue to apply until the expiration of the seventeen (17)-day period beginning on the issuance of such earnings release or the occurrence of a material news or material event. Each Purchaser agrees to enter into a written market stand-off agreement satisfactory to the Company and such underwriter, acting reasonably, to effect the intent of this Section 5.2. The obligations described in this Section 5.2 shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with a legend with respect to the shares of common stock (or other securities) subject to the foregoing restriction until the end of such lock-up period.

**5.3 Usury Exemption**. The lending transactions contemplated by this Agreement are intended to be exempt from the constitutional usury provisions of the California Constitution by operation of Section 25118 of the California Corporations Code, and from the applicable provisions of Delaware law, it being expressly acknowledged by the Company and the Purchasers that each Purchaser has a preexisting personal or business relationship with the Company as such terms are used in Section 25118(f)(1) of the California Corporations Code.

**5.4 No Finder's Fees**. Each party represents that it neither is nor will be obligated for any finder's fee, broker's fee or commission in connection with the transactions contemplated by the Loan Documents. Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee, broker's fee or commission (and the costs and expenses of defending against such liability or asserted liability) for which such Purchaser or any of its officers, employees, or representatives is responsible. The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's fee, broker's fee or commission (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

**5.5 Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

**6. MISCELLANEOUS**

**6.1 Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**6.2 Governing Law/WAIVER OF JURY TRIAL**

(a) This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

(b) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY CONTEMPLATED TRANSACTION UNDER THIS AGREEMENT, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

**6.3 Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties to this Agreement, and an executed copy of this Agreement may be delivered by one or more parties to this Agreement by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.

**6.4 Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**6.5 Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at its principal executive offices, and to the Purchasers at the addresses set forth on the signature pages attached hereto or at such other addresses as the Company or the Purchaser may designate by ten (10) days advance written notice to the other parties hereto.

**6.6 Amendment; Modification; Waiver**. Except as provided in Section 2.3, any term of this Agreement and other Loan Documents may be amended or modified and the observance of any term of this Agreement or other Loan Documents may be waived (either generally or in a particular instance and either retroactively or prospectively) on a *pari passu* basis with respect to all Purchasers or holders of Notes, as applicable, with the written consent of the Company and the holders of Notes representing at least fifty percent (50%) of the aggregate principal amount of the Notes then outstanding (the "***Majority Holders***"), which may consist of one or more holders; *provided, however*, that no such amendment, waiver or consent shall reduce the principal amount of any Note without the affected Purchaser's written consent. Any amendment or waiver effected in accordance with this Section 6.6 shall be binding upon each holder of Notes then outstanding (including securities into which such Notes and/or Warrants have been converted or exchanged or for which such Notes and/or Warrants have been exercised, and each future holder of such Notes, Warrants or such equity securities) and the Company. Each Purchaser acknowledges that by the operation of this Section 6.6, the Majority Holders will have the right and power to diminish or eliminate the rights of such Purchaser under this Agreement, the Notes and the Warrants.

**6.7 Expenses.** Each of the Company and each Purchaser shall be solely responsible for its own expenses and legal fees incurred with respect to this Agreement and the transactions contemplated herein; provided, however, the Company shall reimburse the Lead Investor its reasonable legal fees and expenses incurred with respect to the transactions contemplated herein, in an amount not to exceed, in the aggregate, $50,000.

**6.8 Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement, any Note or any other Loan Documents shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by any Purchaser of any breach or default under this Agreement, or any waiver by any Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to the Purchaser, shall be cumulative and not alternative.

**6.9 Severability; Separability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms. The Company's agreement with each of the Purchasers is a separate agreement and the sale of the Notes to each of the Purchasers is a separate sale. Unless otherwise expressly provided herein or the Notes, the rights of each Purchaser hereunder are several rights, not rights jointly held with any of the other Purchasers.

**6.10 Entire Agreement.** This Agreement (including the Schedule of Purchasers and the exhibits attached hereto) constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

**6.11 Attorney's Fees.** The prevailing party in any litigation instituted under this Agreement shall, in addition to other remedies, be entitled to be reimbursed by the other party for all expenses of such litigation, including reasonable attorneys' fees and expenses.

**6.12 General Interpretation**. The terms of this Agreement have been negotiated by the parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under this Agreement. No rule of strict construction will be applied against any person or entity.

[*Signature Pages Follow*]

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the Effective Date.

**COMPANY:**

**HOUSECANARY, INC**

By: ___________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

Address: 535 Mission Street, Office #1920______
San Francisco, CA 94105____________

Email:

Date:

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the date set forth below.

**PURCHASER:**

**MARBRUCK INVESTMENTS LTD.**

By:________________________________________
Name: ________________________________________
Title: ________________________________________

Address: ________________________________________

________________________________________

Email:

Date:

**Amount of Note**: $_____[5,000,000]______

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the date set forth below.

**PURCHASER:**
**[INDIVIDUAL]**

____________________________________
[NAME]

Address: [___________________________]

Email: [_____________________________]

Date:

**Amount of Note**: $__[______]_____

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the date set forth below.

**PURCHASER:**

**[ENTITY]**

By:_______________________________________
Name: _______________________________________
Title: _______________________________________

Address: _____________________________________

_____________________________________

Email:

Date:

**Amount of Note**: $_____[_________]_____

# SCHEDULES AND EXHIBITS

Schedule 1: Schedule of Purchasers

Exhibit A: Form of Convertible Promissory Note

Exhibit B: Form of Warrant

Exhibit C: Disclosure Schedule

## *Schedule 1: Schedule of Purchasers*

**Initial Closing: [__________], 2023**

| Name of Purchaser | Loan Amount (US$) | Number of Warrant Shares |
|---|---|---|
| Marbruck Investments Limited | 5,000,000 | [●] |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total:** | | |

**Subsequent Closing: [_________], 2023**

| Name of Purchaser | Loan Amount (US$) | Number of Warrant Shares |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total:** | | |

# Exhibit A

## Form of Convertible Promissory Note

THIS NOTE AND THE SECURITIES INTO WHICH IT MAY BE CONVERTED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE “ACT”), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

THIS NOTE IS SUBORDINATED TO INDEBTEDNESS OWED TO THE COMPANY’S SENIOR CREDITORS AS PROVIDED IN SECTION 6 HEREOF.

**HOUSECANARY, INC.**

**CONVERTIBLE PROMISSORY NOTE**

**LOAN AMOUNT: [•]** **DATE: _______, 2023**

FOR VALUE RECEIVED, the undersigned, HouseCanary, Inc., a Delaware corporation (the “***Company***”), promises to pay to the order of [•], or its registered assigns (the “***Holder***”), the Loan Amount set forth above plus simple interest at a fixed rate equal to 10% per annum until this Convertible Promissory Note (this “***Note***”) is paid in full. Provided, however, if the Company fails to pay any amount payable under this Note on the Maturity Date (as defined below), interest shall accrue on the outstanding amount from the due date to the date of actual payment at a rate equal to 12.0% per annum (“***Default Interest***”). Any Default Interest accruing pursuant to the preceding sentence shall be immediately payable by the Company on demand by the Holder. Interest shall be calculated on the basis of actual number of days elapsed over a year of 365 days and shall accrue from the date of this Note. All payments received by the Holder hereunder will be applied first to costs of collection, if any, then to interest and the balance to principal.

Unless converted pursuant to the provisions hereof, payments of principal, interest and other amounts due hereunder will be made by check or wire transfer in immediately available funds sent to the Holder at the address or account furnished to the Company for that purpose.

This is one of a series of the Company’s Convertible Promissory Notes (together with this Note, collectively referred to herein as the “***Notes***”) issued pursuant to that certain Note Purchase Agreement (the “***Purchase Agreement***”) dated [___________], 2023 by and among the Company, the Holder and the other Purchasers of the Notes (together with the Holder, the “***Holders***”), all of like tenor, except as to the names of the Holders, the date of issuance, the Loan Amount thereof and other non-material details. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject to and to which the Holder hereof, by the acceptance of this Note, agrees:

1. Maturity Date. Subject to the provisions of Sections 2 and 5 below, the principal and accrued interest on this Note shall be due and payable on the applicable date set out as follows (the **Maturity Date**):

(x) August 1, 2024, or

(y) in the event the aggregate Loan Amount of all Notes is equal to or greater than $15,250,000 as of December 31, 2023 (including, for the purpose hereof, any Loan Amount repaid by the Company prior to December 31, 2023) and the maturity date under the Senior Loan Agreement has been extended to December 31, 2025, the Maturity Date shall be December 31, 2025,

and in each case subject to the earlier consummation of a Liquidation Event.

2. Note Conversion.

2.1. General.

2.1.1 Automatic Conversion upon Qualified Financing. Upon the closing by the Company of a bona fide third-party preferred equity financing transaction pursuant to which the Company sells its shares of preferred stock (the "***Preferred Securities***") resulting in aggregate gross proceeds to the Company of at least $30,000,000 (excluding for these purposes conversion of the Notes, and any other convertible promissory notes and/or convertible instruments issued by the Company) (a "***Qualified Financing***"), then, subject to Section 2.2.2 below, the entire outstanding Loan Amount and accrued unpaid interest on this Note (the "***Note Balance***") shall automatically be converted, upon the date of the closing of such Qualified Financing, into a number of shares of Shadow Preferred Securities (as defined below), at a conversion price per share (the "***Conversion Price***") which shall be the lower of (i) the price equal to $3.0228 per share (the "***Valuation Cap Price***") and (ii) two-thirds (2/3) of the price per share paid by the other purchasers in a Qualified Financing. The issuance of Shadow Preferred Securities pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions applicable to Preferred Securities sold in the Qualified Financing. For purposes of this Note, the term "***Shadow Preferred Securities***" shall mean shares of one or more series of preferred stock of the Company that are identical in substantially all respects to the Preferred Securities of the Company issued in the Qualified Financing, except that the liquidation preference and original issue price per share of the Shadow Preferred Securities shall equal the applicable Conversion Price with corresponding adjustments to any price-based antidilution and dividend rights provisions.

2.1.2 Voluntary Conversion at Maturity. If the Notes remain outstanding on the Maturity Date, then the outstanding Note Balance (calculated as of the Maturity Date) of each Note shall, (a) at the election of the Holder, for and on behalf of this Note, or (b) at the election of the Majority Holders, for and on behalf of all Holders of the Notes, be converted into (i) such number of shares of the most senior series of Preferred Securities of the Company as of the Maturity Date equal to the quotient of the Note Balance of each applicable Note divided by the Valuation Cap Price, and (ii) a warrant to purchase a number of shares of voting common stock of the Company equal to the quotient of (A) two (2) times the Note Balance of each applicable Note divided by (B) the Valuation Cap Price, at an exercise price per share equal to $0.01. The Holder or Majority Holders, as applicable, shall only be entitled to make such an election to convert the outstanding Note Balance during the thirty (30) day period immediately following the Maturity Date. In the event the Holder or Majority Holders, as applicable, do not elect to convert the outstanding Note Balance, then the right to convert as set forth in this Section 2.1.2 shall expire and no longer be exercisable, and the Company shall repay the outstanding Note Balance of all Notes (calculated as of the Maturity Date), on a pro-rata, pari passu basis in accordance with Section 7 hereof, upon written notice to all Holders who do not elect to convert pursuant to the terms of this Section 2.1.2. Upon the repayment of the Note by the Company pursuant to this Section 2.1.2, the Company shall be released from all of its obligations and liabilities under this Note.

2.2. Conversion Procedure.

2.2.1 Mechanics and Effect of Conversion. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Holder upon the conversion of this Note, the Company shall pay to the Holder in cash the amount of outstanding Note Balance that is not so converted. Upon the conversion of this Note pursuant to Section 2.1, the Holder shall surrender this Note, duly endorsed, at the principal office of the Company or via electronic delivery, as applicable. The Company shall not be required to issue or deliver the capital stock into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. At the Company's expense, the Company shall, as soon as practicable thereafter, issue and deliver to such Holder at such Holder's address or if no such address appears or is given, at such principal office of the Company, a certificate or certificates (if certificated) for, and shall record on the Company's books and records, the capital stock to which the Holder shall be entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon conversion of this Note, including a check payable to the Holder for any cash amounts payable in lieu of fractional shares as described above. Upon conversion of this Note pursuant to Section 2.1, the Company shall be released from all its obligations and liabilities under this Note.

2.2.2 Documentation. Upon the conversion of this Note pursuant to Section 2.1, (a) the Holder agrees to surrender this Note for conversion at the closing of the Qualified Financing or on the Maturity Date, as applicable, and to execute all reasonably necessary documents in connection with the conversion of this Note (including any definitive purchase agreement) that are executed by the investors (or other applicable parties) in the Qualified Financing or on the Maturity Date, as applicable; and (b) the Company shall, at its sole cost and reasonably promptly following such delivery, issue and deliver certificates (if certificated) or such other instrument representing, and shall record on the Company's books and records, the number of shares of fully paid and non-assessable Shadow Preferred Securities. Upon the conversion of this Note into capital stock pursuant to the terms hereof, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this Note.

3. Liquidation Event. In the event that a Liquidation Event shall occur prior to the earlier of a Qualified Equity Financing or the Maturity Date, then upon and concurrently with the consummation of the transaction constituting a Liquidation Event, the Company shall pay to the Holder the greater of (a) the Exit Redemption Amount (as defined below) and (b) the amount the Holder would be entitled to receive in connection with such a Liquidation Event if the total Note Balance had been converted into shares of Preferred Securities at the per share price equal to the Valuation Cap Price. "***Liquidation Event***" means any of the following: (i) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred (except a bona fide capital raising transaction), (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity, (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company, (iv) a liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or any other event or series of related events resulting in the distribution of the Company's assets to its shareholders or creditors for the purpose of ceasing the Company's operation and existence, or (v) the completion of an initial public offering of the Company's securities. The "***Exit Redemption Amount***" means (A) if the Liquidation Event occurs on or before the twelve (12) month anniversary of the Initial Closing Date, an amount equal to two (2) times the Note Balance as of immediately prior to the consummation of the Liquidation Event; (B) if the Liquidation Event occurs after the twelve (12) month anniversary and on or before the twenty-four (24) month anniversary of the Initial Closing Date, an amount equal to two and one-half (2.5) times the Note Balance as of immediately prior to the consummation of the Liquidation Event or (C) if the Liquidation Event occurs after the twenty-four (24) month anniversary of the Initial Closing Date, an amount equal to

three (3) times the Note Balance as of immediately prior to the consummation of the Liquidation Event. Upon the repayment of the Note by the Company pursuant to this Section 3, the Company shall be released from all its obligations and liabilities under this Note.

4. Adjustment Event.

4.1. The Company shall, as soon as practicable prior to the prospective date of an Adjustment Event, give notice in writing to the Holder of any such Adjustment Event, stating (i) that it has resolved to implement an Adjustment Event, (ii) the prospective date of the Adjustment Event and (iii) the proposed terms of the Adjustment Event.

4.2. Following an Adjustment Event, the Company shall certify to the Holder in writing the adjustments to the number and nominal value of the Preferred Securities to be converted which they consider to be necessary so that, after such adjustment and on conversion, the Holder shall be entitled to receive the same percentage of the issued share capital of the Company carrying the same proportion of votes exercisable at a general meeting of shareholders and the same entitlement to participate in distributions of the Company, in each case as nearly as practicable, as would have been the case had no Adjustment Event occurred (and making such reduction or increase as is necessary to the premium arising on the issue and allotment of the Preferred Securities on conversion of the Notes).

4.3. For purposes of this Section 4, "***Adjustment Event***" means any or all of the following, at any time, or by reference to any record date, while the Notes remain outstanding, any sub-division or consolidation of equity securities of the Company.

5. Events of Default. Upon the occurrence and during the continuance of an Event of Default (as defined below), the Majority Holders shall be entitled, by written notice to the Company, to declare this Note and the other Notes to be, and upon such declaration this Note shall be and become, immediately due and payable, in addition to any other rights or remedies the Holder may have under applicable law or the provisions of this Note. The occurrence of any of the following events shall constitute an "***Event of Default***":

5.1. Default in the payment of principal of the Notes or accrued interest thereon when due; or

5.2. Any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary; or

5.3. The institution by the Company of proceedings to be adjudicated as bankrupt or insolvent, or the consent by the Company to institution of bankruptcy or insolvency proceedings against the Company under any federal or state law, or the consent by the Company to or acquiescence in the filing of any petition relating thereto, or the appointment of a receiver, liquidator, assignee, trustee or other similar official of the Company, or of any substantial part of its property, or the making by the Company of an assignment, for the benefit of creditors, or the admission by the Company in writing of its inability to pay its debts generally as such debts become due; or

5.4. Commencement of proceedings against the Company seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulations which proceedings shall not have been dismissed or stayed within thirty (30) days of commencement thereof, or the setting aside of any such stay of any such proceedings, or the appointment without the consent or acquiescence of the equity holders of the Company of any trustee, receiver or liquidator of the Company

or of all or any substantial portion of the properties of the Company which appointment shall not have been vacated within thirty (30) days thereof.

5.5. Failure by the Company to deliver the Preferred Securities as and when such Preferred Securities are required to be delivered following conversion of a Note.

5.6. Failure by the Company to make payment of the Exit Redemption Amount or any other amount in accordance with this Note.

5.7. A default is made by the Company in the performance or observance of any covenant, condition or provision contained in this Note, the Purchase Agreement or other Loan Documents (as defined in the Purchase Agreement), or in any other agreement relating to the issue of or subscription for the Notes and on its part to be performed or observed or a breach of any representation and warranty given by the Company is made and such default or breach continues for the period of 21 days following the earlier of (a) the Company becoming aware of such non-observance or breach and (b) the service by the Holder on the Company of notice requiring such default to be remedied.

5.8. An event or circumstance whereby: (i) a default is made by the Company or any of its subsidiaries in the performance or satisfaction of its obligations, undertakings and/or covenants under any Indebtedness for Borrowed Money, (ii) the lender under such Indebtedness for Borrowed Money (the "**Other Lender**") takes action to enforce the terms and conditions thereof or to accelerate the Company's payment obligations thereunder (the "**Lender Enforcement Action**"), and (iii) the Other Lender does not waive, rescind or dismiss the Lender Enforcement Action within five (5) business days thereof. For the purpose of this clause, "***Indebtedness for Borrowed Money***" means any indebtedness with a then-outstanding aggregate amount of $1,000,000 or more (whether being principal, premium, interest or other amounts) for or in respect of any notes, bonds, debentures, debenture stock, loan stock or other securities or any borrowed money or any liability under or in respect of any acceptance or acceptance credit, other than as disclosed in the Disclosure Schedule (as defined in the Purchase Agreement).

5.9. Any governmental authority or agency compulsorily purchases or expropriates all or, in the opinion of the Investor, any material part of the assets of the Company or any subsidiary without fair compensation.

5.10. Any amendment or modification of any provisions of the Senior Loan Agreement (as defined in the Purchase Agreement) or any other document related to or arising thereunder without the prior written consent of the Majority Holders; provided, however, any waiver of any conditions or covenants set forth in the Senior Loan Agreement by the Senior Creditors shall not be considered an amendment or modification hereunder.

6. Subordination.

6.1. Subject to and except as set forth in Section 6.2 below, all obligations of the Company to Holder under this Note, including without limitation, all principal, interest (including, without limitation, any interest accruing after the commencement of any insolvency, reorganization or any case or proceeding under any bankruptcy or insolvency law or laws relating to the relief of debtors (any of the foregoing, an "***Insolvency Event***"), premiums, fees and expenses (the "***Junior Obligation***") are subordinated in right of payment to all Senior Indebtedness (as defined in Section 6.2, below). Nothing herein shall be deemed to subordinate, waive or restrict the Company's ability to issue capital stock of the Company upon the conversion of this Note in accordance with its terms.

6.2. Notwithstanding Holder's entitlement to demand or receive payment pursuant to the other provisions of this Note and the other Loan Documents, Holder shall not, after the occurrence of an event of default under the Senior Loan Agreement (a "***Senior Default***"): (a) demand or receive from the Company (and the Company shall not pay to any Holder) all or any part of the Junior Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise and the failure of the Company to pay the Junior Obligations shall not constitute a default by the Company in respect of the Junior Obligations under this Note, the Loan Documents or otherwise; (b) exercise any right or remedy, or take any enforcement action regarding any assets of the Company, in connection with the Junior Obligations; (c) commence, or cause to be commenced, prosecute or participate in any administrative, legal or equitable action against the Company or its assets in connection with the Junior Obligations, or (d) take any security for the Junior Obligations, including, without limitation, any security interest in any of the Company's assets, for such time as any payment obligations, now or hereafter existing, under the Senior Loan Agreement (defined below), whether for principal, interest (including, without limitation, any interest accruing after the filing of an Insolvency Event), premiums, fees, expenses or otherwise (the "***Senior Indebtedness***") remain outstanding. For purposes of this Note, the Senior Indebtedness shall not be deemed to have been paid in full until and unless the Senior Creditors (defined below) shall have ceased to have any obligation, whether actual or contingent, to make any credit accommodation to the Company under the Senior Loan Agreement and the Senior Creditors shall have received irrevocable and indefeasible payment of all amounts due or to become due in respect of the Senior Indebtedness in full in cash. For the purposes of this Note, "***Senior Loan Agreement***" means that certain Loan and Security Agreement dated as of March 25, 2021, by and among the Company, Ocean II PLO LLC, as administrative and collateral agent ("***Agent***"), and Structural Capital Investments III, LP, Series Structural DCO II series of Structural Capital DCO, LLC, CEOF Holdings LP and other person or entity from time to time party thereto as a lender (collectively with Agent, "***Senior Creditors***"), as such agreement has been amended to date, and as may be further amended, restated or supplemented from time to time.

6.3. Notwithstanding anything to the contrary in this Note, under applicable law or otherwise, Holder agrees not to directly or indirectly contest the validity, enforceability or priority of any lien securing the Senior Indebtedness. Any and all documents evidencing the Junior Obligation, including, without limitation, any purchase agreements and promissory notes, shall contain a legend stating that the Junior Obligation is subject to the terms of this Note.

6.4. Holder shall be entitled to receive, and the Company shall be entitled to issue, capital stock of the Company to repay or otherwise satisfy Junior Obligations as provided in this Note.

6.5. The Company expressly agrees that it shall not assert as a defense to the Junior Obligation, the passage of time, estoppel, laches or any statute of limitations to the extent that the exercise of any rights or remedies by Holder was precluded by the terms of this Section 6.

6.6. After the occurrence of a Senior Default or if Holder receives payment hereunder in violation of the Senior Loan Agreement, and continuing thereafter until the Senior Indebtedness is paid in full, the Holder shall promptly deliver to Agent for the benefit of Senior Creditors in the form received (except for endorsement or assignment by any Holder where required by Agent) for application to the Senior Indebtedness any payment, distribution, security or proceeds received by Holder with respect to the Junior Obligation other than in accordance with this Section 6 (and prior to such delivery shall not commingle such payments with holder's own assets but instead shall hold such payments, distributions, security or proceeds in trust for Agent for the benefit of Senior Creditors).

6.7. Senior Creditors may amend, restate or supplement the Senior Loan Agreement or any other document related to or arising thereunder without notice to or consent of Holder, and any such amendment, restatement or supplement shall not affect the enforceability by the Senior Creditors of this

Section 6, it being understood by all that any such amendment may result in an Event of Default hereunder pursuant to Section 5.10 hereof.

6.8. The terms and conditions of this Section 6 shall inure to the benefit of and be binding upon the respective successors and assigns of the Secured Parties. Holder agrees that any successors and assigns of the Senior Creditors are intended third party beneficiaries of the terms of this Note, and upon any assignment or transfer by a Senior Creditor under the Senior Loan Agreement, the assignee or transferee shall be entitled to the benefits of this Note.

6.9. The Company and Holder agree that Senior Creditors are intended third party beneficiaries of this Note and shall be entitled to enforce the provision of the legend affixed to this Note, Section 6, Section 10.6, and Section 10.13 of this Note, and that the Company and Holder may not amend or waive any provision of the legend affixed to this Note, Section 6, Section 10.6, or Section 10.13 in a way that would adversely affect Senior Creditors' rights without Agent's prior written consent, to be given or withheld in Agent's sole discretion.

7. Obligations Pari Passu. The obligations of the Company under this Note shall be unsecured obligations of the Company. All the Notes shall rank equally in right of repayment. Any and all repayment or prepayments of the obligations under the Notes shall be made ratably to the holders of all Notes based on the sum of the outstanding principal balance and accrued unpaid interested owed with respect to each Note.

8. No Prepayment. The Company may not prepay this Note (in whole or in part) without the prior written consent of the Majority Holders, which may be withheld or granted in the sole discretion of the Majority Holders.

9. Waiver of Notice; Fees. The Company hereby waives notice, presentment, protest and notice of dishonor. Other than pursuant to a writing by the Holder, no failure to exercise any right of the Holder with respect to this Note, nor any delay in, or waiver of, the exercise thereof, shall impair any such right or be deemed to be a waiver thereof. If the Holder is required to commence legal proceedings or incur any other cost to collect amounts due and payable hereunder or to enforce its rights under this Note, the Company shall be liable to pay or reimburse the Holder for all reasonable costs and expenses incurred in connection with the collection of such amounts and any such legal proceedings, including without limitation attorneys' fees.

10. Miscellaneous.

10.1. No Assignment by Company. The Company may not assign its rights or delegate any obligations hereunder without the prior written consent of the Majority Holders.

10.2. Transfers by Holder. With respect to any offer, sale or other disposition of this Note, the Holder will give written notice to the Company prior thereto, describing briefly the manner thereof, and any such proposed transfer shall be subject to the restrictions on transfer set forth in the Purchase Agreement.

10.3. Successors and Assigns. Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective executors, administrators, heirs, successors and assigns of the parties.

10.4. Loss or Mutilation of Note. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably

satisfactory to the Company, in the case of loss, theft or destruction, or the surrender and cancellation of the Note, in the case of mutilation, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Principal is payable only to the registered Holder of the Note.

10.5. Note Holder Not Stockholder. This Note does not confer upon Holder any right to vote or to consent to or to receive notice as a stockholder of the Company, as such, in respect of any matters whatsoever, or any other rights or liabilities as a stockholder, prior to the conversion hereof.

10.6. Governing Law/WAIVER OF JURY TRIAL.

10.6.1 The terms of this Note shall be construed in accordance with the laws of the State of Delaware, as applied to contracts entered into by Delaware residents within the State of Delaware, which contracts are to be performed entirely within the State of Delaware.

10.6.2 TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE OR ANY CONTEMPLATED TRANSACTION UNDER THIS NOTE, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS NOTE. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

10.7. Notices. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered personally or by email or shall be sent by a reputable express delivery service or by certified mail, postage prepaid with return receipt requested, addressed as set forth in the Purchase Agreement. Either party hereto may change the above specified recipient or mailing address or email address by notice to the other party given in the manner herein prescribed. All notices shall be deemed given on the day when actually delivered as provided above (if delivered personally or by email) or on the day shown on the return receipt (if delivered by mail or delivery service).

10.8. Attorneys' Fees. In addition to fees and expenses owed to the Holder pursuant to the terms of the Agreement, if any principal or interest represented by this Note or any part thereof is collected in bankruptcy, receivership or other judicial proceedings or if this Note is placed in the hands of attorneys for collection after default, the Company agrees to pay, in addition to the principal and interest payable hereunder, reasonable attorneys' fees and costs incurred by Holder.

10.9. Waiver and Amendment. Except as provide in Section 6, any term of this Note may be amended or terminated and the observance of any term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Holders (or in respect of this Note only, the Holder hereof). No waivers of or exceptions to any term, condition or provision of this Note, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision. Any waiver or amendment effected in accordance with this Section 10.9 shall be binding upon each Note holder at the time outstanding, each future holder of all such Notes, and the Company. Each Holder acknowledges that by the operation of this Section 10.9, the Majority Holders will have the right and power to diminish or eliminate the rights of such Holder under this Note.

10.10. Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Note, and the balance of this Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

10.11. Titles and Subtitles. The titles and subtitles of the sections of this Note are used for convenience only and shall not be considered in construing or interpreting this Note.

10.12. Most Favored Nations. While the Note remains outstanding, if the Company sells or issues any convertible notes and/or convertible securities ("***Subsequent Convertible Instruments***") that includes more favorable terms (other than the investment amount or principal amount of such Subsequent Convertible Instruments) which, if applied to the Note in appropriate fashion, would result in a (a) lower Conversion Price or higher interest rate than the Note, (b) higher payout amount, or more preferential payment, upon a Liquidity Event, (c) greater number of Shadow Preferred Securities issued to the Holder in connection with the conversion of the Note , (d) more restrictive covenants imposed on the Company than under the Loan Documents or (e) give the relevant investor greater rights than given to the Holders under the Loan Documents,, then the Company will promptly (and in any event within ten (10) business days) following the issuance of such Subsequent Convertible Instrument, provide the Holder with a written notice of such more favorable terms, and the Majority Holders shall have the option, exercisable within fifteen (15) business days of the receipt of such written notice, to elect to receive such more favorable terms. In the event that the Majority Holders elect to receive such more favorable terms, the parties shall promptly execute and deliver any such amendments to the Notes, Warrants, or Purchase Agreement in order to effectuate this Section 10.12. The parties agree that this Section 10.12 shall apply with respect to any other Notes issued pursuant to the Purchase Agreement regardless of whether such Note was issued prior to the Note.

10.13. General Interpretation. The terms of this Note have been negotiated by the parties hereto and the language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Note shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under this Note. No rule of strict construction will be applied against any person or entity.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the undersigned has caused this Convertible Promissory Note to be signed in its name as of the date first set forth above.

**HOUSECANARY, INC.**

By: ______________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

HOLDER:

[●]

By: ______________________________
Name: [●]
Title: Authorized Signatory

# Exhibit B

## Form of Warrant

THIS WARRANT AND THE UNDERLYING SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IN ACCORDANCE WITH APPLICABLE REGISTRATION REQUIREMENTS OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE, TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. THIS WARRANT MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, TRANSFER, PLEDGE OR HYPOTHECATION OF ANY INTEREST IN ANY OF THE SECURITIES REPRESENTED HEREBY.

**WARRANT TO PURCHASE SHARES**
**of**
**HOUSECANARY, INC.**

**Dated as of July 10, 2023**
**Void after the date specified in Section 8**

**No. [●]**

**Warrant to Purchase**
**[●] Shares**
**(subject to adjustment)**

THIS CERTIFIES THAT, for value received, **[●]**, a **[●]** [corporation], or its registered assigns (the "***Holder***"), is entitled, subject to the provisions and upon the terms and conditions set forth herein, to purchase from HouseCanary, Inc., a Delaware corporation (the "***Company***"), Shares (as defined below) in the amounts, at such times and at the price per share set forth in Section 1. The term "***Warrant***" as used herein shall include this Warrant and any warrants delivered in substitution or exchange therefor as provided herein.

This Warrant is one in a series of warrants issued by the Company in connection with the transactions described in the Note Purchase Agreement, dated as of July 10, 2023, by and among the Company and the purchasers signatory thereto (the "***Purchase Agreement***").

The following is a statement of the rights of the Holder and the conditions to which this Warrant is subject, and to which Holder, by acceptance of this Warrant, agrees:

**1. Number and Price of Shares; Exercise Period.**

(a) ***Definition of Shares.*** "***Shares***" shall mean shares of Voting Common Stock of the Company, $0.00001 par value per share.

(b) ***Number of Shares.*** Subject to any previous exercise of the Warrant, the Holder shall have the right to purchase up to [●] ([●]) Shares, as may be adjusted pursuant hereto, prior to (or in connection with) the expiration of this Warrant as provided in Section 8.

(c) ***Exercise Price.*** The exercise price per Share shall be equal to [$●], subject to adjustment pursuant hereto (the "***Exercise Price***").

(d) ***Exercise Period.*** This Warrant shall be exercisable, in whole or in part, prior to (or in connection with) the expiration of this Warrant as set forth in Section 8.

**2. Exercise of the Warrant.**

(a) ***Exercise.*** The purchase rights represented by this Warrant may be exercised at the election of the Holder, in whole or in part, in accordance with Section 1, by:

(i) the tender to the Company at its principal office (or such other office or agency as the Company may designate) of a notice of exercise in the form of Exhibit A (the "***Notice of Exercise***"), duly completed and executed by or on behalf of the Holder, together with the surrender of this Warrant;

(ii) the payment to the Company of an amount equal to (x) the Exercise Price multiplied by (y) the number of Shares being purchased, by (a) wire transfer or certified, cashier's or other check acceptable to the Company and payable to the order of the Company; (b) surrender and cancellation of promissory notes or other instruments representing indebtedness of the Company to the Holder; or (c) a combination of (a) and (b); and

(iii) executing such agreements between the Company and certain or all of its stockholders (provided that all holders of at least one percent (1%) of the class of securities for which this Warrant is to be exercised are also parties to such agreements), in each case as may be reasonably requested by the Company.

(b) ***Net Issue Exercise.*** In lieu of exercising this Warrant pursuant to Section 2(a)(ii), if the fair market value of one Share is greater than the Exercise Price (at the date of calculation as set forth below), the Holder may elect to receive a number of Shares equal to the value of this Warrant (or of any portion of this Warrant being canceled) by surrender of this Warrant at the principal office of the Company (or such other office or agency as the Company may designate) together with a properly completed and executed Notice of Exercise reflecting such election, in which event the Company shall issue to the Holder that number of Shares computed using the following formula:

$$X = \frac{Y(A - B)}{A}$$

Where:

X = The number of Shares to be issued to the Holder

Y = The number of Shares purchasable under this Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being canceled (at the date of such calculation)

A = The fair market value of one Share (at the date of such calculation)

B = The Exercise Price (as adjusted to the date of such calculation)

For purposes of the calculation above, the fair market value of one Share shall For purposes of this Section 2, the fair market value of a Share shall mean the average of the closing bid and asked prices of

Shares quoted in the over-the-counter market in which the Shares are traded or the closing price quoted on any exchange on which the Shares are listed, whichever is applicable, as published in the Western Edition of The Wall Street Journal for the ten (10) trading days prior to the date of determination of fair market value (or such shorter period of time during which such stock was traded over-the-counter or on such exchange). If the Shares are not traded on the over-the-counter market or on an exchange, the fair market value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company from authorized but unissued Shares, as such prices shall be determined in good faith by the Company's Board of Directors.

(c) ***Stock Certificates.*** The rights under this Warrant shall be deemed to have been exercised and the Shares issuable upon such exercise shall be deemed to have been issued immediately prior to the close of business on the date this Warrant is exercised in accordance with its terms, and the person entitled to receive the Shares issuable upon such exercise shall be treated for all purposes as the holder of record of such Shares as of the close of business on such date. As promptly as reasonably practicable on or after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates (or a notice of issuance of uncertificated shares, if applicable) for that number of shares issuable upon such exercise. In the event that the rights under this Warrant are exercised in part and have not expired, the Company shall execute and deliver a new Warrant reflecting the number of Shares that remain subject to this Warrant.

(d) ***No Fractional Shares or Scrip.*** No fractional shares or scrip representing fractional shares shall be issued upon the exercise of the rights under this Warrant. In lieu of such fractional share to which the Holder would otherwise be entitled, the Company shall make a cash payment equal to the Exercise Price multiplied by such fraction.

(e) ***Conditional Exercise.*** The Holder may exercise this Warrant conditioned upon (and effective immediately prior to) consummation of any transaction that would cause the expiration of this Warrant pursuant to Section 8 by so indicating in the notice of exercise.

(f) ***Automatic Exercise.*** If the Holder of this Warrant has not elected to exercise this Warrant prior to expiration of this Warrant pursuant to Section 8, then this Warrant shall automatically (without any act on the part of the Holder) be exercised pursuant to Section 2(b) effective immediately prior to the expiration of the Warrant to the extent such net issue exercise would result in the issuance of Shares pursuant to such Section 2(b), unless the Holder shall earlier provide written notice to the Company that the Holder desires that this Warrant expire unexercised. If this Warrant is automatically exercised, the Company shall notify the Holder of the automatic exercise as soon as reasonably practicable, and the Holder shall surrender the Warrant to the Company in accordance with the terms hereof.

(g) ***Reservation of Stock.*** The Company agrees during the term the rights under this Warrant are exercisable to take all reasonable action to reserve and keep available from its authorized and unissued Shares as shall from time to time be sufficient to effect the exercise of the rights under this Warrant; and if at any time the number of authorized but unissued Shares shall not be sufficient for purposes of the exercise of this Warrant in accordance with its terms and the conversion of the Shares, without limitation of such other remedies as may be available to the Holder, the Company will use all reasonable efforts to take such corporate action as may, in the opinion of counsel, be necessary to increase its authorized and unissued Shares to a number of Shares as shall be sufficient for such purposes. The Company represents and warrants that all Shares that may be issued upon the exercise of this Warrant will, when issued in accordance with the terms hereof, be duly authorized, validly issued, fully paid and nonassessable.

3. **Replacement of the Warrant.** Subject to the receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company or, in the case of mutilation, on surrender and cancellation of this Warrant, the Company at the expense of the Holder shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor and amount.

4. **Transfer of the Warrant.**

(a) ***Warrant Register.*** The Company shall maintain a register (the "***Warrant Register***") containing the name and address of the Holder or Holders. Until this Warrant is transferred on the Warrant Register in accordance herewith, the Company may treat the Holder as shown on the Warrant Register as the absolute owner of this Warrant for all purposes, notwithstanding any notice to the contrary. Any Holder of this Warrant (or of any portion of this Warrant) may change its address as shown on the Warrant Register by written notice to the Company requesting a change.

(b) ***Warrant Agent.*** The Company may appoint an agent for the purpose of maintaining the Warrant Register referred to in Section 4(a), issuing the Shares or other securities then issuable upon the exercise of the rights under this Warrant, exchanging this Warrant, replacing this Warrant or conducting related activities.

(c) ***Transferability of the Warrant.*** Subject to the provisions of this Warrant with respect to compliance with the Securities Act of 1933, as amended (the "***Securities Act***") and limitations on assignments and transfers, including without limitation compliance with the restrictions on transfer set forth in Section 5, title to this Warrant may be transferred by endorsement (by the transferor and the transferee executing the assignment form attached as Exhibit B (the "***Assignment Form***")) and delivery in the same manner as a negotiable instrument transferable by endorsement and delivery.

(d) ***Exchange of the Warrant upon a Transfer.*** On surrender of this Warrant (and a properly endorsed Assignment Form) for exchange, subject to the provisions of this Warrant with respect to compliance with the Securities Act and limitations on assignments and transfers, the Company shall issue to or on the order of the Holder a new warrant or warrants of like tenor, in the name of the Holder or as the Holder (on payment by the Holder of any applicable transfer taxes) may direct, for the number of shares issuable upon exercise hereof, and the Company shall register any such transfer upon the Warrant Register. This Warrant (and the securities issuable upon exercise of the rights under this Warrant) must be surrendered to the Company or its warrant or transfer agent, as applicable, as a condition precedent to the sale, pledge, hypothecation or other transfer of any interest in any of the securities represented hereby.

(e) ***Minimum Transfer.*** This Warrant may not be transferred in part unless such transfer is to a transferee who, pursuant to such transfer, receives the right to purchase at least Fifty Thousand (50,000) Shares hereunder (as adjusted from time to time in accordance with Section 6).

(f) ***Taxes.*** In no event shall the Company be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate, or a book entry, in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate, or make such book entry, unless and until the person or persons requesting the issue or entry thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company, acting reasonably, that such tax has been paid, to the extent such tax is required by the applicable laws, or is not payable.

5. **Restrictions on Transfer of the Warrant and Shares; Compliance with Securities Laws.** By acceptance of this Warrant, the Holder agrees to comply with the following:

(a) ***Restrictions on Transfers.*** Subject to Section 5(b), this Warrant may not be transferred or assigned in whole or in part without the Company's prior written consent (which shall not be unreasonably withheld)**,** and any attempt by Holder to transfer or assign any rights, duties or obligations that arise under this Warrant without such permission shall be void (other than upon the occurrence and during the continuance of an Event of Default (as defined in the Purchase Agreement), in which event the Holder shall be entitled to transfer or assign any rights, duties or obligations that arise under this Warrant without the permission of the Company) Any transfer of this Warrant or the Shares (collectively, the "***Securities***") must be in compliance with all applicable federal and state securities laws. The Holder agrees not to make any sale, assignment, transfer, pledge or other disposition of all or any portion of the Securities, or any beneficial interest therein, unless and until the transferee thereof has agreed in writing for the benefit of the Company to take and hold such Securities subject to, and to be bound by, the terms and conditions set forth in this Warrant to the same extent as if the transferee were the original Holder hereunder, and either:

(i) There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement, or an exemption from such registration or qualification is available; or

(ii) (A) such Holder shall have given prior written notice to the Company of such Holder's intention to make such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition, (B) the transferee shall have confirmed to the satisfaction of the Company in writing, substantially in the form of Exhibit A-1, that the Securities are being acquired (i) solely for the transferee's own account and not as a nominee for any other party, (ii) for investment and (iii) not with a view toward distribution or resale, and shall have confirmed such other matters related thereto as may be reasonably requested by the Company, and (C) if requested by the Company, such Holder shall have furnished the Company, with (i) an opinion of counsel, reasonably satisfactory to the Company, to the effect that such disposition will not require registration of such Securities under the Securities Act or (ii) a "no action" letter from the Securities and Exchange Commission to the effect that the transfer of such Securities without registration will not result in a recommendation by the staff of the Securities and Exchange Commission that action be taken with respect thereto, whereupon such Holder shall be entitled to transfer such Securities in accordance with the terms of the notice delivered by the Holder to the Company. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 or pursuant to another exemption from registration under the Securities Act.

(b) ***Permitted Transfers.*** The transfer restrictions of Section 5(a) shall not apply to: (i) any transfer not involving a change in beneficial ownership; or (ii) transactions involving the distribution without consideration of Securities by the Holder to (x) a parent, subsidiary or other affiliate of the Holder, (y) any of the Holder's partners, members or other equity owners, or retired partners or members, or to the estate of any of its partners, members or other equity owners or retired partners or members, or (z) a venture capital fund that is controlled by or under common control with one or more general partners or managing members of, or shares the same management company with, the Holder; *provided*, in each case, that the Holder shall give written notice to the Company of the Holder's intention to effect such disposition and shall have furnished the Company with a description of the manner and circumstances of the proposed disposition to the extent required under Section 5(a).

(c) ***Investment Representation Statement.*** Unless the rights under this Warrant are exercised pursuant to an effective registration statement under the Securities Act that includes the Shares with respect to which the Warrant was exercised, it shall be a condition to any exercise of the rights under this Warrant that the Holder shall have confirmed to the Company in writing the matters set forth in Exhibit A-1.

(d) ***Securities Law Legend.*** Each certificate, instrument or book entry representing the Securities shall (unless otherwise permitted by the provisions of this Warrant) be notated with a legend substantially similar to the following (in addition to any legend required by state securities laws):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IN ACCORDANCE WITH APPLICABLE REGISTRATION REQUIREMENTS OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, TRANSFER, PLEDGE OR HYPOTHECATION OF ANY INTEREST IN ANY OF THE SECURITIES REPRESENTED HEREBY.

(e) ***Market Stand-off Legend.*** Each certificate, instrument or book entry representing the Shares issued upon exercise hereof shall also be notated with a legend in substantially the following form:

> THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING, AS SET FORTH IN THE WARRANT PURSUANT TO WHICH THESE SHARES WERE ISSUED, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

(f) ***Instructions Regarding Transfer Restrictions.*** The Holder consents to the Company making a notation on its records and giving instructions to any transfer agent in order to implement the restrictions on transfer established in this Section 5.

(g) ***Removal of Legend.*** The legend referring to federal and state securities laws identified in Section 5(d) notated on any certificate evidencing the Shares and the stock transfer instructions and record notations with respect to such securities shall be removed, and the Company shall issue a certificate without such legend to the holder of such securities (to the extent the securities are certificated), if (i) such securities are registered under the Securities Act, or (ii) such holder provides the Company with an opinion of counsel reasonably acceptable to the Company to the effect that a sale or transfer of such securities may be made without registration, qualification or legend.

(h) ***No Transfers to Bad Actors; Notice of Bad Actor Status.*** The Holder agrees not to sell, assign, transfer, pledge or otherwise dispose of any securities of the Company, or any beneficial

interest therein, to any person (other than the Company) unless and until the proposed transferee confirms to the reasonable satisfaction of the Company that neither the proposed transferee nor any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members nor any person that would be deemed a beneficial owner of those securities (in accordance with Rule 506(d) of the Securities Act) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2) (ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the transfer, in writing in reasonable detail to the Company. The Holder will promptly notify the Company in writing if the Holder or, to the Holder's knowledge, any person specified in Rule 506(d)(1) under the Securities Act becomes subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act.

6. **Adjustments.** Subject to the expiration of this Warrant pursuant to Section 8, the number and kind of shares purchasable hereunder and the Exercise Price therefor are subject to adjustment from time to time, as follows:

(a) ***Merger or Reorganization.*** If at any time there shall be any reorganization, recapitalization, merger or consolidation (a "***Reorganization***") involving the Company (other than as otherwise provided for herein or as would cause the expiration of this Warrant under Section 8) in which shares of the Company's stock are converted into or exchanged for securities, cash or other property, then, as a part of such Reorganization, lawful provision shall be made so that the Holder shall thereafter be entitled to receive upon exercise of this Warrant, the kind and amount of securities, cash or other property of the successor corporation resulting from such Reorganization, equivalent in value to that which a holder of the Shares deliverable upon exercise of this Warrant would have been entitled in such Reorganization if the right to purchase the Shares hereunder had been exercised immediately prior to such Reorganization. In any such case, appropriate adjustment (as determined in good faith by the Board of Directors of the successor corporation and subject to section 6(d)) shall be made in the application of the provisions of this Warrant with respect to the rights and interests of the Holder after such Reorganization to the end that the provisions of this Warrant shall be applicable after the event, as near as reasonably may be, in relation to any shares or other securities deliverable after that event upon the exercise of this Warrant.

(b) ***Reclassification of Shares.*** If the securities issuable upon exercise of this Warrant are changed into the same or a different number of securities of any other class or classes by reclassification, capital reorganization, conversion of all outstanding shares of the relevant class or series (other than as would cause the expiration of this Warrant pursuant to Section 8) or otherwise (other than as otherwise provided for herein) (a "***Reclassification***"), then, in any such event, in lieu of the number of Shares which the Holder would otherwise have been entitled to receive, the Holder shall have the right thereafter to exercise this Warrant for a number of shares of such other class or classes of stock that a holder of the number of securities deliverable upon exercise of this Warrant immediately before that change would have been entitled to receive in such Reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(c) ***Subdivisions and Combinations.*** In the event that the outstanding shares are subdivided (by stock split, by payment of a stock dividend or otherwise) into a greater number of shares of such securities, the number of Shares issuable upon exercise of the rights under this Warrant immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately increased, and the Exercise Price shall be proportionately decreased, and in the event that the outstanding shares are combined (by reclassification or otherwise) into a lesser number of shares of such securities, the number of Shares issuable upon exercise of the rights under this Warrant immediately prior to such

combination shall, concurrently with the effectiveness of such combination, be proportionately decreased, and the Exercise Price shall be proportionately increased.

(d) ***Capitalisation of Profits or Reserves***. In the event the Company issues any Shares as fully paid to the Shareholders by way of capitalisation of profits or reserves (except any Scrip Dividend (as defined below)), the Exercise Price shall be adjusted by multiplying the existing Exercise Price by a fraction where the numerator is the aggregate number of issued Shares (on an as-diluted basis) immediately before the new issue, and the denominator is the aggregate number of issued Shares (on an as-diluted basis) immediately after such issue. "**Scrip Dividend**" means Shares issued in lieu of the whole or any part of any cash dividend.

(e) ***Notice of Adjustments.*** Upon any adjustment in accordance with this Section 6, the Company shall give notice thereof to the Holder, which notice shall state the event giving rise to the adjustment, the Exercise Price as adjusted and the number of securities or other property purchasable upon the exercise of the rights under this Warrant, setting forth in reasonable detail the method of calculation of each. The Company shall promptly upon the occurrence of any adjustment event set out in this Section 6,furnish or cause to be furnished to such Holder a certificate setting forth (i) such adjustments, (ii) the Exercise Price at the time in effect and (iii) the number of securities and the amount, if any, of other property that at the time would be received upon exercise of this Warrant. If there is any dispute by the Holder concerning an adjustment, including the method of adjustment or the adjusted Exercise Price, the matter shall be referred to an Independent Valuation Expert for determination that the adjustment was fair and reasonable, and in the event the adjustment was determined to be not fair and/or not reasonable, the Independent Valuation Expert shall propose the method of adjustment and the adjusted Exercise Price in accordance with the terms of this Warrant. The determination of the Independent Valuation Expert shall be final and binding on all parties. For the purposes of this Section 6(e), "**Independent Valuation Expert**" means a reputable internationally recognised accounting firm, investment bank or securities firm with expertise in valuing companies in the same or similar industry as the Company or expertise in determining value or price adjustments of instruments similar to the Warrant, which has no conflict of interest with either the Company or the warrant holders, selected with the consent of a majority of the warrant holders and the Company. The cost and expense of the Independent Valuation Expert shall be borne by the Company.

7. **Notification of Certain Events.** Prior to the expiration of this Warrant pursuant to Section 8, in the event that the Company shall authorize:

(a) the issuance of any dividend or other distribution on the capital stock of the Company (other than (i) dividends or distributions otherwise provided for in Section 6, (ii) repurchases of common stock issued to or held by employees, officers, directors or consultants of the Company or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase; (iii) repurchases of common stock issued to or held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to rights of first refusal or first offer contained in agreements providing for such rights; or (iv) repurchases of capital stock of the Company in connection with the settlement of disputes with any stockholder), whether in cash, property, stock or other securities;

(b) the voluntary liquidation, dissolution or winding up of the Company; or

(c) any transaction resulting in the expiration of this Warrant pursuant to Section 8;

the Company shall send to the Holder of this Warrant at least ten (10) days prior written notice of the date on which a record shall be taken for any such dividend or distribution specified in clause (a) or the expected effective date of any such other event specified in clause (b) or (c), as applicable. The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the consent of the Holder of this Warrant.

8. **Expiration of the Warrant.** This Warrant shall expire and shall no longer be exercisable as of the earlier of:

(a) 5:00 p.m., Pacific time, on July 10, 2033; or

(b) (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is a party (including, without limitation, any stock acquisition, reorganization, merger or consolidation, but excluding any sale of stock for capital raising purposes and any transaction effected primarily for purposes of changing the Company's jurisdiction of incorporation) other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of transactions, as a result of shares in the Company held by such holders prior to such transaction or series of transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity (or if the Company or such other surviving or resulting entity is a wholly-owned subsidiary immediately following such acquisition, its parent), (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company and its subsidiaries taken as a whole by means of any transaction or series of related transactions, except where such sale, lease or other disposition is to a wholly-owned subsidiary of the Company, (iii) a liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or any other event or series of related events resulting in the distribution of the Company's assets to its shareholders or creditors for the purpose of ceasing the Company's operation and existence, or (iv) the completion of an initial public offering of the Company's securities.

9. **No Rights as a Stockholder.** Nothing contained herein shall entitle the Holder to any rights as a stockholder of the Company or to be deemed the holder of any securities that may at any time be issuable on the exercise of the rights hereunder for any purpose nor shall anything contained herein be construed to confer upon the Holder, as such, any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value or change of stock to no par value, consolidation, merger, conveyance or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or any other rights of a stockholder of the Company until the rights under the Warrant shall have been exercised and the Shares purchasable upon exercise of the rights hereunder shall have become deliverable as provided herein.

10. **Representations and Warranties.**

(a) By acceptance of this Warrant, the Holder represents and warrants to the Company as follows:

(i) ***No Registration.*** The Holder understands that the Securities have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Holder's representations as expressed herein or otherwise made pursuant hereto.

(ii) ***Investment Intent.*** The Holder is acquiring the Securities for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof. The Holder has no present intention of selling, granting any participation in, or otherwise distributing the Securities, nor does it have any contract, undertaking, agreement or arrangement for the same.

(iii) ***Investment Experience.*** The Holder has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company, and has such knowledge and experience in financial or business matters so that it is capable of evaluating the merits and risks of its investment in the Company and protecting its own interests.

(iv) ***Speculative Nature of Investment.*** The Holder is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself and can bear the economic risk of its investment and is able, without impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

(v) ***Access to Data.*** The Holder has had an opportunity to ask questions of officers of the Company, which questions were answered to its satisfaction. The Holder acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.

(vi) ***Accredited Investor.*** The Holder is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission.

(vii) ***Residency.*** The residency of the Holder (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the signature page hereto.

(viii) ***Restrictions on Resales.*** The Holder acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Holder is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. The Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Holder wishes to sell the Securities and that, in such event, the Holder may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. The Holder acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities. The Holder understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

(ix) ***No Public Market.*** The Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

(x) ***Brokers and Finders.*** The Holder has not engaged any brokers, finders or agents in connection with the Securities, and the Company has not incurred nor will incur, directly or indirectly, as a result of any action taken by the Holder, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Securities.

(xi) ***Legal Counsel.*** The Holder has had the opportunity to review this Warrant, the exhibits and schedules attached hereto and the transactions contemplated by this Warrant with its own legal counsel. The Holder is not relying on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by this Warrant.

(xii) ***Tax Advisors.*** The Holder has reviewed with its own tax advisors the U.S. federal, state and local and non-U.S. tax consequences of this investment and the transactions contemplated by this Warrant. With respect to such matters, the Holder relies solely on any such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Holder understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment and the transactions contemplated by this Warrant.

(xiii) ***No "Bad Actor" Disqualification.*** Neither (i) the Holder, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by the Holder is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2) (ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the acceptance of this Warrant, in writing in reasonable detail to the Company.

(b) The Company hereby represents and warrants to the Holder as follows:

(i) ***Organization and Qualification.*** The Company: (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(ii) ***Authority.*** The execution, delivery and performance by the Company of this Warrant and the consummation of the transactions contemplated hereby: (i) are within the corporate power of the Company; and (ii) have been duly authorized by all necessary actions on the part of the Company, including but not limited to obtaining requisite shareholders' approval.

*(iii)* ***Issuance of Warrant Shares***. The Shares issuable upon exercise of this Warrant will be validly issued and fully paid-up, and will be free of any taxes, liens, charges or encumbrances of any nature whatsoever; provided, however, that such Shares issuable pursuant to this Warrant may be subject to restrictions on transfer under state and/or securities laws. Upon exercise of the Warrant, the Company will issue to the Holder certificates for the Shares without withholding any tax, or charge other cost incurred by the Company in connection with such exercise and the related issuance of the

Shares, save as otherwise set out in this Warrant; provided, however, the Holder shall be solely responsible for any taxes incurred as a result of such issuance of Shares upon the exercise of this Warrant.

*(iv)* ***Consents and Approvals.*** No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any governmental authority or agency is required with respect to execution, delivery and the Company's performance of its obligations under this Warrant, except for the filing of any required notices pursuant to federa; and state securities laws, which filings will be effective by the times required thereby.

(v) ***Other Commitments to Register Securities.*** Except as set forth in this Warrant and save as disclosed in the Loan Documents, the Company is not, pursuant to the terms of any other agreement currently in existence, under any obligation to register under the Securities Act any of the Company's presently outstanding securities or any of the Company's securities which may hereafter be issued in respect of such presently outstanding securities of the Company.

*(vi)* ***Enforceability.*** This Warrant has been, or will be, duly executed and delivered by the Company and will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(vii) ***Non-Contravention.*** The execution and delivery by the Company of this Warrant and the performance and consummation of the transactions contemplated hereby do not and will not: (i) violate the Company's Certificate of Incorporation or Bylaws or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) require the consent, notice, or other action by any person under any material contract to which the Company is a party or any of its properties or other assets is subject.

*(viii)* ***Exempt Transaction.*** The Shares to be issued upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

*(ix)* ***Compliance with Rule 144.*** The Holder may sell the Warrant Shares issuable hereunder in compliance with Rule 144 promulgated by the Securities and Exchange Commission. Within ten (10) days of the Holder's request and, to the extent such requirements are met, the Company shall provide the Holder with a written statement confirming the Company's compliance with the filing requirements of the Securities and Exchange Commission as set forth in such Rule 144, as may be amended.

11. **Miscellaneous.**

(a) ***Amendments.*** Any term of this Warrant may be amended or terminated and the observance of any term of this Warrant may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Holders (as defined in the Purchase Agreement), or in respect of this Warrant only, the Holder hereof; *provided, however*, that no such amendment or waiver shall reduce the number of Shares or increase the Exercise Price under this Warrant without the affected Holder's written consent. Any waiver or amendment effected in accordance with this Section 11(a) shall be binding upon each warrant holder at the time outstanding,

each future holder of all such warrants, and the Company. Each Holder acknowledges that by the operation of this Section 11(a), the Majority Holders will have the right and power to diminish or eliminate the rights of such Holder under this Warrant.

(b) ***Waivers.*** No waiver of any single breach or default shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.

(c) ***Notices.*** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by electronic mail or otherwise delivered by hand, messenger or courier service addressed:

(i) if to the Holder, to the Holder at the Holder's address or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof, or until any such Holder so furnishes an address or electronic mail address to the Company, then to and at the address or electronic mail address of the last holder of this Warrant for which the Company has contact information in its records; or

(ii) if to the Company, to the attention of the Chief Executive Officer of the Company at the Company's address as shown on the signature page hereto, or at such other current address as the Company shall have furnished to the Holder.

Each such notice or other communication shall for all purposes of this Warrant be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. In the event of any conflict between the Company's books and records and this Warrant or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(d) ***Governing Law.*** This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(e) ***Jurisdiction and Venue.*** Each of the Holder and the Company irrevocably consents to the exclusive jurisdiction and venue of any court within Delaware, in connection with any matter based upon or arising out of this Warrant or the matters contemplated herein, and agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons.

(f) ***Titles and Subtitles.*** The titles and subtitles used in this Warrant are used for convenience only and are not to be considered in construing or interpreting this Warrant. All references in this Warrant to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(g) ***Severability.*** If any provision of this Warrant becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Warrant, and such illegal, unenforceable or void provision shall be replaced with a valid and enforceable provision that will achieve, to the extent

possible, the same economic, business and other purposes of the illegal, unenforceable or void provision. The balance of this Warrant shall be enforceable in accordance with its terms.

(h) ***Waiver of Jury Trial.*** **EACH OF THE HOLDER AND THE COMPANY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS WARRANT.**

(i) ***Saturdays, Sundays and Holidays.*** If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday, Sunday or U.S. federal holiday, then such action may be taken or such right may be exercised on the next succeeding day that is not a Saturday, Sunday or U.S. federal holiday.

(j) ***Rights and Obligations Survive Exercise of the Warrant.*** Except as otherwise provided herein, the rights and obligations of the Company and the Holder under this Warrant shall survive exercise of this Warrant.

(k) ***Entire Agreement.*** Except as expressly set forth herein, this Warrant (including the exhibits attached hereto) and the other Loan Documents (as such term is defined in the Purchase Agreement) constitute the entire agreement and understanding of the Company and the Holder with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

(*signature page follows*)

The Company and the Holder sign this Warrant as of the date stated on the first page.

**HOUSECANARY, INC.**

By: ______________________________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

Address:

535 Mission Street, Office #1920
San Francisco, CA 94105

Email Address:

**AGREED AND ACKNOWLEDGED,**

**[•]**

By: ______________________________
Name: ____________________________
Title: ____________________________

Address:

[mailing address]

Email address: [insert email address]

# EXHIBIT A

## NOTICE OF EXERCISE

**TO:** **HouseCanary, Inc. (the "*Company*")**

**Attention:** **Chief Executive Officer**

(1) **Exercise.** The undersigned elects to purchase the following pursuant to the terms of the attached warrant:

Number of shares: ______________________________

Type of security: ______________________________

(2) **Method of Exercise.** The undersigned elects to exercise the attached warrant pursuant to:

☐ A cash payment or cancellation of indebtedness, and tenders herewith payment of the purchase price for such shares in full, together with all applicable transfer taxes, if any.

☐ The net issue exercise provisions of Section 2(b) of the attached warrant.

(3) **Conditional Exercise.** Is this a conditional exercise pursuant to Section 2(e):

☐ Yes ☐ No

If "Yes," indicate the applicable condition:

______________________________

(4) **Stock.** Please make a book entry and, if the shares are certificated, issue a certificate or certificates representing the shares in the name of:

☐ The undersigned

☐ Other—Name: ______________________________

Address: ______________________________

______________________________

(5) **Unexercised Portion of the Warrant.** Please issue a new warrant for the unexercised portion of the attached warrant in the name of:

☐ The undersigned

☐ Other—Name: ______________________________

Address: ______________________________

______________________________

☐ Not applicable

(***Signature page to the Notice of Exercise***)

(6) **Investment Intent.** The undersigned represents and warrants that the aforesaid shares are being acquired for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and that the undersigned has no present intention of selling, granting any participation in, or otherwise distributing the shares, nor does it have any contract, undertaking, agreement or arrangement for the same, and all representations and warranties of the undersigned set forth in Section 10(a) of the attached warrant are true and correct as of the date hereof.

(7) **Investment Representation Statement and Market Stand-Off Agreement.** The undersigned has executed, and delivers herewith, an Investment Representation Statement and Market Stand-Off Agreement in a form substantially similar to the form attached to the warrant as Exhibit A-1.

________________________________________
(*Print name of the warrant holder*)

________________________________________
(*Signature*)

________________________________________
(*Name and title of signatory, if applicable*)

________________________________________
(*Date*)

________________________________________
(*Fax number*)

________________________________________
(*Email address*)]

**(*Signature page to the Notice of Exercise*)**

**EXHIBIT A-l**

**INVESTMENT REPRESENTATION STATEMENT**
**AND**
**MARKET STAND-OFF AGREEMENT**

| | |
|---|---|
| INVESTOR: | ________________________________________________ |
| COMPANY: | HouseCanary, Inc. |
| SECURITIES: | THE WARRANT ISSUED ON JULY 10, 2023 (THE "***WARRANT***") AND THE SECURITIES ISSUED OR ISSUABLE UPON EXERCISE THEREOF (INCLUDING UPON SUBSEQUENT CONVERSION OF THOSE SECURITIES) |
| DATE: | ______________________________ |

In connection with the purchase or acquisition of the above-listed Securities, the undersigned (the "**Investor**") represents and warrants to, and agrees with, the Company as follows:

1. **No Registration.** The Investor understands that the Securities have not been, and will not be, registered under the Securities Act of 1933, as amended (the "***Securities Act***"), by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Investor's representations as expressed herein or otherwise made pursuant hereto.

2. **Investment Intent.** The Investor is acquiring the Securities for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof. The Investor has no present intention of selling, granting any participation in, or otherwise distributing the Securities, nor does it have any contract, undertaking, agreement or arrangement for the same.

3. **Investment Experience.** The Investor has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company, and has such knowledge and experience in financial or business matters so that it is capable of evaluating the merits and risks of its investment in the Company and protecting its own interests.

4. **Speculative Nature of Investment.** The Investor is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself and can bear the economic risk of its investment and is able, without impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

5. **Access to Data.** The Investor has had an opportunity to ask questions of officers of the Company, which questions were answered to its satisfaction. The Holder acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.

6. **Accredited Investor.** The Investor is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission.

7. **Residency.** The residency of the Investor (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the signature page hereto.

8. **Restrictions on Resales.** The Investor acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Investor is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. The Investor acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Securities and that, in such event, the Investor may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. The Investor understands and acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities.

9. **No Public Market.** The Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

10. **Brokers and Finders.** The Investor has not engaged any brokers, finders or agents in connection with the Securities, and the Company has not incurred nor will incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Securities.

11. **Legal Counsel.** The Investor has had the opportunity to review the Warrant, the exhibits and schedules attached thereto and the transactions contemplated by the Warrant with its own legal counsel. The Investor is not relying on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Warrant.

12. **Tax Advisors.** The Investor has reviewed with its own tax advisors the U.S. federal, state and local and non-U.S. tax consequences of this investment and the transactions contemplated by the Warrant. With respect to such matters, the Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Warrant.

13. **Market Stand-off.** If requested by the Company and an underwriter of common stock (or other securities) of the Company, the Investor shall not sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any common stock (or other securities) of the Company held by the Investor (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the registration statement for the Company's initial public offering filed under the Securities Act, *provided* that all officers and directors of the Company and holders of at least one percent (1%) of the Company's voting securities are bound by and have entered into similar agreements. The obligations described in this section shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be

promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may notate each such certificate, instrument or book entry with a legend with respect to the shares of common stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day (or other) period. The Investor agrees to execute a market stand-off agreement with the relevant underwriters in customary form consistent with the provisions of this section.

14. **No "Bad Actor" Disqualification.** Neither (i) the Investor, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by the Investor is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the purchase or acquisition of the Securities, in writing in reasonable detail to the Company.

(*signature page follows*)

The Investor is signing this Investment Representation Statement and Market Stand-Off Agreement on the date first written above.

**INVESTOR**

______________________________
(*Print name of the investor*)

______________________________
(*Signature*)

______________________________
(*Name and title of signatory, if applicable*)

______________________________
(*Street address*)

______________________________
(*City, state and ZIP*)

**EXHIBIT B**

**ASSIGNMENT FORM**

ASSIGNOR: ______________________________

COMPANY: HouseCanary, Inc.

WARRANT: THE WARRANT TO PURCHASE SHARES OF VOTING COMMON STOCK ISSUED ON JULY 10, 2023 (THE "***WARRANT***")

DATE: ______________

(1) **Assignment.** The undersigned registered holder of the Warrant ("***Assignor***") assigns and transfers to the assignee named below ("***Assignee***") all of the rights of Assignor under the Warrant, with respect to the number of shares set forth below:

Name of Assignee: ______________________________

Address of Assignee: ______________________________

______________________________

Number of Shares Assigned: ______________________________

and does irrevocably constitute and appoint the Chief Executive Officer of HouseCanary, Inc. as attorney-in-fact to make such transfer on the books of HouseCanary, Inc., with full power of substitution in the premises.

(2) **Obligations of Assignee.** Assignee agrees to take and hold the Warrant and any shares of stock to be issued upon exercise of the rights thereunder (and any shares issuable upon conversion thereof) (the "***Securities***") subject to, and to be bound by, the terms and conditions set forth in the Warrant to the same extent as if Assignee were the original holder thereof.

(3) **Investment Intent.** Assignee represents and warrants that the Securities are being acquired for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and that Assignee has no present intention of selling, granting any participation in, or otherwise distributing the shares, nor does it have any contract, undertaking, agreement or arrangement for the same, and all representations and warranties set forth in Section 10(a) of the Warrant are true and correct as to Assignee as of the date hereof.

(4) **Investment Representation Statement and Market Stand-Off Agreement.** Assignee has executed, and delivers herewith, an Investment Representation Statement and Market Stand-Off Agreement in a form substantially similar to the form attached to the Warrant as Exhibit A-1.

(5) **No "Bad Actor" Disqualification.** Neither (i) Assignee, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's securities held or to be held by Assignee is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act of 1933, as amended (the "***Securities***

***Act***"), except as set forth in Rule 506(d)(2) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the transfer of the Securities, in writing in reasonable detail to the Company.

Assignor and Assignee are signing this Assignment Form on the date first set forth above.

| **ASSIGNOR** | **ASSIGNEE** |
|---|---|
| ______________________________ | ______________________________ |
| (*Print name of Assignor*) | (*Print name of Assignee*) |
| ______________________________ | ______________________________ |
| (*Signature of Assignor*) | (*Signature of Assignee*) |
| ______________________________ | ______________________________ |
| (*Print name of signatory, if applicable*) | (*Print name of signatory, if applicable*) |
| ______________________________ | ______________________________ |
| (*Print title of signatory, if applicable*) | (*Print title of signatory, if applicable*) |
| Address: | Address: |
| ______________________________ | ______________________________ |
| ______________________________ | ______________________________ |

# Exhibit C

## Disclosure Schedule

# HOUSECANARY, INC.
# DISCLOSURE SCHEDULE
# TO
# NOTE PURCHASE AGREEMENT

## DATED JULY 10, 2023

The following disclosure schedule (this "***Disclosure Schedule***") is being provided in connection with that certain Note Purchase Agreement, dated as of July 10, 2023 (the "***Agreement***"), by and between HouseCanary, Inc., a Delaware corporation (the "***Company***"), and the Purchasers signatory thereto. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Agreement.

This Disclosure Schedule is arranged in sections corresponding to the numbered and lettered sections and subsections contained in Section 3 of the Agreement, and the disclosures in any section or subsection of this Disclosure Schedule shall qualify other sections and subsections in Section 3 of the Agreement only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections and subsections. This Disclosure Schedule is not intended to constitute, and shall not be construed or otherwise be deemed to constitute, separate representations or warranties of the Company or any other party except to the extent explicitly provided in the Agreement. Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be disclosed. Such additional matters are set forth for informational purposes only.

No reference to or disclosure of any item or other matter in this Disclosure Schedule (each a "***Section***") shall be construed as an admission, representation, or indication that such item or other matter is "material" or would have a "material adverse effect", unless the corresponding representation requires such disclosure. Without limiting the representations and warranties made by the Company to the Purchasers in the Agreement (as qualified by this Disclosure Schedule), no disclosure in this Disclosure Schedule (1) relating to any possible breach or violation of any law or contract shall be construed as an admission or indication that any such breach or violation exists or has actually occurred and nothing in this Disclosure Schedule shall constitute an admission of any liability or obligation of any Person or shall confer or give any third party any remedy, claim, liability, reimbursement, cause of action or any other right, (2) represents a determination that such item did not arise in the ordinary course of business, and (3) represents a determination that the transactions contemplated by the Agreement require the consent of third parties.

Each Purchaser acknowledges that it has reviewed and has had the opportunity to make inquiries regarding the information contained in this Disclosure Schedule.

The information contained in this Disclosure Schedule is confidential in all respects.

**Section 3.4 - Corporate Structure; Subsidiaries**

| Name of Subsidiary | Jurisdiction of Formation | Ownership |
|---|---|---|
| HouseCanary (CT), Inc. | Delaware | 51% owned by Tom Karras<br>49% owned by the Company |
| ComeHome, Inc | Delaware | 100% owned by the Company |
| acquisition Explorer, LLC | Delaware | 100% owned by the Company |
| HouseCanary Certified Analytics, Inc. | Delaware | 100% owned by the Company |
| HouseCanary R&D, LLC | Delaware | 100% owned by the Company |

HouseCanary (CT), Inc.'s ownership structure as a corporation trust company requires it to be owned 51% by the Company's registered and licensed broker in the State of Connecticut, Tom Karras ("***Karras***"), and 49% by the Company subject to the Company's right to purchase all of the shares owned by Karras for a nominal consideration of $1.00 pursuant to that certain Restricted Stock Purchase Agreement, dated November 21, 2019, by and between HouseCanary (CT), Inc., Karras and the Company (the "***RSPA***").

**Section 3.6 - No Other Securities/Rights**

**(1)** **<u>Annex 3.6 – Capitalization Table</u>**, attached hereto is hereby incorporated by reference as if fully set forth herein and sets forth the capitalization of the Company immediately prior to the Closing.

**(2)** The following agreements provide certain holders of securities of the Company with preemptive rights, rights of first refusal or other rights to purchase such equity securities, or any other rights with respect to such securities:

1. Second Amended and Restated Certificate of Incorporation of the Company, dated August 12, 2019 (the "***COI***").

2. Amended and Restated Investors' Rights Agreement, dated August 13, 2019, by and among the Company and the signatories thereto, which provides, among other things, registration rights to holders of certain securities of the Company.

3. Amended and Restated Right of First Refusal and Co-Sale Agreement, dated August 13, 2019, by and among the Company and the signatories thereto (the "***ROFR Agreement***").

4. Amended and Restated Voting Agreement, dated August 13, 2019, by and among the Company and the signatories thereto (the "***Voting Agreement***").

5. Side Letter, dated May 22, 2017, by and between the Company and HouseCan Investors, L.L.C.

6. Side Letter, dated January 9, 2020, by and between the Company and REach® Ventures LLC.

7. Class A Unit Contribution Agreement, dated February 14, 2017, by and among the Company, as successor-in-interest to Canary Analytics Holdings, LLC ("***CAH***"), and the signatories thereto; the Contribution Agreement, dated February 1, 2018, by and among the Company, as successor-in-interest to CAH, and the signatories thereto; Contribution Agreement, dated July 1, 2019, by and among the Company and the signatories thereto (collectively, the "***Contribution Agreement***").

8. The RSPA.

9. Warrant to Purchase Shares of the Company, dated September 30, 2021, by and between the Company and DataLoft Consulting Inc.

10. Warrant Purchase Agreement, dated April 19, 2017, by and between the Company and Reach® Ventures LLC (the "***Reach Ventures Warrant***").

11. Warrant to Purchase Units of Canary Analytics Holdings, LLC, dated February 2, 2018, by and between the Company (FKA Canary Analytics Holdings, LLC) and QED Partners IV, LLC.

12. Warrant to Purchase Units of Canary Analytics Holdings, LLC, dated January 16, 2019, by and between the Company (FKA Canary Analytics Holdings, LLC) and QED Partners IV, LLC.

13. Warrant to Purchase Stock of the Company, dated March 25, 2021, by and between the Company and CEOF Holdings LP.

14. Warrant to Purchase Stock of the Company, dated March 25, 2021, by and between the Company and Series Structural DCO II Series of Structural Capital DCO, LLC.

15. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Series HouseCanary Series of Structural Keystone VL LLC.

16. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Series HouseCanary Series of Structural Keystone VL LLC.

17. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Structural Capital Investments III, LP.

18. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Structural Capital Holdings III, LP.

19. Simple Agreement for Future Equity, dated March 16, 2022, by and between the Company and Alpaca VC SPV #3 LLC.

20. Simple Agreement for Future Equity, dated March 16, 2022, by and between the Company and Alpaca Built World Fund I LP.

21. Simple Agreement for Future Equity, dated June 9, 2023, by and between the Company and Jeffrey Somers.

22. Simple Agreement for Future Equity, dated June 9, 2023, by and between the Company and Jeremy Sicklick.

23. Simple Agreement for Future Equity, dated June 22, 2023, by and between the Company and Jeffrey Somers.

24. Simple Agreement for Future Equity, dated June 22, 2023, by and between the Company and Jeremy Sicklick.

25. Simple Agreement for Future Equity, dated June 22, 2023, by and between the Company and Christopher Stroud.

**(3)** The following agreements affect or relate to the voting or giving of written consents with respect to, or the right to cause the redemption, or repurchase of, certain security of the Company:

**1.** The ROFR Agreement.

**2.** The Voting Agreement.

**3.** The Contribution Agreement.

**4.** The RSPA.

**5.** Reach Ventures Warrant.

**Section 3.8 - Intellectual Property and Technology**

**(c)**

1. The TSI Litigation (as defined below in Section 3.17).

2. The Quicken Loan Litigation (as defined below in Section 3.17).

## Section 3.9 – Transaction Warranties

**(c)** The Company has obtained a waiver of anti-dilution adjustment and right of first offer with certain holders of securities of the Company in accordance with the COI and the IRA pursuant to that certain Waiver of Anti-Dilution Adjustment and Right of First Offer, dated June 28, 2023, by and among the Company and the signatories thereto.

## Section 3.11 – Borrowings and Financing

**(a)**

1. Loan and Security Agreement, dated March 25, 2021, by and among the Company, Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders and Lenders identified therein (the "***Original LSA***"); First Amendment to Loan and Security Agreement, dated December 30, 2021 (the "***First Amendment***");Consent and Second Amendment to the Loan and Security Agreement, dated March 29, 2023 (the "***Second Amendment***" and collectively, with the Original LSA and the First Amendment, the "***Loan Agreement***"), pursuant to which the Lenders provided a loan facility in the principal amount of $30,000,000 to the Company.

2. Litigation Funding Agreement, dated as of June 6, 2018, by and among the Company, HC 1, LLC ("***HC 1***") and Security Finance 1 LLC, collateral agent for HC 1 (as amended by Amendment No. 1 to Litigation Funding Agreement, dated March 29, 2023), by and between the Company and HC 1 (the "***HC 1 Litigation Funding Agreement***"), pursuant to which HC 1 provided the Company non-recourse funding in the principal amount of $40,000,000 in exchange for receiving an Investment Return (as defined in the HC 1 Litigation Funding Agreement) for any Litigation Proceeds (as defined in the HC 1 Litigation Funding Agreement) and holds a lien on the Collateral (as defined in the HC 1 Litigation Funding Agreement).

3. Litigation Funding Agreement, dated March 29, 2023 (the "***Crane 2 Litigation Funding Agreement***"), by and between the Company and Crane 2 FundingCo 23, LLC ("***Crane 2***"), pursuant to which Crane 2 provided the Company non-recourse funding in the principal amount of $5,000,000 in exchange for receiving an Investment Return (as defined in the Crane 2 Litigation Funding Agreement), subject to the priority payment to HC 1 under the HC 1 Litigation Funding Agreement, for any Litigation Proceeds (as defined in the Crane 2 Litigation Funding Agreement) and holds a lien, subject to HC 1's first priority security interest, on the Collateral (as defined in the Crane 2 Litigation Funding Agreement).

**(b)** The Company is in default of the Loan Agreement for (i) failing to timely deliver its audited financial statements for fiscal year between 2020 and 2021 and fiscal year between 2021 and 2022 (the "***Financial Statement Default***"), and (ii) for failing to maintain the Cash Threshold (as defined in the Loan Agreement) (the "***Cash Threshold Default***" and collectively with the Financial Statement Default, the "***Loan Defaults***"). The Company will obtain a waiver for the Loan Defaults under that certain Waiver, Consent and Third Amendment to Loan and Security Agreement, dated July 10, 2023.

**(c)** The Loan Defaults.

## Section 3.17 – No Litigation

**(i)**

1. Title Source, Inc. v. HouseCanary, Inc. f/k/a Canary Analytics, Inc., 73rd Judicial District Court, Bexar County, Texas, Trial Court No. 2016-CI-06300 (the "***TSI Litigation***").

The TSI Litigation involves (i) the claims of the Company against Title Source Inc. ("***TSI***"; subsequently renamed, Amrock, LLC) for trade secret misappropriation, breach of contract and fraud, and (ii) TSI's claims against the Company for breach of contract and fraud. The agreements between the Company and TSI that gave rise to the litigation called for the Company to provide a software-based appraisal application and granted TSI a limited license to use the Company's automated valuation model and related proprietary technologies. The agreements contained strict protections for the Company's intellectual property.

After a seven-week trial in 2018, a jury found that TSI had misappropriated the Company's trade secrets, breached the parties' agreements, and committed fraud. The jury also rejected all of TSI's affirmative claims. The jury awarded the Company $235.4 million in compensatory damages and $470.8 million in punitive damages for its fraud and trade secret misappropriation claims. As an alternative remedy, the jury awarded the Company $206 million in compensatory damages for its breach of contract claim. The Company elected judgment on its fraud and trade secret misappropriation claims. Following this election, the trial court entered judgment for the Company for $739,717,865.79, which included prejudgment interest and attorney's fees.

TSI appealed the judgment to the Court of Appeals for the Fourth District, San Antonio, Texas. In 2020, the Court of Appeals reversed the judgment of the trial court because it concluded that the trial court had erred in submitting jury instructions on trade secret misappropriation that tracked the language of the Texas Uniform Trade Secrets Act. The Court of Appeal also held that TSI did not improperly acquire the trade secrets because of the parties' contractual relationship. At the same time, the Court of Appeals affirmed the jury's finding that TSI should recover nothing on its claims from the Company. The Court of Appeals also affirmed the jury's findings that the Company owned valid and valuable trade secrets. The Court of Appeals remanded the case for retrial on the fraud and misappropriation claims, but gave the Company the alternative of electing judgment on its breach of contract claim instead of its fraud and trade secret misappropriation claims.

The Company and TSI each filed petitions with the Texas Supreme Court seeking review of the Court of Appeals' decision. On June 17, 2022, the Texas Supreme Court denied both petitions and affirmed the decision of the Court of Appeals. The Company then filed a motion for reconsideration with the Texas Supreme Court, which denied the motion.

Following the Texas Supreme Court's decision, The Company has elected to retry its fraud, misappropriation and breach of contract claims against TSI in the 73rd Judicial District Court, Bexar County, Texas. Judge Canales, the judge who presided over the original trial, will also preside over the re-trial. The re-trial is scheduled to occur in October 2023.

2. HouseCanary, Inc. v. Quicken Loans, Inc., One Reverse Mortgage, LLC, and In-House Realty, LLC, United States District Court for the Western District of Texas, San Antonio Division, Civil Action No. 5:18-CV-00519-FB (the "***Quicken Loans Litigation***").

On May 25, 2018, the Company filed suit against TSI affiliates Quicken Loans, Inc., One Reverse Mortgage, LLC, and In-House Realty, LLC in the United States District Court for Western District of Texas,

asserting claims for trade secret misappropriation under both state and federal law, conspiracy to misappropriate trade secrets, conspiracy to commit fraud, joint enterprise liability, and breach of contract. The Company's complaint requested for damages in the amount to be proved at trial. The court stayed the Quicken Loans Litigation pending resolution of the TSI Litigation.

**Section 3.18 - Consents, No Conflicts**

(iii) None.

**Section 3.20 - Compliance with Other Instruments**

1. The Loan Defaults.

# CONSENT AND FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

This **CONSENT AND FOURTH AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "***Amendment***") is made as of January 6, 2025 (the "***Effective Date***") by and between HouseCanary, Inc., a Delaware corporation ("***Borrower***"), Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders ("***Agent***") and the Required Lenders identified on the signature page to this Amendment. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in that certain Loan and Security Agreement, dated as of March 25, 2021, by and among Borrower, Agent and the Lenders identified therein (the "***Original LSA***"), as amended pursuant to that certain First Amendment to Loan and Security Agreement, dated as of December 30, 2021 (the "***First Amendment***"), as amended pursuant to that certain Consent and Second Amendment to Loan and Security Agreement, dated as of March 29, 2023 (the "***Second Amendment***"), as amended pursuant to that certain Waiver, Consent, Forbearance and Third Amendment to Loan and Security Agreement, dated as of July 10, 2023 (the "***Third Amendment***"), and as amended pursuant to this Amendment, and together with the Original LSA, the First Amendment, the Second Amendment and Third Amendment, collectively, the "***Loan Agreement***".

## RECITALS

**WHEREAS**, reference is made to that certain Litigation Funding Agreement, dated as of June 6, 2018, by and among Borrower, HC 1 LLC ("***HC 1***") and Security Finance 1 LLC, as affected by Security Finance 1 LLC assigning all of its rights and obligations under such agreement to HC 1, and as amended by Amendment No. 1 to Litigation Funding Agreement, dated as of the Effective Date (the "***HC 1 Litigation Funding Agreement***"), pursuant to which Borrower previously received Forty Million Dollars ($40,000,000) in litigation funding (the "***HC 1 Funding Amount***"), the repayment of which, comprising an agreed upon multiple thereof (as set forth in the HC 1 Litigation Funding Agreement), is secured by all proceeds arising from or relating to the Texas Litigation Collateral;

**WHEREAS**, reference is also made to that certain Litigation Funding Agreement dated as of March 29, 2023 and as amended by First Amendment to Litigation Funding Agreement, dated as of the Effective Date (the "***Crane 2 Litigation Funding Agreement***"), by and among Borrower and Crane 2 FundingCo 23, LLC ("***Crane 2***"), pursuant to which Borrower previously received $5,000,000 in litigation funding and will receive an additional $5,000,000 in litigation funding (the "***Crane 2 Funding Amount***"), the repayment of which, comprising an agreed upon multiple thereof (as set forth in the Crane 2 Litigation Funding Agreement), is secured by all proceeds arising from or relating to the Texas Litigation Collateral;

**WHEREAS**, Borrower, Agent and Required Lenders desire to amend certain provisions of the Loan Agreement to provide that (i) the Crane 2 Funding Amount and the obligation of the Borrower under the Crane 2 Funding Agreement shall be Permitted Indebtedness under the Loan Documents and (ii) the subordinated lien and/or rights of Crane 2 in the Texas Litigation Collateral under the Crane 2 Funding Agreement (subject only to the first priority lien in the Texas Litigation Collateral in favor of HC 1), shall be a Permitted Lien under the Loan Documents; and

**WHEREAS**, pursuant to Section 13.4 of the Loan Agreement, any amendments, modifications, discharges or waivers of, or consents to the Loan Agreement or other Loan

Documents require the written consent of the Agent, the Required Lenders and Borrower, and the undersigned constitute the requisite parties to effectuate this Amendment.

**AGREEMENT**

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and agreeing to be bound by the terms hereof, the parties to this Amendment hereby agree as follows:

**1. Consent to Crane 2 Funding Agreement**. Agent acknowledges and agrees that the HC 1 Litigation Funding Agreement provides for the grant of a senior secured priority security interest and lien, and payment priority, in and to all of the Texas Litigation Collateral up to the amounts owed to HC 1 under the HC 1 Litigation Funding Agreement. In addition, Agent acknowledges and agrees that the Crane 2 Litigation Funding Agreement provides for the grant of a security interest and lien, and payment priority, in and to all of the Texas Litigation Collateral up to the amounts owed to Crane 2 under the Crane 2 Litigation Funding Agreement, which liens, security interest and payment priority are subject only to the rights of HC 1 under the HC 1 Litigation Funding Agreement. Agent expressly agrees (i) to Borrower's grant of the senior secured priority security interest and lien, and payment priority, to HC 1, (ii) to Borrower's grant of the security interest and lien, and payment priority, to Crane 2, which liens, security interest and payment priority are subject only to the rights of HC 1 under the HC 1 Litigation Funding Agreement, (iii) that neither Agent nor any Lender shall have any right to be paid any portion of the Texas Litigation Proceeds prior to HC 1 being paid all Texas Litigation Proceeds it is owed under the HC 1 Agreement and Crane 2 being paid all Texas Litigation Proceeds it is owed under the Crane 2 Litigation Funding Agreement, and (iv) that Agent shall not take any action that is in conflict with or contrary to the foregoing. Agent and the Required Lenders further hereby consent to the transactions contemplated by the Crane 2 Funding Agreement.

**2. Amendment to Loan Agreement**.

A. The definition of Crane 2 Litigation Funding Agreement in Section 1.1 of the Loan Agreement is amended and restated in its entirety as follows:

> "*Crane 2 Litigation Funding Agreement*" shall mean that certain Litigation Funding Agreement, dated as of March 29, 2023, by and between Borrower and Crane 2, as amended by that certain First Amendment to Litigation Funding Agreement, dated as of January 6, 2025.

**3. No Other Amendments**. Except as expressly provided in Paragraph 2 hereof, the execution of this Amendment shall not be deemed to constitute an amendment to the Loan Agreement, and all other terms and conditions of the Loan Agreement are hereby ratified, confirmed and approved and shall remain in full force and effect.

**4. Costs and Expenses**. Borrower hereby reaffirms its agreement under the Loan Agreement to pay or reimburse Agent and Lender on demand for all Lender Expenses. Without limiting the generality of the foregoing, Borrower specifically agrees to pay the reasonable fees and disbursements of counsel to Agent or Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto. Borrower hereby agrees that Agent or Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make a loan to Borrower under the

Loan Agreement, or apply the proceeds of any loan, for the purpose of paying any such fees, disbursements, costs and expenses.

5. **Representations and Warranties**. Borrower hereby represents and warrants to Lenders and Agent as follows:

a. Borrower has all requisite power and authority to execute this Amendment and any other agreements or instruments required hereunder and to perform all of its obligations hereunder, and this Amendment and all such other agreements and instruments have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

b. Borrower has no Subsidiaries other than as disclosed in the Perfection Certificate.

c. The execution, delivery and performance by Borrower of this Amendment and any other agreements or instruments required hereunder have been duly authorized by all necessary corporate action and do not (i) require any authorization, consent or approval by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) violate any provision of any law, rule or regulation or of any order, writ, injunction or decree presently in effect, having applicability to Borrower, or the articles of incorporation or by-laws of Borrower, or (iii) result in a breach of or constitute a default under any indenture or loan or Loan Agreement or any other agreement, lease or instrument to which Borrower is a party or by which it or its properties may be bound or affected.

d. As of the Effective Date, Borrower is in compliance with all covenants, conditions and terms of the Loan Documents, and Borrower hereby reaffirms that except as provided in its last Compliance Certificate, all representations and warranties contained in the Loan Agreement are true and correct on and as of the Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, after giving effect in all cases to any standard(s) of materiality contained in the Loan Documents as to such representations and warranties.

6. **Release of Agent/Lender**.

A. Borrower, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby release Agent, Lender and all of their Affiliates, shareholders, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, differences, liabilities and obligations arising under this Amendment, the Loan Agreement and the other Loan Documents after the date hereof, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that Borrower or any of them may have or claim, as of the date hereof or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter related thereto, including, without limitation, the origination and servicing of the loan made under the Loan Documents and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents (collectively, the "**Released Claims**").

B. Borrower further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the date hereof, including, without limitation, any breach of fiduciary duty or duty of fair dealing, breach of confidence, breach of loan commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander, conspiracy or any claim for wrongfully accelerating the loan made under the Loan Documents or attempting to foreclose on, or obtain a receiver for, any collateral for the loan made under the Loan Documents and all statutory claims and causes of action of every nature.

C. In connection with the release contained in this Paragraph 6 (the "**Release**"), Borrower acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is Borrower's intention hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by Borrower against any one or more of the Released Parties. In furtherance of that intention, the Release contained in this Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts.

D. The Release contained in this Amendment shall be effective and irrevocable upon the execution of this Amendment by Agent, Lender and Borrower without any further documentation.

E. BORROWER AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR DISCLOSED TO BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT BORROWER DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE DATE HEREOF. BORROWER UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST AGENT AND LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE COLLATERAL OR THE LOAN.

F. THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

G. Borrower acknowledges having read and understood and hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows (and hereby waives the benefits of any similar law of the state that may be applicable):

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

**7.** **Miscellaneous**. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. The provisions of

Sections 12 and 13 of the Loan Agreement shall be deemed incorporated herein by reference, *mutatis mutandis*.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Consent and Fourth Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ___________________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ___________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ___________________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ___________________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

DocuSigned by:
By: ___________________________
EC77AC48D9C844B...
Name: Daniel Friedman
Title: General Counsel

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Consent and Fourth Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By: Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ________________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

Signed by:

By: Jeremy Sicklick
F6448B340B83446...
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

# FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT

This **FIFTH AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "***Amendment***") is made as of October 21, 2025 (the "***Effective Date***") by and between HouseCanary, Inc., a Delaware corporation ("***Borrower***"), Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders ("***Agent***") and the Required Lenders identified on the signature page to this Amendment. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in that certain Loan and Security Agreement, dated as of March 25, 2021, by and among Borrower, Agent and the Lenders identified therein (the "***Original LSA***"), as amended pursuant to that certain First Amendment to Loan and Security Agreement, dated as of December 30, 2021 (the "***First Amendment***"), as amended pursuant to that certain Consent and Second Amendment to Loan and Security Agreement, dated as of March 29, 2023 (the "***Second Amendment***"), as amended pursuant to that certain Waiver, Consent, Forbearance and Third Amendment to Loan and Security Agreement, dated as of July 10, 2023 (the "***Third Amendment***"), as amended pursuant to that certain Consent and Fourth Amendment to Loan and Security Agreement, dated as of January 6, 2025 (the "***Fourth Amendment***"), and as amended pursuant to this Amendment, and together with the Original LSA, the First Amendment, the Second Amendment, Third Amendment and Fourth Amendment, collectively, the "***Loan Agreement***".

## RECITALS

**WHEREAS**, Borrower requests that the Maturity Date be extended and that interest accrue on a PIK basis, and Agent and Lenders are willing to make such adjustments as provided herein; and

**WHEREAS**, pursuant to Section 13.4 of the Loan Agreement, any amendments, modifications, discharges or waivers of, or consents to the Loan Agreement or other Loan Documents require the written consent of the Agent, the Required Lenders and Borrower, and the undersigned constitute the requisite parties to effectuate this Amendment.

## AGREEMENT

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and agreeing to be bound by the terms hereof, the parties to this Amendment hereby agree as follows:

1. **Recitals**. The recitals set forth above are true and correct and are hereby incorporated by reference.

2. **Amendment to Loan Agreement**.

a. The following definitions in Section 1 of the Loan Agreement are hereby amended and restated as follows:

"*IRR Fee*" means the amount, if any, needed to increase the annual internal rate of return on the principal and interest paid in cash by Borrower to Agent hereunder to 15% using the "XIRR" function in Microsoft's Excel software, provided however, if a Liquidation Event occurs on or before the Maturity Date resulting in Aggregate Consideration of at least $300,000,000, the IRR Fee shall mean the amount, if any, needed to increase the annual internal rate of return on the principal and interest paid in cash by Borrower to Agent hereunder to 16% using the "XIRR" function in Microsoft's Excel software.

"*Maturity Date*" means, with respect to all Advances, August 1, 2024, provided however, that upon the satisfaction of the I/O Extension Conditions, Maturity Date shall mean December 31, 2025, provided further, that upon delivery to Agent on or before December 31, 2025, of a Qualified Term Sheet, Maturity Date shall mean June 30, 2026.

b. The following definitions in Section 1.1 of the Loan Agreement are hereby added in proper alphabetical order:

"*Aggregate Consideration*" shall mean, without duplication, the total amount of cash and the fair market value (on the date of the closing of a Liquidation Event except as set forth below) of all securities and other property paid or payable, directly or indirectly, in connection with the Liquidation Event to Borrower and/or its security holders and its employees (excluding any salaries, benefits, bonuses or other compensation arrangements in the ordinary course, consistent with past practice, but including amounts paid as general retention or exit payments), in connection with a Liquidation Event (including all amounts paid or payable to holders of options, warrants, convertible securities or other similar types of rights and the value of any of the foregoing), plus the value of all indebtedness remaining on Borrower's financial statements at the closing, or assumed, repaid or retired in anticipation of a close of a Liquidation Event. Amounts paid into escrow and contingent payments in connection with any transaction will be included as part of the Aggregate Consideration. Aggregate Consideration also shall include the aggregate amount of any (i) dividends or other distributions declared by Borrower with respect to its securities after the date hereof other than normal recurring cash dividends in amounts not materially greater than currently paid and (ii) amounts paid by Borrower to repurchase any securities of Borrower outstanding on the date hereof owned by former employees or service providers. In connection with a Liquidation Event of fifty percent (50%) or more of the outstanding capital stock of Borrower, on a fully diluted basis, Aggregate Consideration will be calculated as though one hundred percent (100%) of the outstanding capital stock on a fully diluted basis had been acquired for the same per share amount paid in the transaction in which fifty percent (50%) or more of Borrower's outstanding capital stock is acquired in the Liquidation Event. If any portion of the Aggregate Consideration is paid in the form of securities, the value of such securities will be determined by the average of the last sales prices for such securities on the five (5) trading days ending five (5) trading days prior to the date of the consummation of the Liquidation Event. If such securities do not have an existing public trading market, the value of the securities shall be the mutually agreed upon fair market value between Borrower and the counterpart to the Liquidation Event, acting reasonably and in good faith, on the day prior to the consummation of the Liquidation Event.

"*PIK Interest Rate*" means for any day, a per annum rate of interest equal to ten percent (10%).

"*Qualified Term Sheet*" means a *bona fide*, signed term sheet or letter of intent for a Liquidation Event, but excluding a SPAC Acquisition, valued at or above $100,000,000, received by the Borrower and acceptable to Agent in its sole discretion.

c. Section 2.4(a) of the Loan Agreement is amended and restated in its entirety as follows:

(a) **Interest Payments**. Interest on each Advance shall be due and payable to Agent for the benefit of Lenders in advance on the first Business Day of each month and continuing on the first Business Day of each month thereafter (each a "*Payment Date*") during the term of such Advance; provided however, and in addition, that upon the funding of each Advance, interest on such Advance shall be withheld from the Advance on the Funding Date of the Advance for the period between the Funding Date of such Advance and the first Payment Date

immediately following the Funding Date of such Advance, provided further, that upon delivery to Agent of a Qualified Term Sheet on or after October 1, 2025, but before December 31, 2025, interest will begin accruing on the outstanding Advance at a per annum rate equal to the PIK Interest Rate, which interest shall accrue, be capitalized and be compounded and added to the outstanding principal balance monthly in advance on the Payment Date. Once paid, interest is nonrefundable and shall be deemed earned as of the Payment Date for which such interest payment is due. Agent shall allocate and distribute all interest payments received from Borrower to the Lenders based on each Lender's Pro Rata Percentage.

3. **No Other Amendments**. Except as expressly provided in Paragraph 2 hereof, the execution of this Amendment shall not be deemed to constitute an amendment to the Loan Agreement, and all other terms and conditions of the Loan Agreement are hereby ratified, confirmed and approved and shall remain in full force and effect.

4. **Costs and Expenses**. Borrower hereby reaffirms its agreement under the Loan Agreement to pay or reimburse Agent and Lender on demand for all Lender Expenses. Without limiting the generality of the foregoing, Borrower specifically agrees to pay the reasonable fees and disbursements of counsel to Agent or Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto. Borrower hereby agrees that Agent or Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make a loan to Borrower under the Loan Agreement, or apply the proceeds of any loan, for the purpose of paying any such fees, disbursements, costs and expenses.

5. **Representations and Warranties**. Borrower hereby represents and warrants to Lenders and Agent as follows:

a. Borrower has all requisite power and authority to execute this Amendment and any other agreements or instruments required hereunder and to perform all of its obligations hereunder, and this Amendment and all such other agreements and instruments have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

b. Borrower has no Subsidiaries other than as disclosed in the Perfection Certificate.

c. The execution, delivery and performance by Borrower of this Amendment and any other agreements or instruments required hereunder have been duly authorized by all necessary corporate action and do not (i) require any authorization, consent or approval by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) violate any provision of any law, rule or regulation or of any order, writ, injunction or decree presently in effect, having applicability to Borrower, or the articles of incorporation or by-laws of Borrower, or (iii) result in a breach of or constitute a default under any indenture or loan or Loan Agreement or any other agreement, lease or instrument to which Borrower is a party or by which it or its properties may be bound or affected.

d. As of the Effective Date, Borrower is in compliance with all covenants, conditions and terms of the Loan Documents, and Borrower hereby reaffirms that except as provided in its last Compliance Certificate, all representations and warranties contained in the Loan Agreement are true and correct on and as of the Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, after giving effect in all cases to any standard(s) of materiality contained in the Loan Documents as to such representations and warranties.

6. **Release of Agent/Lender**.

a. Borrower, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby release Agent, Lender and all of their Affiliates, shareholders,

partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, differences, liabilities and obligations arising under this Amendment, the Loan Agreement and the other Loan Documents after the date hereof, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that Borrower or any of them may have or claim, as of the date hereof or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter related thereto, including, without limitation, the origination and servicing of the loan made under the Loan Documents and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents (collectively, the "**Released Claims**").

b. Borrower further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the date hereof, including, without limitation, any breach of fiduciary duty or duty of fair dealing, breach of confidence, breach of loan commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander, conspiracy or any claim for wrongfully accelerating the loan made under the Loan Documents or attempting to foreclose on, or obtain a receiver for, any collateral for the loan made under the Loan Documents and all statutory claims and causes of action of every nature.

c. In connection with the release contained in this Paragraph 6 (the "**Release**"), Borrower acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is Borrower's intention hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by Borrower against any one or more of the Released Parties. In furtherance of that intention, the Release contained in this Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts.

d. The Release contained in this Amendment shall be effective and irrevocable upon the execution of this Amendment by Agent, Lenders and Borrower without any further documentation.

e. BORROWER AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR DISCLOSED TO BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT BORROWER DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE DATE HEREOF. BORROWER UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST AGENT AND LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE COLLATERAL OR THE LOAN.

f. THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

g. Borrower acknowledges having read and understood and hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows (and hereby waives the benefits of any similar law of the state that may be applicable):

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

**7. Miscellaneous**. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. The provisions of Sections 12 and 13 of the Loan Agreement shall be deemed incorporated herein by reference, *mutatis mutandis*.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Fifth Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By: Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

DocuSigned by:
By: ______________________
BB706469BF9A44C...
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ______________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

DocuSigned by:
By: ______________________
BB706469BF9A44C...
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
its Manager

DocuSigned by:
By: ______________________
BB706469BF9A44C...
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

Signed by:
By: ______________________
EC77AC48D9C844B...
Name: Daniel Friedman
Title: General Counsel

# SIXTH AMENDMENT TO
# LOAN AND SECURITY AGREEMENT

This **SIXTH AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "***Amendment***") is made as of December 29, 2025, (the "***Effective Date***") by and between HouseCanary, Inc., a Delaware corporation ("***Borrower***"), Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders ("***Agent***") and the Required Lenders identified on the signature page to this Amendment. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in that certain Loan and Security Agreement, dated as of March 25, 2021, by and among Borrower, Agent and the Lenders identified therein (the "***Original LSA***"), as amended pursuant to that certain First Amendment to Loan and Security Agreement, dated as of December 30, 2021 (the "***First Amendment***"), as amended pursuant to that certain Consent and Second Amendment to Loan and Security Agreement, dated as of March 29, 2023 (the "***Second Amendment***"), as amended pursuant to that certain Waiver, Consent, Forbearance and Third Amendment to Loan and Security Agreement, dated as of July 10, 2023 (the "***Third Amendment***"), as amended pursuant to that certain Consent and Fourth Amendment to Loan and Security Agreement, dated as of January 6, 2025 (the "***Fourth Amendment***"), as amended pursuant to that certain Fifth Amendment to Loan and Security Agreement, dated as of October 21, 2025 (the "***Fifth Amendment***"), and as amended pursuant to this Amendment, and together with the Original LSA, the First Amendment, the Second Amendment, the Third Amendment, the Fourth Amendment and the Fifth Amendment, collectively, the "***Loan Agreement***".

## RECITALS

**WHEREAS**, Borrower requests that the Maturity Date be extended by one month, and Agent and Lenders are willing to make such adjustments as provided herein.

## AGREEMENT

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and agreeing to be bound by the terms hereof, the parties to this Amendment hereby agree as follows:

1. **Recitals**. The recitals set forth above are true and correct and are hereby incorporated by reference.

2. **Amendment to Loan Agreement**.

a. The following definition in Section 1 of the Loan Agreement is hereby amended and restated as follows:

"*Maturity Date*" means, with respect to all Advances, August 1, 2024, provided however, that upon the satisfaction of the I/O Extension Conditions, Maturity Date shall mean January 31, 2026.

3. **No Other Amendments**. Except as expressly provided in Paragraph 2 hereof, the execution of this Amendment shall not be deemed to constitute an amendment to the Loan Agreement, and all other terms and conditions of the Loan Agreement are hereby ratified, confirmed and approved and shall remain in full force and effect.

4. **Costs and Expenses**. Borrower hereby reaffirms its agreement under the Loan Agreement to pay or reimburse Agent and Lender on demand for all Lender Expenses. Without limiting the generality of the foregoing, Borrower specifically agrees to pay the reasonable fees and

disbursements of counsel to Agent or Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto. Borrower hereby agrees that Agent or Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make a loan to Borrower under the Loan Agreement, or apply the proceeds of any loan, for the purpose of paying any such fees, disbursements, costs and expenses.

**5. Representations and Warranties**. Borrower hereby represents and warrants to Lenders and Agent as follows:

a. Borrower has all requisite power and authority to execute this Amendment and any other agreements or instruments required hereunder and to perform all of its obligations hereunder, and this Amendment and all such other agreements and instruments have been duly executed and delivered by Borrower and constitute the legal, valid and binding obligation of Borrower, enforceable in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

b. Borrower has no Subsidiaries other than as disclosed in the Perfection Certificate.

c. The execution, delivery and performance by Borrower of this Amendment and any other agreements or instruments required hereunder have been duly authorized by all necessary corporate action and do not (i) require any authorization, consent or approval by any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) violate any provision of any law, rule or regulation or of any order, writ, injunction or decree presently in effect, having applicability to Borrower, or the articles of incorporation or by-laws of Borrower, or (iii) result in a breach of or constitute a default under any indenture or loan or Loan Agreement or any other agreement, lease or instrument to which Borrower is a party or by which it or its properties may be bound or affected.

d. As of the Effective Date, Borrower is in compliance with all covenants, conditions and terms of the Loan Documents, and Borrower hereby reaffirms that except as provided in its last Compliance Certificate, all representations and warranties contained in the Loan Agreement are true and correct on and as of the Effective Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, after giving effect in all cases to any standard(s) of materiality contained in the Loan Documents as to such representations and warranties.

**6. Release of Agent/Lender**.

a. Borrower, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby release Agent, Lender and all of their Affiliates, shareholders, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, differences, liabilities and obligations arising under this Amendment, the Loan Agreement and the other Loan Documents after the date hereof, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that Borrower or any of them may have or claim, as of the date hereof or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter related

thereto, including, without limitation, the origination and servicing of the loan made under the Loan Documents and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents (collectively, the "**Released Claims**").

b. Borrower further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the date hereof, including, without limitation, any breach of fiduciary duty or duty of fair dealing, breach of confidence, breach of loan commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander, conspiracy or any claim for wrongfully accelerating the loan made under the Loan Documents or attempting to foreclose on, or obtain a receiver for, any collateral for the loan made under the Loan Documents and all statutory claims and causes of action of every nature.

c. In connection with the release contained in this Paragraph 6 (the "**Release**"), Borrower acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is Borrower's intention hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by Borrower against any one or more of the Released Parties. In furtherance of that intention, the Release contained in this Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts.

d. The Release contained in this Amendment shall be effective and irrevocable upon the execution of this Amendment by Agent, Lenders and Borrower without any further documentation.

e. BORROWER AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR DISCLOSED TO BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT BORROWER DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE DATE HEREOF. BORROWER UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST AGENT AND LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE COLLATERAL OR THE LOAN.

f. THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

g. Borrower acknowledges having read and understood and hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows (and hereby waives the benefits of any similar law of the state that may be applicable):

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

**7. Miscellaneous**. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. The provisions of

Sections 12 and 13 of the Loan Agreement shall be deemed incorporated herein by reference, *mutatis mutandis*.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Sixth Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: Kai Tse
Name: Kai Tse
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ___________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: Kai Tse
Name: Kai Tse
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: Kai Tse
Name: Kai Tse
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

DocuSigned by:
By: B1995C47338B467...
Name: Steve Carlino
Title: Chief Financial Officer

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Sixth Amendment to Loan and Security Agreement as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ________________________
Name: Kai Tse
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

Signed by:
By: Jeremy Sicklick
F6448B340B83446...
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Kai Tse
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Kai Tse
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

# EXHIBIT D

## Financing Statement

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
(415) 409-1790

B. E-MAIL CONTACT AT FILER (optional)
SGASSER@PREMIERCOUNSEL.COM

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

PREMIERCOUNSEL, LLP
201 SPEAR STREET
SUITE 1100
SAN FRANCISCO, CA 94105

Delaware Department of State
U.C.C. Filing Section
Filed: 04:37 PM 06/02/2026
U.C.C. Initial Filing No: 2026 4407546

Service Request No: 20263254888

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| HOUSECANARY, INC. | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| | | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY | |
| 535 MISSION STREET, OFFICE #1920 | SAN FRANCISCO | CA | 94105 | US | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| COMEHOME, INC. | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 535 MISSION STREET, OFFICE #1920 | SAN FRANCISCO | CA | 94105 | US |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OCEAN II PLO, LLC FOR ITSELF AND AS AGENT FOR OTHERS | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3555 ALAMEDA DE LAS PULGAS SUITE 201 | MENLO PARK | CA | 94025 | US |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor (but excluding intellectual property, the Texas Litigation Collateral (defined below) and the Litigation Reserve Account (defined below)), now owned or hereafter acquired, including all products and proceeds thereof and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any of the foregoing, provided however, that (i) the Collateral shall include all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the any of the Debtor's intellectual property (the "Rights to Payment"); and (ii) if a security interest in Borrower's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Collateral shall automatically, and effective as of the date of March 25, 2021, include the Debtor's intellectual property to the extent necessary to permit perfection of Secured Party's security interest in the Rights to Payment. "Litigation Reserve Account" means a bank account established by HouseCanary, Inc. to hold funds deposited therein as provided in that certain Litigation Funding Agreement between HouseCanary, Inc. and Crane 2 FundingCo 23, LLC, as amended from time to time. "Texas Defendants" means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

# UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

**18. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

18a. ORGANIZATION'S NAME
HOUSECANARY, INC.

OR

18b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**19. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

19a. ORGANIZATION'S NAME
HOUSECANARY (CT), INC.

OR

| 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 535 MISSION STREET, OFFICE #1920 | SAN FRANCISCO | CA | 94105 | US |

**20. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

20a. ORGANIZATION'S NAME
HOUSECANARY CERTIFIED ANALYTICS, INC.

OR

| 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 535 MISSION STREET, OFFICE #1920 | SAN FRANCISCO | CA | 94105 | US |

**21. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

21a. ORGANIZATION'S NAME
HOUSECANARY R&D, LLC

OR

| 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 535 MISSION STREET, OFFICE #1920 | SAN FRANCISCO | CA | 94105 | US |

**22.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

22a. ORGANIZATION'S NAME

OR

| 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**23.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

23a. ORGANIZATION'S NAME

OR

| 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**24. MISCELLANEOUS:**

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

their respective Affiliates. "Texas Litigation" means, collectively, the legal proceedings in the cases captioned (a) Title Source, Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc., Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the facts and/or causes of action set forth therein, and/or (b) HouseCanary, Inc. v. Quicken Loans Inc., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

| OR 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

that may arise from the facts and/or causes of action set forth therein, as applicable. "Texas Litigation Claims" means the claims that HouseCanary, Inc. has against each of the Texas Defendants in connection with the Texas Litigation. "Texas Litigation Collateral" means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all proceeds of any and all of the foregoing. "Texas Litigation Proceeds" means any and all consideration actually paid directly or indirectly to or for the benefit of HouseCanary, Inc. by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of HouseCanary, Inc. from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

9a. ORGANIZATION'S NAME

OR 9b. INDIVIDUAL'S SURNAME

FIRST PERSONAL NAME

ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

10a. ORGANIZATION'S NAME

OR 10b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

11. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

11a. ORGANIZATION'S NAME

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):

any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation.

13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable)

14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing

15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest):

16. Description of real estate:

17. MISCELLANEOUS:

# EXHIBIT E

## Notice of Disposition

**NOTIFICATION OF DISPOSITION OF COLLATERAL**

To: HC 1 LLC

From: Ocean II PLO LLC, 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, CA 94025

---

We will sell the property owned by HouseCanary, Inc. listed on Exhibit A, hereto, in a single lot to the highest qualified bidder in a public sale as follows:

Day and Date: Tuesday, September 22, 2026

Time: 1:00 p.m. (Pacific Daylight Time)

Place: 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, CA

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell. You may request an accounting by contacting our legal counsel, Steve Gasser, by email at: sgasser@premeircounsel.com.

**OCEAN II PLO LLC**
a California limited liability company
By: STRUCTURAL CAPITAL MANAGEMENT COMPANY II, LP,
a Delaware limited partnership
its Manager

By: Kai Tse
Name: Kai Tse
Title: Managing Partner
September 8, 2026

**EXHIBIT A**

**Description of Property Being Sold**

All assets and property of Debtor whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(C) accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property (defined below), the Texas Litigation Collateral (defined below) and the Litigation Reserve Account (defined below), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), and all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "**Rights to Payment**"); and (ii) if a security interest in Debtor's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Intellectual Property to the extent necessary to permit perfection of Secured Creditor's security interest in the Rights to Payment shall also be included; and

(D) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

Notwithstanding the foregoing, in no event shall the Collateral include as of the date of foreclosure: (a) any lease, license, contract, property rights or agreement to which Debtor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Debtor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9406, 9407, 9408 or 9409 of the Uniform Commercial Code as adopted and in effect in the State of California or any successor provision or provisions of any relevant jurisdiction or any other applicable law (including the 11 U.S.C §101, et. seq.) or principles of equity); or (b) any intent-to use Trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable law.

"**Litigation Reserve Account**" means a bank account established by Debtor to hold funds deposited therein as provided in that certain Litigation Funding Agreement between HouseCanary, Inc. and Crane 2 FundingCo 23, LLC, as amended from time to time. "**Texas Defendants**" means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or their respective Affiliates. "**Texas Litigation**" means, collectively, the legal proceedings in the cases captioned (a) Title Source, Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc., Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or

proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the facts and/or causes of action set forth therein, and/or (b) HouseCanary, Inc. v. Quicken Loans Inc., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable. "**Texas Litigation Claims**" means the claims that Debtor has against each of the Texas Defendants in connection with the Texas Litigation. "**Texas Litigation Collateral**" means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all proceeds of any and all of the foregoing. "**Texas Litigation Proceeds**" means any and all consideration actually paid directly or indirectly to or for the benefit of Debtor by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of Debtor from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation. "**Intellectual Property**" means all of Debtor's right, title, and interest in and to the following: domain names, Copyrights, Trademarks and Patents (including registrations and applications therefor prior to granting, and whether or not filed, recorded or issued), trade secrets and related rights, including without limitation rights to unpatented inventions, know-how and manuals, design rights, claims for damages by way of past, present and future infringement of any of the rights included above and amendments, renewals and extensions of any Copyrights, Trademarks or Patents. "**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether or not filed with the United States Copyright Office or foreign equivalent. "**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of a Person connected with and symbolized by such trademarks, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent. "**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent.

# EXHIBIT F

**Correspondence**

DENTONS

**James R. Irving**

james.irving@dentons.com

D +1 502 587 3606

Dentons
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
United States

dentons.com

***Via Priority Mail and Electronic Mail***

September 10, 2026

Steven Gasser, Founding Partner
PremierCounsel LLP
315 Montgomery Street, Suite 900
San Francisco, CA 94104
E-mail: sgasser@premiercounsel.com

*Counsel for Ocean II PLO LLC*

**Re:** ***Notice of Disposition of Collateral***

Steve:

As you know, this office represents HouseCanary, Inc. ("HouseCanary"). We have received the *Notice of Disposition of Collateral* (the "Notice") that you sent on September 8, 2026 indicating that your client, Ocean II PLO LLC ("Structural"), as agent under the *Loan and Security Agreement*, dated as of March 25, 2021 (the "Loan Agreement") seeks to foreclose on certain assets (the "Assets") of HouseCanary. The Notice provides that Structural will conduct a sale of the Assets on September 22, 2026 at your offices in northern California.

I am also in receipt of the *Notice of Public Sale* published by Structural on September 9, 2026 online (https://sfc.ipublishmarketplace.com/sf-marketplace/advert/-general_3120) (the "Publication"). The Publication Notice provides that Structural will conduct a sale of the Assets on September 22, ***2020*** at your offices in northern California. At a minimum, the Publication Notice is facially deficient because of this alone.

HouseCanary has instructed us to make this information request regarding the proposed sale in order to evaluate next steps, including, but not limited to, seeking legal redress from a court of competent jurisdiction for a temporary restraining order stopping this sale. The favor of a reply is requested no later than close of business on September 11, 2026.

Please provide the following information:

1. What is driving the proposed sale date of September 22, 2026, particularly with respect to Assets as complex as these?

2. Please provide any bidding procedures that you propose to make available to interested parties. Although some bidding procedures are included in the Publication Notice, Structural reserves various rights to alter such procedures at any time, to cancel the auction, and even to "cancel the sale to the winning bidder…." Please provide information regarding how these procedures were devised to be commercially reasonable.

3. The Assets involve consumer data as well as confidential intellectual property and trade secrets. Please provide a copy of the confidentiality and non-disclosure agreement you intend to require from potential bidders in the process to sell the Assets.

4. Please also provide access to the data room and other information you intend to make available to potential bidders. For instance, the Notice expressly states that property rights that would be potentially extinguished through the grant of a security interest to Structural are excluded. Does your data room include copies of all such agreements and other diligence materials underlying the Assets?

5. Please provide the identity and contact information for any investment banker or broker Structural intends to use in the sale of Assets. Also, your Notice appears defective insofar as your email contains a typographical error. You may wish to reissue a corrected Notice and ensure any future communications are correct.

6. Please provide a copy of any additional advertisements for the proposed sale of the Assets other than the Publication Notice, along with information including the date, time, and manner such publication or other advertisement was made.

7. Please provide information on how Structural decided to publish the Publication Notice, whether Structural believes that the website where the Publication Notice is posted constitutes a "recognized market."

8. Please provide notice if the Publication Notice is amended or rescinded, if even to correct the significant typographical error that the sale of the Assets is to be conducted nearly six years in the past.

9. Please provide a list of all parties interested in purchasing the Assets you have contacted in your efforts to market and sell the Assets, as well as when those parties were contacted, the method of contact, and their interest.

10. Please provide the accounting of the unpaid indebtedness referenced in the Notice, including principal, accrued interest, default interest, fees, expenses, attorneys' fees and all other amounts Structural contends are secured or otherwise payable, both as of September 8, 2026 and projected through September 22, 2026. Please also provide the amount Structural contends would be required to satisfy the indebtedness in full.

11. Please provide a schedule identifying with reasonable specificity the property Structural contends is included in the Assets to be sold and the property Structural contends is excluded. In particular, please identify each material lease, license, contract, data right, customer agreement and other property right that Structural contends may be transferred through the proposed sale, and the basis upon which Structural has concluded that such transfer would not result in abandonment, invalidation, unenforceability, breach, termination or default.

12. Please provide all non-privileged appraisals, valuations, broker opinions, market analyses or other materials Structural has obtained or prepared concerning the value of the Assets, either individually, in the aggregate or as part of HouseCanary's business, and identify the value Structural presently attributes to the Assets for purposes of the proposed sale.

As you know, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Cal. Comm. Code § 9610(b). "A disposition of collateral is made in a commercially reasonable manner if the disposition satisfies any of the following conditions: (1) It is made in the usual manner on any recognized market. (2) It is made at the price current in any recognized market at the time of the disposition. (3) It is made otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Cal. Com. Code § 9627(b). "'However, the methods of commercially reasonable dispositions listed under § 9627(b) are not required or exclusive, and other types of dispositions may' satisfy the standard." *Jack in the Box, Inc. v. Mehta*, No. CV 13-04444 EJD, 2014 WL 2069530, at *2 (N.D. Cal. May 19, 2014). "Whether a disposition is commercially reasonable is generally a question of fact and depends on all of the circumstances existing at the time of the sale." *Bank of the Sierra v. Kallis*, No. CV 05-01574 AWI, 2006 WL 3513568, at *8 (E.D. Cal. Dec. 6, 2006).

We look forward to Structural's immediate responses. We presume that as Structural has started this foreclosure process under California's adoption of the Uniform Commercial Code, that Structural already has all of the documents and information requested herein because they are what any legitimate, interested bidder would require in a commercially reasonable sale process for the Assets.

Please let me know if you would like to discuss. HouseCanary is focused on maximizing the value of its business for all stakeholders, and a defective and commercially unreasonable sale process would be extremely harmful to those stakeholders. HouseCanary's business with existing customers has been jeopardized, and HouseCanary's efforts to sell its entire business in a commercial method is being undercut. Indeed, HouseCanary may seek discovery on Structural's motivation for commencing a foreclosure and sale process on this timeline, and whether it is to be commercially reasonable or for some improper purpose. HouseCanary explicitly reserves all rights, and nothing in this letter shall constitute a waiver.

Sincerely,

James R. Irving

**PremierCounsel LLP**
ATTORNEYS AT LAW

STEVEN O. GASSER
(415) 409-1790
sgasser@PremierCounsel.com

**Via Email**

September 11, 2026

James Irving, Esq.
Dentons
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202

Re: Response to Letter Dated September 10, 2026 (the "Letter")

Dear Jim:

Thank you for your Letter yesterday regarding Ocean II PLO, LLC's ("Secured Party") scheduled public sale of various assets (the "Collateral") owned by HouseCanary, Inc. (the "Borrower"). Please be advised that we have contacted the San Francisco Chronicle and notified it of the typographical errors in the Notice of Public Sale which was published in its online edition on September 9, 2026. A corrected Notice of Public Sale was published today, September 11, 2026, both in print and online. Please also be advised that the Notice of Public Sale was also published today in the national distribution of the Wall Street Journal.

As for your request for an accounting of the obligations owed, principal and fees as of September 8, 2026 and September 22, 2026 total $34,327,148.54 and $8,478,510.14, respectively. Included in the principal balance is PIK interest in the amount of $4,327,148.54, of which $1,492,120.19 constitutes default interest. Reimbursable expenses are currently $199,243.14, but such amount is subject to increase as expenses are being incurred in connection with the foreclosure process, not all invoices have been received, and more expenses are expected to be incurred.

In your letter, you inquired as to the additional bidding procedures referenced in Notice of Public Sale. In addition to the bidding procedures included in the Notice of Public Sale, Ocean plans to implement the bidding procedures attached hereto as Annex 1, and will provide them to any potential purchaser upon written request. Ocean is intentionally taking a flexible approach to the upcoming public sale in hope that not requiring rigid conformity to a predetermined process (e.g., bidders are not being required to prequalify by showing proof of available funds) will encourage participation at the public sale.

Regarding your request for Ocean to provide a schedule identifying the property to be auctioned, the Borrower is in a better position to provide that information than Ocean, and request was made yesterday to the Borrower to provide such information. Borrower's failure to provide detailed information may impact the interest that potential bidders will have. It is in your client's best interest to provide such information as quickly as possible so that it can be made available to potential purchasers of the Collateral.

Based on representations that the Borrower has made to Ocean, we understand that the Borrower has for months conducted a process with an investment banker to sell its operating business, but has yet to bring a serious buyer to the table. Ocean has not reached out to the Borrower's investment banker as it does not want to interfere with Borrower's relations, but Ocean is amenable to having a conversation with it to determine whether there is any merit to involving the Borrower's investment banker. Please advise if the Borrower would like Ocean to reach out to HouseCanary's investment banker, and if so, please provide contact information. As Ocean has just started the foreclosure process, it has not received any inquiries from potential bidders, so there is no additional information to share with you on point.

As to the numerous discovery-like requests for information and other self-serving points raised in the Letter, Ocean chooses to not engage or respond other than to say that if the Borrower elects to initiate litigation to prevent Ocean from enforcing its clear contractual rights to proceed with the public sale, then Ocean is prepared to defend its position in court. Similarly, if the Borrower chooses to contest the public sale after the fact, Ocean is similarly prepared to defend its position, and of course, reserves all rights and remedies against the Borrower, its board, management and stockholders that have led up to unfortunate circumstances that currently exist. If the Borrower elects to file for bankruptcy protection, request is made to please advise a soon as the filing occurs as Ocean has no desire or intent to violate the automatic stay imposed by 11 U.S.C. §262. Ocean and the Lenders (as defined in the Loan Agreement) explicitly reserve all rights and remedies, and nothing in this letter shall constitute a waiver or release.

Very truly yours,

Steven O. Gasser

Steven O. Gasser, Esq.

Annex 1

1. Prior to the 1:00 pm., September 22, 2026 foreclosure sale of HouseCanary's assets, potential bidders are encouraged to contact Ocean II PLO LLC ("Ocean") to inquire about the assets being sold. Ocean is the collateral agent for certain lenders, has a lien on those assets and will be conducting the public foreclosure of HouseCanary's assets. Ocean can be contacted through its legal counsel, Steve Gasser, by either emailing him at sgasser@premiercounsel.com or calling him at 415-409-1790.

2. The property is expected to be sold in a single lot, but Ocean reserves the right to establish multiple lots. The property to be sold will be announced prior to the auction.

3. If a bid is made other than for cash in immediately available funds, Ocean will have discretion to value such bid in relation to other bids to determine which bid represents the higher of such bids. Ocean is not obligated to accept a bid other than for cash in immediately available funds.

4. The winning bidder is required to remit payment at the conclusion of the foreclosure sale. If a bidder will not be able to settle immediately, the bidder should contact Ocean in advance to determine whether an alternative arrangement is feasible. If a bidder cannot immediately settle, and Ocean has not approved alternative payment terms, Ocean may either void the winning bidder's bid due to non-payment and re-auction the property, or enforce the sale to the winning bidder and pursue payment.

5. At the conclusion of the sale, the winning bidder will be required to sign a Foreclosure Sale Agreement with Ocean. A copy is available upon request prior to the foreclosure sale.

6. After the foreclosure sale is completed, it will be the winning bidder's obligation to collect the property purchased other than the securities and stock powers for which Ocean maintains possession. Those securities and stock powers will be delivered promptly after the conclusion of the Foreclosure Sale, payment of the purchase price and delivery of the Foreclosure Sale Agreement. Ocean, as the secured party, does not have possession or control of the assets being auctioned other than the securities and stock powers noted previously, and is not responsible for delivering any purchased property.

7. Consistent with Ocean's rights as a secured creditor, Ocean may elect to post-pone the foreclosure sale by announcement made at the foreclosure sale of the new date, time and place for the foreclosure sale.

DENTONS

Van C. Durrer, II

van.durrer@dentons.com
D +1 213 243 6050

Dentons US LLP
601 South Figueroa Street
Suite 2500
Los Angeles CA 90017-5704
United States

dentons.com

***Via Priority Mail and Electronic Mail***

September 16, 2026

Steven Gasser, Founding Partner
PremierCounsel LLP
315 Montgomery Street, Suite 900
San Francisco, CA 94104
E-mail: sgasser@premiercounsel.com

*Counsel for Ocean II PLO LLC*

**Re:** ***Notice of Disposition of Collateral***

Steve:

I am writing to follow up on the following recent correspondence: your email yesterday September 15, 2026 (the "Gasser Email"); your letter dated September 11, 2026 (the "Gasser Letter"); the letter dated September 10, 2026 from your client, the Agent, to my client, the Debtor (the "Agent Letter"); and my partner Jim Irving's letter to you of the same date (the "Debtor Letter"). Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Agent Letter.

As a threshold matter, the Public Sale noticed and advertised by the Agent, which you have acknowledged in writing is defective since the initial advertisement noticed a date in the distant past, among other shortcomings, is entirely illegitimate and must be halted immediately. Efforts by your client to amend the Notice of Disposition and advertisement for the Public Sale only serve to create more confusion rather than maximize any recovery for the Agent. Moreover, as you know, the Agent is not pursuing the recovery of a debt in good faith. Rather, as described in more detail below, the Agent has been engaged in a many-months-long scheme to extort value from the Debtor and to improve the Agent's position relative to the Debtor and its other stakeholders—a position that arose from the Agent's own deliberate failure to obtain a lien on intellectual property when the underlying obligations were originated.

It is especially telling that the Agent noticed a foreclosure sale without a "detailed list of each various component of the Collateral," which is only now requested in the Agent Letter, days after the Public Sale was already noticed. The Debtor refers the Agent to the original Disclosure Schedules in the LSA and the most recent financial information provided to Agent pursuant to the LSA. Specifically, on July 16, 2026 the Debtor sent the Agent financial statements going back to January 2025 as well as a forecast through December 2027. On July 29, 2026, the Debtor then sent the Agent an updated cash flow report. Contrary

Puyat Jacinto & Santos ► Link Legal ► Zaanouni Law Firm & Associates ► LuatViet ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

to the suggestion in the Gasser and Agent Letters, the Debtor has no obligation to provide any information regarding value beyond what the Debtor already provided pursuant to the LSA.

Yesterday, in the Gasser Email you indicated that an interested party, SWE Homes, contacted the Agent and requested information to conduct diligence on the Debtor and its assets. However, as you acknowledge in the Gasser Email, "[t]he information requested is not information that [the Agent] has." It is *per se* commercially unreasonable to seek to sell a business and assets as sophisticated as the Debtor's without the ability to answer the basic questions that SWE Homes allegedly posed such as "what [the Debtor] and its affiliated entities do, including their primary products, services, and business operations," and "[a]re [the Debtor] and the related entities currently operating and conducting business as going concerns?" In addition, the Agent has not investigated the identity of SWE Homes nor sought a basic non-disclosure agreement, even assuming that the Agent were in a position to provide information to SWE Homes or any other interested bidders. Be on notice that the Debtor reserves all rights if the Agent shares information regarding the Debtor in violation of Section 13.12 of the LSA.

Despite your request in the Gasser Letter, the Debtor will not be assembling "all Collateral wherever located" at the Premises. This is for several reasons in addition to the fact that the Public Sale is a farce. First, the Debtor operates a going concern business on a hybrid, remote office basis (as do many businesses post 2020) for the benefit of all of its stakeholders, not just the Agent. To interrupt that business by effectively dismantling it and delivering it to an office building in downtown San Francisco would destroy that business and violate the Debtor's fiduciary duties. Second, the demand to assemble makes no sense on its face: while the Agent has advertised the Public Sale to take place in Menlo Park on September 22, 2026, the Agent proposes to have the assets to be sold delivered to downtown San Francisco, *over 30 miles away* and a day later. The Agent has to date refused to provide the proposed documentation and definitive bidding procedures that the Agent is using for the Public Sale (the minimal procedures provided in the Gasser Letter provide little detail, and Structural is explicit that it reserves the right to change them at any point), so the Debtor cannot know for certain, but we would be surprised if the Agent was requiring potential bidders to wait a day and travel over 30 miles. This is just further evidence that the Public Sale is not commercially reasonable. Finally, although the Debtor continues to satisfy its trade payables in the ordinary course of business, the Debtor does not have sufficient liquidity to comply with the Agent's unjustified assembly request.

Simply stated, the Public Sale is not commercially reasonable and must be immediately halted or the Debtor will pursue all available remedies against the Agent for the immediate and irreparable harm that will result to the Debtor's business. The non-exhaustive list of reasons why the Public Sale is defective include the following:

1. The original notice of sale contained incorrect contact information for the Agent, which you have acknowledged. The corrected notice only confuses things given the shortened timeline the Agent is pursuing.
2. The original advertisement of Public Sale noticed an auction date in the distant past (during the COVID crisis, in fact). This alone is fatal, as California courts have held that "[o]ne of the most important elements of commercial reasonableness is the duty to surround the sale with publicity sufficient to attract a 'lively concourse of bidders.'" *Ford & Vlahos v ITT Commercial Finance Corp.*, 885 P.2d 877, 882-83 (Cal. 1994) (quoting *Westgate State Bank v. Clark*, 642 P.2d 961, 970 (Kan. 1982)). Advertising a sale for the wrong date cannot conceivably attract a "lively concourse of bidders." You implicitly acknowledge this yourself, as in the Gasser Letter you indicate that the original advertisement of Public Sale was corrected, however, that correction

was done less than two weeks before the commencement of the Public Sale so that there is likely to be confusion regarding when that Public Sale will actually occur.

3. The notice of sale contains a lengthy and confusing description of the assets to be sold which will not (and is not designed to) generate reasonable bids. The Agent Letter likewise reveals that the Agent does not know what it purports to sell. No sale of a technology company the size and sophistication of the Debtor would ever be conducted in this manner, and therefore the sale is not commercially reasonable. *See e.g., National Housing P'ship v. Municipal Cap. Appreciation Partners I, L.P.*, 935 A.2d 300, 316 (D.C. App. 2007) (applying Maryland law) ("Numerous courts have stated that commercial reasonableness 'means that the disposition shall be made in keeping with prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or a similar business.'") (citations omitted). SWE Homes' contact to you is confirmation of this confusion. What is more, a basic Google search – see attached – suggests that the marketplace is confused and believes that you have noticed all of the Debtor's assets for sale and not just the limited collateral on which the Agent has a lien, which does *not* include intellectual property.
4. Even assuming the Public Sale was otherwise proper, the date noticed for the Public Sale is unreasonable short, and appears to be driven by some litigation purpose which the Agent cannot articulate or justify. This issue is compounded by the corrected and additional advertisements you mention in the Gasser Letter being posted just 11 days before the Public Sale. Just because the sale is scheduled to take place more than 10 days after the Agent sent its original Notice to the Debtor does not mean that the sale timeline is commercially reasonable. *See e.g., Commercial Credit Group v. Barber*, 199 N.C.App. 731, 737-41 (NC Ct. App. 1999) (applying North Carolina law).
5. The Agent Letter suggests, and the Gasser Email confirms, that the Agent has no data room nor diligence to provide potential bidders. No sale of this type should ever be conducted in this manner. *National Housing P'ship*, 935 A.2d at 316.
6. The Agent has refused to identify an investment banker or broker who is conducting the sale which falls well short of commercially reasonable practices for Article 9 auctions. *Id.*
7. The Agent has refused to provide a form of non-disclosure agreement following request or even confirm that it is requiring potential bidders to execute such an agreement.

Most of all, however, the Agent is promoting the Public Sale for an improper purpose—to continue its pattern of attempting to extort value from the Debtor and its stakeholders for an improper purpose. This is evidenced by the following facts. During negotiations in the first half of 2026, when the parties were discussing an amendment to the underlying obligations, the Agent stated that it would only agree to an amendment if the Debtor granted the Agent a lien in intellectual property, knowing full well that the grant of such a lien would be inconsistent with other financing obligations of the Debtor. The Debtor then engaged with its other stakeholders to attempt to reach a three-party compromise to address that issue. The Agent then changed position, and insisted on a $20 million amendment "fee," in lieu of a lien on intellectual property, which fee was approximately half of the existing obligation. The Agent later withdrew that demand, a *de facto* acknowledgment that it was unreasonable, and purported to come back to the negotiating table, but then simply refused to review proposed amendment documents because they were too "complicated." The Debtor does not know why the Agent loaned funds to the Debtor without a lien on intellectual property, nor does that matter—the Agent does not have a lien on intellectual property. The current Public Sale is nothing more than another tactic to force the Debtor to grant rights to the Agent that the Agent does not have. In that vein, the Public Sale is not commercially reasonable, and what is more, it directly exposes the Agent and its lenders to damages done to the Debtor's business in the process.

Please advise by the close of business today whether you are authorized to accept service of process for the Agent. The Debtor reserves all rights.

Very truly yours,

Van C. Durrer, II

Enclosed: Google Search

cc: Ron Bender (RB@lnbyg.com)
Beth Young (bry@lnbyg.com)
Daniel Friedman (dfriedman@corbincapital.com)
Kai Tse (kai@structuralcapital.com)

housecanary ocean ii

Sign in

AI Mode | All | Images | Videos | News | Shopping | Forums | More | Tools

AI Overview

**Ocean II PLO LLC** is a secured creditor linked to a major commercial foreclosure auction of all assets belonging to HouseCanary, Inc..

A formal public notice announced that under Section 9610 of the California Uniform Commercial Code, Ocean II PLO LLC will offer the collateral—encompassing all of HouseCanary's assets, intellectual property, software, accounts, and business components—for sale to the highest bidder at a public auction scheduled for **September 22, 2026**.

Show more

HouseCanary
https://www.housecanary.com

## HouseCanary | AI-Powered Real Estate Data & Analytics

Make smarter real estate decisions with HouseCanary. **Access AI-powered valuations, forecasts, and insights** for over 136M U.S. properties.

Missing: ~~ocean~~ | Show results with: ocean

## People also ask

What is the pricing for HouseCanary?

What is HouseCanary value?

How accurate is HouseCanary?

Who is HouseCanary?

HouseCanary
https://www.housecanary.com › Blog › Market Insights

## 2026 Housing Market Predictions: Mid-Year Reset and ...

Jul 14, 2026 — HouseCanary HPI forecast: **+2.1% home price growth in 2026**. See the major metros forecast to rise - and fall - plus mortgage rates and the ...
Missing: ~~ocean~~ | Show results with: ocean

HouseCanary
https://www.housecanary.com › Blog › Market Insights

## 2025 State Housing Market Forecast: Home Prices and ...

Jul 15, 2025 — According to **HouseCanary's** U.S. housing market forecast for 2025, prices will likely climb further into Q3 and Q4 2025, but at a slower, more ... Read more
Missing: ~~ocean~~ | Show results with: ocean

HouseCanary
https://www.housecanary.com › Blog › Market Insights

## Fall 2025 Home Flip Forecast: Hottest Zip Codes for Investors

Oct 17, 2025 — Our fall flip forecast highlights the **hottest zip codes to flip in 2025**. HouseCanary's proprietary data was used to form a “flip score” across ... Read more

HousingWire
https://www.housingwire.com › housecanary-3

## HouseCanary

HouseCanary is a valuation-focused real estate brokerage that **provides revolutionary services and software** to reshape the housing marketplace and home buying ... Read more
Missing: ~~ocean~~ | Show results with: ocean

HouseCanary
https://www.housecanary.com › The Latest Blogs

## The Latest Blogs

Gain valuable insights into **real estate trends, data analytics, and market forecasts**. Stay informed and inspired with our latest posts.
Missing: ~~ocean~~ | Show results with: ocean

RESIDENT™ | A Luxury Lifestyle Magazine
https://resident.com › Luxury Lifestyle › Tech and Gear

AI Revolution: Transforming Luxury Real Estate Valuations

Aug 2, 2025 — Luxury real estate agents are turning to **AI-powered valuation tools like HouseCanary** and Restb.ai to price elite properties with unmatched ... Read more

HouseCanary
https://www.housecanary.com › Blog › Market Insights

Florida Housing Market Update: 2026 and Beyond

May 14, 2026 — **HouseCanary's** proprietary Housing Price Index (HPI) data shows home prices through the end of 2026 are expected to remain largely flat, with ... Read more

HouseCanary
https://www.housecanary.com › pricing

Real Estate Data & API Pricing Plans

**Access to HouseCanary's core API** for scalable data access with additional usage-based costs. Billed yearly and automatically renews until canceled. Read more
Missing: ~~ocean~~ | Show results with: ocean

People also search for

Housecanary ocean ii **reviews**

HouseCanary **careers**

Housecanary ocean ii **for sale**

**House canary trial**

Housecanary **lawsuit**

Housecanary **property explorer**

Housecanary ocean ii **valuations**

Housecanary **wiki**

1 2 3 4 5 6 7 8 9 10 Next

**Downtown, Louisville, KY** - From your IP address - Update location

Help Send feedback Privacy Terms

**PremierCounsel LLP**
ATTORNEYS AT LAW

STEVEN O. GASSER
(415) 409-1790
sgasser@PremierCounsel.com

**Via Email** (van.durrer@dentons.com)

September 16, 2026

Van Durrer, II
Dentons
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017

Re: Response to Letter Dated September 16, 2026

Van:

I'm in receipt of your letter dated today in which you manufacture a host of unfounded allegations in an attempt to support HouseCanary, Inc.'s ("Debtor") threatened action to seek a temporary restraining order (the "TRO") to prevent Ocean II PLO, LLC's ("Secured Party") September 22, 2026 scheduled foreclosure of certain of Debtor's assets pledged to secure the subject $30,000,000 loan (the "Collateral") now in default. Indeed, what stands out most in your letter, and the Court will surely focus on, is that not only is Debtor in breach of the loan agreement; but also Debtor's admitted default entitles the Secured Party to exercise its rights and remedies, including but not limited to foreclosure on its Collateral. These undisputed facts make clear that there is no legal or equitable basis for the Court to issue any TRO, particularly in light of Debtor's documented diversion of assets through, *inter alia*, opening secret bank accounts and pledging certain intellectual property to third parties, all of which is a willful violation of the loan agreement. When one seeks equitable relief, especially one as extreme as a TRO, one needs clean hands, and Debtor does not have clean hands.

Secured Party rejects your multiple mischaracterizations of the events recounted in your letter and the effect of those events on the commercial reasonableness of the upcoming foreclosure sale. To state the obvious, in the loan agreement at ¶9.3, the Debtor expressly agreed that "any foreclosure sale of Collateral shall be deemed reasonable provided that Agent gives at least 10 days advance notice of the initial date set for such foreclosure sale" and you acknowledge in your letter that Debtor has received more than 10 days. Any argument to the contrary is in bad faith and has no merit.

While the Secured Creditor disputes the balance of the unsupported assertions in your letter, we are not going to litigate this dispute in correspondence since it is obvious that we see the situation entirely different.

Secured Party has offered multiple times to meet with Debtor and its litigation funding partners to ascertain whether an alternative resolution to foreclosure and/or litigation is possible, yet it seems that neither Debtor nor its litigation funding partners are interested in having a constructive conversation. As you acknowledged in our call the other day, a TRO is not a permanent solution to the Debtor's massive default or current financial problems. However, if a resolution out of court is not possible, please be advised that Secured Party is in the process of preparing a complaint for, *inter alia*, breach of contract and appointment of a receiver, and once ready, it will be filed along with an Application for Appointment of Receiver, requesting a hearing on an *ex parte* basis.

Should Debtor decide to reconsider its approach, Secured Creditor continues to be ready to engage in settlement negotiations. Nothing in this letter is intended to be, nor shall be construed as, a waiver, release, modification or alteration of any right, claim, defense or remedy, all of which are expressly reserved.

Very truly yours,



Steven O. Gasser, Esq.

cc: Ron Bender (rb@lnbyg.com)
Beth Young (bry@lnbyg.com)
Daniel Friedman (dfriedman@corbincapital.com)

# EXHIBIT G

## Complaint

THOMAS J. D'ANTONIO (SBN 316472)
DENTONS US LLP
1999 Harrison Street
Suite 1210
Oakland, CA 94612
Telephone: (415) 882-5000
Email: thomas.dantonio@dentons.com

VAN C. DURRER, II (SBN 226693)
NICK JANDA (SBN 253610)
DENTONS US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA 90017-5704
Telephone: (213) 623-9300
Email: van.durrer@dentons.com
nick.janda@dentons.com

Attorneys for Plaintiff
HOUSECANARY, INC.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| HOUSECANARY, INC., a Delaware corporation;<br><br>Plaintiff,<br><br>v.<br><br>OCEAN II PLO LLC, a California limited liability company; STRUCTURAL CAPITAL INVESTMENTS III, LP, a Delaware limited partnership; SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC, a Delaware limited liability company; CEOF HOLDINGS LP, a Delaware limited partnership; and DOES 1-10,<br><br>Defendants. | Case No.<br><br>**VERIFIED COMPLAINT FOR:**<br><br>**(1) DECLARATORY RELIEF;**<br><br>**(2) TORTIOUS INTERFERENCE WITH CONTRACT;**<br><br>**(3) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; AND**<br><br>**(4) UNFAIR BUSINESS PRACTICES** |

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

Plaintiff HouseCanary, Inc. (the "Plaintiff") hereby alleges against Defendants Ocean II PLO LLC ("Ocean II"), Structural Capital Investments III, LP, Structural Capital Management Company II, LP, Structural Capital GP, LLC, Series Structural DCO II Series of Structural Capital DCO, LLC, and CEOF Holdings, LP (together "Defendants") as follows:

## INTRODUCTION

1. This action arises from Defendants' rush to conduct a commercially unreasonable foreclosure sale of all of the Plaintiff's assets (notably, except for its intellectual property), scheduled for September 22, 2026. The Defendants' actions threaten to destroy the Plaintiff as a going concern and undermine the value of its business and assets for all stakeholders. Namely, the uncommercial and rushed nature of the sale will shutter the Plaintiff's operations and threaten the Plaintiff's jury award in litigation against Quicken Loans, Inc. and related defendants pending in Texas state courts (the "Texas Litigation"), which resulted in a jury verdict of approximately $175 million—which serves as the effective minimum amount that Plaintiff stands to receive from the Texas Litigation as the Court will need to determine additional interest, costs, and fees, among other items. If converted to a final judgment and recovered upon, the Texas Litigation could generate substantial proceeds (including at least 10 years of interest) for the benefit of the Plaintiff and its creditors, including Defendants.

2. The scheduled foreclosure sale is not commercially reasonable for multiple reasons: (a) it was noticed with only twelve days before the sale, providing inadequate time for any potential third-party purchaser to marshal resources or conduct meaningful due diligence; (b) the sale fails to approximately identify what assets are for sale and what assets are not for sale, while lacking any meaningful marketing to potential purchasers; and (c) the rushed sale will interfere with the Plaintiff's existing contractual obligations.

3. The Defendants' rush to foreclosure is the latest step in a prolonged scheme to obtain a lien on the Plaintiff's intellectual property. Defendants failed to negotiate these rights when the LSA was originally drafted. Realizing the error of their ways, Defendants approached Plaintiff in early 2026 to negotiate amending the LSA to include these rights. Defendants made this request knowing that this request would violate Plaintiff's preexisting contractual agreements. When talks

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

ultimately fell apart, Defendants changed course, now seeking in bad faith to extort these intellectual property rights through the foreclosure process.

4. The Plaintiff seeks emergency relief by this Verified Complaint and by its concurrently filed *ex parte* application for a temporary restraining order and preliminary injunction, to stay the September 22, 2026 foreclosure sale and to maintain the status quo while this Court adjudicates whether the Defendants' proposed disposition of collateral complies with the commercial reasonableness requirements of California Commercial Code Section 9610.

**THE PARTIES**

5. Plaintiff HouseCanary, Inc. is a Delaware corporation which is authorized to conduct business in California, with its principal place of business at 535 Mission Street, Suite 1400, San Francisco, California 94105. The Plaintiff is a real estate technology company that provides real estate valuation, analysis, forecast, data, and data visualization services.

6. Defendant Ocean II PLO LLC is a California limited liability company with its principal place of business at 355 Alameda De Las Pulgas, Suite 201, Menlo Park, California 94025. Ocean II acts as administrative and collateral agent for the lenders (its fellow defendants) under the Loan and Security Agreement (the "LSA") executed between Plaintiff and Defendants (together, the "Parties").

7. Defendant Structural Capital Management Company II, LP is a Delaware limited partnership that manages Ocean II.

8. Defendant Structural Capital GP, LLC is a Delaware limited liability company and the general partner of Structural Capital Management Company II. Kai Tse serves as Managing Member of Structural Capital GP, LLC.

9. Defendant Structural Capital Investments III, LP is a Delaware limited partnership that is a lender under the LSA.

10. Defendant Series Structural DCO II Series of Structural Capital DCO, LLC is a Delaware limited liability company that is a lender under the LSA.

11. Defendant CEOF Holdings, LP is a Delaware limited partnership that is a lender under the LSA.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

12. The true names and capacities of DOES 1 through 10, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiff at this time, which therefore sues these defendants by such fictitious names. When the true names, capacities, and relationships of these defendants are ascertained, Plaintiff will seek leave of Court to amend this Complaint to insert the same.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action pursuant to the California Constitution, Article VI, Section 10, and the California Code of Civil Procedure.

14. Venue is proper in San Mateo County pursuant to California Code of Civil Procedure Section 395 because Defendant Ocean II PLO LLC maintains its principal place of business in Menlo Park, California, which is located in San Mateo County. Venue is also proper in San Mateo County pursuant to the LSA, which provides that disputes arising thereunder shall be resolved in San Mateo County Superior Court.

## FACTUAL ALLEGATIONS

### I. The Plaintiff and the Defendant Entered into the Loan and Security Agreement.

15. On or about March 25, 2021, the Plaintiff entered into a Loan and Security Agreement with defendant Ocean II PLO LLC as administrative and collateral agent, and defendants Structural Capital Investments III, LP, Series Structural DCO II Series of Structural Capital DCO, LLC, and CEOF Holdings LP as lenders (collectively, the "Lenders"). The LSA established a credit facility of up to $30,000,000 for the Plaintiff. A copy of the Loan and Security Agreement is attached hereto as **Exhibit A.**

16. Pursuant to the LSA, the Plaintiff granted the Defendants a security interest on substantially all of the Plaintiff's tangible assets and contracts (the "Collateral") with significant exclusions. Defendants were not granted a security interest in the following: (1) the Plaintiff's intellectual property, including, but not limited to, its patents, trademarks, copyrights, trade secrets, domain names; (2) the proceeds arising out of the Texas Litigation; and (3) a bank account created for the purposes of funding the Texas Litigation.

17. The LSA has been amended on multiple occasions, most recently by the Sixth Amendment to Loan and Security Agreement, dated December 29, 2025, which extended the Maturity Date to January 31, 2026.

18. The LSA provides that, upon an "Event of Default," the Defendants may, among other remedies, "[s]ell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Agent determines are commercially reasonable." *See* **Exhibit A** (the Loan and Security Agreement) at Section 9.1(f) (emphasis added).

19. The Plaintiff has not made required payments owed to the Defendants under the terms of the LSA, and admits that an "Event of Default" has occurred.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

## II. Defendants' Improper Extortion Campaign for Plaintiff's Intellectual Property Rights

### A. LSA Amendment Negotiations and Plaintiff's Capital-Raising Efforts

20. During the first half of 2026, Ocean II and Plaintiff engaged in negotiations to amend the LSA. During those negotiations, Defendants demanded a lien on Plaintiff's intellectual property as a threshold requirement for any amendment. Ocean II did this knowing full well that such a lien would be inconsistent with Plaintiff's existing contractual agreements and obligations.

21. Despite this, Plaintiff approached one of its other secured parties seeking a three-way compromise to satisfy all parties. However, Ocean II abruptly changed course and instead demanded an "amendment fee" in the amount of $20 million in lieu of the lien on Plaintiff's intellectual property—approximately half of the existing obligation. Realizing that such a request was constituted an enormous penalty, Ocean II withdrew that demand.

22. When Ocean II returned to negotiations with Plaintiff, it steadfastly refused to review any proposed amendment documents stating they were too "complicated."

23. Negotiations between Ocean II and Plaintiff ultimately broke down and an amendment to the LSA was never reached.

24. In an effort to raise capital and deliver value to its stakeholders, Plaintiff continues its efforts to sell its entire business. This sale would result in a cash payment to Defendants. These efforts are actively being undercut by Defendants' insistence on selling the Collateral.

25. In 2026, Ocean II interfered with Plaintiff's discussions with a capital provider to have a recapitalization that would provide capital to both Plaintiff and to Defendants. Specifically, Plaintiff was actively pursuing a financing transaction pursuant to a formal term sheet that, if consummated, would have materially strengthened Plaintiff's capital structure, liquidity, and credit profile for the benefit of Plaintiff and its stakeholders, including Defendants. In the midst of that financing process, Defendants began sending threatening and disruptive correspondence to Plaintiff, ultimately issuing the Notice of Disposition, materially interfering with Plaintiff's ability to complete the contemplated financing.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

## III. The Defendants Issued the Notice of Disposition to Conduct the Commercially Unreasonable Sale.

26. On September 8, 2026, Ocean II issued a Notice of Disposition of Collateral to the Plaintiff, scheduling a public auction of the Collateral for September 22, 2026, at 1:00 p.m. PDT, to be held at the Defendant's counsel's offices at 355 Alameda De Las Pulgas, Suite 201, Menlo Park, California 94025. A copy of the Notice of Disposition is attached hereto as **Exhibit B**.

27. The initial Notice of Disposition contained a typographical error regarding contact information for Ocean II's counsel, and Ocean II issued a corrected Notice of Disposition on September 10, 2026. A copy of the corrected Notice of Disposition is attached hereto as **Exhibit C**.

28. The Notice of Disposition provides only fourteen (14) days' notice before the scheduled sale.

29. The Notice of Disposition contains an inadequate listing of the Collateral which is for sale.

30. On September 10, 2026, the Plaintiff's counsel sent correspondence to Ocean II's counsel inquiring about Notice of Disposition and the various gaps in information provided to the

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

Plaintiff and any interested bidders on the Collateral. A copy of that correspondence is set forth as **Exhibit D**.

31. The following day, Ocean II sent correspondence to the Plaintiff asking for, among other things, a list of the Collateral that the Plaintiff had just advertised for sale. A copy of that correspondence is attached as **Exhibit E**.

32. Also on September 10, 2026, Ocean II published an Advertisement of Sale, a copy of which is attached hereto as **Exhibit F**. The Advertisement of Sale contained a typographical error, noting that the sale was to be conducted in 2020.

33. On September 11, 2026, Ocean II published a corrected Advertisement of Sale, a copy of which is attached hereto as **Exhibit G**.

34. That same day, Ocean II's counsel sent correspondence to the Plaintiff, for the first time providing some details about the proposed sale of the Collateral – but still not identifying the list of Collateral for sale, establishing any method for bidders to conduct due diligence, providing a non-disclosure agreement for interested bidders to review the Collateral, or providing other customary and necessary information as part of a commercially reasonable sale.

35. Ocean II has not retained an investment banker for the scheduled sale.

36. Ocean II has not retained a broker for the scheduled sale.

37. Ocean II has not opened a data room for the scheduled sale.

38. When an interested bidder, SWE Homes, contacted Ocean II seeking basic information about the sale and about Plaintiff—including "a brief overview of what [Plaintiff]…do[es];" what Plaintiff's "primary products, services, and business operations" are; and whether Plaintiff is operating as a going concern, Ocean II was unable to answer even these most basic inquiries about Plaintiff. Instead, counsel for Ocean II emailed counsel for Plaintiff to try and obtain answers to SWE Homes's inquiries. A copy of email correspondence from Ocean II's counsel, Steve Gasser, is attached as **Exhibit H**.

39. Ocean II has not circulated a non-disclosure agreement to interested parties ahead of the scheduled sale. *See* **Exhibit H**.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

40. Ocean II has also demanded that Plaintiff assemble all of the collateral at a location in downtown San Francisco, more than thirty miles from the auction site in Menlo Park, on September 23, 2026, the day *after* the scheduled sale.

41. There is also market confusion stemming from the scheduled sale. A simple Google search of "housecanary ocean ii" delivers results that state Ocean II "will offer the collateral—encompassing all of HouseCanary's assets, intellectual property, software, accounts, and business components" for sale at public auction on September 22, 2026. A true and correct copy of this Google search is attached as **Exhibit I**.

42. The Defendants have refused to postpone the foreclosure sale despite the Plaintiff's objections.

43. Further, Defendants have made it clear to Plaintiff that it is their intent to force Plaintiff into a restructuring proceeding to challenge other secured parties' liens on the Plaintiff's intellectual property - liens that were negotiated for in good faith.

44. Defendants have engaged in this campaign to secure Plaintiff's intellectual property because they are fully aware that the Collateral is, effectively, worthless without it. The Collateral (e.g., contracts) contemplate and require Plaintiff's platform to fulfill them—a platform Defendants do not currently have rights to—and will not without forcing Plaintiff's hand in bad faith.

## FIRST CAUSE OF ACTION

**(Declaratory Relief – Commercially Unreasonable Disposition of Collateral)**
**(Against all Defendants)**

45. The Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 44 above as though fully set forth herein.

46. An actual controversy has arisen and now exists between the Plaintiff and the Defendants concerning their respective rights and duties with respect to the proposed foreclosure sale scheduled for September 22, 2026.

47. The proposed foreclosure sale is not commercially reasonable as required by California Commercial Code Sections 9610, 9611, and 9612 because, among other things:

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

a. The twelve-day notice period is commercially unreasonable for the disposition of a company's entire operating assets;

b. The method and manner of the sale, without meaningful marketing efforts, will result in an inadequate price that does not reflect the true value of the Collateral;

c. Defendants have not retained an investment banker or broker, established a data room, or implemented any meaningful bidding procedures, including circulating non-disclosure agreements for potential bidders.

48. HouseCanary is informed and believes, and thereon alleges, that Ocean II contends that its proposed foreclosure sale is commercially reasonable and that it is entitled to proceed with the sale on September 22, 2026.

49. The Plaintiff desires a judicial determination of its rights and duties, and a declaration that the Defendants may not proceed with its proposed foreclosure sale as scheduled. Such declaration is necessary and appropriate at this time under the circumstances in order to determine the rights and duties of the parties before the scheduled sale on September 22, 2026.

50. The Plaintiff requests that this Court declare that the Defendants cannot proceed with the foreclosure sale scheduled for September 22, 2026 because the proposed sale is not commercially reasonable as required by California Commercial Code Sections 9610, 9611, and 9612.

## SECOND CAUSE OF ACTION

**(Tortious Interference with Contractual Relations)**
**(Against all Defendants)**

51. The Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 50 above as though fully set forth herein.

52. At all times relevant hereto, the Plaintiff had a valid, existing contract with  it had executed regarding security interests in the Texas Litigation Claims, Texas Litigation Proceeds, and related intellectual property.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

53. The Defendants knew of the existence of other agreements Plaintiff executed regarding security interests in the Texas Litigation Claims, Texas Litigation Proceeds, and related intellectual property is referenced in the Notice of Disposition and related correspondence.

54. The Defendants have intentionally and improperly interfered with the Plaintiff's existing contractual relationships by rushing to conduct the September 22, 2026 foreclosure sale and will undermine other parties' collateral in an effort to seek to force the Plaintiff into a restructuring proceeding where the intellectual property related to the Texas Litigation can be attacked.

55. The Defendants' conduct is independently wrongful because: (a) the proposed foreclosure sale is not commercially reasonable; (b) the Defendants are aware that the foreclosure sale will interfere with the Plaintiff's existing contractual obligations; and (c) Ocean II is proceeding with the sale despite the Plaintiff's objections and the harm it will cause to the Plaintiff's relationship with other secured parties.

56. As a direct and proximate result of the Defendants' interference, the Plaintiff has suffered and will continue to suffer damages, including damage to its business relationship with other secured parties, potential breach of its existing contractual obligations regarding security interests in the Texas Litigation Claims, Texas Litigation Proceeds, and related intellectual property, and loss of the benefits of those existing agreements.

## THIRD CAUSE OF ACTION

**(Breach of the Covenant of Good Faith and Fair Dealing)**
**(Against all Defendants)**

57. The Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 56 above as though fully set forth herein.

58. A contract exists between Plaintiff and Defendants, namely the LSA, which includes the covenant of good faith and fair dealing.

59. Plaintiff has performed, or been excused from performing, all or substantially all of its obligations under the LSA.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

60. Defendants engaged in conduct that frustrated the Plaintiff's right to benefit from the LSA and has breached its duty of good faith as alleged herein.

61. Ocean II's exercise of its remedies under the LSA has not been undertaken in good faith to maximize recovery for the Lenders, but rather as a tactic to force the Plaintiff to grant the Ocean II a lien on intellectual property that it failed to negotiate when the LSA was originated. Further, this has been undertaken to force the Plaintiff into a restructuring proceeding where Ocean II hopes to gain advantage over other secured parties.

62. Plaintiff has been harmed by Ocean II's conduct, including but not limited to, Ocean II's proposed sale would destroy Plaintiff's operations, it would leave bidders believing they are buying Plaintiff's intellectual property rather than the Collateral, all without adding any value to the Collateral itself—which Ocean II actually has a lien on.

## FOURTH CAUSE OF ACTION

**(Unfair Business Practices – Cal. Bus. & Prof. Code § 17200 *et seq.*)**
**(Against all Defendants)**

63. The Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 62 above as though fully set forth herein.

64. California Business and Professions Code Section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."

65. Ocean II has engaged in unlawful business practices by conducting a foreclosure sale that is not commercially reasonable, in violation of California Commercial Code Sections 9610, 9611, and 9612. A violation of a statute constitutes an unlawful business practice under Section 17200.

66. The Defendants have also engaged in unfair business practices by: (a) providing only twelve days' notice before the foreclosure sale of substantially all of the Plaintiff's assets; (b) failing to undertake meaningful marketing efforts to attract potential bidders; (c) timing the sale to capture the value of the Texas Litigation Proceeds on the eve of a potential verdict; and (d) proceeding with the sale despite knowledge that it will interfere with the Plaintiff's existing contractual obligations.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

67. The Defendants' conduct is unfair because it offends established public policy embodied in California Commercial Code Article 9, which requires that all aspects of a disposition of collateral be commercially reasonable. The harm to the Plaintiff caused by the Defendants' conduct substantially outweighs any utility of that conduct.

68. As a direct and proximate result of the Defendants' unfair business practices, the Plaintiff has suffered and will continue to suffer injury in fact and has lost money or property, including the value of its assets that will be sold at the commercially unreasonable sale for a price far below their actual value.

69. The Plaintiff is entitled to injunctive relief enjoining the Defendants from continuing to engage in the unfair and unlawful business practices alleged herein, and restitution of any money or property that has been acquired by means of the Defendants' unfair business practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HouseCanary, Inc. prays for judgment against Defendants as follows:

I. For a temporary restraining order and preliminary injunction enjoining Ocean II PLO LLC and the Lenders from proceeding with the foreclosure sale scheduled for September 22, 2026 and from taking any action to transfer, encumber, or otherwise dispose of the Collateral pending resolution of this action;

II. For a permanent injunction enjoining Ocean II PLO LLC and the Lenders from disposing of the Collateral unless and until it complies with the commercial reasonableness requirements of California Commercial Code Sections 9610, 9611, and 9612;

III. For a declaration that Ocean II PLO LLC and the Lenders cannot proceed with the foreclosure sale scheduled for September 22, 2026 because the proposed sale is not commercially reasonable as required by California Commercial Code Sections 9610, 9611, and 9612 and for a declaration that Ocean II's exercise of its remedies under the LSA has not been in good faith and that Ocean II may not use the foreclosure process to obtain security interests or rights not granted under the LSA;

IV. For compensatory damages in an amount to be determined at trial, but not less than $175 million, for tortious interference with contractual relations;

V. For restitution of any money or property acquired by means of Defendants' unfair business practices;

VI. For attorneys' fees and costs of suit incurred herein to the extent permitted by law;

VII. For such other and further relief as the Court may deem just and proper.

Dated: September 17, 2026

DENTONS US LLP

By: ______________________________
Van C. Durrer, II

Attorneys for Plaintiff
HOUSECANARY, INC.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

# VERIFICATION

I, Christopher Rediger, am the Chief Executive Officer of HouseCanary, Inc. and am authorized to make this verification on behalf of HouseCanary, Inc. I have read the foregoing Verified Complaint and know the contents thereof. The matters stated therein are true of my own knowledge, except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 17th 2026, at Parker, Colorado.

____________________________________

Christopher Rediger

Chief Executive Officer, HouseCanary, Inc.

# EXHIBIT A

# LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (this "*Agreement*") is entered into as of March 25, 2021 (the "*Closing Date*"), by and among Structural Capital Investments III, LP ("*SCI*" or "*Lender*"), Series Structural DCO II series of Structural Capital DCO, LLC ("*DCO*"), and CEOF Holdings LP ("*CEOF*" and together with SCI and DCO, "*Lenders*" and each a "*Lender*"), Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders ("*Agent*") and HouseCanary, Inc., a Delaware corporation ("*Borrower*").

## RECITALS

Borrower wishes to borrow money from time to time from Lenders and Lenders desires to lend money to Borrower. This Agreement sets forth the terms on which Lenders will lend to Borrower and Borrower will repay the loan to Lenders.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, parties agree as follows:

### 1. DEFINITIONS AND CONSTRUCTION

**1.1. Definitions**. As used in this Agreement, the following terms shall have the following definitions:

"*ACH Debit Consent*" means Borrower's authorization to allow Agent to debit Borrower's Deposit Accounts to satisfy the Obligations in substantially the form of ***Exhibit H*** attached hereto.

"*Account*" is any "account" as defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to Borrower.

"*Account Debtor*" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

*"Advance"* means the extension of credit by a Lender to Borrower under this Agreement.

"*Affiliate*" means, with respect to any Person, any Person that owns or controls directly or indirectly thirty percent (30%) or more of the outstanding stock of such Person, any Person that controls or is controlled by or is under common control with such Person or any Affiliate of such Person or each of such Person's senior executive officers, directors, members or partners.

*"Amortization Date"* means the later of (i) April 1, 2023 (the "*Initial Amortization Date*"), or (ii) October 1, 2023 if the Interest Extension Period is achieved.

"*Approved Bank*" has the meaning ascribed thereto in the definition of "*Cash Equivalents*" contained herein.

"*Approved Budget*" shall have the meaning given to such term in **Section 6.3**.

*"Basic Rate"* means for any day, a *per annum* rate of interest equal to the greater of (i) nine percent (9.0%), and (ii) five and three quarters percent (5.75%) plus the Prime Rate then in effect, but not to exceed nine and one-half percent (9.5%), provided however, if no Event of Default shall have occurred and Borrower receives at least $35,000,000 of cash proceeds from the sale of its Equity Interests after the Closing Date but on or before December 31, 2021, with evidence thereof satisfactory to Agent having been provided not later than January 31, 2022, the Basic Rate shall thereafter mean for any day, a *per annum* rate of interest equal to the greater of (i) eight

percent (8.0%), and (ii) four and three quarters percent (4.75%) plus the Prime Rate then in effect, but not to exceed eight and one-half percent (8.5%).

"*Board*" means Borrower's board of directors.

*"Borrower's Books"* means all of Borrower's books and records including: ledgers; records concerning Borrower's assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or data storage, and the related devices and equipment, containing such information.

*"Business Day"* means any day that is not a Saturday, Sunday, or other day on which banks in the State of California are authorized to close under the laws of, or are in fact closed in, California.

"*Capital Lease Obligations*" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (consistently applied), and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP (consistently applied).

"*CARES Act - Title I*" means Title I of the Coronavirus Aid, Relief and Economic Security Act, as amended (including any successor thereto), and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, regardless of the date enacted, adopted, issued or implemented.

"*CARES Debt*" means any funds loaned by (i) any Governmental Authority (including the Small Business Administration) or any other Person acting as a financial agent of a Governmental Authority or (ii) any other Person to the extent such Indebtedness under this clause (ii) is guaranteed by a Governmental Authority (including the Small Business Administration), in each case pursuant to the CARES Act - Title I.

"*Cash Equivalents*" means, as to any Person: (a) securities issued or directly and fully and unconditionally guaranteed or insured by the United States or any agency or instrumentality thereof (but only so long as the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve months from the date of acquisition; (b) securities issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof having maturities of not more than 180 days from the date of acquisition and having one of the two highest ratings from either Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or Moody's Investors Service, Inc.; (c) certificates of deposit, denominated solely in U.S. Dollars, maturing within two years after the date of acquisition, issued by any commercial bank organized under the laws of the United States or any state thereof or the District of Columbia or that is a U.S. subsidiary of a foreign commercial bank; in each of the foregoing cases, solely to the extent that: (i) such commercial bank's short-term commercial paper is rated at least A-1 or the equivalent by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or at least P-1 or the equivalent thereof by Moody's Investors Service, Inc. (any such commercial bank, an "*Approved Bank*"); or (ii) the par amount of all certificates of deposit acquired from such commercial bank are fully insured by the Federal Deposit Insurance Corporation; or (d) commercial paper issued by any Approved Bank (or by the parent company thereof), in each case maturing not more than twelve months after the date of the acquisition thereof.

*"Closing Date"* has the meaning given to such term in preamble to this Agreement.

*"Code"* means the Uniform Commercial Code as adopted and in effect in the State of California, as amended from time to time, provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Agent's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of California, the term "**Code**" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

*"Collateral"* means the property described on ***Exhibit A*** attached hereto.

"*Collateral Pledge Agreements*" mean, collectively, any local law pledge agreement relating to the Equity Interests or evidence of Indebtedness of any Subsidiary owned directly or indirectly by a Loan Party to the extent necessary or useful to perfect Agent's security interest therein under applicable laws.

*"Commercial Tort Claim"* means any "commercial tort claim" as defined in the Code.

*"Commitment"* means (a) with respect to all Lenders, $30,000,000, and (b) with respect to each Lender, the amount set forth opposite such Lender's name on Schedule 2.1 attached hereto.

*"Commitment Termination Date"* means noon Pacific Time, June 30, 2022.

*"Compliance Certificate"* has the meaning given to such term in **Section 6.4**.

*"Contingent Obligation"* means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Agent in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

*"Control Agreement"* means an agreement, the terms of which are satisfactory to Agent, which is executed by Agent, Borrower and the applicable financial institution and/or securities/investment intermediary, and which perfects Agent's (for itself and for the benefit of the Lenders) first priority security interest in Borrower's accounts maintained as such financial institution or securities/investment intermediary.

*"Convertible Notes"* means short term unsecured subordinated Indebtedness in connection with a bona fide equity investment in Borrower, *provided* such subordinated convertible Indebtedness is subordinated to the Obligations and is subject to a Subordination Agreement in form and substance reasonably satisfactory to Agent and such Indebtedness by its terms is convertible into equity securities of the Borrower.

*"Copyrights"* means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether or not filed with the United States Copyright Office or foreign equivalent.

*"Current Financial Statements"* has the meaning given to such term in **Section 5.9**.

*"Default"* means any event which with the passing of time or the giving of notice or both would become an Event of Default hereunder.

"*Default Rate*" means the *per annum* rate of interest equal to (i) the then applicable Basic Rate of interest, plus (ii) 5% per annum.

"*Deposit Account*" means any "deposit account" as defined in the Code.

"*Disclosure Schedules*" mean the disclosure schedules attached at the end of this Agreement.

"*Disqualified Stock*" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is one year and one day following the Maturity Date; or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time on or prior to the date that is one year and one day following the Maturity Date.

"*EBITDA*" means, for any measurement period, Net Income (even if negative) plus income taxes, depreciation, amortization, non cash stock compensation expense and interest expense, at all times calculated using the same methodology as calculated in the Current Financial Statements.

"*Equity Interests*" mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, and any option, warrant, convertible debt or other right entitling the holder thereof to purchase or otherwise acquire any such equity interest, provided that in the case of any convertible debt, such convertible debt shall be required to be Subordinated Debt.

*"Equity Round"* means any transaction or a series of related transactions in which Borrower shall issue and sell Equity Interests after the Closing Date, in a third party, bona fide, capital raising event, including a SPAC Acquisition, but excluding in all cases issuance of shares of Borrower's common stock to employees or other services providers under any board and stockholder approved stock option plan.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"*ERISA Affiliate*" means any entity, trade or business (whether or not incorporated) under common control with the Borrower or any of its Affiliates within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) for purposes of provisions relating to Section 412 of the Internal Revenue Code).

*"Event of Default"* has the meaning given to such term in **Section 8**.

"*Excluded Account*" means any Deposit Account that never contains a balance greater than Two Thousand Dollars ($2,000).

*"Excluded Taxes"* has the meaning given to such term in **Section 2.7(d)**.

"*Exit Fee*" means a fee in an amount sufficient to increase the Minimum Return:

(a) to 1.15:1.00 if the Obligations are repaid prior to the first anniversary of the Closing Date; provided, that, such Exit Fee shall only be due and payable to the extent the Minimum Return shall be less than 1.15:1.00 after repayment in full of the Obligations (other than such Obligations that constitute the Exit Fee, Lender Expenses and Warrants);

(b) to 1.20:1.00 if the Obligations are repaid on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date; provided, that, such Exit Fee shall only be due and payable to the extent the Minimum Return shall be less than 1.20:1.00 after repayment in full of the Obligations (other than such Obligations that constitute the Exit Fee, Lender Expenses and Warrants);

(c) to 1.25:1.00 if the Obligations are repaid on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date; provided, that, such

Exit Fee shall only be due and payable to the extent the Minimum Return shall be less than 1.25:1.00 after repayment in full of the Obligations (other than such Obligations that constitute the Exit Fee, Lender Expenses and Warrants); or

(d) to 1.35:1.00 if the Obligations are repaid on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date; provided, that, such Exit Fee shall only be due and payable to the extent the Minimum Return shall be less than 1.35:1.00 after repayment in full of the Obligations (other than such Obligations that constitute the Exit Fee, Lender Expenses and Warrants);

*"Facility Fee"* has the meaning given to such term in **Section 2.5(a)**.

*"FATCA"* has the meaning given to such term in **Section 2.7(d)**.

*"Funding Date"* means any date on which an Advance is made to or on account of Borrower under this Agreement.

"*Funding Milestone*" means the first to occur of (i) Borrower having achieved $25,000,000 or more in trailing twelve consecutive month Revenue, (ii) Borrower having achieved an adjusted EBITDA of not less than zero for a trailing six consecutive month period, and (iii) Borrower having received at least $35,000,000 of cash proceeds from the sale of its Equity Interests after the Closing Date.

*"GAAP"* means, as of any date of determination, generally accepted accounting principles as then in effect in the United States of America set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board.

"*GDPR*" means the European Union General Data Protection Regulation, Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 and, with respect to the).

*"Governmental Authority"* means (a) any United States federal, state, county, municipal or foreign government, or political subdivision thereof, (b) any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, (c) any court or administrative tribunal or (d) with respect to any Person, any arbitration tribunal or other similar non-governmental authority to whose jurisdiction that Person has consented.

"*Hedging Agreement*" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

*"Indebtedness"* of any Person means, without duplication, (a) all obligations of such Person for borrowed money (including interest whether charged at the Basic Rate or otherwise) or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid and all obligations incurred in the ordinary course of such Person's business, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, including any earn-out obligations, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business and not more than 15 days past due), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (g) all Contingent Obligations of such Person including indebtedness of others, (h) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (i) all obligations of such Person as an account party in respect of letters of credit, (j) all obligations of such Person in respect of bankers' acceptances, (k) obligations in respect of Disqualified Stock, and (l) all obligations of such Person in respect of any exchange traded or over the counter derivative transaction, including any Hedging Agreement, in each case, whether entered into for hedging or speculative purposes or otherwise. The amount of any Indebtedness of any Person in

respect of a Hedging Agreement shall be the amount determined in respect thereof as of the end of the then most recently ended fiscal quarter of such Person, based on the assumption that such Hedging Agreement had terminated at the end of such fiscal quarter. In making such determination, if any agreement relating to such Hedging Agreement provides for the netting of amounts payable by and to such Person thereunder or if any such agreement provides for the simultaneous payment of amounts by and to such Person, then in each such case, the amount of such obligation shall be the net amount so determined, in each case to the extent that such agreement is legally enforceable in Insolvency Proceedings against the applicable counterparty thereof. The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer.

"*Initial Amortization Date*" shall have the meaning provided in the definition of Amortization Date.

*"Insolvency Proceeding"* means any proceeding commenced by or against any Person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law (domestic or foreign), including assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"*Insolvent*" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is greater than all of such Person's assets, (b) such Person is engaged or about to engage in a business or transaction for which the remaining assets of such Person are unreasonably small in relation to the business or transaction or for which the property remaining with such Person is an unreasonably small capital, (c) such Person has incurred, or reasonably believes that it will incur, debts beyond its ability to pay such debts as they generally become due (whether at maturity or otherwise), or (d) such Person is not "solvent" or is "insolvent", as applicable within the meaning given those terms and similar terms under applicable laws relating to fraudulent transfers and conveyances.

*"Intellectual Property"* means all of a Person's right, title, and interest in and to the following: domain names; Copyrights, Trademarks and Patents (including registrations and applications therefor prior to granting, and whether or not filed, recorded or issued); all trade secrets and related rights, including without limitation rights to unpatented inventions, know-how and manuals; all design rights; claims for damages by way of past, present and future infringement of any of the rights included above; all amendments, renewals and extensions of any Copyrights, Trademarks or Patents.

"*Interest Extension Period*" has the meaning ascribed thereto in the definition of "*Interest Only Extension*" contained herein.

*"Interest Only Extension"* means immediately following the Initial Amortization Date, an additional six (6) month period of interest only payments ("***Interest Extension Period***") if Borrower achieves the I/O Extension Milestones.

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

*"Inventory"* means "inventory" as defined in the Code, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of Borrower, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Borrower's Books relating to any of the foregoing.

*"Investment"* means any beneficial equity ownership in any Person (including stock, partnership interest or other securities), or any loan, advance or capital contribution to any Person.

"*I/O Extension Milestones*" mean the determination to Agent's satisfaction that (i) no Event of Default has occurred and is continuing, and (ii) either (a) Borrower having achieved $25,000,000 or more in trailing

twelve consecutive month Revenue by December 31, 2021, or (b) Borrower having received at least $35,000,000 of cash proceeds from the sale of its Equity Interests after the Closing Date but on or before December 31, 2021, with evidence thereof satisfactory to Agent having been provided not later than January 31, 2022.

*"IPO"* means the Company's initial public offering of its securities.

"*Joinder Agreement*" means the agreement substantially in the form of ***Exhibit G*** hereto.

*"Landlord Subordination and Access Agreement"* means an agreement between Borrower's landlord(s) and Agent that provides Agent access to the premises that Borrower leases from such landlord in a form satisfactory to Agent.

*"Lender Expenses"* means all reasonable and reasonably documented costs or expenses (including reasonable attorneys' fees and expenses, whether generated in-house or by outside counsel) incurred by Agent or any Lender in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees incurred by Agent or any Lender; and Agent's and any Lender's reasonable attorneys' fees and expenses incurred before, during and/or after an Insolvency Proceeding in maintaining, amending, enforcing, collecting, performing (including any workout or restructuring) or defending the Loan Documents, or incurred in any other matter or proceeding relating to the Loan Documents (including in all cases, without limit, court costs, legal expenses and reasonable attorneys' fees and expenses, whether generated in-house or by outside counsel, whether or not suit is instituted, and, if suit is instituted, whether at trial court level, appellate court level, in a bankruptcy, probate or administrative proceeding or otherwise); provided, however, that the attorneys' fees and expenses of Agent or any Lender constituting Lender Expenses incurred through and including the initial Funding Date shall not exceed $50,000.

*"Lien"* means any pledge, bailment, lease, mortgage, hypothecation, conditional sales and title retention agreement, charge, claim, encumbrance or other lien in favor of any Person.

*"Lien Notice"* has the meaning given to such term in **Section 6.16**.

"*Liquidation Event*" means any of the following: (i) a merger of Borrower with another entity pursuant to which Borrower is not the surviving entity or a SPAC Acquisition; or (ii) the sale of all or substantially all of Borrower's assets; or (iii) a sale or other disposition of the equity securities or interests of Borrower by Borrower or the equity holders of Borrower as of the Closing Date (other than sales or dispositions to Affiliates of such equity holders), which results in such equity holders owning less than 50% of the voting equity securities or interests of Borrower immediately following such transaction (other than through the sale of Borrower's equity securities in the IPO).

"*Loan Documents*" means, collectively, this Agreement, the ACH Debit Consent, the Perfection Certificate, each Note, each Joinder Agreement, each Notice of Borrowing, the Warrants, the Control Agreement(s), the Landlord Subordination and Access Agreement, the Notice and Access Agreement, Collateral Pledge Agreement, any Subordination Agreement and all other documents, instruments and agreements executed or delivered by Borrower and/or any Loan Party to or for the benefit of Agent and Lenders in connection with this Agreement, all as amended or extended from time to time; *provided that* the Loan Documents shall not include any stock purchase agreement or similar equity instruments to acquire, or agreements governing the rights of, any capital stock or other equity security, or any common stock, preferred stock, unit, or equity security issued to or purchased by any Lender or its nominee or assignee under **Section 6.13**.

*"Loan Party"* means any Person (other than Agent) that has executed a Joinder Agreement and delivered it to Agent.

*"Management Rights Letter"* means a letter in substantially the form of ***Exhibit I***.

*"Material Adverse Effect"* means a material adverse effect on (i) the business, operations, performance, properties, Revenue, assets, liabilities, capitalization, results of operations (financial or otherwise), cash flows or condition (financial or otherwise) of Borrower and its Subsidiaries taken as a whole, (ii) the termination (but

not natural expiration in accordance with its terms), material breach or default (or assertion of a termination, material breach or default) of any Material Contracts of Borrower or any of its Subsidiaries, (iii) the ability of Borrower to repay the Obligations or otherwise perform its obligations under the Loan Documents, or (iv) the validity or priority of, or any impairment to, Agent's security interests in the Collateral or Agent's right to enforce any of its rights or remedies with respect to the Obligations.

*"Material Contracts"* means any contract or agreement (whether written or oral) to which the Borrower or any of its Subsidiaries is a party where the aggregate consideration payable to or by the Borrower or such Subsidiary pursuant to the terms of such contract or agreement, or series of related contracts or agreements, exceeds $500,000 per fiscal year, provided however, that for contracts or agreements where the consideration payable is variable, such contract or agreement shall only be deemed a Material Contract if such contract or agreement could reasonably be expected to result in consideration in excess of $500,000 per fiscal year payable by or to Borrower or any of its Subsidiaries.

"*Material Customers*" has the meaning given to such term in **Section 5.19(c)**.

"*Maturity Date*" means, with respect to all Advances, March 31, 2025.

"*Minimum Return*" shall mean the ratio equal to (a) the aggregate amount, without duplication, of (i) the principal and interest and (ii) the Facility Fee, in all cases actually paid in cash by the Loan Parties to Agent for the benefit of Lenders hereunder; divided by (b) the aggregate amount of Advances. For the avoidance of doubt, the foregoing clause (a) shall not include any amounts other than those listed, including, without limitation, fees paid directly to Agent for its own account, Lender Expenses and the value of any Equity Interests or Warrants or any underlying securities.

"*Minimum Funding Amount*" means the lesser of (i) Five Million Dollars ($5,000,000) and (ii) the remaining amount available under the Commitment.

"*Multiemployer Plan*" means any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA) to which the Borrower, any of its Subsidiaries or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six years has made or been obligated to make contributions.

*"Negotiable Collateral"* means all letters of credit of which Borrower is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Borrower's Books relating to any of the foregoing.

"*Net Income*" means net income as defined by GAAP (consistently applied), but excluding (a) extraordinary gains and losses from asset sales, hedging activities, nonrecurring Revenue, one-time expenses incurred upon or related to any acquisition consented to by Agent or permitted under this Agreement, and (b) any other Revenue received outside the ordinary course of Borrower's business.

*"Note"* means a secured promissory note in favor of a Lender in the form of ***Exhibit B***.

*"Notice and Access Agreement"* means an agreement between a third party warehouse, fulfillment center, bailee or similar entity, on the one hand, and Agent on the other, that provides Agent access to the premises containing Borrower's Inventory or other Collateral.

"*Notice of Borrowing*" means a notice of borrowing of an Advance pursuant to the terms of this Agreement in substantially the form of ***Exhibit D***.

*"Obligations"* means all debt, principal, interest, fees, charges, Lender Expenses and other amounts owing by Borrower or any Loan Party to Agent or a Lender of any kind and description whether arising under or pursuant to or evidenced by the Loan Documents, and whether or not for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, including the principal and interest due with respect to the Advances, and further including all Lender's Expenses that Borrower or any Loan Party is required to pay or reimburse by the Loan Documents, by law, or otherwise. Notwithstanding the foregoing,

Obligations shall not include any obligations of Borrower in connection with the Warrant or other equity security of Borrower held by Agent or a Lender or their Affiliates or any agreements governing the rights of Agent or any Lender or their Affiliates with respect to such Warrant or other equity securities; *provided* that Obligations shall include Borrower's obligations, and Agent's and Lenders' rights under **Section 6.13.**

*"Patents"* means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent.

"*Pension Plan*" means any "employee benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, which is subject to Title IV of ERISA or Sections 412 of the Internal Revenue Code or Section 302 of ERISA, and which is or was, within the preceding six years, maintained by Borrower, any of its subsidiaries or any ERISA Affiliate.

*"Perfection Certificate"* means the Perfection Certificate substantially in the form of ***Exhibit F*** hereto.

"*Permitted Indebtedness*" means the following:

(a) Indebtedness of Borrower in favor of Agent or a Lender arising under this Agreement or any other Loan Document;

(b) Indebtedness existing on the Closing Date and disclosed in the Disclosure Schedules;

(c) Indebtedness consisting of: (i) accounts receivable financings on terms satisfactory to Agent in its sole discretion; (ii) capital leases; (iii) Permitted Investments allowed pursuant to **Section (f)** of the definition of Permitted Investments; and (iv) purchase money obligations for fixed or capital assets within the limitations set forth in clause (c) of the defined term "Permitted Liens," *provided* such Indebtedness does not exceed the lesser of the cost or fair market value of the equipment and software financed with such Indebtedness;

(d) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, *provided* that such Indebtedness is promptly extinguished;

(e) Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(f) Indebtedness of Borrower that may be deemed to exist in connection with agreements providing for warranty obligations entered into in the ordinary course of business;

(g) Indebtedness of Borrower arising from customary cash management services or in connection with any automated clearinghouse transfer of funds in the ordinary course of business; and

(h) Indebtedness of Borrower arising from customary credit card charges incurred in the ordinary course of business,

*"Permitted Investment"* means:

(a) Investments existing on the Closing Date disclosed in the Disclosure Schedules; and

(b) Investments constituting cash and Cash Equivalents, provided such cash and Cash Equivalents (other than cash held in Excluded Accounts) are in accounts which are subject to a Control Agreement in favor of Agent;

(c) Investments accepted in connection with Permitted Transfers;

(d) Investments of Subsidiaries in or to other Subsidiaries or to Borrower provided that such Subsidiaries have signed a Joinder Agreement;

(e) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of Borrower's business;

(f) Investments consisting of the purchase of capital assets in an amount not to exceed $500,000 per fiscal year; and

(g) Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

*"Permitted Licenses"* mean non-exclusive licenses and similar arrangements for the use of the property of Borrower or its Subsidiaries in the ordinary course of business, but excluding any such license or arrangement pursuant to which Borrower or its Subsidiaries incurs any payment obligations (excluding inchoate indemnity obligations) to any Person in excess of $500,000 per fiscal year.

*"Permitted Liens"* means the following:

(a) Liens existing on the Closing Date and disclosed in the Disclosure Schedules or as specifically permitted in the definition of Permitted Indebtedness provided that such Liens are not superior to Agent's Lien on the Collateral;

(b) Liens for taxes, fees, assessments or other governmental charges or levies that are delinquent and for which Borrower maintains adequate reserves;

(c) Liens (i) upon or in any equipment acquired or held by Borrower or any of its Subsidiaries to secure the purchase price of such equipment incurred solely for the purpose of financing the equipment not to exceed $500,000 outstanding at any time, or (ii) existing on such assets at the time of their acquisition, provided that with respect to clauses (i) and (ii), the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such assets; provided further that the same have no priority over Agent's Lien in the Collateral (other than with respect to such equipment) and do not encumber the Collateral (other than with respect to such equipment);

(d) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (c) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount and interest rate of the indebtedness being extended, renewed or refinanced does not increase, and the term (or maturity) for payment does not decrease;

(e) Non-exclusive licenses of Intellectual Property granted to third parties in the ordinary course of Borrower's business;

(f) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under **Section 8.5** or **Section 8.7**;

(g) Liens in favor of other financial institutions arising in connection with Borrower's deposit accounts or securities accounts held at such institutions to secure standard fees for services charged by, but not financing made available by such institutions; *provided that* Agent, for itself and the benefit of Lenders has a perfected security interest in the amounts held in such accounts;

(h) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of customs duties in connection with the importation of goods;

(i) Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums;

(j) Liens on deposits securing obligations with suppliers entered into in the ordinary course of business;

(k) statutory Liens of landlords and Liens of carriers, warehousemen, mechanics and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business not to exceed $500,000 in the aggregate; provided that such Liens attach only to Inventory and secure only amounts not yet due and payable or, if due and payable, are unfiled and no other action has been taken to enforce the same, are not overdue by more than 15 days; and

(l) Liens to secure workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than Liens imposed by ERISA).

*"Permitted Transfer"* has the meaning given to such term in **Section 7.2**.

*"Person"* means and includes any individual, any partnership, any corporation, any business trust, any joint stock company, any limited liability company, any unincorporated association or any other entity and any Governmental Authority.

"*Prime Rate*" means, for any day, the Prime Rate most recently published in the Money Rates section of the Western Edition of The Wall Street Journal, provided however, (i) the Prime Rate shall not decrease below three and one-quarter percent (3.25%), and (ii) if the Prime Rate increases during any given month, the Prime Rate shall be deemed to be such increased amount as of the first day of such month and the additional interest resulting from such increase shall be due and payable on the first Business Day of the following month. If the Wall Street Journal, Western Addition no longer reports the Prime Rate, then Agent shall select a reasonably comparable index or source to use as the basis for the Prime Rate.

"*Pro Rata Percentage*" means, with respect to any Lender, a percentage equal to a fraction, the numerator of which is such Lender's Commitment and the denominator of which is the aggregate of the Commitments of all Lenders.

"*Proceeds*" shall have the meaning assigned to such term in the Code.

*"Property"* means any interest in any kind of property or asset, whether real, personal or mixed, whether tangible or intangible.

"*Register*" has the meaning given to such term in **Section 13.1**.

"*Required Lenders*" means Lenders holding a majority in interest of the Commitment.

*"Responsible Officer"* means the President, Chief Executive Officer, Chief Financial Officer, Head of Finance, or Controller of Borrower.

*Revenue"* means, for any Person, revenue received by such Person as determined in accordance with GAAP (consistently applied) from the sale of finished Goods Inventory or services, in all cases in the ordinary course of such entity's business, less returns, credits and sales taxes, computed using the same methodology employed in Current Financial Statements to report Revenue.

"*Securities Account*" means any "securities account" as defined in the Code.

"*Small Business Administration*" means the U.S. Small Business Administration.

"*Software*" means all software, which is comprised of computer programs and certain related technical information and documentation, together with any updates, upgrades, error corrections, bug fixes, other modifications thereto and new versions thereof, which is proprietary to Borrower and which Borrower licenses to customers in the ordinary course of its business.

"*Software Materials*" has the meaning given to such term in **Section 6.18(a)**.

"*SPAC*" means a company with no commercial operations that is formed, or has been repurposed, to raise capital through a public offering for the purpose of acquiring an existing company, whereby upon acquisition, the acquired company will effectively become a publicly traded company.

"*SPAC Acquisition*" Borrower's acquisition by or business combination with a SPAC.

*"Subordinated Debt"* means any Indebtedness incurred by Borrower that is subordinated to the Obligations pursuant to a Subordination Agreement on terms acceptable to Agent.

"*Subordination Agreement*" means any subordination, intercreditor, or other similar agreement in form and substance satisfactory to Agent entered into between Agent and the other creditor, on terms acceptable to Agent whereby a Person subordinates the Indebtedness of any Loan Party to such Person to the Indebtedness of any Loan Party to Agent and/or Lenders.

*"Subsidiary"* means (i) any Person that is an entity of which a majority of the outstanding capital stock, membership interests or other equity interests entitled to vote for the election of directors, managers or the equivalent is owned by Borrower directly or indirectly through Subsidiaries including any Subsidiary formed after the date hereof, or (ii) HouseCanary (CT), Inc., a Delaware corporation, even though it technically does not qualify as a "Subsidiary" under section (i), above.

"*Synthetic Lease Obligations*" means, as to any Person, an amount equal to the capitalized amount of the remaining lease payments under any synthetic lease that would appear on a balance sheet of such Person in accordance with GAAP (consistently applied) if such obligations were accounted for as Capital Lease Obligations.

"*Texas Defendants*" means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or their respective Affiliates.

"*Texas Judgment*" means the verdict awarded to Borrower in connection with the Texas Litigation.

"*Texas Litigation*" means, collectively, the legal proceedings in the cases captioned (a) *Title Source, Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc.*, Case No. 2016-CI-06300, pending in Bexar County, Texas, 73rd Judicial District, and any appeal – including the Petition for Review filed in *HouseCanary Analytics, Inc. v Title Source, Inc.*, No 20-0683, before the Supreme Court of Texas – or remand therefrom or proceedings in connection therewith (collectively, the "*Texas Litigation*"), and any new proceedings that may arise from the facts and/or causes of action set forth therein, and/or (b) *HouseCanary, Inc. v. Quicken Loans Inc., et al.*, Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable.

"*Texas Litigation Claims*" means the claims that Borrower has against each of the Texas Defendants in connection with the Texas Litigation.

"*Texas Litigation Collateral*" means the Texas Litigation Claims, including the Texas Judgement, and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all Proceeds of any and all of the foregoing.

"*Texas Litigation Proceeds*" means any and all consideration actually paid directly or indirectly to or for the benefit of Borrower by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of Borrower from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation.

*"Trademarks"* means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of a Person connected with and symbolized by such trademarks, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent.

*"Transfer"* has the meaning given to such term in **Section 7.2**.

"*Unrestricted Cash*" of any Person, means cash or Cash Equivalents of such Person, (a) that are not, and are not required to be, designated as "restricted" on the financial statements of such Person, (b) that are not contractually required, and have not been contractually committed by such Person, to be used for a specific purpose, (c) that are not subject to (i) any provision of law, statute, rule or regulation, (ii) any provision of the organizational documents of such Person, (iii) any order of any Governmental Authority or (iv) any contractual restriction (including the terms of any Equity Interests), in each case of (i) through (iv), preventing such cash or Cash Equivalents from being applied to the payment of the Obligations, (d) in which no Person other than the Agent has a Lien other than Permitted Liens as set forth in **Subsection (g)** of the definition of Permitted Liens, and (e) that are held in a Deposit Account or Securities Account, as applicable, in which the Agent has a valid and enforceable security interest, perfected by "control" (within the meaning of the applicable Code or for any Deposit Account or Securities Account located outside the United States, other controlling legal authority), but in all cases shall exclude the amount of such Person's Indebtedness which is more than three (3) Business Days overdue.

"*USA FREEDOM Act*" means The Uniting and Strengthening America by Fulfilling Rights and Ending Eavesdropping, Dragnet-collection and Online Monitoring (USA FREEDOM ACT) Act of 2015, Public Law 114-23 (June 2, 2015), as may be amended.

"*USA PATRIOT Act*" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)), as may be amended.

*"Warrant"* means the Warrant (or Warrants) in favor of a Lender or one or more Affiliates of a Lender to purchase securities of Borrower issued to such Lender or its Affiliates on the Closing Date, substantially in the form of ***Exhibit C***.

**1.2 Other Interpretive Provisions**. References in this Agreement to "Articles," "Sections," "Exhibits," "Schedules" and "Annexes" are to articles, sections, exhibits, schedules and annexes herein and hereto unless otherwise indicated. References in this Agreement and each of the other Loan Documents to (a) any other document, instrument or agreement shall include all exhibits, schedules, annexes and other attachments thereto, and (b) any law, statute or regulation shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law, statute or regulation, and (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns. References to this Agreement or any of the other Loan Documents shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, modified and supplemented from time to time and in effect at any given time, provided that Borrower may amend the Perfection Certificate and Disclosure Schedules unilaterally only as expressly authorized in Section 5. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. The words "include" and "including" and words or similar import when used in this Agreement or any

other Loan Document shall not be construed to be limiting or exclusive. Unless otherwise indicated in this Agreement or any other Loan Document, (d) all references to dollars, Dollars or $ shall mean United States Dollars, and (e) all accounting terms used in this Agreement or any other Loan Document (e.g. revenue) shall be construed, and all accounting and financial computations hereunder or thereunder shall be computed, in accordance with GAAP, consistently applied. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

**2. Loan and Terms of Payment**

**2.1 Commitment.** Subject to the terms and conditions of this Agreement and relying upon the representations and warranties herein set forth as and when made or deemed to be made, each Lender agrees to lend to Borrower, prior to the Commitment Termination Date, the Advances; *provided that* the aggregate principal amount of the Advances shall not exceed the Commitment and no Lender shall be required to lend more than its Pro Rata Percentage of the Commitment as set forth on Schedule 2.1. If prepaid, the principal of the Advances may not be re-borrowed.

**2.2 Use of Proceeds; The Advances.**

**(a) Use of Proceeds.** The proceeds of the Advances shall be used solely for the general corporate purposes of the Borrower, including without limitation growth related initiatives, financing of existing Indebtedness, and additional capex spending, in all cases subject to the terms of this Agreement.

**(b) The Advances.** The Advances shall be repayable as set forth in **Section 2.4**. Each Lender and Agent may, and are hereby authorized by Borrower to, endorse in Lender's and Agent's books and records appropriate notations regarding such Lender's interest in the Advances; *provided, however,* that the failure to make, or an error in making, any such notation shall not limit or otherwise affect the Obligations.

**2.3 Procedure for Making Advances; Interest.**

(a) **Notice**. Not less than three (3) Business Days prior to each Funding Date, Borrower shall submit the Notice of Borrowing to Agent, whereupon Agent shall immediately notify Lenders. Each Lender's obligation hereunder to make the Advance on the initial Funding Date shall be subject to the satisfaction of the conditions set forth in **Sections 3.1** and **3.2**. Each Lender's obligation hereunder to make a subsequent Advance shall be subject to the satisfaction of the conditions set forth in **Section 3.2** and the satisfaction of the Funding Milestone. The amount of the requested Advance on the initial Funding Date shall be $20,000,000. The amount of any requested Advance thereafter shall not be less than the Minimum Funding Amount, and must be made, if at all, within ninety (90) days after the satisfaction of the Funding Milestone. Upon satisfaction of the applicable conditions for any Advance requested by Borrower hereunder, each Lender agrees, severally and not jointly, to make such Advance to Borrower in an aggregate principal amount equal to such Lender's Pro Rata Percentage of such Advance.

(b) **Interest Rate**. Borrower shall pay interest to Agent for the benefit of Lenders on the unpaid principal amount of the Advances from the date of such Advance until such Advance has been paid in full, at a *per annum* rate of interest equal to the Basic Rate. In addition, Borrower shall pay interest to Agent for the benefit of Lender on any other Obligation from the time when such Obligation is due until such Obligation has been paid in full. All computations of interest shall be based on a year of three hundred sixty (360) days for actual days elapsed. Notwithstanding any other provision hereof, the amount of interest payable hereunder shall not in any event exceed the maximum amount permitted by the law applicable to interest charged on commercial loans.

(c) **Disbursement**. Subject to the satisfaction of the conditions set forth in **Sections 3.1** and **3.2** with respect to the Advance made on the initial Funding Date, and the satisfaction of the conditions set forth in **Section 3.2** and the Funding Milestone with respect to any subsequent Advance, the Advances shall be disbursed by Agent after receipt from Lenders via wire transfer of funds to one or more accounts designated in writing by Borrower in the Notice of Borrowing.

(d) **Termination of Commitment to Lend.** Notwithstanding anything in the Loan Documents, each Lender's obligation to lend the undisbursed portion of the Commitment to Borrower hereunder shall terminate on the Commitment Termination Date or as set forth in **Section 2.8**.

**2.4 Amortization of Principal and Interest; Final Payment.**

(a) **Interest Payments**. Interest on each Advance shall be due and payable to Agent for the benefit of Lenders in advance on the first Business Day of each month and continuing on the first Business Day of each month thereafter (each a "*Payment Date")* during the term of such Advance; *provided however*, and in addition, that upon the funding of each Advance, interest on such Advance shall be withheld from the Advance on the Funding Date of the Advance for the period between the Funding Date of such Advance and the first Payment Date immediately following the Funding Date of such Advance. Once paid, interest is nonrefundable and shall be deemed earned as of the Payment Date for which such interest payment is due. Agent shall allocate and distribute all interest payments received from Borrower to the Lenders based on each Lender's Pro Rata Percentage.

(b) **Principal Payments**. From and after the Amortization Date, in addition to the payment of interest due under **Section 2.4(a)** hereunder, Borrower shall make equal monthly payments of principal on each Payment Date until the Maturity Date in an amount equal to the amount needed to fully amortize the outstanding Advances as of the Maturity Date. Agent shall allocate and distribute all principal payments received from Borrower to the Lenders based on each Lender's Pro Rata Percentage

(c) **Final Payment**. Unless an Advance is prepaid in full prior to the Maturity Date, Borrower shall pay the entire unpaid principal and accrued interest and all unpaid Obligations on the Maturity Date, including the Exit Fee. Agent shall allocate and distribute all such payments to the Lenders based on each Lender's Pro Rata Percentage.

**2.5 Fees and Expenses.** Borrower shall pay to Agent the following:

(a) **Facility Fee.** On the Closing Date, a cash facility fee equal to $150,000 (the "***Facility Fee***"), payable to Agent for the benefit of SCI. The Facility Fee will be deducted and withheld from the initial Advance. The Facility Fee is nonrefundable and deemed fully earned as of the Closing Date.

(b) **Lender's Expenses.** On the initial Funding Date, all unreimbursed Lender Expenses, which Agent may deduct from the Advance. Thereafter, all unreimbursed Lender Expenses shall be due within 15 days of Agent's demand. Agent shall allocate and disburse such payments to the Person having incurred such Lender Expenses.

(c) **Late Fee.** If any payment is not made when due, Borrower shall pay a late fee equal to the lesser of (i) five percent (5%) of the amount of such unpaid amount or (ii) the maximum amount permitted to be charged under applicable law. Agent shall allocate and distribute all such payments to the Lenders based on each Lender's Pro Rata Percentage.

**2.6 Prepayments**.

(a) **Mandatory Prepayment Upon an Acceleration**. If repayment of the Advances is either automatically or at the election of Agent pursuant to the terms hereof accelerated following the occurrence and continuance of an Event of Default, then Borrower shall immediately pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to the date of prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Exit Fee, and (iv) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(b) **Mandatory Prepayment Upon a Liquidation Event.** If a Liquidation Event shall occur, then Borrower shall upon such Liquidation Event pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to such Liquidation Event, (ii) the outstanding principal amount of the Advances, (iii) the Exit Fee, and (iv) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(c) **Voluntary Prepayment**. Borrower may voluntarily prepay all, but not less than all, of the Advances at any time; *provided that* each of the following conditions is satisfied: Borrower pays to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due up to and including the date of prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Exit Fee, and (iv) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

**2.7 Other Payment Terms**.

(a) **Place and Manner**. Borrower shall authorize Agent to cause all payments due to Agent hereunder, whether such payments are on account of the Advances, Lender Expenses, fees or other payments due, to be made in lawful money of the United States, in good same day or immediately available funds to an account designated by Agent or to Agent's address.

(b) **Date**. Whenever any payment due hereunder shall fall due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in the computation of interest or fees, as the case may be.

(c) **Default Rate**. If an Event of Default has occurred and is continuing, at Agent's election, Borrower shall pay interest on the Obligations from the date of such Event of Default until such Event of Default is cured, at a *per annum* rate equal to the Default Rate. All computations of such interest shall be based on a year of three hundred sixty (360) days for actual days elapsed.

(d) **Payments Free from Taxes**. All payments by or on account of any obligation of Borrower hereunder shall be made free and clear of, and without deduction for, any present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed under U.S. federal, state, local or any foreign law (including additions to tax, penalties and interest), other than (i) taxes imposed on or with respect to a Lender or its assignee based on or measured with respect to overall net income or net profits (including any branch profits or franchise taxes imposed in lieu thereof), (ii) backup withholding taxes by the jurisdiction (or any political subdivision thereof) under the laws of the jurisdiction(s) in which a Lender or its assignee is resident or deemed to be resident, is organized, or carries on business or is deemed to carry on business (other than a jurisdiction in which a Lender or its assignee would not have been treated as carrying on business but for this Agreement) to which such payment relates, (iii) withholding taxes imposed on amounts payable to or for the account of such Lender or assignee with respect to an applicable interest in an Obligation or Advance pursuant to a law in effect on the date on which such Lender or assignee acquires such interest in the Obligation or Advance, (iv) any U.S. federal withholding Taxes imposed under FATCA and (v) any taxes imposed solely as a result of a Lender's or any of its assignee's assignment of this Agreement (such taxes in clauses (i)-(v), "*Excluded Taxes*"). If any taxes, other than Excluded Taxes, shall be deducted (as required by law or otherwise) from, or in respect of, any such payments (including any consent or similar fees), (i) the sum payable by Borrower shall be increased as necessary so that after making all deductions (including deductions on account of taxes that are applicable to additional sums payable under this **Section 2.7(d)**), a Lender or its assignee receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions, and (iii) the applicable withholding agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable laws. Within thirty (30) days after the date of any payment of amounts deducted to the appropriate taxing authority (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), Borrower shall furnish to Agent the original or a certified copy of a receipt evidencing payment thereof, or such other written proof of payment thereof that is reasonably satisfactory to Agent. If Borrower fails to pay any taxes (other than Excluded Taxes) when due to the appropriate taxing authority or fails to remit to Agent for the benefit of the Lenders the required receipts or other required documentary evidence, Borrower shall indemnify Agent and Lenders (and any assignee) for any taxes (other than Excluded Taxes) that may become payable by such person (or such person's beneficial owners) arising out of such failure. Notwithstanding anything to the contrary contained herein, in the event that a Lender shall sell, assign, transfer, convey or otherwise dispose of any or all of its rights and/or obligations hereunder to a Person that is not a "United States Person" (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code, as amended, such Lender (and not Borrower) shall be solely responsible for any withholding or other taxes assessed on account of such transfer, or on account of the payment of principal and/or interest to such Person under this Agreement. As used herein, "*FATCA*" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code**.**

(e) **Crediting Payments.** Unless otherwise approved by Agent, all payments to be made by Borrower under any of the Loan Documents shall be made by same day wire transfer to Agent for the benefit of Lenders in accordance with the wire transfer instructions as provided in writing by Agent, as may be updated in writing from time to time by Agent. Unless otherwise determined by Agent, all payments received from Borrower shall be applied first to any outstanding fees and/or Lender Expenses, then to accrued and unpaid interest, then to principal. Any wire transfer or payment received by Agent after 12:00 noon Pacific Time may be deemed to have

been received by Agent as of the opening of business on the immediately following Business Day. Notwithstanding the foregoing, Borrower authorizes Agent to process payment of all Obligations by debiting Borrower's account as provided in the ACH Debit Consent, and notice shall be provided to Borrower should any payment be processed.

**2.8** **Term**. This Agreement shall become effective on the Closing Date and shall continue in full force and effect for so long as any Obligations remain outstanding (other than inchoate indemnity obligations). Notwithstanding the foregoing, Agent shall have the right to terminate any obligation to make Advances under this Agreement immediately and without notice upon the occurrence and during the continuance of an Event of Default. Notwithstanding termination, Agent's Lien on the Collateral shall remain in effect for so long as any Obligations are outstanding (other than inchoate indemnity obligations) and upon payment in full of all Obligations (other than inchoate indemnity obligations which are not the subject of an indemnity claim), Agent's Lien on the Collateral shall terminate automatically.

**3. Conditions of Closing and Advances**

**3.1** **Conditions Precedent to Initial Funding.** The obligation of each Lender to make the initial Advance is subject to the condition precedent that Agent shall have received, in form and substance satisfactory to Agent, or that Agent shall have waived in writing the requirement to receive such item, all of the following:

(a) The Loan Documents and the Warrant duly executed by Borrower and any Loan Party required to sign a Joinder Agreement;

(b) A duly executed officer's certificate of Borrower and any party signing a Joinder Agreement containing the following documents: (i) current certificate of incorporation (or equivalent document), (ii) bylaws (if such entity is a corporation), (iii) resolutions authorizing the Loan Documents and, in the case of Borrower, the Warrant, (iv) a good standing certificate from each party's state of formation and from any state where such party is, or is required to be, qualified to do business and (v) incumbency and representative signatures;

(c) All necessary consents of stockholders or members and other third parties with respect to the execution, delivery and performance of the Loan Documents and, in the case of Borrower, the Warrant;

(d) Payment of the $25,000 due diligence fee, which fee shall be deemed earned as of the date paid and non-refundable;

(e) All documentation and other information which Agent reasonably requests with respect to any Loan Party in order to comply with their ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT, the USA FREEDOM Act, IRS Form W-9 and other applicable tax forms;

(f) The Current Financial Statements of Borrower shall have been delivered to Agent;

(g) Evidence of the insurance coverage required by **Section 6.8** of this Agreement; and

(h) Such other documents, and completion of such other matters, as Agent may deem necessary or appropriate.

**3.2** **Conditions Precedent to all Advances.** The obligation of Lender to make each Advance, including the initial Advance on the initial Funding Date, is further subject to the following conditions:

(a) If requested by Agent, Borrower shall have executed and delivered to Agent for the benefit of a Lender, the Note in the principal amount of such Advance including the initial Advance;

(b) Agent shall have received such documents, instruments and agreements, including certificates evidencing Collateral consisting of Equity Interests, UCC financing statements or amendments to UCC financing statements, as Agent shall reasonably request to evidence the perfection and priority of the security interests granted to Agent pursuant to **Section 4**;

(c) Borrower shall have delivered to Agent for the benefit of Lender a Subordination Agreement, release, or estoppel letter, as appropriate, from any Person having an existing Lien on any item of Collateral other than Liens of the type described in clause (c) and (g) of the definition of Permitted Liens and listed in the Disclosure Schedules under the heading of Permitted Liens;

(d) The representations and warranties contained in **Section 5** shall be true and correct on and as of effective date of each Advance as though made at and as of each such date, and no Default or Event of Default shall have occurred and be continuing, or would exist after giving effect to such Advance. The making of each Advance shall be deemed to be a representation and warranty by Borrower on the date of such Advance as to the accuracy of the facts referred to in this **Section 3.2**;

(e) In Agent's reasonable discretion, there has not been any material impairment in the Collateral, Borrower's general affairs, management, results of operations, financial condition or the prospect for repayment of the Obligations; and

(f) Such other documents, and completion of such other matters, as Agent may reasonably deem necessary or appropriate.

**3.3 Covenant to Deliver.** Borrower agrees (not as a condition but as a covenant) to deliver to Agent each item required under this Agreement to be delivered to Agent as a condition to each Advance, if such Advance is made. Borrower expressly agrees that the extension of such Advance prior to the receipt by Agent of any such item shall not constitute a waiver by Agent of Borrower's obligation to deliver such item. Upon Agent's written request, Borrower shall promptly deliver an executed Note representing any Advance that is then outstanding.

**4. Creation of Security Interest**

**4.1 Grant of Security Interest.** To secure prompt repayment of any and all Obligations and prompt performance by Borrower of each of its covenants and duties under the Loan Documents, Borrower grants Agent, for itself and as agent for Lenders, a continuing security interest in all presently existing and hereafter acquired or arising Collateral. Except as set forth in the Disclosure Schedules, such security interest constitutes a valid, first priority security interest in the presently existing Collateral, and will constitute a valid, first priority security interest in Collateral acquired after the date hereof. This Agreement is intended by the parties to be a security agreement for purposes of the Code.

**4.2 Duration of Security Interest.** Agent's security interest in the Collateral shall continue until the payment in full in cash and the satisfaction of all Obligations (other than inchoate indemnity obligations or other obligations that expressly survive termination), whereupon such security interest shall terminate and Agent shall, at Borrower's sole cost and expense, promptly execute such further documents and take such further actions as may be necessary to effect the release contemplated by this **Section 4.2**, including duly executing and delivering termination statements for filing in all relevant jurisdictions under the Code.

**4.3 Possession of Collateral.** So long as no Event of Default has occurred and is continuing, Borrower shall remain in full possession, enjoyment and control of the Collateral (except only as may be otherwise required by Agent for perfection of its security interest therein) and shall be entitled to manage, operate and use the same and each part thereof with all the rights and franchises appertaining thereto; *provided*, *however*, that the possession, enjoyment, control and use of the Collateral shall at all times be subject to the observance and performance of the terms of this Agreement.

**4.4 Delivery of Additional Documentation Required.** Borrower shall from time to time execute and deliver to Agent for the benefit of Lenders, at the request of Agent, all Negotiable Collateral (having a value in excess of Five Hundred Thousand Dollars ($500,000) in the aggregate) and other documents that Agent may reasonably request, in a form satisfactory to Agent, to perfect and continue the perfection of Agent's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents. For the avoidance of doubt, if Borrower acquires a Commercial Tort Claim, Borrower shall promptly notify Agent in a writing signed by Borrower of the general details thereof and upon Agent's request, Borrower shall promptly, but in no event more than three (3) Business Days after such request, agree to an amendment to the definition Collateral in ***Exhibit A*** hereto to include such Commercial Tort Claim, such amendment to be in form and substance as required by Agent.

**4.5 Right to Inspect.** Agent (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrower's usual business hours but no more than twice a year (unless an Event of Default has occurred and is continuing), to inspect Borrower's Books and to make copies thereof and to check, test, and appraise the Collateral in order to verify Borrower's financial condition or the amount, condition of, or any other matter relating to, the Collateral.

**5. Representations and Warranties**

Borrower represents, warrants and covenants to Agent and Lenders as follows, which representations, warranties and covenants shall survive the execution and delivery of this Agreement and the providing of Advances pursuant hereto:

**5.1 Due Organization and Qualification.** Borrower is a Delaware corporation duly formed and existing under the laws of its state of formation and qualified and licensed to do business in any state in which the conduct of its business or its ownership of property requires that it be so qualified, except where the failure to do so could not reasonably be expected to cause a Material Adverse Effect. Each of Borrower's Subsidiaries is duly formed and validly existing under the laws of its respective jurisdiction of formation.

**5.2 Authority.** The execution, delivery, and performance of the Loan Documents are within Borrower's powers, have been duly authorized, and are not in conflict with nor constitute a breach of any provision of the Borrower's certificate of incorporation. Borrower is not in default under any Material Contract to which it is a party or by which it is bound and the execution and delivery by Borrower of the Loan Documents will not cause a breach of any Material Contract to which Borrower is a party or by which it is bound.

**5.3 Subsidiaries.** Borrower has no Subsidiaries other than as disclosed in **Section 2.a** of the Perfection Certificate, as may be amended. Except as set disclosed in **Section 2.a** of the Perfection Certificate, as may be amended, the ownership interests in each Subsidiary is evidenced by a physical certificate which has been delivered to Agent in furtherance of its Lien on the Collateral. Each Subsidiaries is duly formed and validly existing under the laws of its respective jurisdiction.

**5.4 Conflict with Other Instruments, etc.** Neither the execution and delivery of any Loan Document to which Borrower is a party nor the consummation of the transactions therein contemplated nor compliance with the terms, conditions and provisions thereof will (a) conflict with or result in a breach of any material law or any material regulation, order, writ, injunction or decree of any court or governmental instrumentality, or (b) result in the creation or imposition of any Lien other than Permitted Liens.

**5.5 Enforceability.** The Loan Documents have been duly executed and delivered by the Borrower and/or any Loan Party that is a party thereto, and constitute legal, valid and binding obligations of Borrower or such Loan Party, enforceable in accordance with their respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application relating to or affecting the enforcement of creditors' rights or by general principles of equity.

**5.6 No Prior Encumbrances.** Borrower has good and marketable title to the Collateral, free and clear of Liens, except for the first priority Lien held by Agent and except for other Permitted Liens. Borrower has all right to dispose of the Collateral free and clear of all Liens except for Permitted Liens.

**5.7 Name; Location of Chief Executive Office, Principal Place of Business and Collateral.** As of the Closing Date and each date that a Compliance Certificate is to be delivered,(a) in the most recent five (5) years, Borrower has not done business under any name other than that specified on the signature page hereof or as disclosed on the Perfection Certificate, as may be amended, (b) the chief executive office, principal place of business, and the locations where Borrower maintains its records concerning the Collateral are presently located at the address(es) set forth in the Perfection Certificate, as may be amended (c) the tangible property included in the Collateral is presently located at the address(es) set forth in the Perfection Certificate, as may be amended, and (d) the Perfection Certificate is accurate and complete. Except as disclosed in **Section 2.f** of the Perfection Certificate, as may be amended, no Collateral is in the possession of a bailee or any third party.

**5.8 Litigation; Governmental Action**. Except as set forth in **Section 6** of the Perfection Certificate, there are no actions or proceedings pending or, to the knowledge of the Responsible Officers, threatened by or against Borrower or any of its Subsidiaries involving (i) more than, individually or in the aggregate, Five Hundred Thousand Dollars ($500,000), (ii) fines, penalties or other sanctions by any Governmental Authority, or (iii) claims for injunctive or equitable relief. Except as set forth in **Section 6** of the Perfection Certificate, there is no action or proceeding pending by or against Borrower or any of its Subsidiaries where Borrower or any Subsidiary has incurred in excess of $500,000 in legal expenses, including without limitation, attorneys' fees, for which Borrower has not been reimbursed by third party insurance (i.e., not self-insurance) within 60 days of Borrower's written request for reimbursement.

**5.9 Financial Statements.** All consolidated financial statements related to Borrower and its Subsidiaries fairly present in all material respects Borrower's consolidated financial condition as of the date thereof and consolidated results of operations for the period then ended. On the Closing Date, there has not been a material adverse change in the financial condition of Borrower since the date of the most recent of such financial statements and submitted to Agent and Lenders and attached to this Agreement (the "*Current Financial Statements*"). Borrower's net Revenue and net cash flows are not materially lower (more than 10%) than as provided in the Approved Budget.

**5.10 Solvency.** Borrower and its Subsidiaries taken as a whole are not Insolvent.

**5.11 Taxes.** Borrower and each Subsidiary has filed or caused to be filed all tax returns required to be filed, and has paid, or has made adequate provision for the payment of, all taxes before the same become delinquent, other than payments of taxes in an outstanding aggregate amount not to exceed $50,000 or except to the extent such taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserve as shall be required in conformity with GAAP, consistently applied, shall have been made therefor. Except as set forth in the "Tax Matters" section of the Disclosure Schedules, Borrower is unaware of any claims or adjustments proposed for any of Borrower's or any Subsidiary's prior tax years which could result in additional taxes in excess of $50,000 becoming due and payable. Borrower and each Subsidiary have paid all amounts necessary, if any, to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and neither Borrower nor any Subsidiary have withdrawn from participation in, and have not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower or any Subsidiary in excess of $500,000, including any such liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

**5.12 Consents and Approvals.** No approval, authorization or consent of any trustee or holder of any indebtedness or obligation of Borrower or of any other Person under any material agreement, contract, lease or license or similar document or instrument to which Borrower or any Subsidiary is a party or by which Borrower or any Subsidiary is bound, is required to be obtained by Borrower in order to make or consummate the transactions contemplated under the Loan Documents. All consents and approvals of, filings and registrations with, and other actions in respect of, all Governmental Authorities required to be obtained by Borrower in order to make or consummate the transactions contemplated under the Loan Documents have been, or prior to the time when required will have been, obtained, given, filed or taken and are or will be in full force and effect.

**5.13 Intellectual Property**. Borrower and each Subsidiary is the sole owner of its Intellectual Property, except for (i) over the counter software and non-customized mass market licenses that are commercially available to the public, (ii) non-exclusive licenses granted by Borrower to its customers or other third parties in the ordinary course of business, and (iii) Intellectual Property licensed to Borrower. **Section 4** of the Perfection Certificate, as may be amended, lists all of Borrower's and each Subsidiary's registered Intellectual Property together with all other Intellectual Property that is material to Borrower's or any Subsidiary's business (except for over the counter software and non-customized mass market licenses that are commercially available to the public). No Intellectual Property material to Borrower's business is owned by any Subsidiary that is not a Loan Party. Except as set forth in the Disclosure Schedules, (a) each of the Copyrights, Trademarks and Patents owned by Borrower or any Subsidiary that is material to its business is valid and enforceable, (b) no part of the Intellectual Property owned by Borrower or any Subsidiary that is material to its business has been judged invalid or unenforceable, in whole or in part, (c) no claim has been made to Borrower or any Subsidiary that any material Intellectual Property violates or infringes the rights of any third party, and (d) other than as set forth in the Disclosure Schedule, Borrower and no Subsidiary is a party to, or bound by, any inbound license or other agreement for the Borrower's use of Intellectual Property, in each case that are material to Borrower's business, that restricts the grant of a security interest in Borrower's or such Subsidiary's rights in such license or Intellectual Property. Borrower has valid license agreements for the use of Intellectual Property rights of third parties known to Borrower to be necessary to the conduct of Borrower's business.

**5.14 Deposit/Security Accounts.** All of Borrower's Deposit Accounts and Securities Accounts are listed on the Disclosure Schedules, as may be amended. Each of such accounts other than Excluded Accounts or as listed in the Post-Closing Schedule is subject to a Control Agreement in favor of Agent. Each account that qualifies as an Excluded Account is identified as such on the Disclosure Schedules.

**5.15 Environmental Condition.** None of Borrower's or any Subsidiary's material properties or assets has ever been used by Borrower or any Subsidiary or, to the Borrower's knowledge, by previous owners or operators, in the disposal of, or to produce, store, handle, treat, release, or transport, any hazardous waste or hazardous substance other than in material compliance with applicable law; to Borrower's knowledge, none of Borrower's material properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a hazardous waste or hazardous substance disposal site, or a candidate for closure pursuant to any environmental protection statute; no lien arising under any environmental protection statute has attached to any material Revenue or to any material real or personal property owned by Borrower or any Subsidiary; and neither Borrower nor any Subsidiary has received a summons, citation, notice, or directive from the Environmental Protection Agency or any other federal, state or other governmental agency concerning any material action or omission by Borrower or any Subsidiary resulting in the releasing, or otherwise disposing of hazardous waste or hazardous substances into the environment.

**5.16 Government Consents.** Borrower has obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Governmental Authorities that are necessary for the continued operation of Borrower's business as currently conducted.

**5.17 Full Disclosure.** No representation, warranty or other statement made by Borrower in any Loan Document, certificate or written statement furnished to Agent or any Lender, taken together with all such certificates, Loan Documents and written statements, contains any untrue statement of a material fact or, to Borrower's knowledge, omits to state a material fact necessary in order to make the statements contained in such Loan Documents, certificates or statements not misleading, it being recognized by Agent and Lenders that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not to be viewed as facts and that actual results during the period or periods covered by any such projections and forecasts may differ from the projected or forecasted results.

**5.18 Inventory.** All Inventory is in all material respects of good and marketable quality, free from all material defects, spoilage, non-conformance, or payment dispute, except for Inventory for which adequate reserves have been made.

**5.19 Material Contracts; Material Customers.**

(a) As of the Closing Date, Borrower has delivered to Agent true and correct copies of all Material Contracts (or, with respect to oral contracts or agreements, written descriptions of the material terms thereof).

(b) If any Material Contract is entered into after the Closing Date, Borrower will provide a copy of such Material Contract with the next scheduled Compliance Certificate to be delivered pursuant to **Section 6.4** and will identify it as such in the Compliance Certificate. Borrower shall also amend the Perfection Certificate and Disclosure Schedules to include such Material Contract. Borrower is not in default under any Material Contract to which it is a party or by which it is bound and the execution and delivery by Borrower of the Loan Documents will not cause a breach of any Material Contract to which Borrower is a party or by which it is bound.

(c) Borrower's and its Subsidiaries' twelve (12) largest customers for each of the fiscal year ended December 31, 2020, and for the fiscal year to date ("*Material Customers*") are listed in the Disclosure Schedules, as may be amended. All Material Customers continue to be customers of the Borrower or any Subsidiary thereof, as the case may be, and none of such Material Customers has reduced materially its business with the Borrower or any of its Subsidiaries, as the case may be, from the levels achieved during the year ended December 31, 2020 or during the fiscal year to date, and neither the Borrower nor any of its Subsidiaries has any knowledge that such reduction will occur provided, however, that Agent and the Lenders acknowledge and agree that the representation contained in this sentence is qualified in its entirety by the fact that the Loan Parties' business and the business of its Material Customers are cyclical and subject to market events and, as such, the level of a Material Customer's business with the Loan Parties vary in the ordinary course of business. No Material Customer has terminated its relationship with the Borrower or any Subsidiary thereof, as the case may be, or, to the knowledge of the Borrower or such Subsidiary, has threatened in writing to do so. Neither the Borrower nor any Subsidiary thereof is involved in any material claim, dispute or controversy with any Material Customer. Neither the Borrower nor any Subsidiary thereof is involved in any claim, dispute or controversy with any of its other customers that could reasonably be expected to have a Material Adverse Effect.

**5.20 Sanctioned Persons**. None of Borrower or any of its Subsidiaries, and to Borrower's knowledge, any of their directors, officers, agents, employees or Affiliates is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("*OFAC*"). Borrower will not directly or indirectly use the proceeds of any Advance or otherwise make available such proceeds to any Person, for the purpose of financing the activities of any Person currently subject to any U.S. sanctions administered by OFAC.

**5.21 Foreign Assets Control Regulations, Etc**.

(a) Neither the borrowing of any Advance by Borrower hereunder nor its use thereof will violate (i) the United States Trading with the Enemy Act, as amended, (ii) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, (iii) Executive Order No. 13,224, 66 Fed Reg 49,079 (2001), issued by the President of the United States (Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) (the "***Terrorism Order***"), (iv) USA PATRIOT ACT, or (v) USA FREEDOM ACT. No part of the Advance will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(b) Neither Borrower nor any Subsidiary (i) is or will become a "blocked person" as described in Section 1.01 of the Terrorism Order or (ii) engages or will engage in any dealings or transactions, or is otherwise associated, with any such blocked person.

(c) Each of Borrower and any Subsidiary and their Affiliates are in compliance, in all material respects, with the USA PATRIOT ACT and the USA FREEDOM ACT.

**5.22 CARES Debt**. Borrower incurred $3,000,000 of CARES Debt on April 27, 2020, and fully repaid such amount within the safe harbor repayment provisions of the CARES Act – Title 1 on May 18, 2020. Neither Borrower nor any of its Subsidiaries has incurred any other CARES Debt and no CARES Debt remains outstanding.

**5.23 Status**. Neither Borrower nor any of its Subsidiaries ever has been, is, or, upon the consummation of the transactions contemplated hereby, by any other Loan Document or any related agreements, will be (i) a "passive foreign investment company" within the meaning of Section 1297 of the Internal Revenue Code or (ii) a "controlled foreign corporation" within the meaning of Section 957(a) of the Internal Revenue Code.

**5.24 Other Permitted Amendments to Perfection Certificate and Disclosure Schedules.** In addition to those provisions in the Perfection Certificate which Borrower is permitted to amend as expressly set forth in this Section 5, Borrower may also amend the following provisions of the Perfection Certificate: Part A, sections 1, 2, 3, 4 (provided that subsection f. may only be amended to add, and not to delete, Material Contracts (except for those Material Contracts that have terminated in accordance with their terms)), and 5; Part B, sections 7, 8, 9 and 10 (provided that this section may only be so amended to delete items therefrom or to add Liens which fall within, and meet the requirements of, clause (c) of the definition of Permitted Liens), 11, 12 and 13. Borrower may also amend the following provisions of the Disclosure Schedules: Permitted Liens (provided that this Disclosure Schedule may only be amended to delete items therefrom or to add Liens which fall within, and meet the requirements of, clause (c) of the definition of Permitted Liens), Material Customers (provided that this Disclosure Schedule may only be amended in accordance with Section 5.19(c)), and Borrower's Accounts. All such amendments to the Perfection Certificate or Disclosure Schedules may be made without Agent's or Lenders' consent, and shall be made by delivery of an amended Perfection Certificate or Disclosure Schedule (together with, in each case, a copy marked to show changes from the previous version) by email to Agent.

## 6. Affirmative Covenants

Borrower covenants and agrees that, until the full and complete payment of the Obligations (other than inchoate indemnity obligations) in cash, Borrower shall do all of the following:

**6.1 Good Standing.** Borrower shall maintain its corporate existence and good standing in its jurisdiction of formation and maintain qualification in each other jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect. Borrower shall maintain in force all licenses, approvals and agreements, the loss of which could reasonably be expected to have a Material Adverse Effect.

**6.2 Government Compliance.** Borrower and each Subsidiary shall comply with all applicable federal and state statutes, laws, ordinances and government rules and regulations to which it or its operations is subject, noncompliance with which could reasonably be expected to have a Material Adverse Effect.

**6.3 Financial Statements, Reports, Certificates.** Borrower shall deliver the following to Agent by email to the address specified pursuant to **Section 11**, and Agent and Lenders shall be entitled to rely on the information contained therein: (a) as soon as available, but in any event within thirty (30) days after the end of each calendar month, Borrower's consolidated financial statements including a cash flow statement, income statement and balance sheet for the period reported, and certified by a Responsible Officer; (b) as soon as available, but in any event within one hundred twenty (120) days after the end of Borrower's fiscal year, audited consolidated financial statements of Borrower in accordance with GAAP, consistently applied, together with an unqualified opinion on the financial statements from an independent certified public accounting firm reasonably acceptable to Agent, provided however, that for the fiscal year ended December 31, 2020, Borrower shall provide as soon as available, but in any event within one hundred twenty (120) days after the end of Borrower's fiscal year, unaudited consolidated financial statements of Borrower in accordance with GAAP, consistently applied; (c) as soon as available, but in any event within thirty (30) days after the end of Borrower's fiscal year, an annual operating budget and financial projections (including income statements, balance sheets and cash flow statements) for such fiscal year, presented in a quarterly format, as approved by the Board (the "*Approved Budget*"); (d) upon Agent's request, copies (or limited on line viewing access) of Borrower's and Subsidiary's bank or brokerage statements delivered monthly as soon as available following the first day of the month reflecting the prior ninety days of activity, from all institutions, whether or not in the U.S., where Borrower or a Subsidiary maintains deposit or securities accounts; (e) copies of all statements, reports and notices sent or made available generally by Borrower to its security holders when made available to its security holders; (f) a copy of all notices, minutes, consents, and other materials that Borrower provides to its Board contemporaneously with delivery to members of the Board, *provided*, *however*, that any materials protected from discovery by the attorney-client privilege or the attorney work product privilege, any materials necessary or advisable in the good faith determination of the Board to avoid a conflict of interest between Borrower, on the one hand, and Agent and Lenders, on the other hand, and any trade secrets may be excluded; (g) promptly upon receipt of notice thereof, a report of any legal actions pending or threatened against Borrower or any Subsidiary that could reasonably be expected to result in damages to Borrower or any Subsidiary exceeding $500,000, fines, penalties or other sanctions by any Governmental Agency, or claims for injunctive or equitable relief; and (h) other financial information as Agent may reasonably request from time to time promptly after such request. Borrower shall provide Agent with a copy of any Board approved changes to any Approved Budget within five (5) days of such approval.

**6.4 Certificates of Compliance; Perfection Certificate Updates.** Each time financial statements are required to be furnished pursuant to **Section 6.3** above, there shall be delivered to Agent a certificate signed by a Responsible Officer (each a "*Compliance Certificate*") in the form attached hereto as Exhibit E certifying that as of the end of the reporting period for such financial statements, Borrower was in full compliance with all of the terms and conditions of the Loan Documents, and setting forth such other information as Agent shall reasonably request. Accompanying each monthly Compliance Certificate shall be an aged listings of accounts receivable and accounts payable (by invoice date). If any information contained in the Perfection Certificate or Disclosure Schedules changes after the Closing Date and if that information relates to a subsection of **Section 5** which specifically allows for information in the Perfection Certificate and/or Disclosure Schedules to be updated after the Closing Date, Borrower shall update such information in an amended Perfection Certificate and/or Disclosure Schedule (if applicable). Borrower shall deliver the Compliance Certificate and updated Perfection Certificate and/or Disclosure Schedules (if any) by email to the address specified pursuant to **Section 11**, and Agent and Lenders shall be entitled to rely on the information contained therein.

**6.5 Notice of Defaults.** As soon as possible, and in any event within two (2) Business Days after the discovery of a Default or an Event of Default, notify Agent of the facts relating to or giving rise to such Default or Event of Default and the action which Borrower proposes to take with respect thereto. Borrower shall deliver such notice to Agent by email to the address specified pursuant to **Section 11**, and Agent and Lenders shall be entitled to rely on the information contained therein.

**6.6 Taxes.** Borrower shall make, and cause each Subsidiary to make, due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by law or imposed upon any properties belonging to it; and Borrower will make due and timely payment or deposit of all material related tax payments and withholding taxes required of it by applicable laws, including those laws

concerning F.I.C.A., F.U.T.A., and state disability, and will, upon request, furnish Agent with proof satisfactory to Agent indicating that Borrower has made such payments or deposits; *provided that* Borrower need not make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is fully reserved against by Borrower.

**6.7 Maintenance.** Borrower, at its expense, shall maintain the Collateral in good condition, normal wear and tear and casualty and condemnation excepted, and will comply in all material respects with all laws, rules and regulations to which the use and operation of the Collateral may be or become subject. Such obligation shall extend to repair and replacement of any partial loss or damage to the Collateral, regardless of the cause, except where the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

**6.8 Insurance.**

(a) Borrower shall maintain, at its sole cost and expense, with financially sound and reputable insurance companies not affiliates of Borrower, insurance with respect to the Collateral, its and its Subsidiaries' properties and businesses against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons, in all cases in amounts acceptable to Agent. All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Agent.

(b) All such policies of property insurance shall contain a lender's loss payable endorsement, in a form satisfactory to Agent, showing Agent for itself and the benefit of Lender as an additional loss payee thereof, and all liability insurance policies shall show Agent for itself and the benefit of Lender as an additional insured and shall specify that the insurer must give at least thirty (30) days' notice to Agent before canceling its policy for any reason (except for nonpayment, which shall be ten (10) days prior notice). Borrower shall promptly deliver to Agent its current copy of such policies of insurance, evidence of the payments of all premiums therefor and insurance certificates and related endorsements thereto, it being understood that any time there is a change or renewal of insurance, it is Borrower's obligation to promptly deliver such materials to Agent.

(c) Borrower shall bear the risk of the Collateral being lost, stolen, destroyed, damaged beyond repair, rendered permanently unfit for use, or seized by a Governmental Authority for any reason whatsoever at any time. Proceeds payable under any insurance policy shall, at Agent's option, be payable to Agent on account of the Obligations.

**6.9 Intellectual Property Rights.**

(a) Concurrently with the delivery of each Compliance Certificate for the months ending March 31, June 30, September 30 and December 31 pursuant to **Section 6.4**, Borrower shall give Agent written notice of: (i) any registration or filing of any Trademark, Copyright or Patent by Borrower or any Subsidiary including the date of such registration or filing, the registration or filing numbers, the location of such registration or filing, and a general description of such registration or filing; (ii) any material change to Borrower's or any Subsidiary's material Intellectual Property, but excluding changes to source code, operating manuals and the like made in the ordinary course of business, and (iii) Borrower's knowledge of an event that could reasonably be expected to materially and adversely affect the value of its or any Subsidiary's material Intellectual Property.

(b) Agent may audit Borrower's Intellectual Property to confirm compliance with this Section, provided such audit may not occur more often than once per year, unless an Event of Default has occurred and is continuing. Agent shall have the right, but not the obligation, to take, at Borrower's sole expense, any actions that Borrower is required under this Section to take but which Borrower fails to take, after 15 days' notice to Borrower. Borrower shall reimburse and indemnify Agent for all Lender Expenses incurred in the exercise of its rights under the previous sentence.

**6.10 Formation or Acquisition of Subsidiaries.** Notwithstanding and without limiting the negative covenants contained in **Section 7.6** hereof, within seven (7) days of the date that a Loan Party or any Affiliate thereof forms any direct or indirect Subsidiary or acquires any direct or indirect Subsidiary, Borrower shall (a) cause such new Subsidiary to provide to Agent a Joinder Agreement, together with such other Loan Documents, all in form and substance satisfactory to Agent (including being sufficient to grant Agent, for itself and for the benefit of Lenders, a first priority Lien in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Agent appropriate certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary (to the extent the same constitutes Collateral), in form and

substance satisfactory to Agent, and (c) provide to Agent all other documentation in form and substance satisfactory to Agent that in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above, including all documentation and other information which Agent may reasonably request with respect to any new Subsidiary that signs and delivers a Joinder Agreement in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT ACT, the USA FREEDOM Act, an IRS Form W-9 or other applicable tax forms.

**6.11 Financial Covenants.** Borrower shall maintain at all times not less than $3,000,000 (the "**Cash Threshold**") of Unrestricted Cash, provided however, provided however, that if Borrower receives at least $35,000,000 of cash proceeds from the sale of its capital stock after the Closing Date and no Event of Default has occurred, then Borrower shall not be required to maintain any amount of Unrestricted Cash.

**6.12 Further Assurances.** At any time and from time to time Borrower shall execute and deliver such further instruments and take such further action as may reasonably be requested by Agent to effect the purposes of this Agreement.

**6.13 Investment Rights**. Borrower shall offer to SCI or its assignee that is reasonably acceptable to Borrower (it being agreed that any Affiliate or limited partner of SCI shall be deemed to be acceptable), at SCI's option, the ability to purchase up to an aggregate of Two Million Dollars ($2,000,000.00) of the Equity Interests issued in any Equity Round, with such purchase to be either in cash or conversion of any Advance, provided, however, (i) Borrower shall have no obligation to make such offer if SCI or its assignee is not an "accredited" investor, as defined in the rules associated with the Securities Act of 1933, and (ii) Borrower may reduce on a pro rata basis the amount SCI (or its assignee) may invest if necessary to allow Borrower's existing investors to exercise their preexisting contractual rights (i.e., rights in existence as of the Closing Date) to maintain their ownership percentage in Borrower. SCI or its assignee shall be entitled to purchase the same class and series of equity, for the same price and on the same terms as are offered to other investors in the Equity Round (provided that SCI shall not be required to undertake any obligations other than (A) to purchase said Equity Interests at the price and ratios provided therein and (B) enter into the same agreements as the other purchasers of Equity Interests in such Equity Round, including without limitation any stockholder agreements provided that such agreements do not alter Lenders' or Agent's rights under any Loan Document). Borrower will promptly notify SCI upon the execution of a term sheet with respect to the Equity Round and at a minimum not less than at least twenty (20) days prior to the close of the Equity Round, and SCI will have twenty (20) days after receipt of that notice to participate, in which case SCI will execute and be party to the purchase agreement, investor rights agreement, and other agreements executed by the other investors in connection with the Equity Round. Without otherwise limiting the foregoing (i) if Borrower shall notify SCI or its assignee that the Equity Round is anticipated to close prior to the end of SCI's 20-day participation election period, SCI or its assignee will use reasonable efforts to make its participation election by two (2) Business Days prior to such anticipated close, and (ii) in any event, in lieu of complying with the advance notice requirements of this **Section 6.13**, Borrower may elect to give SCI or its assignee notice of such Equity Round within five (5) days after the initial closing thereof, and SCI or its assignee will then have twenty (20) days to purchase the Equity Interests that it was otherwise entitled to purchase pursuant to the foregoing provisions of this **Section 6.13**.

**6.14 Reserved**.

**6.15 Inventory, Returns.** Borrower shall keep all Inventory in good and marketable condition, free from all material defects except for Inventory for which adequate reserves have been made. Returns and allowances, if any, as between Borrower and its account debtors shall be on the same basis and in accordance with GAAP, consistently applied, or with the usual customary practices of Borrower, as they exist at the time of the execution and delivery of this Agreement. Borrower shall promptly notify Agent of all returns and recoveries and of all disputes and claims, where the return, recovery, dispute or claim involves more than Two Hundred and Fifty Thousand Dollars ($250,000).

**6.16 Delivery of Third-Party Agreements.**

(a) Within sixty (60) days following the Closing Date, Borrower shall obtain and deliver to Agent a Landlord Subordination and Access Agreement (with respect to the Borrower's headquarters at 201 Spear St #1400, San Francisco, CA 94105), in form and substance satisfactory to Agent. In addition, in the event that Borrower shall enter into a new lease with respect to a new or additional operating location after Closing Date and such lease is entered into with respect to Borrower's headquarters, a primary operating location, or if such lease requires

Borrower to pay $500,000 or more in rent over the stated term of the lease, then Borrower shall, within sixty (60) days following the execution of such lease, obtain and deliver to Agent a Landlord Subordination and Access Agreement with respect to such new lease, in form and substance satisfactory to Agent.

(b) Within sixty (60) days following Agent's written request, Borrower shall obtain and deliver to Agent a Notice and Access Agreement in form and substance satisfactory to Agent in Agent's sole, but reasonable discretion, for any location that contains or any Person that holds greater than 5% of Borrower's Inventory.

**6.17 Management Rights**. Borrower shall issue to each requesting Lender a Management Rights Letter, and perform and observe in all respects each of its obligations and duties under each Management Rights Letter.

**6.18 Reserved**.

**6.19 Accounts Receivable.** Borrower shall promptly notify Agent of all material disputes or claims relating to Accounts. Borrower may forgive (completely or partially), compromise, or settle any Account for less than payment in full, or agree to do any of the foregoing so long as (i) Borrower does so in good faith, in a commercially reasonable manner, in the ordinary course of business, in arm's-length transactions, and reports the same to Agent in the next regular report to be provided to Agent; (ii) no Default or Event of Default has occurred and is continuing; and (iii) the amount forgiven, compromised or otherwise not collected does not represent more than $500,000. Agent may, from time to time, verify directly with the respective Account Debtors the validity, amount and other matters relating to the Accounts, either in the name of Borrower or Agent or such other name as Agent may choose. Agent shall not be responsible or liable for any shortage or discrepancy in, damage to, or loss or destruction of, any goods, the sale or other disposition of which gives rise to an Account, or for any error, act, omission, or delay of any kind occurring in the settlement, failure to settle, collection or failure to collect any Account, or for settling any Account in good faith for less than the full amount thereof, nor shall Agent be deemed to be responsible for any of Borrower's obligations under any contract or agreement giving rise to an Account.

**6.20 Privacy and Data Security**. The Loan Parties and their Subsidiaries shall, at all times, remain in compliance with all applicable United States and international privacy and data security laws and regulations including GDPR.

**6.21 Deposit Accounts/Securities Accounts**. Other than with regard to Excluded Accounts, prior to opening any Deposit Account or Securities Account after the Closing Date, Borrower shall first notify Agent and not deposit any funds or securities into such account until such account is subject to a Control Agreement in favor of Agent, whereupon, Borrower shall update the Disclosure Schedules to include such new account. Borrower shall nevertheless provide prompt written notice to Agent of each Excluded Account opened after the Closing Date.

**6.22 Post-Closing Matters / Post-Closing Schedule**. Borrower agrees to complete, or cause all of the items, matters and documents set forth in the Post-Closing Schedule to be completed, executed and delivered (as applicable) not later than the dates and times set forth in the Post-Closing Schedule.

## 7. Negative Covenants

Borrower covenants and agrees that until the full and complete payment of the Obligations (other than inchoate indemnity obligations) in cash and termination of the Commitment, Borrower will not do any of the following:

**7.1 Chief Executive Office; Location of Collateral.** During the continuance of this Agreement, change the state of formation, chief executive office or principal place of business or remove or cause to be removed, except in the ordinary course of Borrower's business, the Collateral or the records concerning the Collateral from the premises listed in the Perfection Certificate without twenty (20) days prior written notice to Agent, provided that any such removal may not be to a location outside of the United States without Agent's prior written consent.

**7.2 Extraordinary Transactions and Disposal of Assets.**

(a) Convey, sell, lease, transfer or otherwise dispose of (collectively, a "***Transfer***"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, other than: (i) Inventory in the ordinary course of business (including with respect to consignment arrangements with respect to such Inventory); (ii) Permitted Licenses; (iii) Transfers of surplus, worn-out or obsolete Equipment; (v) uses of cash and

Cash Equivalents not prohibited under this Agreement or (vi) other assets of Borrower or its Subsidiaries that do not in the aggregate exceed $500,000 in any fiscal year (collectively, the "***Permitted Transfers***");

(b) Enter into any agreement, or series of related agreements, that could reasonably be expected to require the direct or indirect payment (excluding inchoate indemnity obligations) to any Person in excess of $500,000, or permit any of its Subsidiaries to do the same.

**7.3 Restructure.** Borrower shall not: (i) without providing not less than twenty (20) days advance written notice to Agent, change Borrower's name or jurisdiction of formation, or permit any Subsidiary to do the same, (ii) suspend operation of Borrower's business or permit any Subsidiary to suspend operations of its business, (iii) engage in any business, or permit any of its Subsidiaries to engage in any business, other than the businesses currently engaged in by Borrower and its Subsidiaries, and any business substantially similar or related thereto; (iv) experience a departure of a Responsible Officer, without providing Agent a written notice within 10 days after the occurrence of such departure; (v) without Agent's prior written consent, change the date on which its fiscal year ends; (vi) permit any Subsidiary to liquidate or dissolve (other than the liquidation or dissolution of Subsidiaries that (x) are not Loan Parties or (y) whose assets are transferred to Borrower or another Loan Party at the time of such liquidation or dissolution); or (vii) permit any Subsidiary to enter into any transaction or series of related transactions in which the stockholders of Borrower or such Subsidiary, as applicable, who were not stockholders immediately prior to the first such transaction own more than fifty percent (50%) of the voting Equity Interests of Borrower, or such Subsidiary, as applicable, immediately after giving effect to such transaction or related series of such transactions.

**7.4 Liens/Negative Pledge.** Create, incur, assume or suffer to exist any Lien with respect to any of Borrower's or any Subsidiary's property, including Intellectual Property and Inventory held at warehouse or fulfilment centers, or assign or otherwise convey any right to receive income, or permit any of its Subsidiaries to do so, except for Permitted Liens, or enter into any agreement with any Person other than (a) Lender or (b) the secured party in a Permitted Lien, in each case that prohibits Borrower from granting a security interest in, or otherwise encumbering, any of its property, or permit any Subsidiary to do so.

**7.5 Indebtedness.** Create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness. Borrower shall not, nor shall it allow any Subsidiary to, to incur any CARES Debt without Agent's prior written consent.

**7.6 Investments.** Make any Investment other than a Permitted Investment in any Person without Agent's prior written consent.

**7.7 Distributions.** Pay any dividends or make any other distribution or payment on account of or in redemption, retirement or purchase of any Equity Interests of Borrower, or permit any of its Subsidiaries to do so, except that (a) Borrower may repurchase the capital stock of former employees, officers, directors or other service providers pursuant to repurchase agreements (i) if the Board has approved such repurchase, (ii) if applicable, by the cancellation of Indebtedness owed by such former employees, officers, directors or other service providers to Borrower regardless of whether an Event of Default exists, and (iii) in an amount not to exceed $500,000 per fiscal year, and (b) Subsidiaries may pay dividends or make any other distribution or payment to Borrower (either directly or indirectly) or any other Subsidiary that is party to a Joinder Agreement.

**7.8 Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower after the Closing Date except for (i) ordinary course compensatory transactions and agreements (which shall include employment agreements, benefit plans, incentive equity issuances, and annual bonuses consistent with past practices) with officers and directors, (ii) transactions that are in the ordinary course of Borrower's business, on terms no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person, (iii) transactions between or among Borrower and its Subsidiaries that are a party to a Joinder Agreement, (iv) equity financings, Convertible Notes or Subordinated Debt with Borrower's investors (and including agreements typically entered into in connection therewith, such as stockholder agreements and management rights letters), as permitted hereunder, (v) that certain Letter regarding Litigation Consulting Services dated as of June 27, 2018, by and between the Company and Europlay Capital Advisors, LLC (the "**ECA Letter**"), (vi) forgiveness of any Executive Advance (as defined in the Disclosure Schedules), and (vii) other transactions approved by Agent in writing.

**7.9 Stock Certificates**. For any Subsidiary for which Borrower's ownership interest is not evidenced by a certificate, Borrower shall not allow such Subsidiary to certificate such ownership interest without

Agent's prior written consent, which consent may be conditioned upon requiring such Subsidiary to execute and deliver a Collateral Pledge Agreement satisfactory to Agent.

**7.10 Compliance.** Become an "investment company" under the Investment Company Act of 1940 or undertake as one of its important activities extending credit to purchase or carry margin stock, or use the proceeds of any Advance for that purpose; except as could not be reasonably expected to have a Material Adverse Effect, fail to meet the minimum funding requirements of ERISA with respect to any Pension Plan or permit a Reportable Event (within the meaning of Section 4043(c) of ERISA) or a Prohibited Transaction (as such term is defined in Section 4975 of the Internal Revenue Code) to occur; fail to comply with the Federal Fair Labor Standards Act or violate any other law or regulation, if the violation could reasonably be expected to have a Material Adverse Effect or permit any of its Subsidiaries to do so.

**7.11 Deposit Accounts.** Other than Excluded Accounts, maintain any Deposit Accounts or Securities Accounts except accounts respecting which Agent has obtained a Control Agreement.

**7.12 Inventory**. Store Inventory and/or other tangible Collateral with a bailee, warehouseman, or other third party where the aggregate amount of Inventory and/or other tangible Collateral with such bailee, warehouseman or other third party shall be in excess of 15% of Borrower's Inventory for a period of ninety (90) days or longer (other than those entities for which Borrower has delivered a Notice and Access Agreement pursuant to **Section 6.16**).

**7.13 Excluded Accounts.** Maintain Excluded Accounts whereby the aggregate balance contained in all such Excluded Accounts exceeds Seventy Five Thousand Dollars ($75,000).

**8. Events of Default**

Any one or more of the following events shall constitute an "Event of Default" under this Agreement:

**8.1 Payment Default.** If Borrower or any Loan Party fails to pay, when due, any of the Obligations required under the terms of the Loan Document; *provided, however*, that Borrower shall not be deemed to be in default on account of any late payment to be made through an ACH Debit Consent if and for so long as such late payment was caused by a failure by Agent to initiate an ACH transaction; and *provided further*, if any payment to be made through an ACH Debit Consent cannot be processed by ACH Debit Consent other than due to a failure by Agent to initiate an ACH transaction or the unavailability of funds, then Agent shall notify Borrower in writing, which notice shall contain wire transfer instructions, and Borrower shall make payment by wire transfer within one (1) Business Day of delivery of such notice (and any such payment shall be deemed to have been paid when due).

**8.2 Certain Covenant Defaults.**

(a) If Borrower fails to perform any obligation under **Section 4.4, Section 6.3(g), Section 6.5, Section 6.8, Section 6.9(a),** and **Section 6.13** or violates any of the covenants contained in **Section 7** of this Agreement.

(b) If Borrower fails to comply with the obligations set forth in **Section 6.11**, *provided, however*, that Borrower shall not be deemed to be in default on account of Unrestricted Cash under the Cash Threshold so long as (i) Unrestricted Cash is not under the Cash Threshold for more than 10 consecutive calendar days, and (ii) Unrestricted Cash is not under the Cash Threshold at the end of any given calendar month.

**8.3 Other Covenant Defaults.** If Borrower or any Loan Party fails or neglects to perform or observe any other material term, provision, condition, or covenant, or if any representation or warranty made by Borrower becomes untrue, in each case contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrower or any Loan Party and Agent or Lenders and as to any default under such other term, provision, condition, covenant, representation or warranty that can be cured, has failed to cure such default within ten (10) days after Borrower receives notice thereof or any Responsible Officer of Borrower becomes aware thereof.

**8.4 Material Adverse Effect.** If there occurs any circumstance or circumstances that could reasonably be expected to have a Material Adverse Effect.

**8.5 Attachment.** If any material portion of the Collateral is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or Person acting in a

similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) days, or if Borrower or any Subsidiary is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any material portion of Borrower's or any Subsidiary's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any of Borrower's or such Subsidiary's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten (10) days after Borrower receives notice thereof; *provided that* none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contesting by Borrower or its Subsidiary.

**8.6 Other Agreements.** If there is a default under any agreement to which Borrower or a Subsidiary is a party with a third party or parties resulting in a right by such third party or parties, whether or not exercised, to demand payment of or accelerate the maturity of any Indebtedness in excess of Five Hundred Thousand Dollars ($500,000).

**8.7 Judgments.** If there is entry of a judgment or judgments against Borrower or any Subsidiary for the payment of money in an amount, individually or in the aggregate, of at least Five Hundred Thousand Dollars ($500,000).

**8.8 Management Change.** The occurrence of a material change in management control, directly or indirectly, of Borrower or any of its Subsidiaries whereby Jeremy Sicklick ceases to serve as the Company's chief executive officer (including by death or incapacity) and a successor reasonably acceptable to Agent has not started working within 60 days thereafter.

**8.9 Misrepresentations.** If any material misrepresentation or material misstatement exists now, when made or when deemed made in any written warranty, representation, statement, certificate, or report made to Agent or any Lender by Borrower, any Subsidiary or any Responsible Officer of Borrower or any Subsidiary.

**8.10 Enforceability.** If any Loan Document shall in any material respect cease to be, or Borrower asserts that any Loan Document is not a legal, valid and binding obligation of the Loan Party that is a party thereto, enforceable in accordance with its terms except for the termination of such Loan Document pursuant to its terms. If any Subordination Agreement relating to Subordinated Debt shall in any material respect cease to be a legal, valid and binding obligation, or the holder of any Subordinated Debt challenges the legality, validity or binding nature of the Subordination Agreement to which such Subordinated Debt relates except for the termination of such Subordination Agreement pursuant to its terms.

**8.11 Involuntary Bankruptcy.** If a proceeding shall have been instituted in a court having jurisdiction in the premises seeking a decree or order for relief in respect of Borrower or any Subsidiary in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian, trustee (or similar official) of Borrower or for any substantial part of its property, or for the winding-up or liquidation of its affairs, and such proceeding shall remain undismissed or unstayed and in effect for a period of forty-five (45) consecutive days or such court shall enter a decree or order granting the relief sought in such proceeding.

**8.12 Voluntary Bankruptcy or Insolvency.** If Borrower or any Subsidiary shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian (or other similar official) of Borrower or for any substantial part of its property, or shall make a general assignment for the benefit of creditors, or shall take any corporate action in furtherance of any of the foregoing.

**8.13 Insolvency.** If Borrower and its Subsidiaries taken as a whole become Insolvent.

**9. Agent and Lenders' Rights and Remedies**

**9.1 Rights and Remedies.** Upon the occurrence and during the continuance of any Event of Default, Agent shall have the rights, options, duties and remedies of a secured party as permitted by, and in accordance with, applicable law and, in addition to and without limitation of the foregoing, Agent may (and not any Lender without Agent's written consent), at its election, without notice of election and without demand, do any one or more of the following, all of which are authorized by Borrower:

(a) Declare all Obligations, whether evidenced by this Agreement, or by any of the other Loan Documents, including the outstanding principal amount of, and accrued interest on, each Advance, immediately due and payable and terminate the Commitment (*provided that* upon the occurrence of an Event of Default described in **Section 8.1, 8.11** or **8.12** all Obligations shall become immediately due and payable and the Commitment shall terminate without any action by Agent);

(b) Make such payments and do such acts as Agent considers necessary or reasonable to protect its security interest in the Collateral. Borrower agrees to assemble the Collateral if Agent so requires, and to make the Collateral available to Agent as Agent may designate. Borrower authorizes Agent to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any Lien which in Agent's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith; with respect to any of Borrower's owned premises, Borrower hereby grants Agent, subject to any rights of third parties, a license to enter into possession of such premises and to occupy the same, without charge in order to exercise any of Agent's rights or remedies provided herein, at law, in equity, or otherwise;

(c) Set off and apply to the Obligations any and all Indebtedness at any time owing to or for the credit or the account of Borrower;

(d) Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Agent is hereby granted a license or other right, solely pursuant to the provisions of this **Section 9.1**, to use or sublicense the use of, without charge, Borrower's labels, Patents, Copyrights, rights of use of any name, trade secrets, trade names, Trademarks, service marks, and advertising matter, or any Property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, selling any Collateral and allowing for any resale of such Collateral, and, otherwise, in connection with Agent's exercise of its rights under this **Section 9.1.** Borrower's rights under all licenses and all franchise agreements shall inure to Agent's benefit;

(e) Deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreement providing control of any Collateral:

(f) Sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including Borrower's premises) as Agent determines are commercially reasonable; and

(g) Agent may credit bid and purchase at any public sale.

Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Borrower.

**9.2 Waiver by Borrower.** Upon the occurrence and during the continuance of an Event of Default, to the extent permitted by law, Borrower covenants that it will not at any time insist upon or plead, or in any manner whatever claim or take any benefit or advantage of, any stay or extension of law now or at any time hereafter in force, nor claim, take nor insist upon any benefit or advantage of or from any law now or hereafter in force providing for the valuation or appraisement of the Collateral or any part thereof prior to any sale or sales thereof to be made pursuant to any provision herein contained, or to the decree, judgment or order of any court of competent jurisdiction; nor, after such sale or sales, claim or exercise any right under any statute now or hereafter made or enacted by any state or otherwise to redeem the Property so sold or any part thereof, and, to the full extent legally permitted, except as to rights expressly provided herein, hereby expressly waives for itself and on behalf of each and every Person, except decree or judgment creditors of Borrower acquiring any interest in or title to the Collateral or any part thereof subsequent to the date of this Agreement, all benefit and advantage of any such law or laws, and covenants that it will not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any power herein granted and delegated to Agent, but will suffer and permit the execution of every such power as though no such power, law or laws had been made or enacted.

**9.3 Effect of Sale.** Subject to applicable law, any sale, whether under any power of sale hereby given under this **Article 9** or by virtue of judicial proceedings, shall operate to divest all right, title, interest, claim and demand whatsoever, either at law or in equity, of Borrower in and to the Property sold, and shall be a perpetual bar, both at law and in equity, against Borrower, its successors and assigns, and against any and all Persons claiming the Property sold or any part thereof under, by or through Borrower, its successors or assigns. The

timing of any foreclosure sale of Collateral shall be deemed reasonable provided that Agent gives at least 10 days advance notice of the initial date set for such foreclosure sale.

**9.4 Power of Attorney in Respect of the Collateral.** Borrower does hereby irrevocably appoint Agent (which appointment is coupled with an interest) effective only on the occurrence and during the continuance of an Event of Default, the true and lawful attorney in fact of Borrower with full power of substitution, for it and in its name: (a) to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all rents, issues, profits, avails, distributions, income, payment draws and other sums in which a security interest is granted under **Section 4** with full power to settle, adjust or compromise any claim thereunder as fully as if Agent were Borrower itself, (b) to receive payment of and to endorse the name of Borrower to any items of Collateral (including checks, drafts and other orders for the payment of money) that come into Agent's possession or under Agent's control, (c) to make all demands, consents and waivers, or take any other action with respect to, the Collateral, (d) in Agent's discretion to file any claim or take any other action or proceedings, either in its own name or in the name of Borrower or otherwise, which Agent may reasonably deem necessary or appropriate to protect and preserve the right, title and interest of Agent in and to the Collateral, (e) to sign an amendment to any Loan Document if Borrower is obligated, but fails, to do so, or (f) to otherwise act with respect thereto as though Agent were the outright owner of the Collateral.

**9.5 Lender Expenses.** If Borrower fails to pay any amounts or furnish any required proof of payment due to third persons or entities as required under the terms of this Agreement, then Agent (or a Lender with Agent's consent) may do any or all of the following: (a) make payment of the same or any part thereof; (b) set up such reserves as Agent or such Lender, as applicable, deems necessary to protect Agent and Lender from the exposure created by such failure; or (c) obtain and maintain insurance policies of the type discussed in **Section 6.8** of this Agreement, and take any action with respect to such policies as Agent or such Lender, as applicable, deems prudent. Any amounts paid or deposited by Agent or such Lender, as applicable, shall constitute Lender Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Agent or such Lender shall not constitute an agreement by Agent or any Lender to make similar payments in the future or a waiver by Agent of any Event of Default under this Agreement.

**9.6 Remedies Cumulative.** Agent's and each Lender's rights and remedies under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. Agent and Lenders shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity, provided however, that Lender must first obtain Agent's written consent before exercising any such rights and remedies. No exercise by Agent or Lenders (to the extent authorized by Agent) of one right or remedy shall be deemed an election, and no waiver by Agent, for itself or on behalf of Lenders, of any Event of Default on Borrower's part shall be deemed a continuing waiver. No delay by Agent or Lenders shall constitute a waiver, election, or acquiescence by such party.

**9.7 Reinstatement of Rights.** If Agent (or a Lender with Agent's written consent) shall have proceeded to enforce any right under this Agreement or any other Loan Document by foreclosure, sale, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely, then and in every such case (unless otherwise ordered by a court of competent jurisdiction), Agent and Lenders shall be restored to their former position and rights hereunder with respect to the Property subject to the security interest created under this Agreement.

**9.8 Share Collateral**. Borrower recognizes that Agent may be unable to effect a public sale of any or all the Collateral comprising shares of Borrower's Subsidiaries (the "*Shares*"), by reason of certain prohibitions contained in federal securities laws and any other applicable securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof or other applicable restrictions. Borrower acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. Agent or any other holder of the Shares shall be under no obligation to delay a sale of any of the Shares for the period of time necessary to permit the issuer thereof to register such securities for public sale under federal securities laws or under applicable state or foreign securities laws.

**10. Waivers; Indemnification**

**10.1 Demand; Protest.** Except as otherwise provided in this Agreement, Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, and any other notices relating to the Obligations or Agent's and/or Lenders' rights and remedies hereunder.

**10.2 Liability for Collateral.** So long as Agent complies with its obligations, if any, under Section 9207 of the Code, neither Agent nor any Lender in any way or manner shall be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (c) any diminution in the value thereof; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person whomsoever. All risk of loss, damage or destruction of the Collateral shall be borne by Borrower.

**10.3 Indemnification.**

(a) **General Indemnity.** Borrower shall pay, indemnify, and hold Agent and each Lender, and each of their officers, directors, employees, partners, agents, counsel and attorneys-in-fact (each, an "*Indemnified Person*") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, charges, expenses or disbursements (including Lender Expenses and reasonable attorney's fees) of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and any other Loan Documents, or the transactions contemplated hereby and thereby, and with respect to any investigation, litigation or proceeding (including any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, dissolution or relief of debtors or any appellate proceeding) related to this Agreement or the Advances or the use of the proceeds thereof, whether or not any Indemnified Person is a party thereto (all the foregoing, collectively, the "*Indemnified Liabilities*"); *provided*, that Borrower shall have no obligation hereunder to any Indemnified Person with respect to Indemnified Liabilities arising from solely the gross negligence or willful misconduct of such Indemnified Person as determined by a court of competent jurisdiction in a final, non-appealable judgment.

(b) **Defense.** At the election of Agent, Borrower shall defend such Indemnified Persons in connection with the Indemnified Liabilities, using a single legal counsel satisfactory to Agent (and, in the event of a conflict of interest acknowledged by such legal counsel between the Indemnified Persons, additional legal counsel), at the sole cost and expense of Borrower. All indemnity amounts owing under this **Section 10.3** shall be paid within thirty (30) days after written demand.

**11. Notices**

**11.1** Unless otherwise provided in this Agreement, all notices or demands by any party relating to this Agreement or any other agreement entered into in connection herewith shall be in writing and (except for financial statements and other informational documents which shall be sent by e-mail) shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, by e-mail or by prepaid facsimile to Borrower, to Agent or to Lender, as the case may be, at their respective addresses set forth below:

| | |
|---|---|
| If to Borrower: | HouseCanary, Inc.<br>201 Spear Street, Suite 1400<br>San Francisco, CA 94105<br>Attn: Jeremy Sicklick<br>EMAIL: jeremy@housecanary.com |
| If to Agent: | Ocean II PLO LLC<br>400 Oyster Point Blvd., Suite 229<br>South San Francisco, CA 94080<br>Attn: Todd Jaquez-Fissori, Managing Partner<br>EMAIL: todd@structuralcapital.com |
| If to a Lender: | At such address provided immediately below such Lender's signature to this Agreement |

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

## 12. AGENT PROVISIONS

### 12.1 Appointment and Authorization.

(a) Each Lender hereby irrevocably appoints Agent to act on its behalf as the administrative agent and collateral agent under the Loan Documents, and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms of any of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Should any Lender obtain possession or control of any such Collateral, such Lender shall be deemed to hold such Collateral for the benefit of Agent and each other Lender, shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent.

(b) Each Lender hereby authorizes Agent, on behalf of and for the benefit of Lender, to enter into any of the Loan Documents as secured party, and as Agent for and representative of Lender thereunder, and each Lender agrees to be bound by the terms of each such document; provided that Agent shall not (i) enter into or consent to any material amendment, modification, termination or waiver of any provision contained in any such document or (ii) release any Collateral (except as otherwise expressly permitted or required pursuant to the terms of this Agreement or the applicable Loan Document), in the case of each of clauses (i) and (ii) without the prior consent of Required Lenders (or, if required pursuant to **Section 13.4**, all Lenders); provided further, however, that, without further written consent or authorization from Lenders, Agent may execute any documents or instruments necessary to (a) release any Lien encumbering any item of Collateral that is the subject of a Transfer of assets permitted by this Agreement or to which Required Lenders have otherwise consented, (b) release any party from a Joinder Agreement if all of the Equity Interests of such party are Transferred to any Person (other than an Affiliate of a Loan Party) pursuant to a Transfer permitted hereunder or to which Required Lenders have otherwise consented, or (c) subordinate the Liens of Agent, on behalf of Lenders, to any Permitted Liens or (d) release all Liens in accordance with **Section 2.4**. Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrower, Agent and each Lender hereby agree that (1) no Lender shall have any right individually to realize upon any of the Collateral under or otherwise enforce any Loan Document, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by Agent for the benefit of Lenders and Agent in accordance with the terms thereof, and (2) in the event of a foreclosure by either on any of the Collateral pursuant to a public or private sale, either Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and Agent, as agent for and representative of Lenders (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by Agent at such sale. Without limiting the generality of the foregoing, Agent is hereby expressly authorized to execute any and all documents (including releases) with respect to (i) the Collateral and the rights of Lenders with respect thereto, as contemplated by and in accordance with the provisions of the Loan Documents, and (ii) any other Subordination Agreement with respect to any junior or Subordinated Debt.

**12.2 Agent in Individual Capacity; Lender as Agent.** The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Agent and the term "Lender" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each such Person serving as Agent hereunder in its individual capacity. The exculpatory provisions contained in this **Section 12** shall not relieve a Person acting as Agent from its obligations as a Lender to the extent that such Agent is also a Lender.

**12.3 Exculpatory Provisions.** The Agent shall have no duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, the Agent shall not:

(a) be subject to any fiduciary or other implied duties, regardless of whether any Default or any Event of Default has occurred and is continuing;

(b) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Agent is required to exercise as directed in writing by the Required Lenders, provided that the Agent shall not be required to

take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law; and

(c) except as expressly set forth in the Loan Documents, have any duty to disclose, and the Agent shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by any Person serving as the Agent or any of its Affiliates in any capacity.

Agent shall (i) provide Lenders a copy of material written information its receives from Borrower promptly on receipt, it being understood that Agent anticipates that there will be a significant amount of email correspondence, much of which will not be material and therefore will not be relayed to Lenders, and (ii) endeavor to keep Lenders generally apprised of important non-written information Borrower communicates to Agent.

**12.4 Limitation of Liability.**

(a) Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders or as the Agent shall believe in good faith shall be necessary, under the circumstances or (ii) in the absence of its own gross negligence or willful misconduct.

(b) Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with the Loan Documents, (ii) the contents of any certificate, report or other document delivered under any of the Loan Documents, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any of the Loan Documents, (iv) the validity, enforceability, effectiveness or genuineness of any of the Loan Documents or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in **Article 3** or elsewhere in the Loan Documents, other than to confirm receipt of items expressly required to be delivered to the Agent.

(c) Agent may rely, and shall be fully protected in acting, or refraining to act, upon, any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, bond or other paper or document that it has no reason to believe to be other than genuine and to have been signed or presented by the proper party or parties or, in the case of emails, cables, telecopies and telexes, to have been sent by the proper party or parties. In the absence of its gross negligence or willful misconduct, Agent may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to Agent and conforming to the requirements of any of the Loan Documents. Agent may consult with counsel, and any opinion or legal advice of such counsel shall be full and complete authorization and protection in respect of any action taken, not taken or suffered by Agent under any of the Loan Documents in accordance therewith. Agent shall have the right at any time to seek instructions concerning the administration of the Collateral from any court of competent jurisdiction. Agent shall not be under any obligation to exercise any of the rights or powers granted to Agent by the Loan Documents at the request or direction of any Lender unless Agent shall have been provided by such Lender with adequate security and indemnity against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction, and then, only to the extent that such Lender has the right under the applicable Loan Document to direct Agent to act.

**12.5 Exculpation.** Each Lender acknowledges that neither Agent nor any other Lender has made any representation or warranty to it, and that no act by any Agent or other Lender hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of Borrower or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent or such Lender to any other Lender as to any matter, including whether there has been disclosure of material information in their possession. Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon the Loan Documents, any related agreement or any document furnished thereunder.

**12.6 Indemnification.** The Lenders agree to indemnify Agent in its capacity as such (to the extent not reimbursed by the Loan Parties and without limiting the obligation of the Loan Parties to do so), ratably according to their respective Commitment, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Obligations) be imposed on, incurred by or asserted against such Agent

in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents, or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence, bad faith or willful misconduct. The agreements in this **Section 12.6** shall survive the payment of the Obligations.

**12.7 Successor Agents**. Agent may resign upon twenty (20) days' notice to the Lenders and Borrower. If Agent shall resign in its capacity under this Agreement and the other Loan Documents, then the Required Lenders shall appoint a successor agent, whereupon such successor agent shall succeed to the rights, powers and duties of Agent in its capacity, and the term "Agent" shall mean such successor agent effective upon such appointment and approval, and the former Agent's rights, powers and duties as Agent in its capacity shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any Lender. If no applicable successor agent has accepted appointment as such Agent in its capacity by the date that is twenty (20) days following such retiring Agent's notice of resignation, such retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of such Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Agent's resignation as Agent, the provisions of this **Section 12** shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

**12.8 Agents Generally**. Except as expressly set forth herein, Agent shall not have any duties or responsibilities hereunder in its capacity as such.

**13. General Provisions**

**13.1 Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; *provided, however,* that neither this Agreement nor any rights hereunder may be assigned by Borrower without Agent's prior written consent, which consent may be granted or withheld in Agent's sole discretion. Each Lender shall have the right without the consent of and without written notice to Borrower to sell, transfer, negotiate, or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder and under any Loan Document to an Affiliate of Lender, provided that any other sale, transfer or participation of a Lender's interest in any Loan Document shall require Agent's prior written consent. The Agent, acting solely for his purpose as an agent of the Borrower to the extent required by the Internal Revenue Code, but in any event without liability to Borrower in such capacity as an agent, shall maintain a copy of each assignment and assumption, sale, transfer negotiation or participation document delivered to it and a register for the recordation of the names and addresses of the Lenders and participants from time to time, and the Commitments of, and principal amounts of (and stated interest on) the Advances owing to each Lender pursuant to the terms hereof from time to time (the "*Register*"). The entries in the Register shall be conclusive, and the Borrower, the Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

**13.2 Time of Essence.** Time is of the essence for the performance of all obligations set forth in this Agreement.

**13.3 Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

**13.4 Entire Agreement; Construction; Amendments and Waivers.**

(a) This Agreement, each of the other Loan Documents and the Warrant, taken together, constitute and contain the entire agreement between Borrower, Agent and Lenders and supersede any and all prior agreements, negotiations, correspondence, understandings and communications between the parties, whether written or oral, respecting the subject matter hereof, including that certain term sheet dated February 15, 2021 issued by SCI to Borrower and that certain Mutual Non-Disclosure Agreement dated January 20, 2021.

(b) This Agreement is the result of negotiations between and has been reviewed by each of Borrower, Agent and Lenders as of the date hereof and their respective counsel; *accordingly,* this Agreement shall be deemed to be the product of the parties hereto, and no ambiguity shall be construed in favor of or against Borrower, Agent or any Lender as a result of such provision having been written by such party. Borrower, Agent and Lenders agree that they intend the literal words of this Agreement and the other Loan Documents and that no parol evidence shall be necessary or appropriate to establish Borrower's, Agent's or Lenders' actual intentions.

(c) Any and all amendments, modifications, discharges or waivers of, or consents to any departures from any provision of this Agreement or of any of the other Loan Documents shall not be effective without the written consent of Agent, the Required Lenders and Borrower, provided however, that any amendment to the Commitment or any decrease in the principal amount of any Advance shall also require the written consent of the Lender whose Commitment or principal amount of any Advance is being amended and, provided, further, that Borrower may amend the Perfection Certificate and the Disclosure Schedules without the consent of the Agent or the Required Lenders only as provided in Article 5. Any waiver or consent with respect to any provision of the Loan Documents shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances. Any amendment, modification, waiver or consent effected in accordance with this **Section 13.4** shall be binding upon Agent, Lenders and on Borrower.

**13.5 Reliance.** All covenants, agreements, representations and warranties made herein by Borrower shall, notwithstanding any investigation by Agent and Lenders, be deemed to be material to and to have been relied upon by Agent and Lenders.

**13.6 No Set-Offs by Borrower.** All Obligations payable by Borrower pursuant to this Agreement or any of the other Loan Documents shall be payable without notice or demand and shall be payable in United States Dollars without set-off or reduction of any manner whatsoever.

**13.7 Counterparts.** This Agreement and each of the other Loan Documents may be executed in any number of counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Agreement or any of the other Loan Documents by telecopy or other electronic imaging means (e.g. PDF by email) shall be effective as delivery of a manually executed counterpart.

**13.8 Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force and effect until the Obligations have been paid in full in cash. The obligation of Borrower to indemnify each Indemnified Person with respect to the expenses, damages, losses, costs and liabilities described in **Section 10.3** shall survive until all applicable statute of limitations periods with respect to actions that may be brought against an Indemnified Person have run. Further, **Section 6.13**, **13.9**, and **13.12** shall survive the termination of the Commitment or this Agreement as will any other provision which by its terms extend beyond the payment in full in cash of the Obligations.

**13.9 Publicity.** Collateral Agent and Lender may use Borrower's name and logo, and include a brief description of the relationship between Borrower, Collateral Agent and Lender, in Collateral Agent's and Lender's marketing materials.

**13.10 Correction of Loan Documents.** Agent may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties so long as such Agent provides Borrower and Lenders with written notice of such correction and allows Borrower and Lenders at least ten (10) days to object to such correction. In the event of such objection, such correction shall not be made except by an amendment signed by Agent, the Required Lenders and Borrower.

**13.11 Relationship of Parties.** Borrower, Agent and Lenders acknowledge, understand and agree that the relationship between the Borrower, on the one hand, and Agent and Lenders, on the other, is, and at all times shall remain solely that of a borrower and lender. Neither Agent nor Lenders shall under any circumstances be construed to be a partner or joint venturer of Borrower or any of its Affiliates; nor shall Agent or any Lender under any circumstances be deemed to be in a relationship of confidence or trust or a fiduciary relationship with Borrower or any of its Affiliates, or to owe any fiduciary duty to Borrower or any of its Affiliates. Agent and Lenders do not undertake or assume any responsibility or duty to Borrower or any of its Affiliates to select, review, inspect, supervise, pass judgment upon or otherwise inform the Borrower or any of its Affiliates of any matter in connection with its or their Property, any Collateral or the operations of Borrower or any of its Affiliates. Borrower

and each of its Affiliates shall rely entirely on their own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by Agent or Lenders in connection with such matters is solely for the protection of Agent and Lenders, and neither Borrower nor any Affiliate is entitled to rely thereon.

**13.12 Confidentiality**. Neither Agent, Lenders nor any of their employees, agents or representatives shall disclose to any third party any Confidential Information that Borrower or any Affiliate of Borrower discloses to it pursuant to the Loan Documents, except that Agent and Lenders (i) may disclose Confidential Information to a third party to the extent required by law, subpoena, civil investigative demand, interrogatories or similar legal process, upon giving Borrower reasonable advance notice of such disclosure if allowed pursuant to applicable law to permit Borrower to seek a protective order or otherwise prevent such disclosure, (ii) may disclose Confidential Information to a potential assignee or transferee of or participant in the Loan Documents or Warrant; *provided that* the potential assignee, transferee or participant agrees to be bound by substantially similar confidentiality obligations as Agent and Lenders under this **Section 13.12**, (iii) may disclose Confidential Information to their legal counsel, accountants and other professional advisors provided they are bound by law or contract by the substantially similar confidentiality obligations as Agent or Lender as set forth in this Section, (iv) may disclose Confidential Information to regulatory authorities having jurisdiction over Agent or Lender or any assignee, transferee or participant, and (v) may disclose Confidential Information in connection with the exercise of its rights and remedies during the continuance of an Event of Default, to the extent Agent or Lenders reasonably deems necessary. For purposes hereof, "*Confidential Information*" is information that Borrower or an Affiliate of Borrower discloses to Agent or Lenders pursuant to the Loan Documents that is not information which (i) becomes generally available to the public, other than as a result of disclosure by Agent or Lenders, (ii) was available on a non-confidential basis prior to its disclosure to Agent or Lenders by Borrower or such Affiliate, as applicable, (iii) becomes available to Agent or any Lender on a non-confidential basis from a source other the Borrower or such Affiliate, as applicable; *provided that* neither Agent nor any Lender have actual knowledge that such third party is prohibited from disclosing such information, or (iv) is independently developed by Agent or any Lender without reference to confidential information provided by Borrower or an Affiliate of Borrower.

**13.13 Patriot Act/Freedom Act**. Agent and Lenders hereby notify Borrower and its Subsidiaries that pursuant to the requirements of the USA PATRIOT Act and USA FREEDOM Act, they are required to obtain, verify and record information that identifies Borrower and its Subsidiaries, which information includes the name and address of Borrower and its Subsidiaries and other information that will allow them to identify Borrower and its Subsidiaries in accordance with the USA PATRIOT Act and the USA FREEDOM Act.

**13.14 Governing Law**. California law governs this Agreement without regard to principles of conflicts of law. Each of Borrower, Agent and Lenders submit to the exclusive jurisdiction of the State and Federal courts in the County of San Mateo, California; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Agent. Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens* and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to such party at the address set forth in, or subsequently provided by such party in accordance with, **Section 11** of this Agreement and that service so made shall be deemed completed upon the earlier to occur of a party's actual receipt thereof or three (3) days after deposit in the U.S. mails, proper postage prepaid.

**13.15 Waiver of Jury Trial**. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EACH OF BORROWER, AGENT AND LENDERS WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY CONTEMPLATED TRANSACTION UNDER THIS AGREEMENT, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

**13.16 Judicial Reference**. WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of San Mateo County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in San Mateo County, California; and the parties hereby submit to the jurisdiction of such court. The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the San Mateo, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge.

**13.17 Scope of Authority**. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

**13.18 Covenant Regarding Texas Litigation Proceeds**. As soon as reasonably practicable following the Closing Date, Borrower shall use its commercially reasonable efforts to obtain consent from Bentham to permit Borrower to enter into an agreement with Lenders to deposit into an Account subject to a Control Agreement any Litigation Proceeds remaining following satisfaction of the obligations to Bentham, under the Law Firms Engagement Letter, the ECA Letter, and the Profile Letter,

**[S*ignature page follows*]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**BORROWER:**

**HouseCanary, Inc.**

By: ______________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**In Witness Whereof,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**LENDERS:**

**Structural Capital Investments III, LP,**
a Delaware limited partnership

**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
its General Partner

By: ______________________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II series of Structural Capital DCO, LLC**

**By: Structural Capital GP III, LLC**
its Manager

By: ______________________________
Name: Lawrence Gross
Title: Managing Member

**CEOF Holdings LP**

**By: Corbin Capital Partners, L.P.**
its Investment Manager

By: ______________________________
Name: ______________________________
Title: ______________________________

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP,**
a Delaware limited partnership

**BY: STRUCTURAL CAPITAL GP III, LLC,**
a Delaware limited liability company
its General Partner

By: ____________________________________
Name: Lawrence Gross
Title: Managing Member

**SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC**

**BY: STRUCTURAL CAPITAL GP III, LLC**
its Manager

By: ____________________________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**

**BY: CORBIN CAPITAL PARTNERS, L.P.**
its Investment Manager

DocuSigned by:

EC77AC48D9C844B...

By: ____________________________________
Name: Daniel Friedman
Title: General Counsel

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
a California limited liability company

By: Structural Capital Management Company II, LP,
a Delaware limited partnership
Its Manager

By: Structural Capital GP, LLC,
a Delaware limited liability company
Its General Partner

By: ______________________________
Name: Lawrence Gross
Title: Managing Member

**List of Schedules and Exhibits**


| | |
|---|---|
| Schedule 2.1 | Commitments |
| Exhibit A | Collateral Description |
| Exhibit B | Form of Secured Promissory Note |
| Exhibit C | Form of Warrant |
| Exhibit D | Form of Notice of Borrowing |
| Exhibit E | Form of Compliance Certificate |
| Exhibit F | Perfection Certificate |
| Exhibit G | Form of Joinder Agreement |
| Exhibit H | Form of ACH Debit Consent |
| Exhibit I | Management Rights Letter |

Current Financial Statements

Disclosure Schedules

Post-Closing Schedule

**Schedule 2.1**
**Commitments**

| **Lender Name** | **Commitment** |
|---|---|
| Structural Capital Investments III, LP | $22,000,000.00 |
| Series Structural DCO II series of Structural Capital DCO, LLC | 5,000,000.00 |
| CEOF Holdings LP | $3,000,000.00 |

# EXHIBIT A

**DEBTOR:** **HouseCanary, Inc.**

**SECURED PARTY:** **Ocean II PLO LLC, as Agent for the benefit of Lenders**

## COLLATERAL DESCRIPTION ATTACHMENT TO LOAN AND SECURITY AGREEMENT

All assets and property of Borrower (herein referred to as "Borrower" or "Debtor") whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to (collectively, the "Collateral"):

(a) all accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property and the Texas Litigation Collateral), goods (including fixtures), instruments (including promissory notes), Inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records, provided however, that (i) the Collateral shall include all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "Rights to Payment"); and (ii) if a security interest in Borrower's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Collateral shall automatically, and effective as of the date of this Agreement, include the Intellectual Property to the extent necessary to permit perfection of Agent's security interest in the Rights to Payment; and

(b) all real property interests (including leaseholds, mineral rights, timber, etc.); and

(c) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

Notwithstanding the foregoing, in no event shall the Collateral include: (a) any lease, license, contract, property rights or agreement to which Borrower is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Borrower therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9406, 9407, 9408 or 9409 of the Code (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity); provided that the Collateral shall include and such security interest shall attach immediately (x) at such time as the condition causing such abandonment, invalidation or unenforceability shall be remedied and to the extent severable, shall attach immediately to any portion of such lease, license, contract, property rights or agreement that does not result in any of the consequences specified in (i) or (ii) above and (y) to any all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing such lease, licenses, contract, property right or agreement; or (b) any intent-to use Trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable law.

# EXHIBIT B

## FORM OF SECURED PROMISSORY NOTE

**EXHBIT B**
**SECURED PROMISSORY NOTE**

**THIS SECURED PROMISSORY NOTE** (this "*Promissory Note*") is made as of _________ __, 20__, by **____________, ___**, a ________ [corporation/limited liability company] ("*Borrower*") in favor of _____________________ [lender] ("*Lender*") in connection with that certain Loan and Security Agreement dated as of ___________ __, 20__, by and between Borrower, Lender, Structural Capital Investments II, L.P., as collateral and administrative agent ("*Agent*"), and the lenders party thereto, as such agreement may be amended or amended and restated from time to time (the "*Loan Agreement*").

FOR VALUE RECEIVED, Borrower promises to pay in lawful money of the United States, to the order of Agent for the benefit of Lender, at 400 Oyster Point Blvd, Suite 229, South San Francisco, California 94080, or such other place as Agent may from time to time designate in writing to Borrower ("*Agent's Office*"), the principal sum of $____________ together with interest thereon and all other amounts specified in the Loan Agreement as provided in accordance with the terms hereof and the Loan Agreement.

This Promissory Note is one of the Notes referred to in, and is executed and delivered in connection with, the Loan Agreement, and is entitled to the benefit and security of the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement), to which reference is made for a statement of all of the terms and conditions thereof and which are hereby incorporated by reference. All payments due hereunder shall be made in accordance with the Loan Agreement. All terms defined in the Loan Agreement shall have the same definitions when used herein, unless otherwise defined herein. An Event of Default under the Loan Agreement shall constitute a default under this Promissory Note.

Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest under the Code and any other applicable law. Borrower agrees to make all payments under this Note without setoff, recoupment or deduction and regardless of any counterclaim or defense. No delay or omission by Lender or Agent in exercising or enforcing any of their powers, rights, privileges, remedies or discretions hereunder shall operate as a waiver thereof on that occasion nor on any other occasion. No waiver of any Event of Default shall operate as a waiver of any other Event of Default, nor as a continuing waiver. This Note shall be binding upon Borrower and upon its successors, assigns, and representatives, and shall inure to the benefit of Lender and its successors, endorsees and assigns.

This Promissory Note has been negotiated and delivered to Lender and is payable in the State of California. For the avoidance of doubt, it is agreed that (i) this Promissory Note shall be governed by and construed and enforced in accordance with, the laws of the State of California, excluding any conflicts of law rules or principles that would cause the application of the laws of any other jurisdiction, and (ii) that the Choice of Law and Venue; Jury Trial Waiver provisions of Section 13 of the Loan Agreement are deemed to be incorporated herein, *mutatis mutandis*.

IN WITNESS WHEREOF, Borrower has caused this Promissory Note to be executed by a duly authorized officer as of the day and year first above written.

**BORROWER:**
**____________________________**

**By:** ________________________________
**Name:** ______________________________
**Title:** _______________________________

# EXHIBIT C

## FORM OF WARRANT

THIS WARRANT AND THE UNDERLYING SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IN ACCORDANCE WITH APPLICABLE REGISTRATION REQUIREMENTS OR AN EXEMPTION THEREFROM. THIS WARRANT MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, TRANSFER, PLEDGE OR HYPOTHECATION OF ANY INTEREST IN ANY OF THE SECURITIES REPRESENTED HEREBY.

**WARRANT TO PURCHASE STOCK**
**of**
**HouseCanary, Inc.**

**Dated as of March __, 2021**

**No. SC-[X]**

THIS CERTIFIES THAT, for value received, _________________ or its registered assigns (the "***Holder***"), is entitled, subject to the provisions and upon the terms and conditions set forth herein, to purchase from HouseCanary, Inc., a Delaware corporation (the "***Company***"), a number of fully paid and non-assessable shares of Stock equal to the Warrant Coverage, at such times and at the price per share set forth herein. The term "***Warrant***" as used herein shall include this Warrant and any warrants delivered in substitution or exchange therefor as provided herein. This Warrant is issued in consideration for the provision of term debt financing pursuant to that certain Loan and Security Agreement dated March __, 2021 by and between the Company, Ocean II PLO LLC, Structural Capital Investments III, LP and the other Lenders party thereto (the "***Loan Agreement***").

The following is a statement of the rights of Holder and the conditions to which this Warrant is subject, and to which Holder, by acceptance of this Warrant, agrees:

**1. Definitions; Number and Price of Shares of Stock.** Capitalized terms used but not defined herein shall have the meaning provided in the Loan Agreement.

(a) "***Charter***" shall mean the Company's certificate of incorporation filed with the Delaware Secretary of State, as amended from time to time.

(b) "***Common Stock***" shall mean the Common Stock of the Company.

(c) "***Company***" shall have the meaning provided in the preamble.

(d) "***Date of Issuance***" shall mean March __, 2021.

(e) "***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

(f) "***Exercise Price***" shall mean $3.0228 per share, as adjusted for stock splits, stock combinations and the like.

(g) "***Holder***" shall have the meaning provided in the preamble.

(h) "***IPO***" shall have the meaning provided in Section 2(b)(i).

(i) "***Loan Agreement***" shall have the meaning provided in the preamble.

(j) "***Marketable Securities***" means securities meeting all of the following requirements: (i) the issuer thereof is then subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, and is then current in its filing of all required reports and other information under the Act and the Exchange Act; (ii) the class and series of shares or other security of the issuer that would be received by Holder in connection with the Qualified Acquisition were Holder to exercise this Warrant on or prior to the closing thereof is then traded or quoted on a nationally recognized securities exchange, and (iii) following the closing of such Qualified Acquisition, Holder can immediately and publicly sell without restriction all of the issuer's shares and/or other securities that would be received by Holder in such Qualified Acquisition were Holder to exercise this Warrant in full on or prior to the closing of such Qualified Acquisition.

(k) "***Merger Event***" shall mean any transaction or series of related transactions involving (i) the consummation of the sale, lease, exclusive license or other transfer of all or substantially all assets of the Company, or (ii) the consummation of any merger, acquisition or consolidation involving the Company in which (A) the Company is not the surviving entity (excluding in all instances a merger or consolidation effected exclusively to change the Company's jurisdiction of or type of entity), (B) the holders of a majority of the capital stock the Company prior to such transaction are no longer the holders of a majority of the capital stock after such transaction (excluding in all instances a merger or consolidation effected exclusively to change the Company's jurisdiction of or type of entity), or (C) the outstanding shares of the Company's capital stock are otherwise converted into or exchanged for shares of preferred stock, other securities or property of another entity; provided, however, that a "Merger Event" shall not include the sale and issuance by the Company of its equity securities to one or more investors for cash in a transaction or series of related transactions solely for bona fide equity financing purposes in which cash is received by the Company, indebtedness of the Company is canceled or converted, or a combination thereof.

(l) "***Qualified Acquisition***" shall mean a Merger Event in which the consideration to be received by the stockholders of the Company consists solely of cash and/or Marketable Securities.

(m) "***Rights Agreement***" shall mean that certain Amended and Restated Investors' Rights Agreement entered into by the Company as of August 13, 2019.

(n) "***Securities Act***" shall mean the Securities Act of 1933, as amended.

(o) "***Series B Preferred Stock***" shall mean the Series B Preferred Stock of the Company.

(p) "***Stock***" shall mean Series B Preferred Stock.

(q) "***Underlying Securities***" shall mean the Stock and the shares of Common Stock or other securities or properties issuable upon conversion thereof.

(r) "***Warrant***" shall have the meaning provided in the preamble.

(s) "***Warrant Coverage***" shall mean [1,500,000] [NTD: To be allocated between the lenders] divided by the Exercise Price at the time the Warrant is exercised.[1]

**2. Exercise of the Warrant.**

(a) ***Exercise.*** The purchase rights represented by this Warrant may be exercised at the election of Holder at any time after the Date of Issuance until the end of the period specified in Section 7, in whole or in part, by:

(i) the tender to the Company at its principal office (or such other office or agency as the Company may designate in writing) of (A) a notice of exercise in the form of **Exhibit A** (the "***Notice of Exercise***"), duly completed and executed by or on behalf of Holder, and (B) the surrender of this Warrant; and

(ii) the payment to the Company of an amount equal to (x) the Exercise Price multiplied by (y) the number of shares of Stock being purchased, by wire transfer, setoff from amounts the Company owes Holder pursuant to the Loan Agreement, or certified cashier's or other check acceptable to the Company and payable to the order of the Company.

(b) ***Net Issue Exercise.*** In lieu of exercising this Warrant pursuant to Section 2(a)(ii), if the fair market value of one share of Stock is greater than the Exercise Price (at the date of calculation as set forth below), Holder may elect to receive a number of shares of Stock equal to the value of this Warrant (or of any portion of this Warrant being canceled) by surrender of this Warrant at the principal office of the Company (or such other office or agency as the Company may designate) together with a properly completed and executed Notice of Exercise, in which event the Company shall issue to Holder that number of shares of Stock computed using the following formula:

$$X = \frac{Y(A - B)}{A}$$

Where:

X = The number of shares of Stock to be issued to Holder

Y = The number of shares of Stock purchasable under this Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being canceled (at the date of such calculation)

A = The fair market value of one share of Stock (at the date of such calculation)

B = The Exercise Price (at the date of such calculation)

---

[1] As there could be a repricing of the Series B stock in connection with a restructuring, the composition of this definition needs to stay tied to the amount of warrant coverage to be divided by the exercise price.

For purposes of the calculation above, the fair market value of one share of Stock shall be determined by the Board acting in good faith; *provided, however,* that:

(i) if the Warrant is exercised in connection with the Company's initial public offering of Common Stock (an "***IPO***"), the fair market value per share of Stock shall be the initial price to public specified in the final prospectus of the IPO; and

(ii) if the exercise is after, and not in connection with the IPO, and:

(1) if the Common Stock is traded on a securities exchange, the fair market value shall be the average of the closing prices over a five day period ending three days before the day the current fair market value of the securities is being determined; or

(2) if the Common Stock is traded over-the-counter, the fair market value shall be the average of the closing bid and asked prices quoted on the NASDAQ system (or similar system) over the five day period ending three days before the day the current fair market value of the securities is being determined; or

(3) if neither (1) nor (2) is applicable, then the fair market value of a share of Stock shall be as determined in good faith by the Board unless the Company shall become subject to a Merger Event, in which case the fair market value shall be as determined in Section 2(b)(iii); and

(iii) if the Warrant is exercised in connection with a Merger Event, the entirety of the cash and value of the property that could potentially be paid or distributed to the Company's stockholders (in their capacities as such) in connection with such transaction including any earn outs, holdbacks or other contingent consideration (whether or not actually received) shall be the basis for determining fair market value of the Stock.

(c) ***Certificates.*** The rights under this Warrant shall be deemed to have been exercised and the Stock issuable upon such exercise shall be deemed to have been issued immediately prior to the close of business on the date this Warrant is exercised in accordance with its terms, and the person entitled to receive the Stock issuable upon such exercise shall be treated for all purposes as the holder of record of such Stock as of the close of business on such date, and, as promptly as reasonably practicable on or after such date, but in no event greater than ten (10) Business Days if the Stock is not traded on any securities exchange or two (2) Business Days if the Stock is traded on any securities exchange, the Company shall deliver a certificate evidencing such Stock and cause appropriate book entries to be made in its records to reflect the same.

(d) ***No Fractional shares of Stock or Scrip.*** No fractional shares of Stock shall be issued upon the exercise of the rights under this Warrant. In lieu of such fractional share of Stock to which Holder would otherwise be entitled, the Company shall make a cash payment equal to the Exercise Price multiplied by such fraction.

(e) ***Reservation of shares of Stock.*** The Company agrees during the term the rights under this Warrant are exercisable to take all reasonable action to reserve and keep available from its authorized and unissued Series B Preferred Stock for the purpose of effecting the exercise of this Warrant such number of shares of Stock (and Common Stock for issuance on conversion of such Stock) as shall from time to time be sufficient to effect the exercise of the rights under this Warrant; and if at any time the number of authorized but unissued Series B Preferred Stock (and Common Stock for issuance on conversion of such Stock) shall not be sufficient for purposes of the exercise of this Warrant in accordance with its terms, without

limitation of such other remedies as may be available to Holder, the Company shall increase its authorized and unissued Series B Preferred Stock (and Common Stock for issuance on conversion of such Stock) to a number of shares of Stock as shall be sufficient for such purposes. The capitalization table attached hereto as **Exhibit B** correctly sets forth the authorized, issued and outstanding capital of the Company and all outstanding options, profits interests and warrants to acquire any Equity Interests of the Company.

3. **Replacement of the Warrant.** Subject to the receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company or, in the case of mutilation, on surrender and cancellation of this Warrant, the Company shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor and amount.

**4. Transfer of the Warrant.**

(a) ***Warrant Register.*** The Company shall maintain a register (the "***Warrant Register***") containing the name and address of Holder or Holders. Until this Warrant is transferred on the Warrant Register in accordance herewith, the Company may treat the holder as shown on the Warrant Register as the absolute owner of this Warrant for all purposes, notwithstanding any notice to the contrary, provided however, that the Company shall promptly record the transfer of this Warrant on the Warrant Register upon receipt of written notification of such transfer made as allowed in this Warrant. Any Holder of this Warrant (or of any portion of this Warrant) may change its address as shown on the Warrant Register by written notice to the Company requesting a change.

(b) ***Warrant Agent.*** The Company may appoint an agent for the purpose of maintaining the Warrant Register referred to in Section 4(a), issuing the shares of Stock or other securities then issuable upon the exercise of the rights under this Warrant, exchanging this Warrant, replacing this Warrant or conducting related activities.

(c) ***Transferability of the Warrant.*** Subject to the provisions of this Warrant and the Securities Act, this Warrant may be transferred by endorsement (by the transferor and the transferee executing the assignment form attached as **Exhibit C** (the "***Assignment Form***")) and delivery in the same manner as a negotiable instrument transferable by endorsement and delivery.

(d) ***Exchange of the Warrant upon a Transfer.*** On surrender of this Warrant (and a properly endorsed Assignment Form) for exchange, subject to the provisions of this Warrant with respect to compliance with the Securities Act, the Company shall issue to or on the order of Holder a new warrant or warrants of like tenor without charge, in the name of Holder or as Holder (on payment by Holder of any applicable transfer taxes) may direct, for the number of shares of Stock issuable upon exercise hereof, and the Company shall register any such transfer upon the Warrant Register. This Warrant (and the securities issuable upon exercise of the rights under this Warrant) must be surrendered to the Company or its warrant or transfer agent, as applicable, as a condition precedent to the sale, pledge, hypothecation or other transfer of any interest in any of the securities represented hereby.

(e) ***Transfer Taxes.*** In no event shall the Company be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate in a name other than that of Holder, and the Company shall not be required to issue or deliver any such certificate unless and until the person or persons requesting the issue thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid or is not payable. The Company shall not otherwise charge any fee in connection with any such transfer.

5. **Restrictions on Transfer of the Warrant and shares of Stock; Compliance with Securities Laws.** By acceptance of this Warrant, Holder agrees to comply with the following:

(a) ***Restrictions on Transfers of Warrants.*** This Warrant may be transferred by Holder in whole or in part to as long as such transfer is made in accordance with the Securities Act (including, without limitation, the delivery of investment representation letters and legal opinions reasonably satisfactory to the Company, as reasonably requested by the Company) upon written notice to the Company, such notice containing the portion of the Warrant being transferred with the name, address and taxpayer identification number of the transferee. The Company shall not require Holder to provide an opinion of counsel if the transfer is to an affiliate of Holder, provided that any such transferee is an "accredited investor" as defined in Regulation D promulgated under the Securities Act. Additionally, the Company shall also not require an opinion of counsel if there is no material question as to the availability of Rule 144 promulgated under the Securities Act. By its acceptance of this Warrant, such transferee that becomes a Holder hereby makes to the Company each of the representations and warranties set forth in Section 11 hereof and agrees to be bound by all of the covenants, terms and conditions of this Warrant as if the original Holder hereof. Holder hereby agrees to surrender this Warrant to the Company for reissuance to the transferee(s).

(b) ***Securities Law Legend.*** This Warrant and its underlying securities shall (unless otherwise permitted by the provisions of this Warrant) be stamped, imprinted, or electronically notated with a legend substantially similar to the following (in addition to any legend required by state securities laws):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IN ACCORDANCE WITH APPLICABLE REGISTRATION REQUIREMENTS OR AN EXEMPTION THEREFROM. THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, TRANSFER, PLEDGE OR HYPOTHECATION OF ANY INTEREST IN ANY OF THE SECURITIES REPRESENTED HEREBY.

(c) ***Instructions Regarding Transfer Restrictions.*** Holder consents to the Company making a notation on its records and giving instructions to any transfer agent in order to implement the restrictions on transfer established in this Section 5.

(d) ***Removal of Legend.*** The legend referring to federal and state securities laws identified in Section 5(b) stamped on any certificate evidencing the shares of Stock (and the Common Stock issuable upon conversion thereof) shall be removed and the Company shall issue a certificate without such legend to Holder of such securities (i) in connection with sale of such securities that has been registered under the Securities Act pursuant to an effective registration statement, or (ii) if such holder provides the Company with an opinion of counsel reasonably acceptable to the Company to the effect that a sale or transfer of such securities may be made without registration or qualification.

6. **Adjustments and Related Rights.** The number and kind of shares of Stock purchasable hereunder and the Exercise Price therefor are subject to adjustment from time to time, as follows:

(a) ***Merger or Reorganization.***

(i) If at any time there shall be a Qualified Acquisition and Holder has not exercised this Warrant in full then this Warrant shall automatically be deemed to be exercised pursuant to the

net issue exercise provisions of Section 2(b) of this Warrant effective immediately prior to and contingent upon the consummation of such Qualified Acquisition.

(ii) If at any time there shall be a Merger Event other than a Qualified Acquisition, prior to closing of such Merger Event, lawful provision shall be made so that Holder shall thereafter be entitled to receive at its election, upon exercise of this Warrant, (A) the number of shares of Stock or Underlying Securities that Holder would have received in connection with such Merger Event if Holder had exercised this Warrant immediately prior to the Merger Event, or (B) the number of shares of stock or other equity interests Holder would be entitled to receive if the surviving entity in such Merger Event assumed this Warrant. In any such case, appropriate adjustment (as determined in good faith by the Company's Board of Directors and reasonably acceptable to Holder) shall be made in the application of the provisions of this Warrant with respect to the rights and interests of Holder after the Merger Event to the end that the provisions of this Warrant (including adjustments of the Exercise Price and adjustments to ensure that the provisions of this Section 6 shall thereafter be applicable, as nearly as possible, to the purchase rights under this Warrant in relation to any Underlying Securities thereafter acquirable upon exercise of such purchase rights) shall continue to be applicable in their entirety, as near as reasonably may be. In connection with a Merger Event and upon Holder's written election to the Company, the Company shall cause this Warrant to be exchanged for the consideration that Holder would have received if Holder had chosen to exercise its right to have shares issued pursuant to the Net Issue Exercise provisions of this Warrant in Section 2(b) without actually exercising such right, acquiring such shares and exchanging such shares for such consideration. The provisions of this Section 6(a)(ii) shall similarly apply to successive Merger Events.

(b) ***Reclassification of Stock.*** Except for Merger Events subject to Section 6(a), if the Company at any time shall, by combination, reclassification, exchange or subdivision of securities or otherwise, change any of the securities as to which purchase rights under this Warrant exist into the same or a different number of securities of any other class or classes, this Warrant shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the securities which were subject to the purchase rights under this Warrant immediately prior to such combination, reclassification, exchange, subdivision or other change. The provisions of this Section 6(b) shall similarly apply to any successive combination, reclassification, exchange, subdivision or other change.

(c) ***Subdivisions and Combinations.*** In the event that the outstanding shares of Series B Preferred Stock are subdivided (by stock split, by payment of a stock distribution or otherwise) into a greater number of shares of Stock, the number of shares of Stock issuable upon exercise of the rights under this Warrant immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately increased, and the Exercise Price shall be proportionately decreased, and in the event that the outstanding Series B Preferred Stock are combined (by reclassification or otherwise) into a lesser number of shares of such securities, the number of shares of Stock issuable upon exercise of the rights under this Warrant immediately prior to such combination shall, concurrently with the effectiveness of such combination, be proportionately decreased, and the Exercise Price shall be proportionately increased.

(d) ***Adjustments for Diluting Issuances***. Without duplication of any adjustment otherwise provided for in this Section 6, the number of shares of Common Stock or other securities issuable upon conversion of the Underlying Securities shall be subject to the anti-dilution adjustment and protective provisions in accordance with the Charter. The anti-dilution rights set forth in the Charter shall not be restated, amended or modified in any manner which affects Holder's rights adversely and differently than all other holders of Stock without Holder's written consent. The Company shall provide Holder with any restatement, amendment or modification to the Charter promptly after the same has been made.

(e) ***Notice of Adjustments.*** If: (i) the Company shall declare any dividend or distribution upon its stock, whether in stock, cash, property or other securities or offer for subscription *pro rata* to holders of its securities any additional securities; (ii) there shall be any Merger Event; (iii) there shall be an IPO; (iii) the Company shall sell, lease, license or otherwise transfer all or substantially all of its assets; or (iv) there shall be any voluntary dissolution, liquidation or winding up of the Company; then, in connection with each such event, the Company shall send to Holder: (A) at least ten (10) days' prior written notice of the date on which the books of the Company shall close or a record shall be taken for such event described in (i), (ii) or (iii), above, (specifying the date on which Holders of the Company's securities shall be entitled thereto) or for determining rights to vote in respect of such event or for exchanging shares of stock for securities or other property deliverable upon such event); and (B) in the case of an IPO, the Company shall give Holder at least ten (10) Business Days' written notice prior to the effective date thereof. Any such notice shall state the event giving rise to the adjustment, including adjustment of the Exercise Price as adjusted and the number of securities or other property purchasable upon the exercise of the rights under this Warrant, setting forth in reasonable detail the method of calculation of each. The Company shall, upon the written request of Holder, furnish or cause to be furnished to Holder a certificate setting forth (x) such adjustments, (y) the Exercise Price at the time in effect and (z) the number of securities and the amount, if any, of other property that at the time would be received upon exercise of this Warrant.

(f) ***Dividends/Distributions***. If the Company at any time while this Warrant is outstanding and unexpired shall:

(i) pay a dividend with respect to the Stock payable in Stock, then the Exercise Price shall be adjusted, from and after the date of determination of stockholders entitled to receive such dividend or distribution, to that price determined by multiplying the Exercise Price in effect immediately prior to such date of determination by a fraction (A) the numerator of which shall be the total number of shares of Stock outstanding immediately prior to such dividend or distribution, and (B) the denominator of which shall be the total number of shares of Stock outstanding immediately after such dividend or distribution; or

(ii) make any other dividend or distribution with respect to Underlying Securities, except any dividend covered by Section 6(f)(i), then, in each such case, provision shall be made by the Company such that the Holder shall receive upon exercise or conversion of this Warrant a proportionate share of any such dividend or distribution as though it were the holder of the Underlying Securities as of the record date fixed for the determination of the stockholders of the Company entitled to receive such dividend or distribution. For the avoidance of doubt, this Section 6(f)(ii) includes without limitation any subscription right in, or entitlement to receive, any securities that are afforded to Company stockholders in connection with any spin-off or similar transaction whereby Company stockholders receive a dividend or distribution in connection with the Transfer of a line of business, a Subsidiary (direct or indirect) or any other asset(s).

(g) ***IPO.*** If the Company shall effect an IPO, which results in the conversion of the Stock into Common Stock (or any other class or series of shares) pursuant to the provisions of the Charter in effect immediately prior to or upon such offering, then, effective upon such offering, this Warrant shall change from the right to purchase Stock to the right to purchase Common Stock (or such other class or series of shares, if applicable), and Holder shall thereupon have the right to purchase, at a total price equal to that payable upon the exercise of this Warrant in full, the number of Common Stock (or such other class or series of shares, if applicable) which would have been receivable by Holder upon the exercise of this Warrant for Stock immediately prior to such conversion of such Stock into Common Stock (or such other class or series of shares, if applicable), and in such event appropriate provisions shall be made with respect to the rights and interest of Holder to the end that the provisions hereof (including, without limitation, the provisions for the adjustment of the Exercise Price and of the number of shares of Stock purchasable upon exercise of this

Warrant and the provisions relating to the net issue election) shall thereafter be applicable to Common Stock (or such other class or series of shares, if applicable) deliverable upon the exercise hereof.

(h) ***Information Rights; Confidentiality***. For as long as Holder holds this Warrant or the Stock issuable upon exercise hereof (including any Underlying Securities), the Company shall deliver Holder the Company's quarterly financial statements and a current capitalization table within 45 days of the end of each quarter or sooner if available, and its annual financial statements within 210 days of the end of each fiscal year or sooner if available; *provided*, in each case, that such Holder shall be subject to the same confidentiality obligations set forth in Section 13.12 of the Loan Agreement. Notwithstanding the foregoing, the Company shall have no separate obligation hereunder to deliver to Holder any information the substantial equivalent of which shall have been provided to Holder pursuant to the Loan Agreement or, after an IPO, available through timely made publicly available filings with the Securities and Exchange Commission.

7. **Expiration of the Warrant.** This Warrant shall no longer be exercisable after the earlier of (a) 5:00 p.m., Pacific time, on March __, 2028, and (b) the closing of a Qualified Acquisition.

8. **Automatic Cashless Exercise upon Expiration.** In the event that, upon the expiration of this Warrant, the fair market value of one share of Stock (or other security issuable upon the exercise hereof) as determined in accordance with Section 2(b) above is greater than the Exercise Price in effect on such date, then this Warrant shall automatically be deemed on and as of such date to be exercised pursuant to Section 2(b) above as to all shares of Stock (or such other securities) for which it shall not previously have been exercised at the Exercise Price, and the Company shall, within a reasonable time, but in no event greater than three (3) Business Days, deliver to Holder a certificate representing the shares of Stock (or such other securities) issued upon such exercise.

9. **Rights as Stockholder.** In lieu of receiving the adjustment with regard to any particular dividend or distribution as provided in Section 6(f)(ii), Holder may by written election to the Company elect to receive any such dividend and/or distribution prior to exercising this Warrant and becoming a stockholder. Within two (2) Business Days after the Company's receipt of such written election, the Company shall deliver to Holder such dividend and/or distribution as if Holder were a stockholder for the maximum number of shares of Stock into which this Warrant is then exercisable, whereupon Holder shall no longer be entitled to receive the adjustment provided in Section 6(f)(ii) for such dividend or distribution. Except as provided in this Warrant, until Holder exercises its right to purchase Stock as provided herein, Holder shall not have any rights as a stockholder of the Company, including the right to vote for the election of directors or upon any matter submitted to stockholders at any meeting.

10. **Representations and Warranties of the Company.** Company represents, warrants and covenants to the Company as follows:

(a) ***Capitalization; Issuance.*** The authorized capital stock of the Company consists of 92,000,000 shares of Voting Common Stock, 32,679,883 of which are issued and outstanding 32,000,000 shares of Non-Voting Common Stock, 6,477,324 of which are issued and outstanding, and 57,131,633 shares of Preferred Stock, 7,471,674 of which are designated Series A Preferred Stock, all of which are currently issued and outstanding, 22,850,296 of which are designated Series A-1 Preferred Stock, all of which are currently issued and outstanding, 19,882,228 of which are designated Series B Preferred Stock, 16,426,814 of which are issued and outstanding, 2,731,683 of which are designated Series B-1 Preferred Stock, all of which are issued and outstanding, and 4,195,752 of which are designated Series B-2 Preferred Stock, all of which are issued and outstanding. The Company has reserved (i) 4,743,285 shares of Non-Voting Common Stock for issuance upon the exercise of options granted and currently outstanding under the Company's Amended and Restated 2019 Stock Incentive Plan (the "***2019 Stock Plan***"); (ii) 6,822,508 shares of Non-Voting

Common Stock for future issuance to officers, directors, employees and consultants of the Company under the 2019 Stock Plan; and 7,495,915 shares of Non-Voting Common Stock for issuance upon the exercise of options granted and currently outstanding under the Canary Analytics Incentive, LLC 2015 Equity Incentive and Unit Option Plan. The Company has reserved 923,595 shares of Voting Common Stock for issuance pursuant to outstanding warrants. All issued and outstanding shares of Common Stock and Preferred Stock of the Company have been duly authorized and validly issued and are fully paid and nonassessable, and were issued in full compliance with all federal and state securities laws.

(b) ***Reservation of Stock.*** The Series B Preferred Stock issuable upon exercise of Holder's rights hereunder has been duly and validly reserved and, when issued in accordance with the provisions of this Warrant, will be validly issued, fully paid and non-assessable, and will be free of any taxes, liens, charges or encumbrances of any nature whatsoever; provided, that the Stock issuable pursuant to this Warrant may be subject to restrictions on transfer under state and/or federal securities laws. The Company has made available to Holder true, correct and complete copies of its Charter and current bylaws.

(c) ***Consents and Approvals.*** No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any state, federal or other governmental authority or agency is required with respect to the execution, delivery and performance by the Company of its obligations under this Warrant, except for the filing of notices pursuant to Regulation D under the Securities Act and any filing required by applicable state securities law, which filings will be effective by the time required thereby.

(d) ***Due Authority.*** The execution and delivery by the Company of this Warrant and the performance of all obligations of the Company hereunder, including the issuance to Holder of the right to acquire the Underlying Securities into which it may be converted, have been duly authorized by all necessary corporate action on the part of the Company. This Agreement: (i) does not violate the Charter or the Company's current bylaws; (ii) does not contravene any law or governmental rule, regulation or order applicable to the Company; and (iii) does not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract or other instrument to which the Company is a party or by which it is bound. This Agreement constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms.

(e) ***Exempt Transaction.*** Subject to the accuracy of Holder's representations in Section 11, the issuance of the Stock upon exercise of this Warrant, and the issuance of the Common Stock upon conversion of the Stock, will each constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

(f) ***Compliance with Rule 144.*** If Holder proposes to sell Stock issuable upon the exercise of this Warrant, or the Common Stock into which it is convertible, in compliance with Rule 144 promulgated by the SEC, then, upon Holder's written request to the Company, the Company shall furnish to Holder, within five (5) Business Days after receipt of such request, a written statement confirming or denying the Company's compliance with the filing requirements of the SEC as set forth in such Rule, as such Rule may be amended from time to time.

(g) ***Registration Rights.*** The Company agrees that the shares of Common Stock issued and issuable upon conversion of the Stock issuable upon exercise of this Warrant, and, at all times (if any) when the Stock shall be Common Stock, the Stock issued and issuable upon exercise of this Warrant, shall have the "Piggyback," and S-3 registration rights pursuant to and as set forth in Section 2.2 and Section 2.1 of the Rights Agreement on a *pari passu* basis with the stockholders of the Company who are parties thereto. The provisions set forth in the Rights Agreement in effect as of the Effective Date may not be amended, modified

or waived without the prior written consent of Holder unless such amendment, modification or waiver affects the rights associated with the shares of Stock issued and issuable upon exercise hereof in the same manner as such amendment, modification, or waiver affects the rights associated with all outstanding shares of Stock whose holders are parties thereto.

11. **Representations and Warranties of Holder.** By acceptance of this Warrant, Holder represents and warrants to the Company as follows:

(a) ***No Registration.*** Holder understands that this Warrant and the Underlying Securities have not been, and will not be, registered under the Securities Act or qualified under applicable state securities laws by reason of the fact that the issuance of this Warrant is exempt from the registration and qualification provisions thereof, the availability of which exemption depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of Holder's representations as expressed herein or otherwise made pursuant hereto.

(b) ***Investment Intent.*** Holder is acquiring this Warrant (and shall, if applicable, acquire the Underlying Securities) for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof in violation of the Securities Act. Holder has no present intention of selling, granting any participation in, or otherwise distributing this Warrant, or the Underlying Securities nor does it have any contract, undertaking, agreement or arrangement for the same. Holder has not been formed for the specific purpose of acquiring this Warrant or the Underlying Securities.

(c) ***Investment Experience.*** Holder has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company, and has such knowledge and experience in financial or business matters so that it is capable of evaluating the merits and risks of its investment in the Company and protecting its own interests.

(d) ***Speculative Nature of Investment.*** Holder understands and acknowledges that its investment in the Company is highly speculative and involves substantial risks. Holder can bear the economic risk of its investment and is able, without impairing its financial condition, to hold this Warrant and its underlying securities an indefinite period of time and to suffer a complete loss of its investment.

(e) ***Access to Data.*** Holder is aware of the Company's business affairs and financial condition and has received or has had full access to all the information it considers necessary or appropriate to make an informed investment decision with respect to the acquisition of this Warrant and the Underlying Securities. Holder further has had an opportunity to ask questions and receive answers regarding the terms and conditions of the offering of this Warrant and the Underlying Securities and to obtain additional information necessary to verify any information furnished to Holder or to which Holder has access.

(f) ***Accredited Investor.*** Holder is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission and agrees to submit to the Company such further assurances of such status as may be reasonably requested by the Company.

(g) ***Residency***. Holder's principal place of business is correctly set forth on the signature page hereto.

(h) ***Restrictions on Resales.*** Holder acknowledges that this Warrant and the Underlying Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. Holder is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of securities purchased in a private placement subject to the satisfaction of

certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of securities being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time Holder wishes to sell shares of the Stock or the Underlying Securities and that, in such event, Holder may be precluded from selling shares of the Stock or the Underlying Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. Holder acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of shares of Stock or the Underlying Securities. Holder understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

(i) ***No Public Market.*** Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

(j) ***Brokers and Finders.*** Holder has not engaged any brokers, finders or agents in connection with this Warrant, and the Company has not incurred nor will incur, directly or indirectly, as a result of any action taken by Holder, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Warrant or the Underlying Securities.

(k) ***Advisors***. Holder has had the opportunity to review this warrant, the exhibits and schedules attached hereto and the transactions contemplated by this Warrant with its own legal counsel and tax advisors. Holder is not relying on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by this Warrant. Holder understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment and the transactions contemplated by this Warrant.

(l) ***No "Bad Actor" Disqualification.*** Neither (i) Holder, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by Holder is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2)(ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the acceptance of this Warrant, in writing in reasonable detail to the Company.

12. **Miscellaneous.**

(a) ***Amendments.*** Except as expressly provided herein, neither this Warrant nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Warrant and signed by the Company and Holder.

(b) ***Waivers.*** No waiver of any single breach or default shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.

(c) ***Notices.*** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or electronic mail or otherwise delivered by hand, messenger or courier service addressed:

(i) if to Holder, to Holder at Holder's address, facsimile number or electronic mail address as shown on the signature page hereto, or at such other current address, facsimile number or electronic mail address as the Company shall have furnished to Holder from time to time, with a copy (which shall not constitute notice) to Steven O. Gasser, Esq. PremierCounsel, LLP, 388 Market Street, Suite 1300, San Francisco, CA 94111;

(ii) if to the Company, to the attention of the Chief Executive Officer of the Company at the Company's address, facsimile number or electronic mail address as shown on the signature page hereto, or at such other current address, facsimile number or electronic mail address as the Company shall have furnished to Holder from time to time, with a copy (which shall not constitute notice) to Stubbs Alderton & Markiles, LLP, Attn: Greg Akselrud, 15260 Ventura Blvd., 20th Floor, Sherman Oaks, CA 91403.

Any notice or other communication provided pursuant to this Section 12(c) shall for all purposes of this Warrant be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the share of United States mail, addressed and mailed as aforesaid, (iii) if sent via facsimile, upon confirmation of facsimile transfer, or (iv) if sent via electronic mail, upon confirmation of delivery when directed to the electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day.

(d) ***Governing Law.*** This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(e) ***Jurisdiction and Venue.*** Each of Holder and the Company irrevocably consents to the exclusive jurisdiction and venue of any court within San Mateo County, State of California, in connection with any matter based upon or arising out of this Warrant or the matters contemplated herein, and agrees that process may be served upon them in any manner authorized by the laws of the State of California for such persons.

(f) ***Waiver of Jury Trial***. THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS WARRANT. WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of San Mateo County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in San Mateo County, California; and the parties hereby submit to the jurisdiction of such court. The reference proceedings shall be conducted pursuant to and in accordance with

the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the San Mateo County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

(g) ***Titles and Subtitles.*** The titles and subtitles used in this Warrant are used for convenience only and are not to be considered in construing or interpreting this Warrant. All references in this Warrant to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(h) ***Severability.*** If any provision of this Warrant becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Warrant, and such illegal, unenforceable or void provision shall be replaced with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, unenforceable or void provision. The balance of this Warrant shall be enforceable in accordance with its terms.

(i) ***No Strict Construction.*** The parties hereto have participated jointly in the negotiation and drafting of this Warrant. In the event an ambiguity or question of intent or interpretation arises, this Warrant shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

(j) ***Electronic Execution of Documents.*** The words “execution,” “signed,” “signature” and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

(k) ***Counterparts.*** This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

(l) ***Entire Agreement.*** Except as expressly set forth herein, this Warrant (including the exhibits attached hereto) constitutes the entire agreement and understanding of the Company and Holder with

respect to the subject matter hereof and supersede all prior agreements and understandings relating to the subject matter hereof.

(m) ***No Impairment of Rights.*** The Company will not, by amendment of its Charter or through any other means, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate in order to protect the rights of Holder against impairment.

(n) ***Attorney's Fees.*** In the event of any dispute between the parties concerning the terms and provisions of this Warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

(*signature page follows*)

The Company and Holder sign this Warrant as of the date stated on the first page.

**HouseCanary, Inc.**

By: ______________________________________________
Name:
Title:

**AGREED AND ACKNOWLEDGED:**

________________________

**By: Structural Capital GP III, LLC,**
its General Partner

By: ___________________________________

Name: _________________________________

Title: __________________________________
Address:

Structural Capital GP III, LLC
3555 Alameda De Las Pulgas, Suite 205
Menlo Park, CA 94025
Attn: Todd Jaquez-Fissori
EMAIL: tood@structuralcapital.com

**EXHIBIT A**

**NOTICE OF EXERCISE**

**TO:** **HouseCanary, Inc. (the "*Company*")**

**Attention:** **Chief Executive Officer**

Capitalized terms used but not defined herein shall have the meaning provided in the attached Warrant.

(1) **Exercise.** The undersigned elects to purchase the following pursuant to the terms of the attached warrant:

Number of shares of Stock: ____________________________________________

Type of security: ____________________________________________

(2) **Method of Exercise.** The undersigned elects to exercise the attached warrant pursuant to:

☐ A cash payment or cancellation of indebtedness, and tenders herewith payment of the purchase price for such shares of Stock in full, together with all applicable transfer taxes, if any.

☐ The net issue exercise provisions of Section 2(b) of the attached warrant.

(3) **Certificate.** Please issue a certificate or certificates representing the Stock in the name of:

☐ The undersigned

☐ Other—Name: ____________________________________________

Address: ____________________________________________

____________________________________________

(4) **Consent to Receipt of Electronic Notice**. Subject to the limitations set forth in Delaware General Corporation Law §232(e), the undersigned consents to the delivery of any notice to stockholders given by the Company under the Delaware General Corporation Law or the Company's certificate of incorporation or bylaws by (i) facsimile telecommunication to the facsimile number provided below (or to any other facsimile number for the undersigned in the Company's records), (ii) electronic mail to the electronic mail address provided below (or to any other electronic mail address for the undersigned in the Company's records), (iii) posting on an electronic network together with separate notice to the undersigned of such specific posting or (iv) any other form of electronic transmission (as defined in the Delaware General Corporation Law) directed to the undersigned. This consent may be revoked by the undersigned by written notice to the Company and may be deemed revoked in the circumstances specified in Delaware General Corporation Law §232.

________________________________________

(*Print name of the warrant holder*)

________________________________________

(*Signature*)

________________________________________

(*Name and title of signatory, if applicable*)

________________________________________

(*Date*)

**EXHIBIT B**

**CAPITALIZATION TABLE**

(see attached)

**HouseCanary, Inc. Summary Capitalization Table**
**17-Mar-21**

| Name | Voting Common | NonVoting Common | Series A-1 Preferred | Series A Preferred | Series B Preferred | Series B-1 Preferred | Series B-2 Preferred | *Options and RSU's Outstanding Under Canary Analytics Incentive, LLC 2015 Equity Incentive and Unit Option Plan | **Shares Reserved Under 2019 HouseCanary, Inc. Stock Incentive Plan | Voting Common Warrants | Outstanding Shares | Fully Diluted Shares |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fully diluted shares | 32,679,883 | 6,477,324 | 22,850,296 | 7,471,674 | 16,426,814 | 2,731,683 | 4,195,752 | 7,495,915 | 11,565,793 | 923,595 | | 112,818,729 |
| Fully Diluted Ownership | 28.9667% | 5.7414% | 20.2540% | 6.6227% | 14.5604% | 2.4213% | 3.7190% | 6.6442% | 10.2517% | .8187% | | 100.0000% |
| Total Shares Outstanding | 32,679,883 | 6,477,324 | 22,850,296 | 7,471,674 | 16,426,814 | 2,731,683 | 4,195,752 | | | | 92,833,426 | |
| Percentage Outstanding | 35.2027% | 6.9774% | 24.6143% | 8.0485% | 17.6949% | 2.9426% | 4.5197% | | | | 100.0000% | |

**Plan terminated in 2019 merger and conversion at which time there were 10,152,036 shares reserved for issuance thereunder; it remains in place only to the extent necessary with respect to outstanding options thereunder. Expired options thereunder are not available for future issuance.*

***Net of shares issued*

**EXHIBIT C**

**ASSIGNMENT FORM**

ASSIGNOR: ____________________________________________________________

COMPANY: _____________, INC.

WARRANT: THE WARRANT TO PURCHASE ______________________________ ISSUED ON [*INSERT DATE*] (THE "***WARRANT***")

DATE: ________________________

(1) **Assignment.** The undersigned registered holder of the Warrant ("***Assignor***") assigns and transfers to the assignee named below ("***Assignee***") all of the rights of Assignor under the Warrant, with respect to the number of shares of Stock set forth below:

Name of Assignee: ____________________________________________________________

Address of Assignee: __________________________________________________________

__________________________________________________________

Number/Amount of shares of Stock Assigned: __________________________________________

and does irrevocably constitute and appoint ______________________ as attorney to make such transfer on the books of __________, Inc. maintained for the purpose, with full power of substitution in the premises.

(2) **Obligations of Assignee.** Assignee agrees to take and hold the Warrant and any shares of Stock to be issued upon exercise of the rights thereunder (and any shares of Stock issuable upon conversion thereof) (the "***Securities***") subject to, and to be bound by, the terms and conditions set forth in the Warrant to the same extent as if Assignee were the original holder thereof.

(3) **Investment Intent.** Assignee represents and warrants that the Securities are being acquired for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof in violation of the Securities Act of 1933, as amended, and that Assignee has no present intention of selling, granting any participation in, or otherwise distributing the shares of Stock in violation of the Securities Act of 1933, as amended, nor does it have any contract, undertaking, agreement or arrangement for the same, and all representations and warranties set forth in Section 91 of the Warrant are true and correct as to Assignee as of the date hereof.

Assignor and Assignee are signing this Assignment Form on the date first set forth above.

| **ASSIGNOR** | **ASSIGNEE** |
| --- | --- |
| ______________________________ | ______________________________ |
| (*Print name of Assignor*) | (*Print name of Assignee*) |
| ______________________________ | ______________________________ |
| (*Signature of Assignor*) | (*Signature of Assignee*) |
| ______________________________ | ______________________________ |
| (*Print name of signatory, if applicable*) | (*Print name of signatory, if applicable*) |
| ______________________________ | ______________________________ |
| (*Print title of signatory, if applicable*) | (*Print title of signatory, if applicable*) |
| Address: | Address: |
| ______________________________ | ______________________________ |
| ______________________________ | ______________________________ |

# EXHIBIT D

## NOTICE OF BORROWING

__________, ____

Ocean II PLO LLC
400 Oyster Point Blvd., Suite 229
South San Francisco, CA 94080
Attn: Todd Jaquez-Fissori,
EMAIL: todd@structuralcapital.com

Ladies and Gentlemen:

Reference is made to the Loan and Security Agreement dated as of__________, 2021 (as it may be amended from time to time, the "*Loan Agreement*," the capitalized terms used herein as defined therein), between **Ocean II PLO LLC**, **Structural Capital Investments III, LP**, and _____________ (the "*Company*").

The undersigned is a Responsible Officer of the Company, and hereby requests an Advance under the Loan Agreement, and in that connection certifies as follows:

1. The amount of the proposed Advance is $__________, and should be wired to the Company as follows:

   *[insert wire instructions]*.

2. The Funding Date of the proposed Advance is __________.

3. As of this date, no Default or Event of Default has occurred and is continuing, or will result from the making of the proposed Advance, and the representations and warranties of the Company contained in **Section 5** of the Loan Agreement are true and correct in all respects as of the date hereof except for such representations and warranties made as of a specific date.

4. As of the Funding Date, no injunction or other restraining order has been issued and no hearing to cause an injunction or other restraining order to be issued is pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by the Loan Agreement or the making of the proposed Advance.

5. No event which could reasonably be expected to have a Material Adverse Effect has occurred since the date of the most recent financial statements submitted to you by the Company.

The Company agrees to notify you promptly before the funding of the Advance if any of the matters to which I have certified above shall not be true and correct on the Funding Date.

Very truly yours,

______________

# EXHIBIT E

## COMPLIANCE CERTIFICATE

VIA EMAIL: todd@structuralcapital.com

[Date]

Ocean II PLO LLC
400 Oyster Point Blvd., Suite 229
South San Francisco, CA 94080
ATTN: Todd Jaquez-Fissori

Re: Loan and Security Agreement - Compliance Certificate for [*enter fiscal period*]

Dear Todd:

Reference is made to that certain Loan and Security Agreement dated __________ __, 20__ entered into by and among _______________, a Delaware corporation (the "*Borrower*"), Ocean II PLO LLC (the "*Agent*"), the several lenders party thereto from time to time (collectively, the "Lenders"), as may be amended from time to time (hereinafter referred to as the "Loan Agreement"). Capitalized terms used but not defined herein shall have the meaning provided in the Loan Agreement.

The undersigned is an Officer of the Borrower, knowledgeable of all Borrower financial matters, and is authorized to provide certification of information regarding the Borrower. The undersigned hereby certifies on behalf of the Borrower that in accordance with the terms and conditions of the Loan Agreement, the Borrower is in compliance for the period ending ___________ of all covenants, conditions and terms of the Loan Documents, and hereby reaffirms that except as provided below, all representations and warranties contained therein are true and correct on and as of the date of this Compliance Certificate with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, after giving effect in all cases to any standard(s) of materiality contained in the Loan Documents as to such representations and warranties. Attached are the required documents supporting the above certification, including evidence showing compliance with **Section 6.11** of the Loan Agreement. The undersigned further certifies that the attached financial statements are prepared in accordance with GAAP, consistently applied, (except for the absence of footnotes with respect to unaudited financial statement and subject to normal year end adjustments) and are consistent from one period to the next except as explained below.

| Reporting Requirement | Due Date | Check if Included |
|---|---|---|
| Monthly Financial Statements | Monthly within 30 days | _____ |
| Annual Audited Financial Statements [Note: can be unaudited for FY 2020] | FYE within 120 days | _____ |
| Annual Budget | FYE within 30 days | _____ |

The undersigned hereby also confirms the below disclosed accounts represent all depository accounts and securities accounts presently open in the name of each Borrower and Subsidiary, as applicable.

| Holder of Account | Financial Institution | Account Number | Type of Account (deposit/ securities) | Account Name | Last Month Ending Balance | New Account? (yes/no) |
|---|---|---|---|---|---|---|
| | | | | | | |

| **Financial Covenant** | **Required** | **Actual** | **Complies (yes/no)** |
|---|---|---|---|
| Minimum Cash (**Section 6.11**) | | | |

As applicable, attached hereto is an amended Perfection Certificate or Disclosure Schedule (together with, in each case, a copy marked to show changes from the previous version).

Please use the following space to list any exceptions with respect to the certifications provided above (the listing on an exception does not excuse non-compliance):

_________________________

___________________________________
Name:
Title

# EXHIBIT F

## PERFECTION CERTIFICATE

# PERFECTION CERTIFICATE

**TO: STRUCTURAL CAPITAL INVESTMENTS III, L.P.**

The undersigned, a duly authorized officer of HouseCanary, Inc., a Delaware corporation (the "Company"), submits this Perfection Certificate pursuant to that certain Loan and Security Agreement by and among the undersigned, Ocean II PLO LLC, Structural Capital Investments III, LP and the other parties thereto dated even date herewith, and hereby represents and warrants that the following information is true, accurate and complete:

## PART A

### 1. NAMES OF THE COMPANY

a. The exact corporate name of the Company as it appears in its current Articles or Certificate of Formation is as follows: **HouseCanary, Inc.**

b. The federal employer identification number of the Company is as follows: **47-2312307**

c. The Company is formed under the laws of state/country: **Delaware**

d. The Company's country/state /provincial registration/file number is as follows: **5616136**

e. The Company transacts business in the following jurisdictions (list all domestic and foreign jurisdictions other than jurisdiction of formation): **All 50 States plus the District of Columbia**

f. The Company is duly qualified to transact business as a foreign entity registered with the Secretary of State in the following United States jurisdictions (list jurisdictions other than jurisdiction of formation): **All 50 States plus the District of Columbia**

g. The following is a list of all other names (including fictitious names, d/b/a's, trade names or similar names) currently used by the Company or used within the past six years, together with the location(s) of use:

| Name | Period of Use | Jurisdiction(s) of Use |
|---|---|---|
| **ComeHome** | **Perpetual** | All States with the exception of the following States: Arkansas, Michigan and Utah. Note that Kansas and New Mexico do not have DBA Statutes and South Carolina does not allow for a DBA name unless property is owned in that State |
| **ComeHome By HouseCanary** | **Perpetual** | Arkansas |
| **ComeHome Real Estate** | **Perpetual** | Michigan and Utah |
| **Canary Analytics International BV** | **This entity has been dissolved and wound down** | The Netherlands |

| | | |
|---|---|---|
| **Canary Analytics Inc.** | **This was the name of Borrower until a name change effective April 23, 2015** | Delaware and Texas |

h. The following are the names of all corporations which have been merged into the Company during the past six years:

| Name of Merged Company | Year of Merger |
|---|---|
| The Company underwent a reorganization from an LLC Top Co. into a Delaware C-Corp in July of 2019.<br><br>The sequence of events is as follows. The Canary Analytics Incentive, LLC organization where employee incentive units were held, was first merged into Canary Analytics Holdings, LLC.<br><br>Canary Analytics Holdings, LLC was then changed into Canary Analytics Holdings, Inc.<br><br>Canary Analytics Holdings, Inc. was then finally merged into HouseCanary, Inc. | 2019 |
| **Canary Analytics Incentive, LLC** | **2019** |
| **Canary Analytics Holdings, Inc.** | **2019** |

i. The following are the names and addresses of all entities from whom the Company has acquired any personal property in a transaction not in the ordinary course of business during the past six years, together with the date of such acquisition and the type of personal property acquired (e.g., equipment, inventory, etc.):

| Name | Street and Mailing Address | Date of Acquisition | Type of Property |
|---|---|---|---|
| **DropModel, LLC, a Delaware limited liability company** | 1437 Francisco Street<br>San Francisco, CA 94123 | **3/19/2020** | **Cash, Accounts Receivables, IP Agreements, IP Assets, DropModel Name** |

**2. NAMES OF SUBSIDIARIES/PARENT OF THE COMPANY.**

a. The exact corporate name and address of each subsidiary and parent of the Company, its jurisdiction of formation, tax and jurisdictional identification number(s), is as follows. (A "parent" is a company owning more than 50% of the outstanding capital stock of the Company or otherwise controlling such other entity.)

| Name and Address | Subsidiary/Parent | Jurisdiction | Tax ID No. | Jurisdictional ID No. | Other ID No. |
|---|---|---|---|---|---|
| **ComeHome, Inc.** | Sub X Parent ☐ | **Delaware** | **86-2650328** | **7397004** | **N/A** |
| **HouseCanary (CT), Inc. (*)** | Sub X Parent ☐ | **Delaware** | **84-3751814** | **7691230** | **0006685023- Connecticut Corporate ID Number** |
| **HouseCanary Certified Analytics, Inc.** | Sub X Parent ☐ | **Delaware** | **NOTE: This entity is inactive with plans to dissolve it later this year** | **6848994** | **N/A** |
| **HouseCanary R&D, LLC (**)** | Sub X Parent ☐ | **Delaware** | **NOTE: This entity is inactive with plans to dissolve it later this year** | **5330176** | **N/A** |

(*) HouseCanary (CT), Inc. is owned 49% by Borrower, with the other 51% subject to Borrower's right to purchase for nominal ($1.00) consideration.

(**) Interest in HouseCanary R&D, LLC are not certificated.

b. The following is a list of all other names (including fictitious names, d/b/a's, trade names or similar names) used by each subsidiary of the Company during the past six years:

| Name | Subsidiary |
|---|---|
| **Not Applicable** | |

d. The following are the names of all corporations which have been merged into a subsidiary of the Company during the six years:

| Name | Subsidiary |
|---|---|
| **See Section 1H** | |

e. The following are the names and addresses of all entities from whom a subsidiary of the Company has acquired any personal property in a transaction not in the ordinary course of business

during the past six years, together with the date of such acquisition and the type of personal property acquired (e.g., equipment, inventory, etc.):

| Name | Mailing Address | Date of Acquisition | Type of Property | Subsidiary |
|---|---|---|---|---|
| **Not Applicable** | | | | |

## 3. LOCATIONS OF COMPANY AND ITS SUBSIDIARIES.

a. The chief executive offices of the Company and its subsidiaries are presently located at the following addresses:

| Complete Street / Mailing Address, including County, Postal Code and Telephone Numbers | Company/Subsidiary |
|---|---|
| **201 Spear Street, Suite 1400, San Francisco, CA 94105** | **Company X** OR<br>Name of Sub |

b. During the past six years, the Company's chief executive office and the chief executive offices of its subsidiaries have been located at the following additional addresses:

| Complete Street and Mailing Address, including County and Postal Code | Company/Subsidiary |
|---|---|
| **201 Spear Street, Suite 1400, San Francisco, CA 94105** | **Company** X OR<br>Name of Sub |

c. The following are all the locations at which the Company and each of its subsidiaries maintain any books or records relating to any of their accounts receivable (if different from the above):

| Complete Street and Mailing Address, including County and Postal Code | Company/Subsidiary |
|---|---|
| **201 Spear Street, Suite 1400, San Francisco, CA 94105** | **Company X** OR<br>Name of Sub |

d. The following are all of the locations where the Company and its subsidiaries maintain any equipment, fixtures, inventory or other property;

201 Spear St., Suite 1400, San Francisco, CA 94105

2045 Broadway, Boulder, CO 80302

19707 IH-10 West, Suite 309, San Antonio, TX 78257

e. The following are all the locations where the Company and its subsidiaries own, lease, or occupy any real property, **together with the name and address** of the landlord for such location(s) and the type and value of Collateral located at each such premises:

| Complete Street and Mailing Address, including County and Postal Code | Company/Subsidiary | Type and Value of Collateral |
|---|---|---|
| **201 Spear St., Suite 1400, San Francisco, CA 94105**<br>**County of San Francisco**<br><br>**Landlord:**<br>**KBSIII 201 Spear Street, LLC**<br>**℅ Cushman & Wakefield of CA, Inc.**<br>**201 Spear St., Suite 175, San Francisco, CA 94105**<br>**Attn: Property Manager** | Company **X** OR<br>Name of Sub | Furniture, fixtures, and computer equipment. Net book value less than $150,000. |
| **2045 Broadway, Boulder, CO 80302**<br>**County of Boulder**<br><br>**Landlord:**<br>**Willard Building LLC**<br>**℅ Berg Hill Greenleaf Ruscitti LLP**<br>**1712 Pearl St., Boulder, CO 80302**<br>**Attn: Patrick K. Perrin, Esq.** | Company **X** OR<br>Name of Sub | Furniture, fixtures, and computer equipment. Net book value less than $50,000. |
| **19707 IH-10 West, Suite 309, San Antonio, TX 78257**<br>**County of Bexar**<br><br>**Landlord:**<br>**Aye 10 Tejas LLC**<br>**19206 Huebner Rd., Suite 200, San Antonio, TX 78258** | Company **X** OR<br>Name of Sub | Furniture, fixtures, and computer equipment. Net book value less than $50,000. |
| **Multiple Regus locations:**<br><br>**NOTE: The following are leased properties used primarily to satisfy Brokerage compliance requirements; as such there is no Collateral.** | Company **X** OR<br>Name of Sub | n/a |

| | | |
|---|---|---|
| **202 E Northern Lights Blvd, Anchorage, AK 99503**<br><br>**2415 E Camelback Rd, Suite 700, Phoenix, AZ 85016**<br><br>**1110 Nuuanu Ave, Honolulu, HI 96817**<br><br>**605 N. Michigan Avenue, Suite 400, Chicago, IL, 60611**<br><br>**41000 Woodward Ave, Suite 350 East, Bloomfield Hills, MI 48304**<br><br>**1299 Farnam Street, Suite 300, Omaha, Nebraska, 68102**<br><br>**400 S 4th St, Suite 500, Las Vegas, NV 89101**<br><br>**12 Windsor Way, Fairport, NY 14450**<br><br>**470 Olde Worthington Rd, Suite 200, Westerville Ohio 43082**<br><br>**2005 SE 192nd Ave, Suite 200, Camas, WA, 98607** | | |

If there is Collateral in excess of $10,000 value maintained in any of the facilities identified in clause "e" above, **please provide a copy** of each such lease and all amendments thereto.

f. The following are the names and addresses of all warehousemen or bailees who have possession of any of the Company's inventory or any of the inventory of its subsidiaries:

| Name | Complete Street and Mailing Address, including County and Postal Code | Company/Subsidiary | Value of Inventory and other Collateral |
|---|---|---|---|
| **Not Applicable** | | Company ☐ OR<br>Name of Sub | |

If there is Collateral in excess of $10,000 value maintained in any of the facilities identified in clause "f" above, **please provide a copy** of each such lease and all amendments thereto.

g. Separately identified **for the Company and each Subsidiary**, **please list by the following categories the US$ value of all Collateral owned by each such entity**: (1) cash and cash equivalents; (2) inventory; (3) all tangible assets (other than inventory); and (4) intangible assets (e.g., intellectual property).

| Name of Entity | Cash and Cash Equivalents | Inventory | All other tangible assets | Intangible Assets |
|---|---|---|---|---|
| HouseCanary, Inc.<br>as of 1/31/2021 | $9,521,000 | $0 | $208,900<br>(net) | $3,546,400 |

(Use continuation sheet if necessary to identify assets, e.g., "contract rights")

## 4. SPECIAL TYPES OF COLLATERAL

a. The Company and its subsidiaries own the following kinds of assets. (If the answer is "Yes" to any of the following questions, **attach a schedule listing each such asset owned** by the Company and/or its subsidiaries **(separately identified and scheduled for each entity)** and identifying which party owns the asset, the relevant jurisdiction, each registration, application or other identification number and all other relevant information, including in the case of licenses, the relevant parties, and if any contracts are material to the Company's business, **provide copies of such contracts**.) In the case of Domain names, please identify the hosting service and/or ISP along with contact information, name and contact information for the administrative contact, and identity of domain name registrar. In the case of patents, trademarks, and copyrights, please provide a listing of each item, with application/registration numbers and filing dates.

| | |
|---|---|
| Copyrights or copyright applications registered with the U.S. Copyright Office and any other governmental copyright authority in any jurisdiction | Yes No X |
| Software registered with the U.S. Copyright Office and any other governmental copyright authority in any jurisdiction | Yes No X |
| Software not registered with the U.S. Copyright Office and any other governmental copyright authority in any jurisdiction | **Yes X** No |
| Patents and patent applications in any jurisdiction - **See Attachments** | **Yes X** No |
| Trademarks or trademark applications (including any service marks, collective marks and certification marks) in any jurisdiction - **See Attachments** | **Yes X** No |
| Licenses to use trademarks, patents and copyrights of others -<br><br>Black Knight Financial Services — June 9, 2015<br>HowLoud, Inc. - Flood Data — July 18, 2017<br>ReportSee, Inc. - SpotCrime-Crime Data — July 6, 2017<br>Real Estate Portal-Parcel Data — October 1, 2014<br>Altos Research, Inc. - MLS Stats — February 20, 2015<br>Mapbox Enterprise -Maps — Order Date<br>Melissa Data Corp. - Geocoding — January 26, 2017<br>Precisely — August 17, 2015<br>(fka Pitney Bowes Software/Maponics-School Data)<br><br>**Note: The Company also uses Public Source Licenses** | **Yes X** No |
| Stocks, Bonds or other securities: | Yes No X |
| Promissory notes, or other instruments of indebtedness | Yes No X |
| Domain names - **See Attachments** | **Yes X** No |
| Leases of equipment by the Company or a subsidiary as lessor, security agreements naming the Company or a subsidiary as secured party, or other chattel paper: | Yes No X |

| | |
|---|---|
| Real Estate | Yes No X |
| Motor Vehicles | Yes No X |
| Aircrafts, vessels, boats or ships | Yes No X |

b. The following are all governmental permits and licenses held by the Company and its subsidiaries, by entity and applicable jurisdiction:

| Description of License | Company/Subsidiary |
|---|---|
| **Real Estate Brokerage, Broker, and Associate Broker Licenses in all of the 50 States and the District of Columbia** | **Company X** OR Name of Sub |
| **Fictitious Business Name Statements filed in all 58 California counties** | **Company X** OR Name of Sub |
| **Doing Business As Certificates for the ComeHome name in 44 States and the District of Columbia** | **Company X** OR Name of Sub |

c. The following are all banks or savings institutions at which the Company or any of its subsidiaries maintain deposit accounts:

| Bank Name | Account Number (last four) | Type of Account | Branch Address | Company/Subsidiary |
|---|---|---|---|---|
| **First Republic Bank** | **80007148978** | Money Market | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80006706552** | Checking | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80006706578** | Payroll | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80006706545** | Revenue | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **50019866586** | CD | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **50019927529** | CD | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80007120118** | Trust | **111 Pine St. San Francisco, CA 94111** | Name of Sub: HouseCanary Certified Analytics, Inc. |

| | | | | |
|---|---|---|---|---|
| Wells Fargo Bank | 8132113633 | Checking | 101 Mission Street, San Francisco, CA 94105 | Company X OR Name of Sub |
| Wells Fargo Bank | 5108661900 | Checking | 299 Main St Floor 1, Salt Lake City, UT 84111 | Company X OR Name of Sub |
| Wells Fargo Bank | 7564674732 | Checking | 101 Mission Street, San Francisco, CA 94105 | Company X OR Name of Sub |
| Wells Fargo Bank | 2976768206 | Checking | 1248 O Street, Lincoln, NE 68508 | Company X OR Name of Sub |
| Citizens Bank | 4016689367 | Checking | 715 Panorama Trail, Rochester, NY 14625 | Company X OR Name of Sub |
| WesBanco | 4912000586 | Checking | 1 Bank Plaza, Wheeling, WV 26003 | Company X OR Name of Sub |
| Keybank | 454681003579 | Trust | 149 Bank St, Burlington, VT 05401 | Company X OR Name of Sub |
| Keybank | 191271003961 | Trust | 1 Monument Square, Portland, ME 04101 | Company X OR Name of Sub |

d. The following are all banks or savings institutions at which the Company or any of its subsidiaries maintain securities accounts:

| Bank Name | Account Number | Branch Address | Company/Subsidiary |
|---|---|---|---|
| Not Applicable | | | Company ☐ OR Name of Sub |

e. The following are the details of all internet domain name ownership, domain servers and website hosting arrangements involving the Company or any of its subsidiaries:

| Domain Name | Service Provider Contact Details and Account Number (if any) | Owner and Registrar or Administrative Contact of Record | Expiry Date of Domain |
|---|---|---|---|
| See Attachments | | | |

f. The following is a list of Material Contracts to which the Company is a party (include any equipment leases) or in which the Company has an interest (including whether such contract has

a non- assignability provision which would require the other party's or another person's consent to the granting of a security interest in such contract):

| | | Non Assignability Clause | | |
|---|---|---|---|---|
| Other Party to Contract | Title/Date of Contract | Asset Sale (Y/N) | Security Interest (Y/N) | Consent Obtained (Y/N) |
| **CUSTOMERS** | | | | |
| Hudson Americas L.P. | 4/30//2018 | Y* | Y | N |
| JPMorgan Chase Bank, National Association | 06/01/2019 | Y* | N | N |
| OpenDoor Labs, Inc. | 5/16/2019 | Y* | Y | N |
| Progress Residential, LLC | 07/05/2018 | Y* | Y | N |
| United Shore Financial Services, LLC | 10/01/2017 | Y* | N | N |
| **VENDORS** | | | | |
| Amazon Web Services (AWS) | Subscription (January, April, August) | Y* | Y | N |
| Black Knight Data & Analytics, LLC | 6/2015-6/2022 | Y* | Y | N |
| KBSIII 201 Spear Street, LLC | 7/16/2015-9/16/2022 | Y* | Y | N |

*The starred contracts have exceptions to non-assignability in connection with a sale of all or substantially all of the assets to a successor entity.

## 5. OFFICERS OF THE COMPANY AND ITS SUBSIDIARIES

The following are the names and titles of the officers of the Company and its Subsidiaries.

| Office/Title | Name of Officer | Company/Subsidiary |
|---|---|---|
| **Jeremy Sicklick** | **Chief Executive Officer and Treasurer** | **Company X** |
| **Jeffrey Somers** | **President and Chief Operating Officer** | **Company X** |
| **Sachin Adarkar** | **Secretary, Chief Privacy Officer and General Counsel** | **Company X** |
| **Jeremy Sicklick** | **President, Chief Financial Officer and Secretary** | ComeHome, Inc. |
| **Thomas J. Karras** | **President, Chief Financial Officer and Secretary** | HouseCanary (CT), Inc. |
| **Jeremy Sicklick** | **President, Chief Financial Officer and Secretary** | HouseCanary Certified Analytics, Inc. |
| **Jeremy Sicklick** | **Chief Executive Officer** | HouseCanary R+D, LLC |

**6. CLAIMS / LITIGATION.**

a. The following are the only claims which the Company has against others (other than claims on accounts receivable), which the Company is asserting or intends to assert, and in which the potential recovery exceeds $100,000:

See Litigation Summary in Attachments. Except as set forth therein, the Company does not currently have any claims against others that it is asserting or intends to assert.

b. The following are the only claims which, to the knowledge of the Company, have been or are reasonably likely to be asserted against the Company:

See Litigation Summary in Attachments. Except as set forth therein and below, there are no claims pending against the Company or, to the Company's knowledge, reasonably likely to be asserted, against the Company.

On February 23, 2021, Borrower received a written demand from counsel for a former employee to preserve evidence under California Code of Civil Procedure Section 2023.0120, to produce payroll and personnel records, and to provide certain additional information, in respect of a potential wrongful termination claim of the former employee. On March 15, 2021, Borrower responded to the notice (via employment counsel), produced payroll records, and advised that it would timely produce personnel records. As of the Closing Date, there have been no further communications with the former employee's counsel. Borrower has not received a written demand asserting any specific claims or request for compensation from counsel. Should any specific claim arise, Borrower expects to dispute the claim and vigorously defend its position."

There are no other litigation other than as set forth in the Attachments.

## PART B - EQUITY-RELATED MATTERS.

**7. PUBLIC OR PRIVATE**

Is the Company publicly-traded or privately held? Public ☐ **Private X**

If **PUBLIC**:

| | |
|---|---|
| Date of Listing: | |
| Exchange (e.g., NASDAQ, NYSE, LSE, SGX, CAC) | |
| Ticker / Trading Symbol: | |
| Tax / Accounting Year | |
| Is the Company current in its public market reporting? If not, attach Schedule. | Yes ☐ No ☐ |
| Last Report Filed: | |

**8. If PRIVATE:**

Please complete the information below relating to the Company's outstanding "securities". The term "securities" includes derivative securities, such as warrants, options, SAR's and the like.
Please provide a current capitalization table as a Schedule.

| Class / Series | Shares Authorized | Issued and Outstanding | Date Authorized |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| Non-Voting Common<br><br>Note: These replaced the corresponding interests in Canary Analytics Holdings LLC with the July 2019 reorganization | 32,000,000 | 6,477,324 | 7/1/2019 |
| Voting Common<br><br>Note: These replaced the corresponding interests in Canary Analytics Holdings LLC with the July 2019 reorganization | 92,000,000 | 32,679,883 | 7/1/2019 |
| Series A-1 Preferred<br><br>Note: These replaced the corresponding interests in Canary Analytics Holdings LLC with the July 2019 reorganization | 22,850,296 | 22,850,296 | 7/1/2019 |
| Series A Preferred<br><br>Note: These replaced the corresponding interests in Canary Analytics Holdings LLC with the July 2019 reorganization | 7,471,674 | 7,471,674 | 7/1/2019 |
| Series B-1 Preferred | 2,731,683 | 2,731,683 | 11/14/2019 |
| Series B-2 Preferred | 4,195,752 | 4,195,752 | 11/14/2019 |
| Series B Preferred | 19,882,228 | 16,426,814 | 11/14/2019 |
| CSW Warrants | 923,595 | 98,815<br><br>494,075<br>330,705 | 4/19/2017<br><br>2/2/2018<br>1/16/2019 |
| Canary Analytics Incentive, LLC 2015 Equity Incentive and Unit Option Plan | 10,152,036* | 7,495,915 | 10/12/2015 |
| Amended and Restated 2019 Stock Incentive Plan | 11,578,668 | 4,743,285 options outstanding<br>12,875 shares of Non-Voting Common Stock outstanding from issuance upon exercised options (which Non-Voting Common Stock is included in the total Non-Voting Common Stock reflected above in this table) | 11/14/2019 (as amended and restated; originally authorized 7/1/2019) |

*Plan terminated in 2019 merger and conversion; it remains in place only to the extent necessary with respect to outstanding options thereunder. Expired options thereunder are not available for future issuance.

Please identify the Company's "constitutional documents" currently in effect. Constitutional documents include (without limitation) Articles / Certificate of Incorporation / Charter, bylaws, stockholder agreements, voting agreements, investor rights agreements, co-sale / right of refusal agreements and any other agreements or

instruments that govern or affect the rights of stockholders or by which stockholders have agreed to act in a particular way in respect of the Company. **Please provide copies of each document listed below.**

| **Name of Instrument / Agreement** | **Date** |
|---|---|
| **Second Amended and Restated Certificate** | **8/12/2019** |
| **Certificate of Amendment to the Second Amended and Restated Certificate** | **11/14/2019** |
| **Amendment No. 1 to Bylaws** | **8/9/2019** |
| **Amended and Restated Co-Sale Right of First Refusal** | **8/13/2019** |
| **Amended and Restated Investors' Rights Agreement** | **8/13/2019** |
| **Amended and Restated Voting Agreement** | **8/13/2019** |

## 9. ALL COMPANIES - Governance

The table below sets forth the current members of the Board of Directors and, where relevant, the relationship of such person to any equityholder or lender or holder of convertible securities, the number of and type of securities held by such person (and, if related to an equityholder, lender or holder of convertible securities, the amount held by such other person) or such person's position if a member of Company management or a founder.

| **Name of Director** | **Relationship** | **Securities Held** | **Date Elected** |
|---|---|---|---|
| Egon Durban | Investor - Hilltop III Investments, LLC | ● Hilltop III Investments, LLC<br>(Voting Common) - 200,000<br>(Series A Preferred) - 265,070<br>(Series B-1 Preferred) - 136,574<br>(Series B-2 Preferred) - 41,958<br>● | October 12, 2015 |
| Mark Dyne | Investor - ECA, Morpheus HC Partners I, LP; Morpheus HC Partners II, LP; Morpheus HC Partners III, LP; Morpheus Ventures I-A,LP | ● ECA<br>(Common Voting) - 8,463,701<br>(Series A Preferred) - 99,401<br>● Morpheus HC Partners I,LP (Series A-1 Preferred) - 2,529,665<br>● Morpheus HC Partners II, LP (Series B Preferred) - 8,849,410<br>● Morpheus HC Partners III, LP (Series B Preferred) - 491,266<br>● Morpheus Ventures I-A, LP<br>(Series A-1 Preferred) - 2,391,324<br>(Series B-1 Preferred) - 1,149,998<br>(Series B-2 Preferred) - 1,840,722 | October 12, 2015 |
| Joseph Miller | Investor - ECA, Morpheus HC Partners I, LP; Morpheus HC Partners II, LP; Morpheus HC Partners III, LP; Morpheus Ventures I-A,LP | ● ECA<br>(Common Voting) - 8,463,701<br>(Series A Preferred) - 99,401<br>● Morpheus HC Partners I,LP (Series A-1 Preferred) - 2,529,665<br>● Morpheus HC Partners II, LP (Series B Preferred) - 8,849,410<br>● Morpheus HC Partners III, LP (Series B Preferred) - 491,266 | August 12, 2019 |

| | | | |
|---|---|---|---|
| | | ● Morpheus Ventures I-A, LP<br>(Series A-1 Preferred) - 2,391,324<br>(Series B-1 Preferred) - 1,149,998<br>(Series B-2 Preferred) - 1,840,722<br>● | |
| Scott Miller | Independent Board Member | Stock Options - 300,000 | November, 2019 |
| Michael Oleshansky | Investor - HouseCan Investors, L.L.C. Oleshansky | ● HouseCan Investors, L.L.C. Oleshansky<br>(Series A-1 Preferred) - 3,952,602<br>(Series B Preferred) - 3,308,190<br>(Series B-1 Preferred) - 312,522<br>(Series B-2 Preferred) - 500,232<br>● | August 12, 2019 |
| Nate Redmond | Investor - Basepoint Ventures II, LLC; Alpha Edison, L.P.; Alpha Edison Westwood III, L.L.C. | ● Basepoint Ventures II, LLC<br>(Common Voting) - 187,500<br>(Series A Preferred) - 6,626,769<br>(Series A-1 Preferred) - 3,557,342<br>(Series B Preferred) - 496,228<br>(Series B-1 Preferred) - 820,057<br>(Series B-2 Preferred) - 944,044<br>● Alpha Edison Westwood III, L.L.C.<br>(Series B Preferred) - 2,398,438<br>● Alpha Edison, L.P.<br>(Series A-1 Preferred) - 3,952,602<br>(Series B Preferred) - 827,047<br>(Series B-1 Preferred) - 312,522<br>(Series B-2 Preferred) - 868,796<br>● | March, 2015 |
| Jeremy Sicklick | CEO & Co-Founder | ● Canary Analytics, LLC.<br>(Common Voting) - 2,000,000<br>● Jeremy and Jennifer A. Sicklick, as Co-Trustees of the Sicklick Living Trust dated March 1, 2015<br>(Common Voting) -8,556,711<br>● First Republic Bank of Delaware LLC, as Trustee of the Sicklick 2015 Children's Trust dated March 1, 2015<br>(Common Voting) - 4,948,387 | October 6, 2014 |
| Christopher Stroud | Chief of Research & Co-Founder | ● Christopher Stroud, as Trustee of the Christopher Stroud Living Trust, dated December 27, 2014<br>(Common Voting) - 4,815,280<br>● Kim Stroud, as Trustee of the Stroud 2014 Children's Trust, dated December 27, 2014<br>(Common Voting) - 1,979,355 | October 6, 2014 |

## 10. SECURITY INTERESTS / LIENS / CHARGES

The following table **and each related attached schedule** sets forth all security interests, liens, charges, mortgages, debentures or the like relating to any property owned by the Company and any Subsidiary, including any Collateral identified in Section 4, above:

| Secured Party / Address and Contact Information and Company or Subsidiary granting security | Source (e.g., loan, lease) | Type of Lien (e.g., equipment-specific, blanket) | Date Filed |
|---|---|---|---|
| **Willard Building, LLC**<br>**1101 Green Street #1601**<br>**San Francisco, CA 94109** | Standby Letter of Credit for Boulder Office Lease | **SBLC has Lien on CD held at First Republic ending in 6586** | **Feb 20, 2020** |
| **KBS 201 Spear Street, LLC**<br>**800 Newport Center Drive, Suite 700**<br>**Newport Beach, CA 92660** | Standby Letter of Credit for San Francisco Office Lease | **SBLC has Lien on CD held at First Republic ending in 7529** | **Aug 12, 2020** |
| **HC 1, LLC ("Bentham")**<br>**437 Madison Avenue, 19th Floor, New York, NY 10022** | Litigation Funding Agreement dated as of June 6, 2018, by and among the Borrower, Bentham, and Security Finance 1 LLC, as collateral agent for Bentham | **Bentham holds a lien on Texas Litigation Collateral** | **On or about June 6, 2018** |
| **Susman Godfrey L.L.P. ("Susman"), Davis, Cedillo & Mendoza, Inc. ("DCM", and together with Susman, the "Law Firms")**<br>**Susman: 1000 Louisiana St # 5100, Houston, TX 77002**<br>**DCM: 755 E Mulberry Ave # 500, San Antonio, TX 78212** | Contingency Fee Engagement Letter dated as of January 2, 2018 (the "**Engagement Letter**"), by and between the Law Firms and Borrower | **The Law Firms hold a lien on Texas Litigation Collateral under the Engagement Letter to the extent permitted by law** | |

## 12. INSURANCE BROKER.,

The following broker handles the Company's property insurance:

| Broker | Contact | Telephone | Fax | Email |
|---|---|---|---|---|
| Embroker | Justin Sorensen | (312) 399-7582 | N/A | justin.sorensen@embroker.com |

## 13. LEGAL COUNSEL.

The following firm will represent the Company in connection with the loan documents:

| Attorney | Law Firm | Telephone | Fax | Email |
|---|---|---|---|---|
| **Caroline Cherkassky** | **Stubbs Alderton & Markiles, LLP** | (818) 444-4540 | (818) 444-4540 | ccherkassky@stubbsalderton.com |

## 14. ACCOUNTANTS.

The following firm audits the financial statements of the Company and has been engaged in such capacity since
If less than 3 years, the prior Company auditors were:

| Resp. Partner | Accounting Firm | Telephone | Fax | Email |
|---|---|---|---|---|
| **Not Applicable** | | | | |
| Prior Resp. Partner | Prior Accounting Firm | Telephone | Fax | Email |
| **Not Applicable** | | | | |

The undersigned undertakes to advise you of any change or modification to any of the foregoing information. Until such notice is received by you, you shall be entitled to rely upon all of the foregoing and presume it is correct and accurate in all respects.

Date: March , 2021

**BORROWER:**

HouseCanary, Inc.
a Delaware corporation

By: ______________________________

Name: Jeremy Sicklick

Title: Chief Executive Officer______________________________

Continuation Page—Additional Information

See Attachments File for Documents

# ACTIVE PATENT APPLICATION

International Patent Application No. PCT/IB2019/057837
Filing Date: September 18, 2019
Publication number: WO/2020/058856
Title: IMAGE-BASED PROPERTY CONDITION DETERMINATION SYSTEMS, METHODS, AND DEVICES

# HOUSECANARY INC.
# TRADEMARK STATUS REPORT

## As of January 6, 2021

| Mark | Owner | App/Reg Number | App/Reg Date | Class | Status | Goods/Services | Affidavits §§8&15 | Renewal Period |
|---|---|---|---|---|---|---|---|---|
| **HOUSECANARY** | HouseCanary, Inc. | **Reg. No.** 4,937,800 | **Reg. Date** 04/12/16 | 36 | Registered | Real estate valuation, analysis, forecast, data, and data visualization services | 04/13/21-04/11/22 | 04/13/25-04/11/26 |
| **HOUSECANARY** | HouseCanary, Inc. | **Reg. No.** 4,937,801 | **Reg. Date** 04/12/16 | 9 | Registered | Computer application software for mobile phones, portable media players, handheld computers, namely, software for real estate appraisal, valuation, analysis, forecast, data, and data visualization services; Computer software for real estate appraisal, analysis, forecast, data, and data visualization services | 04/13/21-04/11/22 | 04/13/25-04/11/26 |
| HouseCanary | HouseCanary, Inc. | **Reg. No.** 5,110,339 | **Reg. Date** 12/27/16 | 36 | Registered | Real estate valuation, analysis, forecast, data, and data visualization services | 12/28/21-12/26/22 | 12/28/25-12/26/26 |

| **Mark** | **Owner** | **App/Reg Number** | **App/Reg Date** | **Class** | **Status** | **Goods/Services** | **Affidavits §§8&15** | **Renewal Period** |
|---|---|---|---|---|---|---|---|---|
| HouseCanary | HouseCanary, Inc. | **Reg. No.** 5,110,340 | **Reg. Date** 12/27/16 | 9 | Registered | Computer application software for mobile phones, portable media players, handheld computers, namely, software for real estate appraisal, valuation, analysis, forecast, data, and data visualization services; Computer software for real estate appraisal, analysis, forecast, data, and data visualization services | 12/28/21-12/26/22 | 12/28/25-12/26/26 |
| **AGILE APPRAISAL** | HouseCanary, Inc. | **Reg. No.** 5,450,211 | **Reg. Date** 04/17/18 | 36 | Registered | Real estate valuation services; Real estate valuations; Real estate appraisal and valuation | 04/18/23-04/17/24 | 04/18/27-04/17/28 |
| **CANARY** | HouseCanary, Inc. | **Reg. No.** 5,561,327 | **Reg. Date** 09/11/18 | 36 | Registered | Real estate valuation, analysis, forecast, data, and data visualization services. | 09/12/23-09/10/24 | 09/12/27-09/10/28 |
| **AGILE EVALUATION** | HouseCanary, Inc. | **Reg. No.** 5,705,059 | **Reg. Date** 03/19/19 | 36 | Registered | Real estate valuation services; Real estate valuations; Real estate appraisal and valuation | 03/20/24-03/18/25 | 03/20/28-03/18/29 |
| **CANARY RENTAL INDEX** | HouseCanary, Inc. | **Reg. No.** 5,755,871 | **Reg. Date** 05/21/19 | 9, 35, 36, 41 | Registered | 09: Electronic downloadable publications, namely, reports and fact sheets in the field of real estate markets; Electronic downloadable publications, namely, reports and fact sheets in the field of real estate markets at the national and state levels.<br><br>35: Providing business information and business analysis regarding real estate markets; Business information services, namely, collection, reporting, and analysis of real estate market research information; Providing an interactive website featuring real estate market research | 05/22/24-05/20/25 | 05/22/28-05/20/29 |

| Mark | Owner | App/Reg Number | App/Reg Date | Class | Status | Goods/Services | Affidavits §§8&15 | Renewal Period |
|---|---|---|---|---|---|---|---|---|
| | | | | | | information.<br><br>36: Providing an interactive website featuring information in the field of financial investments in real estate.<br><br>41: Providing an interactive website featuring non-downloadable publications in the nature of reports and fact sheets in the field of real estate markets at the national and state levels. | | |
| **AGILE SUITE** | HouseCanary, Inc. | **Reg. No.** 6,012,175 | **Reg. Date** 03/17/20 | 35, 36 | Registered | 35: Providing business information and business analysis regarding real estate markets; Business information services, namely, collection, reporting, and analysis of real estate market research information; Real estate market analysis services; real estate economic forecasting services.<br><br>36: Real estate valuation services; Real estate valuations; Real estate appraisal and valuation; Appraisal and valuation of real estate; Providing real estate listings and real estate information via the Internet; Real estate valuation, financial analysis, and financial forecast services; Financial valuation of personal property and real estate; Providing data in the field of real estate. | 03/18/25-03/16/26 | 03/18/29-03/16/30 |
| **AGILE INSIGHTS** | HouseCanary, Inc. | **Reg. No.** 6,161,461 | **Reg. Date** 09/29/20 | 9, 36 | Registered | 9: Electronic downloadable publications, namely, reports and fact sheets in the fields of real estate and real estate markets; Electronic downloadable publications, namely, reports and fact sheets in the fields of real estate and real estate markets at | 09/30/25-09/28/26 | 09/30/29-09/28/30 |

| Mark | Owner | App/Reg Number | App/Reg Date | Class | Status | Goods/Services | Affidavits §§8&15 | Renewal Period |
|---|---|---|---|---|---|---|---|---|
| | | | | | | the national and state levels.<br><br>36: Real estate valuation services; Real estate valuations; Real estate appraisal and valuation; Providing real estate listings and real estate information via the Internet; Real estate valuation, analysis, financial forecast and data visualization services; Financial valuation of personal property and real estate; providing data in the field of real estate. | | |
| **COMEHOME** | HouseCanary, Inc. | **Reg. No.** 6,195,799 | **Reg. Date** 11/10/20 | 9, 35, 36 | Registered | 9: Computer software that enables users to display and view real estate listings, and for searching and viewing information and data in the fields of real estate, real estate appraisals, valuations, analysis, and forecasts; software for searching and viewing information and data in the fields of real estate valuation and appraisal.<br><br>35: Providing a website featuring information in the fields of real estate marketing analysis and economic forecasting services related to real estate; advertising and marketing services in the fields of real estate; promoting the goods and services of others by providing hypertext links to the web sites of others featuring real estate, consumer goods and consumer services; providing on-line commercial information in the field of real estate on the Internet; online advertising and marketing services in the field of real estate; real estate marketing, marketing analysis, and economic forecasting services related to real estate. | 11/11/25-11/09/26 | 11/11/29-11/09/30 |



*\\SQL1\ProLaw\Documents\MT\13307-42\1335841.docx*

| **Mark** | **Owner** | **App/Reg Number** | **App/Reg Date** | **Class** | **Status** | **Goods/Services** | **Affidavits §§8&15** | **Renewal Period** |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 36: Real estate valuation services, and data and data visualization services in the nature of providing a database of information about residential real estate listings in different neighborhoods and communities; financial valuation of real estate; providing information in the field of real estate by means of a website; financial valuation of residential homes; providing a website featuring information in the fields of real estate listings, appraisals of real estate, real estate valuation, and data and data visualization services in the nature of a database of information about residential real estate listings; providing a website featuring information in the fields of real estate valuation and appraisal. | | |
| | HouseCanary, Inc. | **Reg. No.** 6,206,737 | **Reg. Date** 11/24/20 | 9, 35, 36, 42 | Registered | 09: Downloadable software and mobile software applications for real estate valuation, analysis, forecast, data, and data visualization services; downloadable software for real estate valuation; Downloadable software for real estate listings; downloadable software for real estate appraisal.<br><br>35: Providing a website featuring information in the fields of real estate marketing analysis and economic forecasting services related to real estate; providing on-line commercial information in the field of real estate on the Internet; real estate marketing, analysis and economic forecasting services related to real estate; Advertising and marketing services in the field of real estate; promoting the goods and services of others; promoting the goods and services of | 11/25/25-11/23/26 | 11/25/29-11/23/30 |



\\SQL1\ProLaw\Documents\MT\13307-42\1335841.docx

| **Mark** | **Owner** | **App/Reg Number** | **App/Reg Date** | **Class** | **Status** | **Goods/Services** | **Affidavits §§8&15** | **Renewal Period** |
|---|---|---|---|---|---|---|---|---|
| | | | | | | others by providing hypertext links to the web sites of others featuring real estate and consumer services; online advertising and marketing services in the field of real estate.<br><br>36: Real estate valuation services; financial valuation of real estate; providing real estate information by means of a website; financial valuation of residential properties; providing a website featuring information in the field of real estate valuation; providing a website in the field of real estate valuation; providing an interactive website featuring information in the field of financial investments in real estate; Providing a website featuring real estate listings and information related thereto; providing a website featuring a database of information about residential real estate listings; providing a database of information about residential real estate listings in different neighborhoods and communities; providing a website featuring information in the fields of real estate listings, appraisals of real estate, and a database of information about residential real estate listings; providing a website in the field of real estate appraisal.<br><br>42: Providing online non-downloadable software for real estate valuation, analysis, forecast, data, and data visualization services; providing online non-downloadable software for real estate valuation; providing online non-downloadable software for real estate listings; providing online | | |



\\SQL1\ProLaw\Documents\MT\13307-42\1335841.docx

| Mark | Owner | App/Reg Number | App/Reg Date | Class | Status | Goods/Services | Affidavits §§8&15 | Renewal Period |
|---|---|---|---|---|---|---|---|---|
| | | | | | | non-downloadable software for real estate appraisal. | | |
| comehome | HouseCanary, Inc. | **Reg. No.** 6,206,741 | **Reg. Date** 11/24/20 | 9, 35, 36, 42 | Registered | 09: Downloadable software and mobile software applications for real estate valuation, analysis, forecast, data, and data visualization services; downloadable software for real estate valuation; downloadable software for real estate listings; downloadable software for real estate appraisal.<br><br>35: Providing a website featuring information in the fields of real estate marketing analysis and economic forecasting services related to real estate; providing on-line commercial information in the field of real estate on the Internet; real estate marketing, analysis and economic forecasting services related to real estate; advertising and marketing services in the field of real estate; promoting the goods and services of others; Promoting the goods and services of others by providing hypertext links to the web sites of others featuring real estate, consumer goods and consumer services; online advertising and marketing services in the field of real estate.<br><br>36: Real estate valuation services; financial valuation of real estate; providing real estate information by means of a website; financial valuation of residential properties; providing a website featuring information in the field of real estate valuation; providing a website in the field of real estate valuation; Providing an interactive website featuring information in the field of financial investments in real estate; Providing a | 11/25/25-11/23/26 | 11/25/29-11/23/30 |

| Mark | Owner | App/Reg Number | App/Reg Date | Class | Status | Goods/Services | Affidavits §§8&15 | Renewal Period |
|---|---|---|---|---|---|---|---|---|
| | | | | | | website featuring real estate listings and information related thereto; Providing a website featuring a database of information about residential real estate listings; providing a database of information about residential real estate listings in different neighborhoods and communities; providing a website featuring information in the fields of real estate listings, appraisals of real estate, and a database of information about residential real estate listings; providing a website in the field of real estate appraisal.<br><br>42: Providing online non-downloadable computer software for real estate valuation, analysis, forecast, data, and data visualization services; providing online non-downloadable software for real estate valuation; providing online non-downloadable software for real estate listings; providing online non-downloadable software for real estate appraisal. | | |
| **COMEHOME BY HOUSECANARY** | HouseCanary, Inc. | **Reg. No.** 6,206,822 | **Reg. Date** 11/24/20 | 09, 35, 36, 42 | Registered. | 09: Downloadable software and mobile software applications for real estate valuation, analysis, forecast, data, and data visualization services; downloadable software for real estate valuation; downloadable software for real estate listings; downloadable software for real estate appraisal.<br><br>35: Providing a website featuring information in the fields of real estate marketing analysis and economic forecasting services related to real estate; providing on-line commercial information in the field of real estate on the Internet; real | 11/25/25-11/23/26 | 11/25/29-11/23/30 |

| Mark | Owner | App/Reg Number | App/Reg Date | Class | Status | Goods/Services | Affidavits §§8&15 | Renewal Period |
|---|---|---|---|---|---|---|---|---|
| | | | | | | estate marketing, analysis and economic forecasting services related to real estate; advertising and marketing services in the field of real estate; promoting the goods and services of others; Promoting the goods and services of others by providing hypertext links to the web sites of others featuring real estate, consumer goods and consumer services; online advertising and marketing services in the field of real estate.<br><br>36: Real estate valuation services; financial valuation of real estate; providing real estate information by means of a website; financial valuation of residential properties; providing a website featuring information in the field of real estate valuation; providing a website in the field of real estate valuation; Providing an interactive website featuring information in the field of financial investments in real estate; Providing a website featuring real estate listings and information related thereto; Providing a website featuring a database of information about residential real estate listings; providing a database of information about residential real estate listings in different neighborhoods and communities; providing a website featuring information in the fields of real estate listings, appraisals of real estate, and a database of information about residential real estate listings; providing a website in the field of real estate appraisal.<br><br>42: Providing online non-downloadable software for real estate valuation, analysis, forecast, data, and data visualization services; providing online non-downloadable software for real estate | | |



\\SQL1\ProLaw\Documents\MT\13307-42\1335841.docx

| **Mark** | **Owner** | **App/Reg Number** | **App/Reg Date** | **Class** | **Status** | **Goods/Services** | **Affidavits §§8&15** | **Renewal Period** |
|---|---|---|---|---|---|---|---|---|
| | | | | | | valuation; providing online non-downloadable software for real estate listings; providing online non-downloadable software for real estate appraisal. | | |
| comehome by HouseCanary | HouseCanary, Inc. | **Reg. No.** 6,206,823 | **Reg. Date** 11/24/20 | 09, 35, 36, 42 | Registered. | 09: Downloadable software and mobile software applications for real estate valuation, analysis, forecast, data, and data visualization services; downloadable software for real estate valuation; downloadable software for real estate listings; downloadable software for real estate appraisal.<br><br>35: Providing a website featuring information in the fields of real estate marketing analysis and economic forecasting services related to real estate; providing on-line commercial information in the field of real estate on the Internet; real estate marketing, analysis and economic forecasting services related to real estate; advertising and marketing services in the field of real estate; promoting the goods and services of others; Promoting the goods and services of others by providing hypertext links to the web sites of others featuring real estate, consumer goods and consumer services; online advertising and marketing services in the field of real estate; providing a web site featuring users' ratings, reviews and recommendations on products and services in the field of real estate.<br><br>36: Real estate valuation services; financial valuation of real estate; providing real estate information by means of a website; financial valuation of residential properties; providing a | 11/25/25-11/23/26 | 11/25/29-11/23/30 |

| **Mark** | **Owner** | **App/Reg Number** | **App/Reg Date** | **Class** | **Status** | **Goods/Services** | **Affidavits §§8&15** | **Renewal Period** |
|---|---|---|---|---|---|---|---|---|
| | | | | | | website featuring information in the field of real estate valuation; providing a website in the field of real estate valuation; Providing an interactive website featuring information in the field of financial investments in real estate; Providing a website featuring real estate listings and information related thereto; Providing a website featuring a database of information about residential real estate listings; providing a database of information about residential real estate listings in different neighborhoods and communities; providing a website featuring information in the fields of real estate listings, appraisals of real estate, and a database of information about residential real estate listings; providing a website in the field of real estate appraisal.<br><br>42: Providing online non-downloadable computer software for real estate valuation, analysis, forecast, data, and data visualization services; providing online non-downloadable software for real estate valuation; providing online non-downloadable software for real estate listings; providing online non-downloadable software for real estate appraisal. | | |
| **PROPSCREEN** | HouseCanary Inc. | **App. No.** 88/847,199 | **App. Date** 03/25/20 | 42 | Application Pending.<br><br>NOA Issued: Sep. 22, 2020 | Providing a website featuring on-line non-downloadable software that enables users to identify and search residential properties; Providing a website featuring non-downloadable software for identifying and searching residential properties; Providing temporary use of on-line non-downloadable software and applications for | | |

| **Mark** | **Owner** | **App/Reg Number** | **App/Reg Date** | **Class** | **Status** | **Goods/Services** | **Affidavits §§8&15** | **Renewal Period** |
|---|---|---|---|---|---|---|---|---|
| | | | | | | identifying and searching residential properties; Providing temporary use of on-line non-downloadable software for identifying and searching residential properties. | | |

## ABANDONED REGISTRATIONS/APPLICATIONS

| Mark | Owner | App/Reg Number | App/Reg Date | Class | Status | Goods/Services |
|---|---|---|---|---|---|---|
| **CANARY ANALYTICS** | HouseCanary, Inc. | **App. No.** 86/481,130 | **App. Date** 12/15/14 | 36 | Abandoned | Real estate valuation, analysis, forecast, data, and data visualization services |
| **COMEHOME A HOUSECANARY COMPANY**<br><br>Abandoned per C. Torres 10/29/19 email. | HouseCanary, Inc. | **App. No.** 88/506,405 | **App. Date** 07/09/19 | 35, 36 | Abandoned | 35: (Based on Use): Providing a website featuring information in the fields of real estate marketing analysis and economic forecasting services related to real estate; providing on-line commercial information on the Internet; real estate marketing, analysis and economic forecasting services related to real estate; (Intent to Use): Providing a website featuring real estate listings and information related thereto; advertising and marketing services in the field of real estate; promoting the goods and services of others; providing hypertext links to the web sites of others featuring real estate, consumer goods and consumer services; online advertising and marketing services in the field of real estate; providing a web site featuring users' ratings, reviews and recommendations on products and services in the field of real estate.<br><br>36: (Based on Use): Real estate valuation services; financial valuation of real estate; providing real estate information by means of a website; financial valuation of residential properties; providing a website featuring information in the field of real estate valuation; providing a website in the field of real estate valuation; Providing an interactive website featuring information in the field of financial investments in real estate. (Intent to Use): Providing a website featuring information in the field of data and data visualization services in the nature of a database of information about residential real estate listings; data and data visualization services in the nature of providing a database of information about residential real estate listings in different neighborhoods and communities; providing a website featuring information in the fields of real estate listings, appraisals of real estate, and data and data visualization services in the nature of a database of information about residential real estate listings; providing a website in the field of real estate appraisal. |

| | | | | | | |
|---|---|---|---|---|---|---|
| comehome<br>a HouseCanary company<br><br>Abandoned per C. Torres 10/29/19 email. | HouseCanary, Inc. | **App. No.** 88/506,415 | **App. Date** 07/09/19 | 35, 36 | Abandoned | 35: (Based on Use): Providing a website featuring information in the fields of real estate marketing analysis and economic forecasting services related to real estate; providing on-line commercial information on the Internet; real estate marketing, analysis and economic forecasting services related to real estate; (Intent to Use): Providing a website featuring real estate listings and information related thereto; advertising and marketing services in the field of real estate; promoting the goods and services of others; providing hypertext links to the web sites of others featuring real estate, consumer goods and consumer services; online advertising and marketing services in the field of real estate; providing a web site featuring users' ratings, reviews and recommendations on products and services in the field of real estate.<br><br>36: (Based on Use): Real estate valuation services; financial valuation of real estate; providing real estate information by means of a website; financial valuation of residential properties; providing a website featuring information in the field of real estate valuation; providing a website in the field of real estate valuation; Providing an interactive website featuring information in the field of financial investments in real estate. (Intent to Use): Providing a website featuring information in the field of data and data visualization services in the nature of a database of information about residential real estate listings; data and data visualization services in the nature of providing a database of information about residential real estate listings in different neighborhoods and communities; providing a website featuring information in the fields of real estate listings, appraisals of real estate, and data and data visualization services in the nature of a database of information about residential real estate listings; providing a website in the field of real estate appraisal. |
| **AGILE CERTIFIED**<br><br>(Abandoned per C. Torres 4-9-2020 email) | HouseCanary, Inc. | **App. No.** 88/510,834 | **App. Date** 07/11/19 | 9, 35, 36 | Abandoned | 9: Electronic downloadable publications, namely, reports and fact sheets in the fields of real estate and real estate markets; Electronic downloadable publications, namely, reports and fact sheets in the fields of real estate and real estate markets at the national and state levels.<br><br>35: Providing business information and business analysis regarding real estate markets; Business information services, namely, collection, reporting, and analysis of real estate market research information; Real estate market analysis services; real estate economic forecasting services. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | 36: Real estate valuation services; Real estate valuations; Real estate appraisal and valuation; Appraisal and valuation of real estate; Providing real estate listings and real estate information via the Internet; Real estate valuation, financial analysis, and financial forecast services; Financial valuation of personal property and real estate; Providing data in the field of real estate. |

# DOMAIN NAMES

| Domain Name | Status | Expiration Date | Ownership Date | Auto-renew |
|---|---|---|---|---|
| **agile1004.co** | Active | 2021-11-15 | 2017-11-15 | On |
| **agile1004.com** | Active | 2022-11-14 | 2017-11-15 | On |
| **agile1004.info** | Active | 2022-11-15 | 2017-11-15 | On |
| **agile1004.net** | Active | 2022-11-14 | 2017-11-15 | On |
| **agile1004.org** | Active | 2022-11-15 | 2017-11-15 | On |
| **agileappraisal.co** | Active | 2022-07-27 | 2017-07-28 | On |
| **agileappraisal.com** | Active | 2022-07-27 | 2017-07-28 | On |
| **agileappraisal.info** | Active | 2022-07-28 | 2017-07-28 | On |
| **agileappraisal.net** | Active | 2022-07-27 | 2017-07-28 | On |
| **agileappraisal.org** | Active | 2022-07-28 | 2017-07-28 | On |
| **agilebpos.co** | Active | 2021-11-15 | 2017-11-15 | On |
| **agilebpos.com** | Active | 2022-11-14 | 2017-11-15 | On |
| **agilebpos.info** | Active | 2022-11-15 | 2017-11-15 | On |
| **agilebpos.net** | Active | 2022-11-14 | 2017-11-15 | On |
| **agilebpos.org** | Active | 2022-11-15 | 2017-11-15 | On |
| **agileevaluation.co** | Active | 2023-03-22 | 2018-03-22 | On |
| **agileevaluation.com** | Active | 2023-03-22 | 2018-03-22 | On |
| **agileevaluation.info** | Active | 2023-03-22 | 2018-03-22 | On |
| **agileevaluation.net** | Active | 2023-03-22 | 2018-03-22 | On |
| **agileevaluation.org** | Active | 2023-03-22 | 2018-03-22 | On |
| **citytastic.com** | Active | 2021-08-24 | 2018-08-25 | On |
| **comehome.com** | Active | 2021-06-23 | 2018-08-24 | On |
| **hoodcrunch.com** | Active | 2021-08-24 | 2018-08-25 | On |
| **hoodlens.com** | Active | 2021-08-24 | 2018-08-25 | On |
| **hoodtastic.com** | Active | 2021-08-24 | 2018-08-25 | On |
| **housecanary.app** | Active | 2022-01-18 | 2020-01-18 | On |
| **HOUSECANARY.COM** | Active | 2021-09-30 | 2012-10-01 | On |
| **HOUSECANARY.NET** | Active | 2024-12-05 | 2014-12-06 | On |
| **housecanery.com** | Active | 2023-06-22 | 2020-08-25 | On |
| **lendcobank.com** | Active | 2021-04-15 | 2019-04-15 | On |
| **mortgagerate.guru** | Active | 2021-08-26 | 2020-08-26 | On |
| **valuationsuite.co** | Active | 2023-03-22 | 2018-03-22 | On |
| **valuationsuite.com** | Active | 2023-03-22 | 2018-03-22 | On |
| **valuationsuite.info** | Active | 2023-03-22 | 2018-03-22 | On |
| **valuationsuite.net** | Active | 2023-03-22 | 2018-03-22 | On |
| **valuationsuite.org** | Active | 2023-03-22 | 2018-03-22 | On |

***Title Source Inc. vs. HouseCanary, Inc. Formerly Known as Canary Analytics, Inc.* (73rd Judicial District Court, Bexar County, TX; Cause NO. 2016-CI-06300)**

This litigation, involving HouseCanary's claims of trade secret misappropriation, breach of contract and fraud by Title Source Inc. ("TSI" now Amrock), is currently pending on appeal before the Texas Supreme Court. After a seven-week trial in 2018, a jury unanimously found that TSI had misappropriated HouseCanary's trade secrets, breached the parties' agreements, and committed fraud. The jury also rejected all of TSI's affirmative claims. The jury awarded HouseCanary $235.4 million in compensatory damages and $470.8 million in punitive damages. After rejecting TSI's post-trial motions, the trial court entered judgment for $739,717,865.79, including prejudgment interest and attorney's fees.

TSI had originally sued HouseCanary on April 12, 2016 in the 73rd Judicial District Court, Bexar County, Texas claiming breach of contract and fraud arising out of a series of agreements between the parties. The agreements called for HouseCanary to build and provide a software-based appraisal application and provided for a limited license to use HouseCanary's AVM and related proprietary technologies. The agreements contained strict protections for HouseCanary's intellectual property. The jury found TSI violated these restrictions and also rejected all of TSI's claims against HouseCanary.

TSI appealed the judgment to the 4th Court of Appeals, San Antonio. In 2020, the 4th Court of Appeals reversed the judgment of the trial court because it believed it was error to submit jury instructions on trade secret misappropriation that tracked the language of the Texas Uniform Trade Secrets Act. It also held TSI did not improperly acquire the trade secrets because of the parties' contractual relationship. At the same time, the Court affirmed the jury's finding that TSI should recover nothing on its claims from HouseCanary. The Court also confirmed the jury's findings that HouseCanary owned valid and valuable trade secrets. The Court of Appeal remanded the case for retrial on the fraud and misappropriation claims or in the alternative for HouseCanary to elect its contract damages.

HouseCanary and TSI have each filed pending petitions for review with the Texas Supreme Court.

***HouseCanary, Inc. V. Quicken Loans Inc., One Reverse Mortgage, LLC, and In-House Realty, LLC* (U.S. District Court, WDTX; Civil Action No. No. 5:18-CV-00519-FB)**

On May 25, 2018, HouseCanary filed suit against TSI affiliates Quicken Loans Inc., One Reverse Mortgage, LLC, and In-House Realty, LLC in the U.S. District Court for Western District of Texas, asserting claims for trade secret misappropriation under both state and federal law, conspiracy to misappropriate trade secrets, conspiracy to commit fraud, joint enterprise liability, and breach of contract. The Court stayed the Western District of Texas case pending its resolution of outstanding motions on jurisdiction over the defendants.

**HouseCanary, Inc. Summary Capitalization Table**

| Name | Voting Common | NonVoting Common | Series A-1 Preferred | Series A Preferred | Series B Preferred | Series B-1 Preferred | Series B-2 Preferred | *Options and RSU's Outstanding Under Canary Analytics Incentive, LLC 2015 Equity Incentive and Unit Option Plan | **Shares Reserved Under 2019 HouseCanary, Inc. Stock Incentive Plan | Voting Common Warrants | Outstanding Shares | Fully Diluted Shares |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fully diluted shares | 32,679,883 | 6,477,324 | 22,850,296 | 7,471,674 | 16,426,814 | 2,731,683 | 4,195,752 | 7,495,915 | 11,565,793 | 923,595 | | 112,818,729 |
| Fully Diluted Ownership | 28.9667% | 5.7414% | 20.2540% | 6.6227% | 14.5604% | 2.4213% | 3.7190% | 6.6442% | 10.2517% | .8187% | | 100.0000% |
| Total Shares Outstanding | 32,679,883 | 6,477,324 | 22,850,296 | 7,471,674 | 16,426,814 | 2,731,683 | 4,195,752 | | | | 92,833,426 | |
| Percentage Outstanding | 35.2027% | 6.9774% | 24.6143% | 8.0485% | 17.6949% | 2.9426% | 4.5197% | | | | 100.0000% | |

**Plan terminated in 2019 merger and conversion at which time there were 10,152,036 shares reserved for issuance thereunder; it remains in place only to the extent necessary with respect to outstanding options thereunder. Expired options thereunder are not available for future issuance.*

***Net of shares issued upon exercise*

# EXHIBIT G
## FORM OF JOINDER AGREEMENT

This Joinder Agreement (the "Joinder Agreement") is made and dated as of [ ], 20[ ], and is entered into by and between__________________., a ___________ corporation ("Subsidiary"), and Ocean II PLO LLC (as "Agent").

## RECITALS

A. Subsidiary's Affiliate, [ ] ("Company") [has entered/desires to enter] into that certain Loan and Security Agreement dated [ ], 20[ ], with the several banks and other financial institutions or entities from time to time party thereto as lender (collectively, the "Lender") and the Agent, as such agreement may be amended (the "Loan Agreement"), together with the other agreements executed and delivered in connection therewith;

B. Subsidiary acknowledges and agrees that it will benefit both directly and indirectly from Company's execution of the Loan Agreement and the other agreements executed and delivered in connection therewith;

## AGREEMENT

NOW THEREFORE, Subsidiary and Agent agree as follows:

1. The recitals set forth above are incorporated into and made part of this Joinder Agreement. Capitalized terms not defined herein shall have the meaning provided in the Loan Agreement.

2. By signing this Joinder Agreement, Subsidiary shall be bound by the terms and conditions of the Loan Agreement the same as if it were the Borrower (as defined in the Loan Agreement) under the Loan Agreement, *mutatis mutandis*, provided however, that (a) with respect to (i) **Section 5.1** of the Loan Agreement, Subsidiary represents that it is an entity duly organized, legally existing and in good standing under the laws of [ ], (b) neither Agent nor Lender shall have any duties, responsibilities or obligations to Subsidiary arising under or related to the Loan Agreement or the other Loan Documents, (c) that as long as Company satisfies the requirements of **Sections 6.3** through **6.5** of the Loan Agreement, Subsidiary shall not have to provide Agent separate Financial Statements, Compliance Certificates or notices of default and (d) that if Subsidiary is covered by Company's insurance, Subsidiary shall not be required to maintain separate insurance or comply with the provisions of **Section 6.8** of the Loan Agreement.

3. To the extent that Agent or any Lender has any duties, responsibilities or obligations arising under or related to the Loan Agreement or the other Loan Documents, those duties, responsibilities or obligations shall flow only to Company and not to Subsidiary or any other Person or entity. By way of example (and not an exclusive list): (i) Agent's providing notice to Company in accordance with the Loan Agreement or as otherwise agreed among Company, Agent and Lender shall be deemed provided to Subsidiary; (ii) a Lender's providing an Advance to Company shall be deemed an Advance to Subsidiary; and (iii) Subsidiary shall have no right to request an Advance or make any other demand on Lender.

4. [Subsidiary agrees not to certificate its equity securities without Agent's prior written consent, which consent may be conditioned on the delivery of such equity securities to Agent in order to perfect Agent's security interest in such equity securities.]

5. Subsidiary acknowledges that it benefits, both directly and indirectly, from the Loan Agreement, and hereby waives, for itself and on behalf on any and all successors in interest (including without limitation any assignee for the benefit of creditors, receiver, bankruptcy trustee or itself as debtor-in-possession under any bankruptcy proceeding) to the fullest extent provided by law, any and all claims, rights or defenses to the enforcement of this Joinder Agreement on the basis that (a) it failed to receive adequate consideration for the execution and delivery of this Joinder Agreement or (b) its obligations under this Joinder Agreement are avoidable as a fraudulent conveyance.

6. As security for the prompt, complete and indefeasible payment when due (whether on the payment dates or otherwise) of all the Obligations, Subsidiary grants to Agent a security interest in all of Subsidiary's right, title, and interest in and to the Collateral.

7. **Section 13** of the Loan Agreement is incorporated herein by reference, *mutatis mutandis.*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

SUBSIDIARY:

________________________________

By: ______________________________________
Name: ______________________________________
Title: ______________________________________

AGENT:

**OCEAN II PLO LLC**
a California limited liability company

**By: Structural Capital Management Company II, LP,**
a Delaware limited partnership
Its Manager

**By: Structural Capital GP, LLC,**
a Delaware limited liability company
Its General Partner

By: ______________________________________
Name: ______________________________________
Title: Managing Member

## EXHIBIT H

## FORM OF ACH DEBIT CONSENT

# Ocean II PLO LLC

Payment Authorization to Draw Funds from Borrower Accounts for Payments

The undersigned hereby authorizes Ocean II PLO LLC (“Agent”) for itself and as agent for Structural Capital Investments III, LP, and other lenders (collectively, “Lenders”) to debit via EFT/ACH funds transfers from the account listed below to satisfy the amounts due under the Loan and Security Agreement dated as of _________ between Agent, Lenders and _____________ (“Borrower”), as such agreement may be amended, modified or restated from time to time (the “Loan Agreement”), with respect to the loan(s) issued thereunder and all other Obligations (as defined in the Loan Agreement) owed to Lenders and/or Agent, and all as calculated by Lenders or Agent. The undersigned consents to all such EFT/ACH funds transfers on account of the Obligations under the Loan Agreement. The undersigned represents and warrants that the account information is accurate and complete and is a business account maintained solely in the name of the undersigned. The foregoing consent and authorization shall remain in effect until the Loan Agreement is terminated by Agent and all Obligations have been repaid in full in cash.

Account Information: (For ACH Draws)

______________________________________________

Financial Institution

______________________________________________

Bank Routing Number

______________________________________________

Name as It Appears on Account

______________________________________________

Account Number

Type of Account:

☐ Checking ☐ Savings

_________________________________________ [Insert name of account holder]

_______________________________________ _____________

Signature Date

Name (please print or type): _________________________________________

Title: _________________________

# EXHIBIT I

## FORM OF MANAGEMENT RIGHTS LETTER

**[Borrower Letterhead]**

____________ __, 202_

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
400 Oyster Point Blvd., Suite 229
South San Francisco, CA 94080
Attn: Mr. Kai Tse

Re: Management Rights

Ladies and Gentlemen:

This letter will confirm our agreement that pursuant to and effective as of the Closing Date of the Loan and Security Agreement dated on or about the date hereof, as it may be amended or amended and restated from time-to-time (the "**Loan Agreement**"), by and among ___________ (the "**Borrower**"), the Agent and Structural Capital Investments III, LP, as a Lender thereunder (the "**Lender**") shall be entitled to the following contractual management rights, in addition to any rights to non-public financial information, inspection rights, and other rights specifically provided to the Agent in the Loan Documents:

1. If Lender is not represented on Borrower's Board of Directors, Lender shall be entitled to consult with and advise management of the Borrower on significant business issues, including but not limited to management's proposed annual operating plans, and management will meet with Lender regularly during each year at the Borrower's facilities at mutually agreeable times for such consultation and advice and to review progress in achieving said plans.

2. Lender may examine the books and records of the Borrower and inspect its facilities and may request information at reasonable times and intervals concerning the general status of the Borrower's financial condition and operations, provided that access to highly confidential proprietary information and facilities need not be provided.

3. If Lender is not represented on the Borrower's Board of Directors, the Borrower shall, concurrently with delivery to the Board of Directors, give a representative of Lender copies of all notices, minutes, consents and other material that the Borrower provides to its directors, except that the representative may be excluded from access to any material or meeting or portion thereof if the Board of Directors determines in good faith, upon advice of counsel, that such exclusion is reasonably necessary to preserve the attorney-client privilege, to protect highly confidential proprietary information, or for other similar reasons. Upon reasonable notice and at a scheduled meeting of the Board or such other time, if any, as the Board may determine in its sole discretion, such representative may address the Board with respect to Lender's concerns regarding significant business issues facing the Borrower.

Lender agrees that any confidential information provided to or learned by it in connection with its rights under this letter shall be subject to the confidentiality provisions set forth in the Loan Agreeement .

The rights described herein shall terminate and be of no further force or effect upon (a) such time as no warrants or other rights to purchase shares, or no shares, of the Borrower's capital stock are held by the Lender or its affiliates; (b) the consummation of the sale of the Borrower's securities pursuant to a registration statement filed by the Borrower under the Securities Act of 1933, as amended, in connection with the firm commitment underwritten offering of its securities to the general public; or (c) the consummation of a merger or consolidation of the Borrower that is effected (i) for independent business reasons unrelated to extinguishing such rights; and (ii) for purposes other than (A) the reincorporation of the Borrower in a different state; or (B) the formation of a holding company that will be owned exclusively by the Borrower's stockholders and will hold all of the outstanding shares of capital stock of the Borrower's successor. The confidentiality obligations referenced herein will survive any such termination.

Any capitalized terms used herein, but not defined herein, shall have the meaning ascribed to such term in the Loan Agreement.

| | |
|---|---|
| Very Truly Yours,<br><br>**Lender:**<br><br>Structural Capital Investments III, LP,<br>a Delaware limited partnership<br><br>By: Structural Capital GP III, LLC,<br>a Delaware limited liability company<br>its General Partner<br><br>By: ______________________________<br>Name:<br>Title: | Agreed and Accepted:<br><br>**Borrower:**<br><br>___________________<br><br><br>By: ________________________________<br>Name:<br>Title: |

**CURRENT FINANCIAL STATEMENTS**

# HouseCanary

## P&L Summary FY20 (Quarterly)

| $000's | FY'20 Q1'20 Act. | FY'20 Q2'20 Act. | FY'20 Q3'20 Act. | FY'20 Q4'20 Act. | FY'20 Act. |
|---|---|---|---|---|---|
| **Revenue:** | | | | | |
| Core | $1,940.2 | $1,720.2 | $1,876.2 | $2,080.4 | $7,617.1 |
| Investor | 428.3 | 24.1 | 254.8 | 542.5 | 1,249.7 |
| ComeHome | 387.1 | 1,473.0 | 607.6 | 905.4 | 3,373.0 |
| **Total Revenue** | **2,755.6** | **3,217.3** | **2,738.6** | **3,528.3** | **12,239.8** |
| **Cost of Goods Sold** | | | | | |
| Hosting | 446.7 | 479.1 | 510.0 | 581.1 | 2,016.9 |
| Inspections | 60.4 | 16.4 | 61.5 | 77.3 | 215.6 |
| Payment Processing | 0.3 | 0.3 | 0.3 | 0.3 | 1.2 |
| **Total COGS** | **507.4** | **495.8** | **571.8** | **658.7** | **2,233.7** |
| **Gross Margin** | **2,248.2** | **2,721.5** | **2,166.8** | **2,869.7** | **10,006.1** |
| *% Margin* | *81.6%* | *84.6%* | *79.1%* | *81.3%* | *81.8%* |
| **Operating Expenses:** | | | | | |
| Employee & related | 7,328.3 | 6,032.5 | 5,664.6 | 5,856.9 | 24,882.3 |
| Data licensing & brokerage | 736.7 | 694.9 | 689.8 | 680.8 | 2,802.2 |
| Software licensing | 375.7 | 335.6 | 272.4 | 320.3 | 1,303.9 |
| Professional services | 985.6 | 563.6 | 566.6 | 535.3 | 2,651.2 |
| Sales & Marketing | 536.1 | 205.7 | 268.5 | 252.1 | 1,262.4 |
| General, administrative & other | 677.1 | 551.0 | 559.0 | 488.0 | 2,275.1 |
| **Total Operating Expenses** | **10,639.4** | **8,383.3** | **8,020.9** | **8,133.4** | **35,177.1** |
| **Adj. Cash EBITDA** | **($8,391.2)** | **($5,661.8)** | **($5,854.2)** | **($5,263.7)** | **($25,171.0)** |
| **Non-operating Expenses:** | | | | | |
| Litigation | $796.1 | $141.7 | $136.0 | $449.2 | $1,523.0 |
| Executive Search & One-Time Recruiting | 5.9 | – | – | – | 5.9 |
| Severance | 324.9 | 311.0 | 110.9 | – | 746.8 |
| **Total Non-operating Expenses** | **1,126.9** | **452.7** | **246.9** | **449.2** | **2,275.7** |
| **Cash EBITDA** | **($9,518.2)** | **($6,114.6)** | **($6,101.0)** | **($5,712.9)** | **($27,446.7)** |

# HouseCanary

## P&L Summary FY20 Projections (Monthly)

| $000's | Q1'20 Jan'20 Act. | Q1'20 Feb'20 Act. | Q1'20 Mar'20 Act. | Q2'20 Apr'20 Act. | Q2'20 May'20 Act. | Q2'20 Jun'20 Act. |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Core Business | $639.2 | $680.1 | $620.9 | $524.2 | $573.1 | $622.9 |
| Investor - Lead Feed | 117.2 | 198.0 | 113.1 | 15.7 | 4.2 | 4.2 |
| ComeHome | 350.5 | 15.4 | 21.1 | 1,076.9 | 198.1 | 198.0 |
| **Total Revenue** | **1,106.9** | **893.6** | **755.1** | **1,616.8** | **775.4** | **825.0** |
| **Cost of Goods Sold** | | | | | | |
| Hosting | 143.0 | 143.0 | 160.7 | 173.4 | 153.1 | 152.6 |
| Inspections | 14.0 | 18.7 | 27.8 | 6.2 | 3.9 | 6.3 |
| Payment Processing | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **Total COGS** | **157.1** | **161.8** | **188.6** | **179.7** | **157.1** | **158.9** |
| **Gross Margin** | **949.8** | **731.9** | **566.5** | **1,437.1** | **618.3** | **666.1** |
| *% Margin* | *85.8%* | *81.9%* | *75.0%* | *88.9%* | *79.7%* | *80.7%* |
| **Operating Expenses:** | | | | | | |
| Employee & related | 2,488.3 | 2,513.4 | 2,326.5 | 2,154.8 | 1,935.3 | 1,942.4 |
| Data licensing & brokerage | 241.2 | 258.0 | 237.5 | 233.0 | 189.9 | 272.1 |
| Software licensing | 119.9 | 120.4 | 135.4 | 111.5 | 108.8 | 115.3 |
| Professional services | 386.6 | 357.3 | 241.7 | 201.0 | 200.6 | 162.1 |
| Sales & Marketing | 181.1 | 185.9 | 169.1 | 68.5 | 65.4 | 71.8 |
| General, administrative & other | 233.6 | 230.9 | 212.7 | 182.0 | 192.0 | 176.9 |
| **Total Operating Expenses** | **3,650.7** | **3,665.9** | **3,322.9** | **2,950.8** | **2,692.0** | **2,740.6** |
| **Adj. Cash EBITDA** | **($2,700.8)** | **($2,934.0)** | **($2,756.4)** | **($1,513.8)** | **($2,073.6)** | **($2,074.5)** |
| **Non-operating Expenses:** | | | | | | |
| Litigation | $258.9 | $315.1 | $222.2 | $21.0 | $23.5 | $97.1 |
| Executive Search & One-Time Recruiting | $0.3 | $5.2 | $0.5 | – | – | – |
| Severance | $85.3 | $85.3 | $154.3 | $311.0 | – | – |
| **Total Non-operating Expenses** | **344.4** | **405.5** | **376.9** | **332.1** | **23.5** | **97.1** |
| **Cash EBITDA** | **($3,045.3)** | **($3,339.5)** | **($3,133.3)** | **($1,845.8)** | **($2,097.1)** | **($2,171.6)** |

| Q3'20<br>Jul'20<br>Act. | Q3'20<br>Aug'20<br>Act. | Q3'20<br>Sep'20<br>Act. | Q4'20<br>Oct'20<br>Act. | Q4'20<br>Nov'20<br>Act. | Q4'20<br>Dec'20<br>Act. |
|---|---|---|---|---|---|
| $625.8 | $623.2 | $627.2 | $680.1 | $689.1 | $711.2 |
| 38.3 | 99.2 | 117.3 | 103.8 | 126.9 | 311.8 |
| 198.0 | 211.3 | 198.3 | 448.3 | 200.4 | 256.6 |
| **862.0** | **933.7** | **942.9** | **1,232.2** | **1,016.5** | **1,279.7** |
| 155.6 | 172.5 | 181.9 | 193.5 | 183.0 | 204.6 |
| 21.1 | 25.6 | 14.8 | 24.2 | 22.9 | 30.2 |
| 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| **176.8** | **198.2** | **196.8** | **217.8** | **206.0** | **234.9** |
| **685.1** | **735.5** | **746.1** | **1,014.5** | **810.4** | **1,044.7** |
| *79.5%* | *78.8%* | *79.1%* | *82.3%* | *79.7%* | *81.6%* |
| 1,856.1 | 1,730.6 | 2,077.9 | 1,920.1 | 1,861.2 | 2,075.6 |
| 231.5 | 219.9 | 238.4 | 232.8 | 221.9 | 226.0 |
| 92.8 | 86.2 | 93.4 | 95.0 | 101.8 | 123.5 |
| 176.1 | 224.5 | 166.0 | 215.3 | 155.2 | 164.8 |
| 87.5 | 101.4 | 79.6 | 84.3 | 84.5 | 83.3 |
| 193.1 | 188.3 | 177.5 | 170.6 | 159.5 | 157.9 |
| **2,637.2** | **2,551.0** | **2,832.7** | **2,718.1** | **2,584.1** | **2,831.2** |
| **($1,952.1)** | **($1,815.4)** | **($2,086.7)** | **($1,703.6)** | **($1,773.6)** | **($1,786.5)** |
| $48.7 | $31.9 | $55.5 | $343.6 | $105.4 | $0.2 |
| – | – | – | – | – | – |
| – | $110.9 | – | – | – | – |
| **48.7** | **142.8** | **55.5** | **343.6** | **105.4** | **0.2** |
| **($2,000.7)** | **($1,958.2)** | **($2,142.2)** | **($2,047.2)** | **($1,879.1)** | **($1,786.7)** |

## HouseCanary Inc.
Balance Sheet as of Period

| | Mar'20 | Jun'20 | Sep'20 | Dec'20 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| Bank | $28,967,614 | $22,097,233 | $16,986,790 | $10,970,883 |
| Accounts Receivable | $2,200,370 | $1,171,502 | $1,236,534 | $1,545,311 |
| Other Current Asset | $1,065,196 | $1,218,878 | $1,161,243 | $1,221,855 |
| **Total Current Assets** | **$32,233,180** | **$24,487,614** | **$19,384,567** | **$13,738,050** |
| **Fixed Assets** | **$384,027** | **$324,558** | **$272,676** | **$224,309** |
| **Other Assets** | **$1,286,239** | **$1,285,364** | **$394,541** | **$394,541** |
| **Total ASSETS** | **$33,903,447** | **$26,097,535** | **$20,051,783** | **$14,356,900** |
| **LIABILITIES & EQUITY** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | $1,869,241 | $846,866 | $765,903 | $554,150 |
| Credit Card | $82,832 | $14,815 | $71,224 | ($2,179) |
| Other Current Liability | $2,941,746 | $2,777,415 | $3,308,847 | $1,852,340 |
| **Total Current Liabilities** | **$4,893,819** | **$3,639,096** | **$4,145,974** | **$2,404,311** |
| **Long Term Liabilities** | **$40,213,546** | **$40,191,544** | **$40,169,328** | **$40,145,612** |
| **Equity** | **($11,203,919)** | **($17,733,105)** | **($24,263,518)** | **($28,193,023)** |
| **Total LIABILITIES & EQUITY** | **$33,903,447** | **$26,097,535** | **$20,051,783** | **$14,356,900** |
| | TRUE | TRUE | TRUE | TRUE |

# DISCLOSURE SCHEDULES

**Permitted Indebtedness**

1. Indebtedness under that certain Litigation Funding Agreement dated as of June 6, 2018, by and among the Borrower, HC 1, LLC ("**Bentham**") and Security Finance 1 LLC, as collateral agent for Bentham.

2. $837,000 Letter of Credit to secure lease obligations for the real property located at 201 Spear Street, Suite 1400, San Francisco, CA maintained at First Republic Bank, account number 50019927529.

3. $265,000 Letter of Credit to secure lease obligations for the real property located at 2045 Broadway, Boulder, CO maintained at First Republic Bank, account number 50019866586.

4. There are one or more outstanding undocumented cash advances made by Borrower to one or more of its executives, in an aggregate amount of less than $250,000 (the "**Executive Advances**").

**Permitted Investments**

1. Borrower's ownership of 49% of HouseCanary (CT), Inc., a Delaware corporation, where the other 51% ownership is subject to Borrower's right to purchase for nominal ($1.00) consideration.

**Permitted Liens**

1. A first priority lien on the Texas Litigation Collateral in favor of Bentham.

2. Subordinated liens and/or secondary rights in the Texas Litigation Collateral under the following:

a. Contingency Fee Engagement Letter dated as of January 2, 2018 (the "**Law Firms Engagement Letter**"), by and between Susman Godfrey L.L.P. ("**Susman**"), Davis, Cedillo & Mendoza, Inc. ("**DCM**", and together with Susman, the "**Law Firms**"), and the Borrower, pursuant to which the Law Firms have represented, and continue to represent, the Borrower with respect to the Texas Litigation Claims, as amended by that certain Amendment to Contingency Fee Engagement Letter dated June 6, 2018, by and among the Borrower and the Law Firms.

b. The ECA Letter.

c. Engagement Letter dated as of February 15, 2020, by and among the Borrower, Susman and Profile Advisors LLC (the "**Profile Letter**").

**Material Customers**

**2020:**

| Name | Fiscal 2020 Revenue |
|---|---|
| JPMorgan Chase Bank, N.A. | $2,606,000.00 |
| Hudson Advisors / Lone Star | $1,774,661.87 |
| Progress Residential | $1,071,675.00 |
| Opendoor | $627,390.40 |

| | |
|---|---|
| United Wholesale Mortgage | $477,732.90 |
| Home Partners of America | $294,253.52 |
| Caliber Home Loans, Inc. | $292,546.00 |
| Nextdoor.com, Inc. | $240,000.00 |
| Nomura Securities International | $165,322.58 |
| Consolidated Analytics | $161,180.32 |
| Credible | $158,252.20 |
| Hometap, LLC | $153,688.00 |

**2021 (through January 31, 2021):**

| Name | Fiscal 2020 Revenue |
|---|---|
| Progress Residential | $173,250.00 |
| JPMorgan Chase Bank, N.A. | $163,332.00 |
| Hudson Advisors / Lone Star | $149,409.00 |
| Opendoor | $90,275.00 |
| United Wholesale Mortgage | $63,002.65 |
| Pagaya Investments US LLC | $26,667.00 |
| Home Partners of America | $24,000.00 |
| Avenue One | $20,667.00 |
| Nextdoor.com, Inc. | $20,000.00 |
| Caliber Home Loans, Inc. | $17,500.00 |
| Referral Exchange | $17,000.00 |
| Nomura Securities International | $15,000.00 |

**Bank Accounts:**

| Bank Name | Account Number | Type of Account | Excluded Account (Yes/No) | Branch Address | Company/Subsidiary |
|---|---|---|---|---|---|
| **First Republic Bank** | **80007148978** | Money Market | **No** | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80006706552** | Checking | **No** | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80006706578** | Payroll | **No** | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80006706545** | Revenue | **No** | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **50019866586** | CD | **No** | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **50019927529** | CD | **No** | **111 Pine St. San Francisco, CA 94111** | Company **X** OR Name of Sub |
| **First Republic Bank** | **80007120118** | Trust | **No** | **111 Pine St. San Francisco, CA 94111** | Company OR Name of Sub: HouseCanary Certified Analytics, Inc. |
| **Wells Fargo Bank** | **8132113633** | Checking | **Yes** | **101 Mission Street, San Francisco, CA 94105** | Company **X** OR Name of Sub |
| **Wells Fargo Bank** | **5108661900** | Checking | **Yes** | **299 Main St Floor 1, Salt Lake City, UT 84111** | Company **X** OR Name of Sub |
| **Wells Fargo Bank** | **7564674732** | Checking | **Yes** | **101 Mission Street, San Francisco, CA 94105** | Company **X** OR Name of Sub |
| **Wells Fargo Bank** | **2976768206** | Checking | **Yes** | **1248 O Street, Lincoln, NE 68508** | Company **X** OR Name of Sub |
| **Citizens Bank** | **4016689367** | Checking | **Yes** | **715 Panorama Trail, Rochester, NY 14625** | Company **X** OR Name of Sub |
| **WesBanco** | **4912000586** | Checking | **Yes** | **1 Bank Plaza, Wheeling, WV 26003** | Company **X** OR Name of Sub |
| **Keybank** | **454681003579** | Trust | **Yes** | **149 Bank St, Burlington, VT 05401** | Company **X** OR Name of Sub |
| **Keybank** | **191271003961** | Trust | **Yes** | **1 Monument Square, Portland, ME 04101** | Company **X** OR Name of Sub |

**Tax Matters:**

Borrower is evaluating whether any adjustment is required with respect to the Executive Advances.

**License Restrictions:**

| Other Party to Contract | Date of Contract | Nonassignability Clause Asset Sale (Y/N) | Nonassignability Clause Security Interest (Y/N) | Consent Obtained (Y/N) |
|---|---|---|---|---|
| Black Knight Financial Services | June 2015 | Y* | N | N |
| HowLoud, Inc. – Flood Data | July 18, 2017 | Y* | N | N |
| ReportSee, Inc. - SpotCrime – Crime Data | July 06, 2017 | Y | N | N |
| Real Estate Portal – Parcel Data | October 1, 2014 | Y | N | N |
| Altos Research, Inc. – MLS Stats | February 20, 2015 | Y* | N | N |
| Mapbox – Maps | Order date | Y* | Y | N |
| Melissa Data Corp. – Geocoding | January 26, 2017 | Y | N | N |
| Precisely (formerly Pitney Bowes/Maponics) – School Data | August 17, 2015 | Y* | N | N |

*The starred contracts have exceptions to non-assignability in connection with a sale of all or substantially all of the assets to a successor entity.

Borrower also uses public source licenses.

**POST-CLOSING SCHEDULE**

The Borrower agrees to and will complete, or cause to be completed, all of the following actions, including execution and delivery of any documents, as applicable, not later than the dates specified following the Closing Date:

| **Task** | **Deadline** |
|---|---|
| Landlord Subordination and Access Agreement pursuant to Section 6.16(a) for the following locations:<br><br>201 Spear Street, Suite 1400, San Francisco, CA<br><br>2045 Broadway, Boulder<br><br>19707 IH-1 West, Suite 309, San Antonia, TX | Sixty days following the Effective Date |
| Insurance endorsements required pursuant to Section 6.8(b) | April 15, 2021 |
| Enter into subordination agreement with First Republic Bank to obtain a junior lien on accounts numbers 50019927529 and 50019866586. | May 14, 2021 |
| Obtain Bentham consent pursuant to Section 13.18. | As soon as reasonably practicable |

# EXHIBIT B

**NOTIFICATION OF DISPOSITION OF COLLATERAL**

To: HouseCanary, Inc.

From: Ocean II PLO LLC, 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, CA 94025

---

We will sell the property owned by HouseCanary, Inc. listed on Exhibit A, hereto, in a single lot to the highest qualified bidder in a public sale as follows:

Day and Date: Tuesday, September 22, 2026

Time: 1:00 p.m. (Pacific Daylight Time)

Place: 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, CA

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell. You may request an accounting by contacting our legal counsel, Steve Gasser, by email at: sgasser@premeircounsel.com.

**OCEAN II PLO LLC**
a California limited liability company
By: STRUCTURAL CAPITAL MANAGEMENT COMPANY II, LP,
a Delaware limited partnership
its Manager

By: Kai Tse ______________________
Name: Kai Tse
Title: Managing Partner

September 8, 2026

**EXHIBIT A**

**Description of Property Being Sold**

All assets and property of Debtor whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(A) accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property (defined below), the Texas Litigation Collateral (defined below) and the Litigation Reserve Account (defined below), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), and all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "**Rights to Payment**"); and (ii) if a security interest in Debtor's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Intellectual Property to the extent necessary to permit perfection of Secured Creditor's security interest in the Rights to Payment shall also be included; and

(B) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

Notwithstanding the foregoing, in no event shall the Collateral include as of the date of foreclosure: (a) any lease, license, contract, property rights or agreement to which Debtor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Debtor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9406, 9407, 9408 or 9409 of the Uniform Commercial Code as adopted and in effect in the State of California or any successor provision or provisions of any relevant jurisdiction or any other applicable law (including the 11 U.S.C §101, et. seq.) or principles of equity); or (b) any intent-to use Trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable law.

"**Litigation Reserve Account**" means a bank account established by Debtor to hold funds deposited therein as provided in that certain Litigation Funding Agreement between HouseCanary, Inc. and Crane 2 FundingCo 23, LLC, as amended from time to time. "**Texas Defendants**" means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or their respective Affiliates. "**Texas Litigation**" means, collectively, the legal proceedings in the cases captioned (a) Title Source,

Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc., Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the facts and/or causes of action set forth therein, and/or (b) HouseCanary, Inc. v. Quicken Loans Inc., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable. "**Texas Litigation Claims**" means the claims that Debtor has against each of the Texas Defendants in connection with the Texas Litigation. "**Texas Litigation Collateral**" means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all proceeds of any and all of the foregoing. "**Texas Litigation Proceeds**" means any and all consideration actually paid directly or indirectly to or for the benefit of Debtor by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of Debtor from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation. "**Intellectual Property**" means all of Debtor's right, title, and interest in and to the following: domain names, Copyrights, Trademarks and Patents (including registrations and applications therefor prior to granting, and whether or not filed, recorded or issued), trade secrets and related rights, including without limitation rights to unpatented inventions, know-how and manuals, design rights, claims for damages by way of past, present and future infringement of any of the rights included above and amendments, renewals and extensions of any Copyrights, Trademarks or Patents. "**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether or not filed with the United States Copyright Office or foreign equivalent. "**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of a Person connected with and symbolized by such trademarks, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent. "**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent.

# EXHIBIT C

**NOTIFICATION OF DISPOSITION OF COLLATERAL**

To: HouseCanary, Inc.

From: Ocean II PLO LLC, 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, CA 94025

---

We will sell the property owned by HouseCanary, Inc. listed on Exhibit A, hereto, in a single lot to the highest qualified bidder in a public sale as follows:

Day and Date: Tuesday, September 22, 2026

Time: 1:00 p.m. (Pacific Daylight Time)

Place: 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, CA

You are entitled to an accounting of the unpaid indebtedness secured by the property that we intend to sell. You may request an accounting by contacting our legal counsel, Steve Gasser, by email at: sgasser@premiercounsel.com.

**OCEAN II PLO LLC**
a California limited liability company
By: STRUCTURAL CAPITAL MANAGEMENT COMPANY II, LP,
a Delaware limited partnership
its Manager

By: DocuSigned by: Kai Tse
00DF39B80B68460...
Name: Kai Tse
Title: Managing Partner

September 10, 2026

## EXHIBIT A

### Description of Property Being Sold

All assets and property of Debtor whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(A) accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property (defined below), the Texas Litigation Collateral (defined below) and the Litigation Reserve Account (defined below), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), and all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "**Rights to Payment**"); and (ii) if a security interest in Debtor's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Intellectual Property to the extent necessary to permit perfection of Secured Creditor's security interest in the Rights to Payment shall also be included; and

(B) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

Notwithstanding the foregoing, in no event shall the Collateral include as of the date of foreclosure: (a) any lease, license, contract, property rights or agreement to which Debtor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Debtor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9406, 9407, 9408 or 9409 of the Uniform Commercial Code as adopted and in effect in the State of California or any successor provision or provisions of any relevant jurisdiction or any other applicable law (including the 11 U.S.C §101, et. seq.) or principles of equity); or (b) any intent-to use Trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable law.

"**Litigation Reserve Account**" means a bank account established by Debtor to hold funds deposited therein as provided in that certain Litigation Funding Agreement between HouseCanary, Inc. and Crane 2 FundingCo 23, LLC, as amended from time to time. "**Texas Defendants**" means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or their respective Affiliates. "**Texas Litigation**" means, collectively, the legal proceedings in the cases captioned (a) Title Source,

Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc., Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the facts and/or causes of action set forth therein, and/or (b) HouseCanary, Inc. v. Quicken Loans Inc., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable. "**Texas Litigation Claims**" means the claims that Debtor has against each of the Texas Defendants in connection with the Texas Litigation. "**Texas Litigation Collateral**" means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all proceeds of any and all of the foregoing. "**Texas Litigation Proceeds**" means any and all consideration actually paid directly or indirectly to or for the benefit of Debtor by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of Debtor from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation. "**Intellectual Property**" means all of Debtor's right, title, and interest in and to the following: domain names, Copyrights, Trademarks and Patents (including registrations and applications therefor prior to granting, and whether or not filed, recorded or issued), trade secrets and related rights, including without limitation rights to unpatented inventions, know-how and manuals, design rights, claims for damages by way of past, present and future infringement of any of the rights included above and amendments, renewals and extensions of any Copyrights, Trademarks or Patents. "**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether or not filed with the United States Copyright Office or foreign equivalent. "**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of a Person connected with and symbolized by such trademarks, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent. "**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent.

# EXHIBIT D

DENTONS

**James R. Irving**

james.irving@dentons.com

D +1 502 587 3606

Dentons
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202
United States

dentons.com

***Via Priority Mail and Electronic Mail***

September 10, 2026

Steven Gasser, Founding Partner
PremierCounsel LLP
315 Montgomery Street, Suite 900
San Francisco, CA 94104
E-mail: sgasser@premiercounsel.com

*Counsel for Ocean II PLO LLC*

**Re:** ***Notice of Disposition of Collateral***

Steve:

As you know, this office represents HouseCanary, Inc. ("HouseCanary"). We have received the *Notice of Disposition of Collateral* (the "Notice") that you sent on September 8, 2026 indicating that your client, Ocean II PLO LLC ("Structural"), as agent under the *Loan and Security Agreement*, dated as of March 25, 2021 (the "Loan Agreement") seeks to foreclose on certain assets (the "Assets") of HouseCanary. The Notice provides that Structural will conduct a sale of the Assets on September 22, 2026 at your offices in northern California.

I am also in receipt of the *Notice of Public Sale* published by Structural on September 9, 2026 online (https://sfc.ipublishmarketplace.com/sf-marketplace/advert/-general_3120) (the "Publication"). The Publication Notice provides that Structural will conduct a sale of the Assets on September 22, ***2020*** at your offices in northern California. At a minimum, the Publication Notice is facially deficient because of this alone.

HouseCanary has instructed us to make this information request regarding the proposed sale in order to evaluate next steps, including, but not limited to, seeking legal redress from a court of competent jurisdiction for a temporary restraining order stopping this sale. The favor of a reply is requested no later than close of business on September 11, 2026.

**Puyat Jacinto & Santos ► Link Legal ► Zaanouni Law Firm & Associates ► LuatViet ► For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms**

Please provide the following information:

1. What is driving the proposed sale date of September 22, 2026, particularly with respect to Assets as complex as these?

2. Please provide any bidding procedures that you propose to make available to interested parties. Although some bidding procedures are included in the Publication Notice, Structural reserves various rights to alter such procedures at any time, to cancel the auction, and even to "cancel the sale to the winning bidder…." Please provide information regarding how these procedures were devised to be commercially reasonable.

3. The Assets involve consumer data as well as confidential intellectual property and trade secrets. Please provide a copy of the confidentiality and non-disclosure agreement you intend to require from potential bidders in the process to sell the Assets.

4. Please also provide access to the data room and other information you intend to make available to potential bidders. For instance, the Notice expressly states that property rights that would be potentially extinguished through the grant of a security interest to Structural are excluded. Does your data room include copies of all such agreements and other diligence materials underlying the Assets?

5. Please provide the identity and contact information for any investment banker or broker Structural intends to use in the sale of Assets. Also, your Notice appears defective insofar as your email contains a typographical error. You may wish to reissue a corrected Notice and ensure any future communications are correct.

6. Please provide a copy of any additional advertisements for the proposed sale of the Assets other than the Publication Notice, along with information including the date, time, and manner such publication or other advertisement was made.

7. Please provide information on how Structural decided to publish the Publication Notice, whether Structural believes that the website where the Publication Notice is posted constitutes a "recognized market."

8. Please provide notice if the Publication Notice is amended or rescinded, if even to correct the significant typographical error that the sale of the Assets is to be conducted nearly six years in the past.

9. Please provide a list of all parties interested in purchasing the Assets you have contacted in your efforts to market and sell the Assets, as well as when those parties were contacted, the method of contact, and their interest.

10. Please provide the accounting of the unpaid indebtedness referenced in the Notice, including principal, accrued interest, default interest, fees, expenses, attorneys' fees and all other amounts Structural contends are secured or otherwise payable, both as of September 8, 2026 and projected through September 22, 2026. Please also provide the amount Structural contends would be required to satisfy the indebtedness in full.

11. Please provide a schedule identifying with reasonable specificity the property Structural contends is included in the Assets to be sold and the property Structural contends is excluded. In particular, please identify each material lease, license, contract, data right, customer agreement and other property right that Structural contends may be transferred through the proposed sale, and the basis upon which Structural has concluded that such transfer would not result in abandonment, invalidation, unenforceability, breach, termination or default.

12. Please provide all non-privileged appraisals, valuations, broker opinions, market analyses or other materials Structural has obtained or prepared concerning the value of the Assets, either individually, in the aggregate or as part of HouseCanary's business, and identify the value Structural presently attributes to the Assets for purposes of the proposed sale.

As you know, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Cal. Comm. Code § 9610(b). "A disposition of collateral is made in a commercially reasonable manner if the disposition satisfies any of the following conditions: (1) It is made in the usual manner on any recognized market. (2) It is made at the price current in any recognized market at the time of the disposition. (3) It is made otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Cal. Com. Code § 9627(b). "'However, the methods of commercially reasonable dispositions listed under § 9627(b) are not required or exclusive, and other types of dispositions may' satisfy the standard." *Jack in the Box, Inc. v. Mehta*, No. CV 13-04444 EJD, 2014 WL 2069530, at *2 (N.D. Cal. May 19, 2014). "Whether a disposition is commercially reasonable is generally a question of fact and depends on all of the circumstances existing at the time of the sale." *Bank of the Sierra v. Kallis*, No. CV 05-01574 AWI, 2006 WL 3513568, at *8 (E.D. Cal. Dec. 6, 2006).

We look forward to Structural's immediate responses. We presume that as Structural has started this foreclosure process under California's adoption of the Uniform Commercial Code, that Structural already has all of the documents and information requested herein because they are what any legitimate, interested bidder would require in a commercially reasonable sale process for the Assets.

Please let me know if you would like to discuss. HouseCanary is focused on maximizing the value of its business for all stakeholders, and a defective and commercially unreasonable sale process would be extremely harmful to those stakeholders. HouseCanary's business with existing customers has been jeopardized, and HouseCanary's efforts to sell its entire business in a commercial method is being undercut. Indeed, HouseCanary may seek discovery on Structural's motivation for commencing a foreclosure and sale process on this timeline, and whether it is to be commercially reasonable or for some improper purpose. HouseCanary explicitly reserves all rights, and nothing in this letter shall constitute a waiver.

Sincerely,

James R. Irving

# EXHIBIT E

**PremierCounsel LLP**
ATTORNEYS AT LAW

STEVEN O. GASSER
(415) 409-1790
sgasser@PremierCounsel.com

**Via Email**

September 11, 2026

James Irving, Esq.
Dentons
3500 PNC Tower
101 South Fifth Street
Louisville, KY 40202

Re: Response to Letter Dated September 10, 2026 (the "Letter")

Dear Jim:

Thank you for your Letter yesterday regarding Ocean II PLO, LLC's ("Secured Party") scheduled public sale of various assets (the "Collateral") owned by HouseCanary, Inc. (the "Borrower"). Please be advised that we have contacted the San Francisco Chronicle and notified it of the typographical errors in the Notice of Public Sale which was published in its online edition on September 9, 2026. A corrected Notice of Public Sale was published today, September 11, 2026, both in print and online. Please also be advised that the Notice of Public Sale was also published today in the national distribution of the Wall Street Journal.

As for your request for an accounting of the obligations owed, principal and fees as of September 8, 2026 and September 22, 2026 total $34,327,148.54 and $8,478,510.14, respectively. Included in the principal balance is PIK interest in the amount of $4,327,148.54, of which $1,492,120.19 constitutes default interest. Reimbursable expenses are currently $199,243.14, but such amount is subject to increase as expenses are being incurred in connection with the foreclosure process, not all invoices have been received, and more expenses are expected to be incurred.

In your letter, you inquired as to the additional bidding procedures referenced in Notice of Public Sale. In addition to the bidding procedures included in the Notice of Public Sale, Ocean plans to implement the bidding procedures attached hereto as Annex 1, and will provide them to any potential purchaser upon written request. Ocean is intentionally taking a flexible approach to the upcoming public sale in hope that not requiring rigid conformity to a predetermined process (e.g., bidders are not being required to prequalify by showing proof of available funds) will encourage participation at the public sale.

Regarding your request for Ocean to provide a schedule identifying the property to be auctioned, the Borrower is in a better position to provide that information than Ocean, and request was made yesterday to the Borrower to provide such information. Borrower's failure to provide detailed information may impact the interest that potential bidders will have. It is in your client's best interest to provide such information as quickly as possible so that it can be made available to potential purchasers of the Collateral.

Based on representations that the Borrower has made to Ocean, we understand that the Borrower has for months conducted a process with an investment banker to sell its operating business, but has yet to bring a serious buyer to the table. Ocean has not reached out to the Borrower's investment banker as it does not want to interfere with Borrower's relations, but Ocean is amenable to having a conversation with it to determine whether there is any merit to involving the Borrower's investment banker. Please advise if the Borrower would like Ocean to reach out to HouseCanary's investment banker, and if so, please provide contact information. As Ocean has just started the foreclosure process, it has not received any inquiries from potential bidders, so there is no additional information to share with you on point.

As to the numerous discovery-like requests for information and other self-serving points raised in the Letter, Ocean chooses to not engage or respond other than to say that if the Borrower elects to initiate litigation to prevent Ocean from enforcing its clear contractual rights to proceed with the public sale, then Ocean is prepared to defend its position in court. Similarly, if the Borrower chooses to contest the public sale after the fact, Ocean is similarly prepared to defend its position, and of course, reserves all rights and remedies against the Borrower, its board, management and stockholders that have led up to unfortunate circumstances that currently exist. If the Borrower elects to file for bankruptcy protection, request is made to please advise a soon as the filing occurs as Ocean has no desire or intent to violate the automatic stay imposed by 11 U.S.C. §262. Ocean and the Lenders (as defined in the Loan Agreement) explicitly reserve all rights and remedies, and nothing in this letter shall constitute a waiver or release.

Very truly yours,

Steven O. Gasser

Steven O. Gasser, Esq.

Annex 1

1. Prior to the 1:00 pm., September 22, 2026 foreclosure sale of HouseCanary's assets, potential bidders are encouraged to contact Ocean II PLO LLC ("Ocean") to inquire about the assets being sold. Ocean is the collateral agent for certain lenders, has a lien on those assets and will be conducting the public foreclosure of HouseCanary's assets. Ocean can be contacted through its legal counsel, Steve Gasser, by either emailing him at sgasser@premiercounsel.com or calling him at 415-409-1790.

2. The property is expected to be sold in a single lot, but Ocean reserves the right to establish multiple lots. The property to be sold will be announced prior to the auction.

3. If a bid is made other than for cash in immediately available funds, Ocean will have discretion to value such bid in relation to other bids to determine which bid represents the higher of such bids. Ocean is not obligated to accept a bid other than for cash in immediately available funds.

4. The winning bidder is required to remit payment at the conclusion of the foreclosure sale. If a bidder will not be able to settle immediately, the bidder should contact Ocean in advance to determine whether an alternative arrangement is feasible. If a bidder cannot immediately settle, and Ocean has not approved alternative payment terms, Ocean may either void the winning bidder's bid due to non-payment and re-auction the property, or enforce the sale to the winning bidder and pursue payment.

5. At the conclusion of the sale, the winning bidder will be required to sign a Foreclosure Sale Agreement with Ocean. A copy is available upon request prior to the foreclosure sale.

6. After the foreclosure sale is completed, it will be the winning bidder's obligation to collect the property purchased other than the securities and stock powers for which Ocean maintains possession. Those securities and stock powers will be delivered promptly after the conclusion of the Foreclosure Sale, payment of the purchase price and delivery of the Foreclosure Sale Agreement. Ocean, as the secured party, does not have possession or control of the assets being auctioned other than the securities and stock powers noted previously, and is not responsible for delivering any purchased property.

7. Consistent with Ocean's rights as a secured creditor, Ocean may elect to post-pone the foreclosure sale by announcement made at the foreclosure sale of the new date, time and place for the foreclosure sale.

# EXHIBIT F

★

NOTICE OF PUBLIC SALE

NOTICE IS HEREBY GIVEN that pursuant to Section 9610 of the California Uniform Commercial Code, Ocean II PLO LLC ("Secured Creditor") shall on September 21, 2026 offer for sale to the highest bidder at public sale by auction (the "Sale") of the following assets owned by HouseCanary, Inc. ("Debtor") in a single lot as follows (collectively, the "Collateral"):

(A) accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property (defined below), the Texas Litigation Collateral (defined below) and the Litigation Reserve Account (defined below), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), and all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "Rights to Payment"); and (ii) if a security interest in Debtor's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Intellectual Property to the extent necessary to permit perfection of Secured Creditor's security interest in the Rights to Payment shall also be included; and
(B) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

Notwithstanding the foregoing, in no event shall the Collateral include as of the date of foreclosure: (a) any lease, license, contract, property rights or agreement to which Debtor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Debtor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9406, 9407, 9408 or 9409 of the Uniform Commercial Code as adopted and in effect in the State of California or any successor provision or provisions of any relevant jurisdiction or any other applicable law (including the 11 U.S.C §101, et. seq.) or principles of equity); or (b) any intent-to use Trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable law.

"Litigation Reserve Account" means a bank account established by Debtor to hold funds deposited therein as provided in that certain Litigation Funding Agreement between HouseCanary, Inc. and Crane 2 FundingCo 23, LLC, as amended from time to time. "Texas Defendants" means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or their respective Affiliates. "Texas Litigation" means, collectively, the legal proceedings in the cases captioned (a) Title Source, Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc., Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the facts and/or causes of action set forth therein, and/or (b) HouseCanary, Inc. v. Quicken Loans Inc., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable. "Texas Litigation Claims" means the claims that

Debtor has against each of the Texas Defendants in connection with the Texas Litigation. "Texas Litigation Collateral" means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all proceeds of any and all of the foregoing. "Texas Litigation Proceeds" means any and all consideration actually paid directly or indirectly to or for the benefit of Debtor by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of Debtor from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation. "Intellectual Property" means all of Debtor's right, title, and interest in and to the following: domain names, Copyrights, Trademarks and Patents (including registrations and applications therefor prior to granting, and whether or not filed, recorded or issued), trade secrets and related rights, including without limitation rights to unpatented inventions, know-how and manuals, design rights, claims for damages by way of past, present and future infringement of any of the rights included above and amendments, renewals and extensions of any Copyrights, Trademarks or Patents. "Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether or not filed with the United States Copyright Office or foreign equivalent. "Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of a Person connected with and symbolized by such trademarks, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent. "Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent.
The Sale shall take place as follows:

Date: September 22, 2020
Time: 1:00 p.m. (Pacific Daylight Time)
Place: Offices of Ocean II PLO LLC
355 Alameda De Las Pulgas, Suite 201
Menlo Park, CA 94025

THE COLLATERAL WILL BE SOLD "AS IS, WHERE IS" WITHOUT RECOURSE, AND SECURED CREDITOR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL WHETHER EXPRESS OR IMPLIED, INCLUDING ANY AND ALL WARRANTIES AS TO TITLE, POSSESSION, NON-INFRINGEMENT, QUIET ENJOYMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Minimum Bid Amounts:

There will be no minimum bid amount or minimum bidding increments.

Qualifying Bids:

Bidders at the auction will not be required to qualify in advance to bid, but the winning bidder will be required to tender the full payment of the winning bid at the conclusion of the auction. If payment in full is not so tendered, Secured Party reserves the right, in its sole discretion, to either cancel the sale to the winning bidder or pursue collection of the bid amount from the winning bidder. Secured Creditor reserves the right to require any payment to be made by cash, cashier's check or other immediately available funds acceptable to Secured Creditor in its sole discretion unless prior arrangements have been made. Potential bidders may contact Secured Creditor's counsel to inquire about alternative payment arrangements. Successful bidders will be required to enter into a

Foreclosure Sale Agreement with Secured Creditor memorializing the sale. Secured Creditor reserves the right to bid at the auction, whether by credit bid, cash or otherwise.

Bids For Less Than All Of The Collateral:

In the event a bidder desires to bid for less than all of the Collateral, such bidder shall make such request prior to the commencement of the auction. Secured Creditor is not required allow for the sale of less than all the Collateral or to inquire whether any bidder desires to bid on less than all Collateral. Secured Creditor may, in its discretion at the time of sale, establish more than one "lot" for competitive bidding. In such case, competitive bidding will proceed on a lot by lot basis.

Summary Of Auction Procedures: The following is a summary of the rules governing the auction:
1. The Sale may be adjourned from time to time and notice of any adjourned sale date will be given only at the time of the scheduled sale and to those who attend the scheduled sale.
2. Any interested party desiring to evaluate the Collateral should immediately contact counsel for Secured Creditor by email at sgasser@premiercounsel.com. Secured Creditor is not in possession of Collateral but will use reasonable efforts to provide additional information concerning the Collateral.
3. At the conclusion of the auction, the winning bidder shall immediately tender payment of the winning bid to Secured Party and sign the Foreclosure Sale Agreement.
The above is a summary of the Collateral and auction procedures, and interested parties desiring additional information concerning the Collateral, auction/bid procedures or terms of sale should contact Secured Creditor's counsel, Steve Gasser of PremierCounsel LLP, by email at sgasser@premiercounsel.com prior to the Sale.

*Post Date: 09/09 12:00 AM*

*Refcode: #IPLSFC01628070 iPrint*

## Similar Listings

★

Maine Judicial Branch District Court, Somerset, Skowhegan
DEBRA MURCH and RAY-ALLAN MORSE, in their capacities as Co-Personal Representatives of the Estate of Chester Morse, Sr., Plaintiffs v. JOHN AND JANE DOES 1-100, the unknown heirs or distributees of ABRAHAM E. HECHT et al, Defendants
TO THE UNNAMED HEIRS OR DISTRIBUTEES of Abraham E. Hecht, Louie Hecht, Michael Hecht, and Jacob Hecht
SUMMONS M.R. Civ. P. 4(d). The Plaintiff has begun a lawsuit against you in the District Court, which holds session at 47 Court Street, Skowhegan, Maine 04976. If you wish to oppose this lawsuit, you or your attorney MUST PREPARE AND SERVE A WRITTEN ANSWER to the Complaint in this action WITHIN 20 DAYS from the date of the third weekly publication of this Notice. You or your attorney must also file the original of your Answer with the court by mailing it to Clerk of District Court, 47 Court St., Skowhegan, Maine 04976 before, or within a reasonable time after such notice. Court rules governing the preparation of service of answers are found at www.courts.maine.gov.
IMPORTANT WARNING: If you fail to serve an answer within the time stated above, or if, after you answer, you fail to appear at any time the Court notifies you to do so, a judgment by default may be entered against you in your absence for the money damages or other relief demanded in the Complaint. If this occurs, your

employer may be ordered to pay part of your wages to the Plaintiff or your personal property, including bank accounts and your real estate may be taken to satisfy the judgment. If you intend to oppose this lawsuit, do not fail to answer within the requested time.
If you believe the Plaintiff is not entitled to all or part of the claim set forth in the Complaint or if you believe you have a claim of your own against the Plaintiff, you should talk to a lawyer. If you feel you cannot afford to pay a fee to a lawyer, you may ask the clerk of court for information as to places where you may seek legal assistance.
Plaintiffs' Attorney
Eamonn R. C. Hart (Bar No. 5936)
ehart@brannlaw.com
BRANN & ISAACSON
113 Lisbon Street, Box 3070
Lewiston, ME 04243-3070
Tel. (207) 786-3566 Show more »

*Post Date: 09/08 12:00 AM*

*Refcode: #IPLSFC01608440*

★

NOTICE TO ALL POLICYHOLDERS, CLAIMANTS, CREDITORS, CERTIFICATE OF CONTRIBUTION HOLDERS, SHAREHOLDERS, AND ALL OTHER PERSONS OR ENTITIES INTERESTED IN CRUSADER INSURANCE COMPANY

NOTICE IS HEREBY GIVEN that on June 10, 2026, the Superior Court of the City and County of Los Angeles, California entered a Liquidation Order, in the case entitled Insurance Commissioner of the State of California v. Crusader Insurance Company, Case No. 23STCP01915 ("Liquidation Order"). Pursuant to the Liquidation Order, the California Insurance Commissioner has been appointed as the statutory Liquidator of Crusader Insurance Company ("Crusader") effect June 10, 2026. The Liquidation Order authorizes and empowers the Commissioner, through his Conservation & Liquidation Office, to liquidate Crusader and its assets for the benefit of Crusaders policyholders, claimants, creditors, and shareholders, as provided in Sections 1010 through 1062 of the Insurance Code of the State of California. The California Insurance Commissioner has retained the Conservation and Liquidation Office to handle the liquidation proceedings. A copy of the Liquidation Order can be found on the Conservation & Liquidation Office website at: www.caclo.org. A set of frequently asked questions and answers concerning the liquidation of Crusader can be found on the same website.

Proof of Claim forms and instructions will be mailed to all parties believed to have a claim against Crusader Insurance Company. If you believe you have a claim and have not received a Proof of Claim form by October 1, 2026 you may request a form at: CrusaderPOC@caclo.org or by phone at (415) 676-2133.

In accordance with the Liquidation Order, all Proof of Claim forms must be received by the Conservation and Liquidation Office or post-marked no later than the court approved claims bar date of March 31, 2027.

For additional Frequently Asked Questions regarding the Proof of Claim process please visit: www.caclo.org/crusader

Crusader has been found to be statutorily insolvent. The Liquidation Order contains an express finding of

insolvency thereby triggering the statutory obligation of the various property and casualty insurance guaranty entities, in those states where Crusader wrote business, to begin paying covered Crusader claims up to statutory limits. The majority of Crusader's business was written in California and the open claims as of June 10, 2026 have been transferred to the California Insurance Guarantee Association ("CIGA"). Claims contact information for CIGA is:

California Insurance Guarantee Association
P.O. Box 29066
Glendale, CA 91209-9066
818-844-4300 (office) 818-291-1863 (fax)
assistance@caiga.org

RICARDO LARA
Insurance Commissioner of the
State of California as Liquidator of
Crusader Insurance Company

By:

______________________________
Joseph B. Holloway
Special Deputy Insurance Commissioner Show more »

*Post Date: 09/04 12:00 AM*

*Refcode: #IPLSFC01622170*

★

CITY OF OAKLAND
REQUEST FOR PROPOSAL (RFP) FOR
VIDEO BASED INTERVIEW PLATFORM PROVIDER

Contract Amount: TBD Terms: Up to 5 Years

Project Description: The City of Oakland, Human Resource Management Department (HRMD), is seeking proposals from qualified firm(s) to provide a video-based interview platform to support and streamline the City's remote recruitment and hiring process. Interested and qualified respondents are invited to submit proposals demonstrating their expertise, experience, qualifications, and capacity to provide responsive and effective services in accordance with the requirements of the RFP. Experience working with public sector agencies and integration with NeoGov is highly desired.

Pre-Proposal Meeting (Voluntary): Monday, August 31, 2026 - 10:00 AM (Pacific) via Microsoft Teams.
Link to attend is below:
https://teams.microsoft.com/meet/215486521535495?p=ocDlllbGouBoRiqsHa
Meeting ID: 215 486 521 535 495
Passcode: sB39eT7m

Proposal Submittal Deadline: Friday, September 11, 2026, by 2:00 P.M. via iSupplier.

Reminders:

All who wish to participate in this RFP must register (at least 5 days prior to submittal due date) through iSupplier at (https://www.oaklandca.gov/services/register-with-isupplier) to avoid last minute submittal complications and receive addenda/updates on this RFP. For additional help registering and submitting your proposal to iSupplier please watch the user guide videos at (https://www.oaklandca.gov/documents/isupplier-user-guides).

Did not receive an invitation? Start Early with iSupplier registration. Upon completion of registration, send an email to iSupplier@oaklandca.gov listing "RFP – Video Based Interview Platform Provider" as the subject and request an invitation to the RFP. The Contract Analyst will add your business to the RFP invitation.

The following policies apply to this RFP: Equal Benefits - 0% L/SLBE - Living Wage - Campaign Reform Act - Professional Services Local Hire - Prompt Payment - Arizona Boycott - Dispute Disclosure - Border Wall Prohibition - Sanctuary City Contracting and Investment Ordinance.

Answers to Questions:
1. For project-related questions contact Contract Administration at contractadmin@oaklandca.gov
2. For iSupplier related questions after registration contact iSupplier@oaklandca.gov

Asha Reed, City Clerk and Clerk of the City Council, Friday, August 21, 2026
The City Council reserves the right to reject all proposals. Show more »

*Post Date: 08/18 12:00 AM*

*Refcode: #IPLSFC01585540*

# EXHIBIT G

★

NOTICE OF PUBLIC SALE
This notices corrects the dates listed for the Sale (defined below) that was published on September 9, 2026.

NOTICE IS HEREBY GIVEN that pursuant to Section 9610 of the California Uniform Commercial Code, Ocean II PLO LLC ("Secured Creditor") shall on September 22, 2026 offer for sale to the highest bidder at public sale by auction (the "Sale") of the following assets owned by HouseCanary, Inc. ("Debtor") in a single lot as follows (collectively, the "Collateral"):

All assets and property of Debtor whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(A) accounts (including health-care-insurance receivables), chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, securities accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles but excluding Intellectual Property (defined below), the Texas Litigation Collateral (defined below) and the Litigation Reserve Account (defined below)), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), and all accounts and general intangibles that consist of rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights in, the Intellectual Property (the "Rights to Payment"); and (ii) if a security interest in Debtor's Intellectual Property is necessary to have a security interest in the Rights to Payment, then the Intellectual Property to the extent necessary to permit perfection of Secured Creditor's security interest in the Rights to Payment shall also be included; and

(B) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment.

Notwithstanding the foregoing, in no event shall the Collateral include as of the date of foreclosure: (a) any lease, license, contract, property rights or agreement to which Debtor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of Debtor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9406, 9407, 9408 or 9409 of the Uniform Commercial Code as adopted and in effect in the State of California or any successor provision or provisions of any relevant jurisdiction or any other applicable law (including the 11 U.S.C §101, et. seq.) or principles of equity); or (b) any intent-to use Trademark applications prior to the filing of a "Statement of Use", "Amendment to Allege Use" or similar filing with regard thereto, to the extent and solely during the period, in which the grant of a security interest therein may impair the validity or enforceability of any Trademark that may issue from such intent to use Trademark application under applicable law.

"Litigation Reserve Account" means a bank account established by Debtor to hold funds deposited therein as provided in that certain Litigation Funding Agreement between HouseCanary, Inc. and Crane 2 FundingCo 23, LLC, as amended from time to time. "Texas Defendants" means Amrock Inc. (f/k/a Title Source, Inc.), Quicken Loans Inc. and/or their respective Affiliates. "Texas Litigation" means, collectively, the legal proceedings in the cases captioned (a) Title Source, Inc. v. HouseCanary, Inc. fka Canary Analytics, Inc., Case No. 2016-CI-06300, pending in the 73rd Judicial District Court, Bexar County, Texas, and any retrial, appeal or remand therefrom or proceedings in connection therewith, and any new proceedings or the expected retrial that may arise from the

facts and/or causes of action set forth therein, and/or (b) HouseCanary, Inc. v. Quicken Loans Inc., et al., Case No. 5-18-CV-00519, pending in the United States District Court for the Western District of Texas, San Antonio Division (or any other jurisdiction where this action may be transferred or re-commenced), and any appeal or remand therefrom or proceedings in connection therewith, and any new proceedings that may arise from the facts and/or causes of action set forth therein, as applicable. "Texas Litigation Claims" means the claims that Debtor has against each of the Texas Defendants in connection with the Texas Litigation. "Texas Litigation Collateral" means the Texas Litigation Claims and any proceeds therefrom; the Texas Litigation Proceeds; and to the extent not otherwise included, all proceeds of any and all of the foregoing. "Texas Litigation Proceeds" means any and all consideration actually paid directly or indirectly to or for the benefit of Debtor by or on behalf of Texas Defendants or received directly or indirectly by or for the benefit of Debtor from or on behalf of Texas Defendants in connection with the Texas Litigation (whether by judgment, settlement, licensing or otherwise), including any damages (punitive or otherwise), penalties, interest and other amounts paid or property transferred in respect of the Texas Litigation. "Intellectual Property" means all of Debtor's right, title, and interest in and to the following: domain names, Copyrights, Trademarks and Patents (including registrations and applications therefor prior to granting, and whether or not filed, recorded or issued), trade secrets and related rights, including without limitation rights to unpatented inventions, know-how and manuals, design rights, claims for damages by way of past, present and future infringement of any of the rights included above and amendments, renewals and extensions of any Copyrights, Trademarks or Patents. "Copyrights" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work or authorship and derivative work thereof, whether or not filed with the United States Copyright Office or foreign equivalent. "Trademarks" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of a Person connected with and symbolized by such trademarks, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent. "Patents" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, whether or not filed with the United States Patent and Trademark Office or any foreign equivalent.

The Sale shall take place as follows:
Date: September 22, 2026
Time: 1:00 p.m. (Pacific Daylight Time)
Place: Offices of Ocean II PLO LLC
3555 Alameda De Las Pulgas, Suite 201
Menlo Park, CA 94025
THE COLLATERAL WILL BE SOLD "AS IS, WHERE IS" WITHOUT RECOURSE, AND SECURED CREDITOR EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL WHETHER EXPRESS OR IMPLIED, INCLUDING ANY AND ALL WARRANTIES AS TO TITLE, POSSESSION, NON-INFRINGEMENT, QUIET ENJOYMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Minimum Bid Amounts:
There will be no minimum bid amount or minimum bidding increments.

Qualifying Bids:
Bidders at the auction will not be required to qualify in advance to bid, but the winning bidder will be required to tender the full payment of the winning bid at the conclusion of the auction. If payment in full is not so tendered, Secured Party reserves the right, in its sole discretion, to either cancel the sale to the winning bidder or pursue collection of the bid amount from the winning bidder. Secured Creditor reserves the right to require any payment to be made by cash, cashier's check or other immediately available funds acceptable to Secured Creditor in its

sole discretion unless prior arrangements have been made. Potential bidders may contact Secured Creditor's counsel to inquire about alternative payment arrangements. Successful bidders will be required to enter into a Foreclosure Sale Agreement with Secured Creditor memorializing the sale. Secured Creditor reserves the right to bid at the auction, whether by credit bid, cash or otherwise.

Bids For Less Than All Of The Collateral:
In the event a bidder desires to bid for less than all of the Collateral, such bidder shall make such request prior to the commencement of the auction. Secured Creditor is not required allow for the sale of less than all the Collateral or to inquire whether any bidder desires to bid on less than all Collateral. Secured Creditor may, in its discretion at the time of sale, establish more than one "lot" for competitive bidding. In such case, competitive bidding will proceed on a lot by lot basis.

Summary Of Auction Procedures: The following is a summary of the rules governing the auction:
The Sale may be adjourned from time to time and notice of any adjourned sale date will be given only at the time of the scheduled sale and to those who attend the scheduled sale.
1. Any interested party desiring to evaluate the Collateral should immediately contact counsel for Secured Creditor by email at sgasser@premiercounsel.com. Secured Creditor is not in possession of Collateral but will use reasonable efforts to provide additional information concerning the Collateral.
2. At the conclusion of the auction, the winning bidder shall immediately tender payment of the winning bid to Secured Party and sign the Foreclosure Sale Agreement.

The above is a summary of the Collateral and auction procedures, and interested parties desiring additional information concerning the Collateral, auction/bid procedures or terms of sale should contact Secured Creditor's counsel, Steve Gasser of PremierCounsel LLP, by email at sgasser@premiercounsel.com prior to the Sale.

*Post Date: 09/09 12:00 AM*

*Refcode: #IPLSFC01628070* *iPrint*

## Similar Listings

★

NOTICE OF ENTRY OF JUDGMENT ON SISTER-STATE JUDGMENT

Michael R. Farrell (SBN 173831)
Leilee Ghassemi (SBN 351484)
Allen Matkins Leck Gamble Mallory & Natsis LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017

Attorneys for: Chia Tiger

Superior Court of California
County of San Francisco
400 McAllister Street
San Francisco, CA 94102

Case Number: CPF-26-519577

1. TO JUDGMENT DEBTOR: Francesco Lugli
2. YOU ARE NOTIFIED
a. Upon application of the judgment creditor, a judgment against you has been entered in this court as follows:
(1) Judgment creditor (name): Chia Tiger
(2) Amount of judgment entered in this court: $ 175,426.32
b. This judgment was entered based upon a sister-state judgment previously entered against you as follows:
(1) Sister state (name): New York
(2) Sister-state court (name and location): New York County Supreme Court
(3) Judgment entered in sister state on (date): December 15, 2025
(4) Title of case and case number (specify): Chia Tiger v Francesco Lugli, Index No.: 151343/2023

3. A sister-state judgment has been entered against you in a California court. Unless you file a motion to vacate the judgment in this court within 30 DAYS after service of this notice, this judgment will be final. This court may order that a writ of execution or other enforcement may issue. Your wages, money, and property could be taken without further warning from the court.
If enforcement procedures have already been issued, the property levied on will not be distributed unit 30 days after you are served with this notice.

Michael R. Farrell (mfarrell@allenmatkins.com)
Leilee Ghassemi (lghassemi@allenmatkins.com)
Allen Matkins Leck Gamble Mallory & Natsis LLP
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017

Publication dates: Sep. 4, 11, 18, 25, 2026 Show more »

*Post Date: 09/01 12:00 AM*

*Refcode: #IPLSFC01616430*

★

Community Reinvestment Act ("CRA") regulations require a bank that has developed a CRA Strategic Plan (the "Plan") to publish Notice of the Plan and solicit formal written public comment for at least a 30-day period. Western Alliance Bank (the "Bank") hereby provides notice of its intention to submit a CRA Strategic Plan to the Federal Reserve Bank (the "FRB"). Written comments from the public concerning the Plan are encouraged. On or after September 15, 2026, requests for copies of the plan at no charge or comments regarding the Plan should be directed to Craig Robinson, Head of Community Relations, by mail or phone, at 1 East Washington Street, Suite 1400, Phoenix, Arizona 85004, (408) 689-8417. Comments received on or before October 15, 2026 will be considered prior to submission of the Plan for approval to the FRB. Show more »

*Post Date: 09/08 12:00 AM*

*Refcode: #IPLSFC01622020*

★

NOTICE TO ALL POLICYHOLDERS, CLAIMANTS, CREDITORS, CERTIFICATE OF CONTRIBUTION HOLDERS, SHAREHOLDERS, AND ALL OTHER PERSONS OR ENTITIES INTERESTED IN CRUSADER INSURANCE COMPANY

NOTICE IS HEREBY GIVEN that on June 10, 2026, the Superior Court of the City and County of Los Angeles, California entered a Liquidation Order, in the case entitled Insurance Commissioner of the State of California v. Crusader Insurance Company, Case No. 23STCP01915 ("Liquidation Order"). Pursuant to the Liquidation Order, the California Insurance Commissioner has been appointed as the statutory Liquidator of Crusader Insurance Company ("Crusader") effect June 10, 2026. The Liquidation Order authorizes and empowers the Commissioner, through his Conservation & Liquidation Office, to liquidate Crusader and its assets for the benefit of Crusaders policyholders, claimants, creditors, and shareholders, as provided in Sections 1010 through 1062 of the Insurance Code of the State of California. The California Insurance Commissioner has retained the Conservation and Liquidation Office to handle the liquidation proceedings. A copy of the Liquidation Order can be found on the Conservation & Liquidation Office website at: www.caclo.org. A set of frequently asked questions and answers concerning the liquidation of Crusader can be found on the same website.

Proof of Claim forms and instructions will be mailed to all parties believed to have a claim against Crusader Insurance Company. If you believe you have a claim and have not received a Proof of Claim form by October 1, 2026 you may request a form at: CrusaderPOC@caclo.org or by phone at (415) 676-2133.

In accordance with the Liquidation Order, all Proof of Claim forms must be received by the Conservation and Liquidation Office or post-marked no later than the court approved claims bar date of March 31, 2027.

For additional Frequently Asked Questions regarding the Proof of Claim process please visit: www.caclo.org/crusader

Crusader has been found to be statutorily insolvent. The Liquidation Order contains an express finding of insolvency thereby triggering the statutory obligation of the various property and casualty insurance guaranty entities, in those states where Crusader wrote business, to begin paying covered Crusader claims up to statutory limits. The majority of Crusader's business was written in California and the open claims as of June 10, 2026 have been transferred to the California Insurance Guarantee Association ("CIGA"). Claims contact information for CIGA is:

California Insurance Guarantee Association
P.O. Box 29066
Glendale, CA 91209-9066
818-844-4300 (office) 818-291-1863 (fax)
assistance@caiga.org

RICARDO LARA
Insurance Commissioner of the
State of California as Liquidator of
Crusader Insurance Company

By:

______________________________

Joseph B. Holloway

Special Deputy Insurance Commissioner Show more »

*Post Date: 09/04 12:00 AM*

*Refcode: #IPLSFC01622170*

# EXHIBIT H

**D'Antonio, Thomas**

| | |
|---|---|
| **From:** | Steve Gasser <sgasser@premiercounsel.com> |
| **Sent:** | Tuesday, September 15, 2026 3:43 PM |
| **To:** | Durrer, II, Van C. |
| **Cc:** | Beth R. Young; Irving, James R.; Ron Bender |
| **Subject:** | RE: Foreclosure Sale |

[WARNING: EXTERNAL SENDER]

Please provide a form of NDA that HouseCanary would be comfortable with Structural using. We don't want to be second guessed after the fact.

**From:** Durrer, II, Van C. <van.durrer@dentons.com>
**Sent:** Tuesday, September 15, 2026 3:40 PM
**To:** Steve Gasser <sgasser@premiercounsel.com>
**Cc:** Beth R. Young <bry@lnbyg.com>; Irving, James R. <james.irving@dentons.com>; Ron Bender <rb@lnbyg.com>
**Subject:** Re: Foreclosure Sale

Steve,

We still haven't received any response as to whether you are utilizing a standard NDA nor seen the form. It would be irresponsible to provide any of this information without that.

Van

Van C. Durrer, II
Partner, Restructuring, Insolvency and Bankruptcy

+1 213 243 6050 | +1 213 500 2050
Los Angeles

**From:** Steve Gasser <sgasser@premiercounsel.com>
**Sent:** Tuesday, 15 September 2026 15:33:08
**To:** Durrer, II, Van C. <van.durrer@dentons.com>
**Cc:** Beth R. Young <bry@lnbyg.com>
**Subject:** Foreclosure Sale

[WARNING: EXTERNAL SENDER]

Van:

I know you stated today that HouseCanary would not allow the September 22, 2026 scheduled foreclosure sale to proceed, but I received an inquiry this afternoon from a potential bidder, SWE Homes, for information. The information requested is not information that Structural has, so I'm writing to you to see whether HouseCanary can provide information responsive to the following requests so that I can pass it on to SWE Homes:

- Could you provide a brief overview of what HouseCanary, Inc. and its affiliated entities do, including their primary products, services, and business operations?
- Are HouseCanary, Inc. and the related entities currently operating and conducting business as going concerns?
- Is any financial information available for any of the assets or entities being sold, such as financial statements, revenue information, capitalization tables, operating metrics, or other due diligence materials that prospective bidders may review?

Please let me know whether this is something with which HouseCanary will assist.

Thanks,

Steve

Steven Gasser | Founding Partner | PremierCounsel LLP |
315 Montgomery Street, Suite 900, San Francisco, CA 94104
sgasser@premiercounsel.com | Direct: 415.409.1790 | Mobile: 415.497.5927
www.premiercounsel.com | Office: 415.357.1400 x112 | Fax: 415-357-1414

This communication, including any attachments, is confidential and may be protected by privilege. If you are not the intended recipient, any use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by telephone or email, and permanently delete all copies, electronic or other, you may have.

To ensure compliance with requirements imposed by the IRS, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

The foregoing applies even if this notice is embedded in a message that is forwarded or attached.

# EXHIBIT I

housecanary ocean ii

Sign in

AI Mode All Images Videos News Shopping Forums More Tools

AI Overview

**Ocean II PLO LLC** is a secured creditor linked to a major commercial foreclosure auction of all assets belonging to HouseCanary, Inc..

A formal public notice announced that under Section 9610 of the California Uniform Commercial Code, Ocean II PLO LLC will offer the collateral—encompassing all of HouseCanary's assets, intellectual property, software, accounts, and business components—for sale to the highest bidder at a public auction scheduled for **September 22, 2026**.

Show more

HouseCanary
https://www.housecanary.com

## HouseCanary | AI-Powered Real Estate Data & Analytics

Make smarter real estate decisions with HouseCanary. **Access AI-powered valuations, forecasts, and insights** for over 136M U.S. properties.

Missing: ~~ocean~~ | Show results with: ocean

## People also ask

What is the pricing for HouseCanary?

What is HouseCanary value?

How accurate is HouseCanary?

Who is HouseCanary?

HouseCanary
https://www.housecanary.com › Blog › Market Insights

## 2026 Housing Market Predictions: Mid-Year Reset and ...

Jul 14, 2026 — HouseCanary HPI forecast: **+2.1% home price growth in 2026**. See the major metros forecast to rise - and fall - plus mortgage rates and the ...

Missing: ~~ocean~~ | Show results with: ocean

HouseCanary
https://www.housecanary.com › Blog › Market Insights

## 2025 State Housing Market Forecast: Home Prices and ...

Jul 15, 2025 — According to **HouseCanary's** U.S. housing market forecast for 2025, prices will likely climb further into Q3 and Q4 2025, but at a slower, more ... Read more

Missing: ~~ocean~~ | Show results with: ocean

HouseCanary
https://www.housecanary.com › Blog › Market Insights

## Fall 2025 Home Flip Forecast: Hottest Zip Codes for Investors

Oct 17, 2025 — Our fall flip forecast highlights the **hottest zip codes to flip in 2025**. HouseCanary's proprietary data was used to form a “flip score” across ... Read more

HousingWire
https://www.housingwire.com › housecanary-3

## HouseCanary

HouseCanary is a valuation-focused real estate brokerage that **provides revolutionary services and software** to reshape the housing marketplace and home buying ... Read more

Missing: ~~ocean~~ | Show results with: ocean

HouseCanary
https://www.housecanary.com › The Latest Blogs

## The Latest Blogs

Gain valuable insights into **real estate trends, data analytics, and market forecasts**. Stay informed and inspired with our latest posts.

Missing: ~~ocean~~ | Show results with: ocean

RESIDENT™ | A Luxury Lifestyle Magazine
https://resident.com › Luxury Lifestyle › Tech and Gear

## AI Revolution: Transforming Luxury Real Estate Valuations

Aug 2, 2025 — Luxury real estate agents are turning to **AI-powered valuation tools like HouseCanary** and Restb.ai to price elite properties with unmatched ... Read more

HouseCanary
https://www.housecanary.com › Blog › Market Insights

## Florida Housing Market Update: 2026 and Beyond

May 14, 2026 — **HouseCanary's** proprietary Housing Price Index (HPI) data shows home prices through the end of 2026 are expected to remain largely flat, with ... Read more

HouseCanary
https://www.housecanary.com › pricing

## Real Estate Data & API Pricing Plans

**Access to HouseCanary's core API** for scalable data access with additional usage-based costs. Billed yearly and automatically renews until canceled. Read more

Missing: ~~ocean~~ | Show results with: ocean

## People also search for

Housecanary ocean ii **reviews**

HouseCanary **careers**

Housecanary ocean ii **for sale**

**House canary trial**

Housecanary **lawsuit**

Housecanary **property explorer**

Housecanary ocean ii **valuations**

Housecanary **wiki**

1 2 3 4 5 6 7 8 9 10 Next

**Downtown, Louisville, KY** - From your IP address - Update location

Help Send feedback Privacy Terms

# EXHIBIT H

## TRO Motion and Memorandum in Support

THOMAS J. D'ANTONIO (SBN 316472)
DENTONS US LLP
1999 Harrison Street
Suite 1210
Oakland, CA 94612
Telephone: (415) 882-5000
Email: thomas.dantonio@dentons.com

VAN C. DURRER, II (SBN 226693)
NICK JANDA (SBN 253610)
DENTONS US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA 90017-5704
Telephone: (213) 623-9300
Email: van.durrer@dentons.com
nick.janda@dentons.com

Attorneys for Plaintiff
HOUSECANARY, INC.



SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

HOUSECANARY, INC., a Delaware corporation;

Plaintiff,

v.

OCEAN II PLO LLC, a California limited liability company; STRUCTURAL CAPITAL INVESTMENTS III, LP, a Delaware limited partnership; SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC, a Delaware limited liability company; CEOF HOLDINGS LP, a Delaware limited partnership; and DOES 1-10,

Defendants.

Case No. 26-CIV-07276

**PLAINTIFF HOUSECANARY'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Filed Concurrently: Memorandum of Points and Authorities; Declarations of Van Durrer, II, James Albertelli, and Chris Rediger; [Proposed] Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

Date: September 21, 2026
Time: 1:30 p.m.
Dept.: 28
Courtroom: I

Date Action Filed: September 17, 2026
Trial Date: Not Set

Date of Sale: September 22, 2026, 1 p.m.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

**EX PARTE APPLICATION FOR**

**TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE**

TO DEFENDANTS, THEIR COUNSEL, AND THE COURT:

NOTICE IS GIVEN that, on September 21, 2026 at 1:30 p.m. or as soon thereafter as the matter may be heard in Department 28 of the above-captioned Court Plaintiff HouseCanary, Inc. ("Plaintiff" or "HouseCanary") will and hereby does apply *ex parte* for a temporary restraining order ("TRO") and an order to show cause ("OSC") re preliminary injunction, enjoining Defendants Ocean II PLO LLC ("Ocean II"), Structural Capital Investments III, LP, Series Structural DCO II Series of Structural Capital DCO, LLC, and CEOF Holdings LP (together, "Defendants"), and their respective officers, agents, servants, employees, attorneys, and all persons acting in active concert or participation with any of them who receive actual notice of the order, from:

(a) Proceeding with the public foreclosure sale of the Collateral (as defined in the Loan and Security Agreement dated March 25, 2021, as amended) currently scheduled for September 22, 2026, at 1:00 p.m. PDT at 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, California; and

(b) Transferring, encumbering, or otherwise disposing of the Collateral pending further order of this Court.

The sale of the Collateral is scheduled for September 22, 2026, before a regularly noticed motion can be heard. If the Court does not hear this Application and preserve the status quo before the sale, the requested pre-sale relief will become moot; post-sale relief cannot provide the specific preventive relief sought, recreate the competitive sale process Article 9 requires, or reliably restore HouseCanary's going-concern operations. This is the emergency contemplated by Cal. Civ. Proc. Code § 527(c)(1): great or irreparable injury will occur before the matter can be heard on notice.

This Application is made pursuant to Code of Civil Procedure sections 526, 527(a), and 527(c)(1), California Rules of Court, rules 3.1200 *et seq.*, and California Commercial Code § 9625(a).

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

## I. STATEMENT OF FACTS

HouseCanary develops proprietary residential real-estate valuation models, analytics platforms, and forecasting tools. It is an operating business with employees, customer contracts, and ongoing operations. On March 25, 2021, HouseCanary entered into a Loan and Security Agreement (the "LSA") with Ocean II as administrative and collateral agent and the lender defendants, establishing a credit facility of up to $30 million. The LSA grants Ocean II a security interest in substantially all of HouseCanary's operating assets, but excludes HouseCanary's intellectual property except to the narrow extent needed to perfect a security interest in Rights to Payment, and excludes the Texas Litigation proceeds and litigation reserve account. HouseCanary is in default of the LSA. It does not dispute Ocean II's right to enforce remedies against collateral in which Ocean II holds a valid security interest under Article 9. However, it disputes the scope of any such lien and the manner in which Ocean II proposes to dispose of that collateral. Verified Compl. ¶¶ 1, 5, 15–19; Declaration of Van C. Durrer, II ("Durrer Decl.") ¶ 11, 14, 16.

On September 8, 2026, Ocean II issued a Notice of Disposition (the "Notice") scheduling a public auction of the Collateral for September 22, 2026, at 1:00 p.m. PDT at 3555 Alameda De Las Pulgas, Suite 201, Menlo Park, California. The initial advertisement stated the wrong sale year; Ocean II corrected it on September 11, leaving just eleven days before the sale. The Notice does not clearly identify what is being sold or excluded from the sale. Ocean II began the sale process without an investment banker or broker, a data room, or a non-disclosure agreement, and on September 15 its counsel acknowledged that Ocean II lacked even the most basic information a prospective bidder would need to evaluate the Collateral. Verified Compl. ¶¶ 26–39; Durrer Decl. ¶ 6-9, 11, 16, Exs. B-E.

That information gap affected actual prospective bidders. SWE Homes asked basic questions about HouseCanary and its affiliates, including their products, services, and operations. Ocean II could not answer these elementary questions and, instead, sought responses from HouseCanary. Presa LLC, a financially capable mortgage and technology services company, cannot determine what is being sold or complete meaningful diligence by September 22 and needs a few weeks to evaluate the transaction. Verified Compl. ¶¶ 35–41; Declaration of James

Albertelli on Behalf of Presa LLC ("Presa Decl.") ¶¶ 2-5.

Ocean II refused to postpone the sale and demanded that HouseCanary assemble all of the Collateral in downtown San Francisco on September 23, 2026, the day after the Menlo Park auction. That mismatch underscores the absence of a coherent pre-sale diligence process. Verified Compl. ¶¶ 40, 42; Durrer Decl. ¶ 10, Ex. F.

## II. BASIS FOR EX PARTE RELIEF

The grounds supporting the Court's issuance of a TRO and preliminary injunction are set forth more fully in HouseCanary's concurrently filed memorandum of points and authorities, the declarations and evidence submitted in support of this application, and are only summarily recited here.

A temporary restraining order preserves the status quo or prevents irreparable harm pending a hearing for a preliminary injunction. *See Scripps Health v. Marin* (1999) 72 Cal. App. 4th 324, 334. HouseCanary seeks a narrow injunction focused on preventing irreparable harm by stopping the sale of the Collateral set to take place on September 22, 2026.

Cal. Civ. Proc. Code § 527(a) authorizes preliminary injunction relief on a verified complaint or affidavits showing sufficient grounds. Section 527(c)(1) supplies the emergency standard for a TRO before a noticed hearing: facts in an affidavit or verified complaint must show that great or irreparable injury will result before the matter can be heard on notice. California Rules of Court, rule 3.1202(c), separately requires an affirmative factual showing in a declaration based on personal knowledge of irreparable harm, immediate danger, or another statutory basis for ex parte relief. The Presa and Durrer Declarations supplement, rather than replace, the Verified Complaint. The traditional injunction standards under Cal. Civ. Proc. Code § 526(a) also apply; the accompanying Memorandum sets out the full authorities and analysis.

Separately, California Commercial Code § 9610(b) requires every aspect of a disposition of collateral—including the method, manner, time, place, and other terms—to be commercially reasonable. Section 9625(a) authorizes a court to order or restrain disposition on appropriate terms when a secured party is not proceeding in compliance with Article 9. HouseCanary is likely to succeed because the compressed timeline leaves no meaningful opportunity for diligence; the

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

Notice does not clearly identify the assets; Ocean II has not secured a banker, broker or data room, nor has it put in place an NDA; Ocean II's counsel acknowledged that it lacked information needed to evaluate the Collateral; and an actual, financially capable bidder cannot participate by September 22. These facts support a violation of § 9610(b), which requires publicity sufficient to attract a "lively concourse of bidders." *Ford & Vlahos v. ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, 1230. The accompanying Memorandum provides the full merits analysis. Verified Compl. ¶¶ 47–50; Presa Decl. ¶¶ 4-5.

## III. IRREPARABLE HARM

If the sale occurs before a regularly noticed motion can be heard, the requested pre-sale relief will become moot. Post-sale remedies would not restore the specific pre-sale relief sought here: they could not recreate the competitive sale process Article 9 requires or reliably restore HouseCanary's going-concern operations. The sale also risks operational disruption, loss of customers and employees, and impairment of HouseCanary's ability to pursue the Texas Litigation. That litigation produced a verdict of approximately $175 million; if converted to a final judgment and recovered upon, the verdict amount is the effective minimum. The Texas court still must determine additional prejudgment interest, costs, and fees, including at least ten years of interest, and the verdict alone is more than five times Ocean II's approximately $34.3 million debt. Verified Compl. ¶¶ 1–4, 62, 66–69.

Equities favor relief. A TRO preserves any valid security interest Ocean II holds in the Collateral, its credit-bid rights as to that Collateral, and accruing interest. HouseCanary, by contrast, faces operational disruption, loss of customer and employee relationships, impairment of the Texas Litigation, and loss of the opportunity for informed competitive bidding. Preserving the status quo while the Court determines whether the disposition complies with Article 9 imposes a temporary delay without impairing Ocean II's secured rights.

## IV. EX PARTE NOTICE

Pursuant to California Rules of Court, rule 3.1204, HouseCanary's counsel provided notice of this *ex parte* application to Defendants' counsel on September 18, 2026, at approximately 9:58

a.m. by email. Durrer Decl. ¶¶ 18-19, Ex. L. Defendants' counsel advised they would oppose the Application, but did not advise if they would appear at the hearing. Id., at ¶ 20, Ex. M.

Counsel of record for Defendants is listed below. *See* Cal. Rule of Ct. 3.1202(a).

| | |
|---|---|
| Steven O. Gasser<br>PremierCounsel LLP<br>315 Montgomery Street, Suite 900<br>San Francisco, CA 94104<br>(415) 409-1790<br>Email: sgasser@premiercounsel.com<br><br>Beth Ann R. Young<br>Ronald Bender<br>LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.<br>2818 La Cienega Avenue<br>Los Angeles, CA 90034<br>(310) 229-1234<br>Email: bry@lnbyg.com<br>rb@lnbyg.com | ***<u>Counsel for Defendants</u>*** |

Durrer Decl. ¶ 21.

## V. PRIOR EX PARTE APPLICATIONS

No prior *ex parte* application for the same or substantially similar relief has been made in this action or any related action.

## VI. UNDERTAKING

Pursuant to Code of Civil Procedure section 529, HouseCanary is prepared to post an undertaking of $5,000 or such other amount as the Court deems appropriate. The undertaking should reflect reasonably foreseeable harm from a short preservation period, including accruing interest and any decline in the value of the Collateral addressed by the proposed conditions in the [Proposed] Order; the TRO would not impair any valid security interest Ocean II holds in the Collateral, its priority, or its credit-bid rights.

This application is based on the concurrently filed Memorandum of Points and Authorities, Verified Complaint, Declaration of Van C. Durrer, II, Declaration of James Albertelli on Behalf of Presa LLC, Declaration of Chris Rediger on Behalf of HouseCanary, Inc., [Proposed] Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction,

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

the complete files and records of this action, and additional evidence as may be presented at hearing.

Dated: September 18, 2026

DENTONS US LLP

By: ______________________________
Van C. Durrer, II

Attorneys for Plaintiff
HOUSECANARY, INC.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

THOMAS J. D'ANTONIO (SBN 316472)
DENTONS US LLP
1999 Harrison Street
Suite 1210
Oakland, CA 94612
Telephone: (415) 882-5000
Email: thomas.dantonio@dentons.com

VAN C. DURRER, II (SBN 226693)
NICK JANDA (SBN 253610)
DENTONS US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA 90017-5704
Telephone: (213) 623-9300
Email: van.durrer@dentons.com
nick.janda@dentons.com

Attorneys for Plaintiff
HOUSECANARY, INC.



SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

HOUSECANARY, INC., a Delaware corporation;

Plaintiff,

v.

OCEAN II PLO LLC, a California limited liability company; STRUCTURAL CAPITAL INVESTMENTS III, LP, a Delaware limited partnership; SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC, a Delaware limited liability company; CEOF HOLDINGS LP, a Delaware limited partnership; and DOES 1-10,

Defendants.

Case No. 26-CIV-07276

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF HOUSECANARY'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Filed Concurrently: *Ex Parte* Application; Declarations of Van Durrer, II, James Albertelli, and Chris Rediger; [Proposed] Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction

Date: September 21, 2026
Time: 1:30 p.m.
Dept.: 28
Courtroom: I

Date Action Filed: September 17, 2026
Trial Date: Not Set

Date of Sale: September 22, 2026, 1 p.m.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..... **1**

II. STATEMENT OF FACTS ..... **2**

A. HouseCanary, the Loan, and the Collateral ..... 2

B. The Default ..... 3

C. The Texas Litigation and the March 2026 Verdict ..... 3

D. The Notice of Disposition ..... 4

E. HouseCanary's Objections and Ocean II's Position ..... 5

III. NOTICE OF APPLICATION ..... **5**

IV. LEGAL STANDARD ..... **6**

V. ARGUMENT ..... **7**

A. HouseCanary Is Likely to Prevail: The Sale as Noticed Is Not Commercially Reasonable ..... 7

B. The Sale Is an Unlawful Business Practice ..... 10

C. HouseCanary Will Suffer Immediate and Irreparable Harm ..... 10

D. The Balance of Hardships Favors HouseCanary Decisively ..... 12

E. The Court Should Set the Terms of a Commercially Reasonable Process ..... 13

F. The Court Should Set a Modest Undertaking ..... 13

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

## I. INTRODUCTION

Ocean II PLO LLC ("Ocean II") intends to sell substantially all of the operating assets of HouseCanary, Inc. ("HouseCanary"), a technology company at a public auction on September 22, 2026, six days from now. Ocean II has not retained an investment banker or broker. Ocean II has not created a data room and circulated a non-disclosure agreement. Ocean II's counsel admitted in writing on September 15 that Ocean II does not have the information a bidder would need to evaluate the collateral. The Notice describes the collateral so loosely that a sophisticated prospective bidder believed it was buying HouseCanary's intellectual property , although Ocean II's interest in that property is limited as described below. Ocean II also has demanded that HouseCanary deliver the collateral to a location thirty miles from the auction site on the day after the auction, preventing meaningful pre-sale inspection. The documented process lacks a banker, broker, data room, NDA, basic bidder information, adequate diligence time, and pre-sale inspection. An actual interested and financially capable bidder cannot meaningfully evaluate participation on the current timetable. The proposed sale threatens immediate operational harm, including loss of the personnel, systems, records, and customer relationships needed to continue HouseCanary's business and preserve the Texas Litigation. Declaration of Christopher Rediger ("Rediger Decl."), ¶¶ 6-13; Declaration of Van C. Durrer, II ("Durrer Decl."), ¶ 11, 16, Ex. G. Article 9 of the Uniform Commercial Code requires that every aspect of a disposition of assets be commercially reasonable. Cal. U. Com. Code § 9610(b). This one is not.

On March 6, 2026, after a four-week retrial, a Bexar County, Texas jury found that Amrock misappropriated HouseCanary's trade secrets and defrauded the company, and awarded HouseCanary approximately $175 million plus additional interest, costs, and fees to be determined. Amrock has stated that it will appeal. HouseCanary must remain operational, staffed, and able to preserve its systems, records, and personnel to obtain entry of judgment on the $175 million verdict, address post-trial proceedings, defend the judgment on appeal, pursue enforcement, and prosecute the related federal action. Rediger Decl., ¶¶ 11-12; Verified Compl., ¶¶ 1, 2, 4. The Texas Litigation and its proceeds are excluded from Ocean II's collateral, and the proposed sale would impair

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

HouseCanary's ability to preserve and prosecute that litigation without adding value to the collateral in which Ocean II holds a valid security interest.

HouseCanary does not dispute the occurrence of a default, nor does it dispute Ocean II's ability to pursue remedies against collateral in which it holds a valid security interest. HouseCanary disputes the scope and manner of the disposition Ocean II proposes. HouseCanary asks the Court to restrain this sale, on this schedule, under this notice, and to set an order to show cause so that a commercially reasonable process can be conducted on terms the Court approves. Section 9625(a) of the Commercial Code authorizes that relief.

## II. STATEMENT OF FACTS

### A. <u>HouseCanary, the Loan, and the Collateral</u>

HouseCanary develops proprietary residential real-estate valuation models, analytics platforms, and forecasting tools. Those models and the data behind them are the trade secrets at issue in the Texas Litigation described below. Verified Compl., ¶¶ 1, 5.

On March 25, 2021, HouseCanary entered into a Loan and Security Agreement (the "LSA") with Ocean II, as administrative and collateral agent. The LSA has been amended six times. The Sixth Amendment, executed December 29, 2025, extended the maturity date to January 31, 2026. Verified Compl., ¶¶ 15-17; *see also* id. Ex. A.

The LSA grants Ocean II a security interest in certain of HouseCanary's tangible assets and contracts, with significant exclusions. It excludes Intellectual Property generally, the Texas Litigation Collateral, and the Litigation Reserve Account except to the limited extent necessary to perfect a security interest in Rights to Payment arising from the sale, licensing, or disposition of Intellectual Property.

If a security interest in Intellectual Property is necessary to perfect that security interest, the Intellectual Property is included only to the extent necessary to permit perfection. Verified Compl., ¶ 16; see also id. Ex. A. Ocean II's lien therefore does not transfer ownership of HouseCanary's technology or the Texas Litigation. Ocean II's recorded financing statement reflects the same limits. Durrer Decl., ¶ 4-5, Ex. A.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

**B. The Default**

HouseCanary did not repay the facility at maturity and is in default under the LSA. HouseCanary does not dispute the occurrence of a default or Ocean II's ability to pursue remedies against collateral in which it holds a valid security interest. HouseCanary disputes the scope and manner of the disposition Ocean II proposes. Verified Compl., ¶¶ 4, 18-19, 26-42, 44.

**C. The Texas Litigation and the March 2026 Verdict**

HouseCanary is the plaintiff in two related proceedings (together, the "Texas Litigation"): *HouseCanary,* Inc. *v. Amrock, LLC* , No. 2016-CI-06300, in the 438th Judicial District Court, Bexar County, Texas, [1] and *HouseCanary, Inc. v. Quicken Loans Inc.*, No. 5:18-cv-00519, in the United States District Court for the Western District of Texas. Both concern the misappropriation of HouseCanary's valuation models, data, and analytics. *See* Verified Compl., Ex. A, p. 124.[2]

On March 6, 2026, after a four-week retrial, a Bexar County, Texas jury found that Amrock misappropriated HouseCanary's trade secrets and defrauded the company, and awarded HouseCanary approximately $175 million in compensatory damages. That amount is an effective minimum of approximately $175 million, plus additional interest, costs, and fees to be determined. Amrock has stated that it will appeal. HouseCanary must remain operational and staffed to obtain entry of judgment on the $175 million verdict, address post-trial proceedings, defend the judgment on appeal, pursue enforcement, and prosecute the related federal action. Rediger Decl., ¶¶ 11-12; Verified Compl., ¶¶ 1, 2, 4.

/ / /

/ / /

/ / /

---

[1] This case was formerly captioned *Title Source, Inc. v. HouseCanary, Inc.*, and referenced as such in the Notice of Disposition; Amrock, Inc. was formerly known as Title Source, Inc.

[2] For ease of reference, any citation to Plaintiff's Verified Complaint includes both the Complaint itself and the exhibits filed concurrently therewith. Citations that include page numbers refer to the page numbers within the entirety of the document filed on September 17, 2026, including exhibits (*i.e.*, a total of 179 pages).

**D. The Notice of Disposition**

On September 8, 2026, Ocean II served a Notice of Disposition (the "Notice") setting a public auction for September 22, 2026, at 1:00 p.m. at 3555 Alameda De Las Pulgas, Suite 201, Menlo Park. Verified Compl., ¶ 26; *see also* id. Ex. B. Exhibit A to the Notice describes substantially all of HouseCanary's assets and excludes Intellectual Property, the Texas Litigation Collateral, and the Litigation Reserve Account. Id. Ex. B, p. 143. The first advertisement, published September 9, gave the sale year as "2020." Id., Ex. F, pp. 160-161. Ocean II served a corrected Notice and published corrected advertisements in the San Francisco Chronicle and the Wall Street Journal on September 11, eleven days before the sale. Verified Compl., ¶ 33; *see also* id. Ex. G, pp. 167-168.

Ocean II has not retained an investment banker or a broker. It has not opened a data room.. It has not circulated a non-disclosure agreement. Verified Compl., ¶ 35-39, Ex. H. On September 15, Ocean II's counsel, Mr. Gasser, wrote that Ocean II lacks the information bidders would need to evaluate the collateral. Id. ¶ 38, Ex. H.

Public descriptions of the scheduled sale also create confusion. A search for "housecanary ocean ii" returns a description stating that Ocean II "will offer the collateral—encompassing all of HouseCanary's assets, intellectual property, software, accounts, and business components" for sale at public auction on September 22, 2026. Verified Compl., ¶ 41, Ex. I. That description conflicts with the Notice's exclusion of Intellectual Property and reinforces the need for a precise description of what Ocean II may sell. Ocean II has demanded that HouseCanary assemble all of the collateral at a location in downtown San Francisco, more than thirty miles from the auction site, on September 23, 2026, the day after the sale. Verified Compl., at ¶ 40. No bidder will be able to inspect the collateral before the auction. A public sale of operating assets that no buyer can see, at a location thirty miles from where the assets will be, is not a process designed to attract bidders. The resulting disruption to HouseCanary's personnel, systems, records, and customer relationships would cause immediate operational harm. Rediger Decl., ¶¶ 6-10, 13.

/ / /

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

**E. HouseCanary's Objections and Ocean II's Position**

On September 10, HouseCanary's counsel wrote to Ocean II's counsel objecting to the notice period, the absence of any marketing process, and the misdescription of the collateral, and asked Ocean II to retain an investment banker. Verified Compl., ¶ 30; *see also* id., Ex. D, pp. 150-153. Mr. Gasser responded on September 11. He asserted Ocean II's "clear contractual rights," described Ocean II's approach as "flexible," and committed to no change in the process. Id. ¶ 31; *see also* id., Ex. E, pp. 155-156. His September 15 email conceded the information gap. *See* Id. ¶ 38; *see also* id., Ex. H pp. 173-174. On September 16, HouseCanary sent a further objection and declined to assemble the collateral. *See* Id., Ex. H p. 173. Ocean II has stated that it will proceed with the auction on September 22. Id. ¶ 42.

HouseCanary has sought to negotiate a stay of the auction, but no agreement was reached. HouseCanary does not ask the Court to adjudicate the rights of other secured parties. It asks only that the sale not purport to transfer property or rights excluded from Ocean II's collateral, including preexisting third-party rights in the Texas Litigation and related intellectual property, and that the sale proceed only through a commercially reasonable process.

## III. NOTICE OF APPLICATION

HouseCanary gave Ocean II's counsel proper and timely notice of this application in accordance with California Rules of Court Rule 3.1204 by email on September 18, 2026. *See* Durrer Decl., ¶¶ 18-19, Ex. L. *See* Cal. Rule of Ct. 3.1204. Ocean II's counsel they would oppose the Application, but did not advise if they would appear at the hearing. Id., at ¶ 20, Ex. M.

The names and email addresses of counsel for all parties in this action are as follows:

| | |
|---|---|
| Steven O. Gasser<br>PremierCounsel LLP<br>315 Montgomery Street, Suite 900<br>San Francisco, CA 94104<br>(415) 409-1790<br>Email: sgasser@premiercounsel.com<br><br>Beth Ann R. Young<br>Ronald Bender<br>LEVENE, NEALE, BENDER, YOO &<br>GOLUBCHIK L.L.P. | ***Counsel for Defendants*** |

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

| | |
|---|---|
| 2818 La Cienega Avenue<br>Los Angeles, CA 90034<br>(310) 229-1234<br>Email: bry@lnbyg.com<br>rb@lnbyg.com | |

Id., at ¶ 21. *See* Cal. Rule of Ct. 3.1202(a).

## IV. LEGAL STANDARD

The Commercial Code supplies the remedy. "If it is established that a secured party is not proceeding in accordance with this division, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions." Cal. U. Com. Code § 9625(a). Preliminary injunction relief is authorized by Code of Civil Procedure section 527(a), and the traditional injunction grounds in section 526 remain applicable where an act would produce great or irreparable injury to a party, pecuniary compensation would not afford adequate relief, or the amount of damages would be extremely difficult to ascertain. Code Civ. Proc. §§ 526(a)(2), (a)(4)-(5), 527(a). A temporary restraining order may issue under section 527(c)(1) when great or irreparable injury will result before the matter can be heard on notice. The ex parte application must include an affirmative factual showing in a declaration of this harm based on personal knowledge under California Rules of Court, rule 3.1202(c). The Rediger Declaration provides that showing. Rediger Decl., ¶¶ 6-13.

For a preliminary injunction, the Court weighs two factors: the likelihood that the plaintiff will prevail on the merits, and the interim harm to the plaintiff if relief is denied compared with the harm to the defendant if relief is granted. *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69-70. These factors operate on a sliding scale. The stronger the showing on one, the less is required on the other. *King v. Meese* (1987) 43 Cal.3d 1217, 1227; *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 858.

/ / /

/ / /

/ / /

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

## V. ARGUMENT

### A. <u>HouseCanary Is Likely to Prevail: The Sale as Noticed Is Not Commercially Reasonable</u>

#### 1. Article 9 governs every aspect of the sale, and statutory notice is not enough.

"Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Cal. U. Com. Code § 9610(b). The debtor cannot waive that duty. Cal. U. Com. Code § 9602(7). The parties may agree on standards for measuring it, but only if those standards are not manifestly unreasonable. Cal. U. Com. Code § 9603(a).

Compliance with the statute's notice requirements does not make a sale commercially reasonable. In *Ford & Vlahos v. ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, the secured party gave the notice the statute required and advertised the sale. The Supreme Court held that was not enough. The secured party must also give the sale the "publicity sufficient to attract a 'lively concourse of bidders[,]'" measured against the nature of the collateral. *Id.* at 1230. The ten-day safe harbor in section 9612(b) governs only the timing of the notification. Section 9610(b) governs every other aspect of the sale. An agreed notice period does not settle whether a sale with no marketing, no diligence, no inspection, and a misdescribed collateral package is reasonable. *See* Cal. U. Com. Code §§ 9602, 9603.

The question is whether Ocean II built a process capable of attracting informed, competing bids for the operating assets of a technology company. Four defects, each shown by Ocean II's own documents, establish that it did not.

#### 2. Ocean II has no marketing process.

Ocean II has not retained an investment banker, although HouseCanary asked it to. It has not retained a broker. It has not opened a data room. It has not circulated a non-disclosure agreement. Its only outreach to the market is a newspaper advertisement, the first version of which gave the wrong year. Verified Compl., ¶ 32.

Mr. Gasser's September 15 email closes the question. Ocean II admits it does not have the information a bidder would need to evaluate the collateral. Verified Compl., Ex. H. A secured party that cannot tell a bidder what the business earns, what contracts come with it, or what liabilities

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

attach to it has not created a process capable of producing a competitive price. For an operating technology company, whose value lies in contracts, data, and personnel that cannot be evaluated from a newspaper notice, that is not the publicity *Ford & Vlahos* requires.

**3. The schedule gives the market no meaningful opportunity to value the collateral.**

Fourteen days from the original Notice, and eleven from the corrected one, is the entire window in which a buyer must learn of the sale, obtain information Ocean II admits it does not have, evaluate revenue, contracts, technology, workforce, and litigation exposure, prepare a bid, and appear in Menlo Park. Ocean II served the Notice more than seven months after maturity and allowed two weeks for the entire disposition. The time chosen for a sale is an aspect of the sale, and it must be commercially reasonable. Cal. U. Com. Code § 9610(b).

Indeed, Pressa, LLC ("Presa"), a mortgage and technology services company, is an interested and financially capable prospective bidder for HouseCanary's assets. Presa is prepared to evaluate participation if given a reasonable opportunity for diligence, but it cannot meaningfully evaluate or participate on Ocean II's compressed schedule or without basic diligence information. *See* Declaration of James Albertelli on Behalf of Presa LLC ("Presa Decl."), ¶¶ 4-5. Presa learned of the September 22, 2026 foreclosure sale only days before the scheduled auction through the public notice and advertisement. Because Presa's business is aligned with the assets described, it has a strong interest in evaluating them; yet the notice and advertisement are the only information Ocean II has made available. *See* Presa Decl., ¶¶ 2-3. Presa cannot verify precisely what is being offered or complete meaningful diligence by September 22, 2026. Its owner, James Albertelli, estimates that the company would require at least a few weeks to evaluate and pursue a transaction of the kind described in the Notice. *See* Presa Decl., ¶¶ 4-5.

Presa's inability to diligence the collateral is not unique to Presa. It results directly from Ocean II's failure to conduct a commercially reasonable process. Ocean II retained no investment banker or broker, established no data room, and circulated no confidentiality or non-disclosure agreement through which a prospective bidder could review the information necessary to formulate an informed bid. *See* Presa Decl., ¶¶ 3-4; Verified Compl., ¶¶ 35-37, 39. Ocean II's own counsel

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

confirmed the information gap in writing, stating that the information requested by a prospective bidder was not information that the Agent had. *See* Verified Compl., Ex. H, pp. 173–174. A sale process in which the secured party cannot answer basic questions about the assets and offers no data room or confidentiality agreement is not designed to produce a fair price.

California Commercial Code section 9610(b) requires that every aspect of a disposition of collateral—including its method, manner, time, place, and other terms—be commercially reasonable. A central object of that requirement is to surround the sale with publicity and process sufficient to attract a lively concourse of bidders, so that competitive bidding yields a price approximating the collateral's actual value. A process that allows days rather than weeks for diligence and withholds basic information is not commercially reasonable. It risks depressing the price realized at sale. *See* Cal. U. Com. Code § 9610(b); *Ford & Vlahos, supra,*, 8 Cal.4th at 1230.

Presa's inability to complete diligence illustrates that the process Ocean II has arranged for the foreclosure sale is commercially unreasonable. The resulting sale threatens irreparable harm to HouseCanary by disrupting its business and its ability to preserve the Texas Litigation. A brief injunction would allow a commercially reasonable, adequately noticed process in which bidders such as Presa can evaluate and participate. *See* Presa Decl., ¶ 6.

**4. The Notice misdescribes the collateral.**

A notification of disposition must reasonably describe the collateral. Cal. U. Com. Code § 9613(a)(1)(B). Exhibit A describes substantially all of HouseCanary's assets and then carves out intellectual property in a manner that can leave sophisticated bidders uncertain whether that property is included. *See* Verified Compl., Ex. B, p. 143. Public descriptions of the scheduled sale add to that uncertainty by stating that Ocean II will offer "all of HouseCanary's assets, intellectual property, software, accounts, and business components" for sale. Verified Compl., ¶ 41, Ex. I. Ocean II's interest in intellectual property is limited to the extent necessary to perfect a security interest in Rights to Payment arising from the sale, licensing, or disposition of intellectual property. The Notice should state that limitation clearly. Durrer Decl., ¶ 6, Ex. B.

A bidder who believes it may be buying the technology will price the sale differently from a bidder who understands it is buying operating assets and only the limited interest described above.

A notice that leaves the market unsure which sale is occurring cannot produce a reliable price. If the sale proceeds under that unresolved description, a purchaser may later assert that it acquired intellectual property that HouseCanary still owns, creating a cloud on title and potential disputes with holders of preexisting third-party rights in the Texas Litigation and related intellectual property. That confusion would be difficult to unwind after payment and delivery.

**5. No bidder can inspect the collateral before the sale.**

Ocean II has demanded that HouseCanary assemble the collateral in downtown San Francisco on September 23, the day after the Menlo Park auction. Verified Compl., ¶ 40. No bidder will be able to inspect the collateral before the hammer falls. A public sale of operating assets that no buyer can see, at a location thirty miles from where the assets will be, is not a process designed to attract bidders.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

Taken together, these defects go to the four things a disposition must do to produce a competitive price: tell the market what is for sale, give the market time, give the market information, and let the market inspect. Ocean II's process does none of them.

HouseCanary is likely to establish that the sale as noticed violates section 9610(b), which is the showing section 9625(a) requires.

## B. <u>The Sale Is an Unlawful Business Practice</u>

A violation of Article 9's commercial-reasonableness requirement is an "unlawful" business practice under Business and Professions Code section 17200, and injunctive relief is an available remedy. Bus. & Prof. Code §§ 17200, 17203; *see Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1088. The UCL claim rests on Part V.A and supplies an independent statutory basis for the injunction.

## C. <u>HouseCanary Will Suffer Immediate and Irreparable Harm</u>

Article 9's post-sale remedies may address a lower price, but they cannot fully repair the harm threatened here. Sections 9626 and 9625(b) address deficiency and damages remedies; they do not necessarily restore a disrupted operating business or remove a cloud over the technology and litigation assets needed to preserve the Texas Litigation. The Legislature authorized courts to

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

restrain a non-compliant disposition before it happens. Cal. U. Com. Code § 9625(a). Four categories of harm warrant relief before September 22.

**1. The sale ends HouseCanary as a going concern.**

A sale of substantially all operating assets terminates HouseCanary's customer contracts, workforce, and market position. Rediger Decl., ¶¶ 7-10; Verified Compl., ¶ 1. Once the assets are dispersed, there is no practical mechanism to reassemble the business. Code of Civil Procedure section 526 treats that injury as a ground for injunction where pecuniary compensation cannot afford adequate relief or the amount of the loss is extremely difficult to ascertain. Code Civ. Proc. § 526(a)(4)-(5).

**2. The sale impairs the Texas Litigation and HouseCanary's ability to preserve it.**

HouseCanary holds an approximately $175 million jury verdict and a pending federal action against Quicken Loans concerning the same technology; it must obtain entry of judgment on the $175 million verdict, address post-trial proceedings, defend the judgment on appeal, pursue enforcement, and prosecute the related federal action. Verified Compl., ¶ 1. The sale as noticed impairs those assets in two critical ways. First, the Notice and related public descriptions create uncertainty about whether intellectual property is included, even though Ocean II's interest is limited to the extent necessary to perfect a security interest in Rights to Payment arising from the sale, licensing, or disposition of intellectual property. Verified Compl., ¶¶ 3, 20, 43. That uncertainty threatens to cloud ownership of technology needed to preserve the Texas Litigation and may lead to disputes with purchasers and holders of preexisting third-party rights in the Texas Litigation and related intellectual property.

Second, HouseCanary must be able to produce, explain, and defend its technology in post-trial proceedings, on appeal, and at the federal trial. The systems, records, and personnel through which it does so are the operating assets Ocean II proposes to sell. Verified Compl., Ex. C, pp. 146-148; Rediger Decl., ¶¶ 5-10. A company without those employees, systems, and records cannot defend a trade-secret verdict about its own technology.

/ / /

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

**3. The sale clouds title to intellectual property beyond Ocean II's stated Rights-to-Payment interest.**

Public descriptions of the sale can lead prospective bidders to believe intellectual property is included. HouseCanary would then face a dispute over ownership of the technology at the center of the Texas Litigation against a third party. That cloud on title would result from confusion created by the Notice and would be difficult to unwind after payment and delivery. Ocean II's recorded financing statement reflects the same limits. Durrer Decl., ¶ 4-5, Ex. A. The sale must also preserve preexisting third-party rights in the Texas Litigation and related intellectual property.

**4. The harm is immediate.**

The sale will occur before a regularly noticed motion can be heard. Ocean II has stated that it will proceed. Verified Compl., ¶ 42. If it does, the harms above will be complete before any court can rule on whether the process complied with Article 9. Rediger Decl., ¶¶ 11-13.

**D. <u>The Balance of Hardships Favors HouseCanary Decisively</u>**

On HouseCanary's side of the scale are the company, its workforce, its ability to preserve the Texas Litigation, and an approximately $175 million verdict. On Ocean II's side is a temporary delay. A restraining order does not impair Ocean II's lien, eliminate its right to credit-bid at a properly conducted sale, or stop interest from accruing on the obligation. Cal. U. Com. Code § 9610(c). Ocean II's auction procedures also permit it to postpone the sale by announcement. Verified Compl., Ex. B, pp. 160–161. Ocean II can do voluntarily what HouseCanary asks the Court to order.

Delay costs Ocean II nothing in the end. Interest will continue to accrue, Ocean II will retain the ability to credit-bid at a properly conducted sale, and the proposed conditions will preserve the collateral pending a commercially reasonable disposition. The verdict that a rushed sale would jeopardize is the asset most likely to pay Ocean II in full. Every creditor, Ocean II included, is better served by a HouseCanary that survives to collect it than by a credit bid for operating assets at a sale no one else can meaningfully attend. The balance therefore favors temporary relief.

/ / /

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

**E. The Court Should Set the Terms of a Commercially Reasonable Process**

Section 9625(a) permits the Court to restrain a disposition "on appropriate terms and conditions." HouseCanary does not ask for an open-ended injunction. It asks the Court to restrain the September 22 sale and, at the hearing on the order to show cause, to set the terms of a disposition of collateral consistent with Article 9. HouseCanary proposes the following and will comply with each as a condition of relief:

(1) Ocean II retains an investment banker or broker acceptable to both parties within 14 days. (2) HouseCanary opens a data room and provides the banker with financial statements, customer contracts, technology documentation, and employee information within 21 days, subject to a non-disclosure agreement. (3) The banker markets the assets for not less than 45 days and sets a bid deadline. (4) The notice of sale describes the collateral with precision and states the limits of Ocean II's interest in intellectual property and the exclusion of the Texas Litigation, its proceeds, and the litigation reserve account. (5) Ocean II's right to credit-bid is preserved. (6) Pending the sale, HouseCanary maintains insurance on the collateral, does not transfer or encumber it outside the ordinary course, permits inspection on reasonable notice, and reports to Ocean II on a schedule the Court sets.

Those terms preserve Ocean II's secured rights while allowing a commercially reasonable process. A sale conducted under them will produce a higher price than a sale on September 22, which benefits Ocean II as well.

**F. The Court Should Set a Modest Undertaking**

Code of Civil Procedure section 529 requires an undertaking in an amount the Court determines will cover the damages the enjoined party may sustain if the injunction is later found wrongful. The measure here is the cost to Ocean II of a delay of roughly 90 days: interest for that period, which continues to accrue, and any decline in the value of collateral, which the conditions in Part V.E address. Ocean II's lien, priority, and credit-bid rights in that collateral are unaffected. HouseCanary proposes an undertaking of $5,000.

/ / /

## VI. CONCLUSION

HouseCanary respectfully requests that the Court (1) issue a temporary restraining order enjoining Ocean II PLO LLC, Structural Capital Investments III, LP, Series Structural DCO II Series of Structural Capital DCO, LLC, CEOF Holdings, LP, Does 1–10, and all persons acting in concert with them from conducting, proceeding with, or facilitating the September 22, 2026 sale, or any transfer, encumbrance, or other disposition of the collateral, pending the hearing on the order to show cause; (2) issue an order to show cause why a preliminary injunction should not issue restraining any disposition of the collateral except on the terms set forth in Part V.E or such other terms the Court finds commercially reasonable; (3) set an undertaking in the amount of $5,000; and (4) grant such further relief as the Court deems proper.

Dated: September 18, 2026

DENTONS US LLP



By: ______________________________
Van C. Durrer, II

Attorneys for Plaintiff
HOUSECANARY, INC.

DENTONS US LLP
1999 HARRISON STREET, SUITE 1210
OAKLAND, CALIFORNIA 94612
415 882 5000

**EXHIBIT I**

**Opposition to TRO Motion**

BETH ANN R. YOUNG (State Bar No. 143945)
RICHARD P. STEELMAN, JR. (State Bar No. 266449)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: BRY@LNBYG.COM; RPS@LNBYG.COM

Attorneys for Defendant
Ocean II PLO LLC, solely in its capacity as
administrative and collateral agent for the Lenders

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN MATEO**

| | |
|---|---|
| HOUSECANARY, INC., a Delaware corporation;<br><br>Plaintiff,<br><br>v.<br><br>OCEAN II PLO LLC, a California limited liability company; STRUCTURAL CAPITAL INVESTMENTS III, LP, a Delaware limited partnership; SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC, a Delaware limited liability company; CEOF HOLDINGS, LP, a Delaware limited partnership; and DOES 1-10,<br><br>Defendants. | Case No. 26-CIV-07276<br><br>[Unlimited Jurisdiction]<br><br>**OPPOSITION BY DEFENDANT OCEAN II PLO LLC TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>[Filed Concurrently with Declaration of Steve Gasser and Declaration of Kai Tse, both in Support of Opposition of Defendant]<br><br>Date: September 21, 2026<br>Time: 1:30 pm<br>Dept. 28 |

Defendant Ocean II PLO LLC, solely in its capacity as administrative and collateral agent for the Lenders ("**Defendants**" and "**Agent**") hereby submits it Opposition to the Plaintiff's *Ex Parte* Application for Temporary Restraining Order ("**TRO**") and Order to Show Cause Re Preliminary Injunction (the "**Application**") as follows:

## TABLE OF CONTENTS


**Page**

**I. PLAINTIFF IS NOT ENTITLED TO A TRO OR INJUNCTIVE RELIEF**..........Error! Bookmark not defined.

**II. THE FORECLOSURE PROCESS IS COMMERCIALLY REASONABLE................5**

**A. An Investment Banker Is Not Required To Conduct A Foreclosure Sale.............6**

**B. Agent Has Invigorated The Marketing Process To Reach A Larger Audience And Provide Flexibility To Potential Bidders.........................................................7**

**C. The Advertisement Of Sale And The Notice Of Disposition Provides Adequate Description Of The Collateral To Potential Bidders...............................................8**

**D. The Advertisement Of Sale Provided Adequate Time For Potential Bidders......8**

**E. Adequacy Of Information..........................................................................................9**

**F. Adequacy Of Inspection.............................................................................................9**

**III. THE TEXAS LITIGATION IS IRRELEVANT TO THE AGENT'S FORECLOSURE**..................................................................Error! Bookmark not defined.

**IV. PLAINTIFF PROVIDES NO EVIDENCE OF IRREPARABLE HARM OR THAT THERE WILL BE ANY GREATER VALUE OBTAINED IN A PRIVATE SALE AS COMPARED TO THE FORECLOSURE SALE ........................................11**

**V. PLANTIFF HAS NOT SATISFIED THE STANDARDS FOR ISSUANCE OF A TRO.........................................................................................................13**

**A. Plaintiff Cannot Prevail on Its Claims ..................................................................13**

**B. Plaintiff Admits that Agent Has the Right to Foreclose ........................................13**

**C. Plaintiff Has Unclean Hands...................................................................................14**

**VI. PLAINTIFF SHOULD BE REQUIRED TO POST AT LEAST A $2,000,000 BOND ..........................................................................................................15**

**A. Recovery Of Attorney's Fees..............................................................16**

**B. Interest On The Indebtedness..............................................................17**

**VII. CONCLUSION............................................................................................17**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

ABBA Rubber Co. v. Seaquist,
235 Cal. App. 3d 1 (1991)……16, 17

Am. Academy of Pediatrics v. Van de Kamp,
214 Cal. App. 3d 831 (1989)……13

Buran Equipment Co. v. H. & C. Investment Co.,
142 Cal. App. 3d 338 (1983)……6

Butt v. State,
4 Cal. 4th 668 (1992)……13

Church of Christ in Hollywood v. Super. Ct.,
99 Cal. App. 4th 1244 (2002)……13

Fibreboard Paper Products Corp. v. East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO,
227 Cal. App. 2d 675 (1964)……14

Gen. Elec. Capital Corp. v. Banc of Cal.,
2014 WL 12696353 (C.D. Cal., Sept. 24, 2014)……8

Intel Corp. v. Hamidi,
30 Cal.4th 1342 (2003)……13, 14

Kendall-Jackson Winery, Ltd. v. Super. Ct.,
76 Cal. App. 4th 970 (1999)……14

Tahoe Keys Property Owners' Ass'n v. State Water Resources Control Bd.,
23 Cal. App. 4th 1459 (1994)……14

Xport Forwarding LLC v. Mesitis DWC LLC,
694 F.Supp.3d 1258 (C.D. Cal. 2023)……12

White v. Davis,
30 Cal.4th 528 (2003)……15, 16

**Statutes**

11 U.S.C. § 362……4

Commercial Code § 9108……8

Commercial Code § 9610……5

Commercial Code § 9627……5

I.

**PLAINTIFF IS NOT ENTITLED TO A TRO OR INJUNCTIVE RELIEF**

The Application must be denied for at least the following nine undisputed reasons:

1. Plaintiff fails to submit any legal authority that it has the pre-foreclosure right to seek this Court's intervention for injunctive relief under Division 9 of the California Commercial Code to regulate and halt the September 22, 2026 UCC foreclosure sale (the "**Foreclosure**").
2. Plaintiff fails to submit any factual evidence or legal authority that the noticed Foreclosure is not commercially reasonable.
3. Plaintiff fails to submit any evidence of what its company value is if sold in a foreclosure sale or through an investment banker marketing process. Indeed, during the last year, Plaintiff had engaged an investment banker to sell the company without any success.[1]
4. Plaintiff admits it is in default on the subject loan, now totaling in excess of $43,000,000 (the "**Indebtedness**"), and has no proposal for any repayment.
5. Plaintiff admits that the Agent holds a valid security interest and is entitled to pursue foreclosure remedies against the Collateral.
6. Plaintiff is insolvent and has no means to pay the Indebtedness and has provided no evidence of any means to do so in the Application.
7. Plaintiff is not asking for a "short preservation period" to maintain the status quo, but rather a years' long freeze on the Agent's enforcement of its rights.
8. Plaintiff has an adequate legal remedy. Filing a chapter 11 bankruptcy case will provide Plaintiff the benefit of the automatic stay under 11 U.S.C. § 362 of the Bankruptcy Code, which will provide a longer stay as compared to a potentially 14-day stay by the improperly requested TRO. In a bankruptcy case, Plaintiff can (a) continue to operate as a going concern if Plaintiff's business is viable, (b) run an independent sale process under the spotlight and scrutiny of Plaintiff's creditors and the United States

[1] (See concurrently filed Declaration of Kai Tse ("**Tse Decl.**") ¶ 12.)

Bankruptcy Court, and (c) attempt to reorganize its distressed financial circumstances instead of trying to invoke this Court's equitable jurisdiction.[2] A TRO provides none of these protections.

9. Plaintiff has failed to establish any irreparable harm, offering only undefined speculative injury relating to a "Texas Judgment" which has not been entered yet, which Plaintiff admits will take years to resolve on appeal. Plaintiff fails to disclose to the Court that Plaintiff no longer has any economic interest in as the proceeds from that litigation will be consumed by the contingency lawyers trying that case and the litigation funding partners that are financing it and hold a security interest in them.

Apparently, Plaintiff has belatedly come to realize that a "forced transfer of operating assets" could impact the Plaintiff's operations. While Plaintiff should have thought of this before defaulting on the Loan Agreement[3], since this is an obvious consequence of borrowing money and not paying it back, in any event, *Plaintiff agreed to the timing of the proposed foreclosure sale in the Loan Agreement* at ¶9.3: "any foreclosure sale of Collateral shall be deemed reasonable provided that Agent gives at least 10 days advance notice of the initial date set for such foreclosure sale." Agent has complied with this provision.

## II.

## THE FORECLOSURE PROCESS IS COMMERCIALLY REASONABLE

Plaintiff does not provide a single authority (binding or persuasive) that it has the pre-foreclosure right to injunctive relief under Division 9 of the California Commercial Code. The statutory framework of a UCC foreclosure sale under California Commercial Code Division 9 establishes that commercial reasonableness is a **post-disposition standard** enforced through remedies such as the denial of a deficiency judgment, and not through pre-sale judicial intervention or injunctive relief. In short, Plaintiff is putting the cart before the horse.

This Court should not regulate Agent's disposition of collateral before it occurs. Neither Commercial Code section 9610 nor section 9627 authorizes a court to enjoin a creditor's

[2] Plaintiff already has "Restructuring, Insolvency and Bankruptcy" counsel ready to file a bankruptcy case. (See Declaration of Van Durrer filed with the Application.)

[3] The Loan Agreement is attached as Exhibit "A" to Plaintiff's filed Complaint in this Action.

disposition or to pre-adjudicate whether a forthcoming planned sale will satisfy the commercial reasonableness standard. "It is clear that the failure of the secured party to comply with either the commercial reasonableness requirement or the notice requirement precludes the secured party from recovering a deficiency judgment." Buran Equipment Co. v. H. & C. Investment Co., 142 Cal. App. 3d 338, 341 (1983). Accordingly, Plaintiff has an alternative remedy. Thus, after the Foreclosure takes place, Plaintiff can challenge the logistics then, but cannot do so before, especially given the fact that Plaintiff (a) has not identified or established any irreparable harm from Agent enforcing its legal rights and remedies under the Loan Agreement and Loan Documents which Plaintiff has admittedly defaulted under, and (b) has adequate remedies at law, *i.e.*, seek bankruptcy protection to stop the foreclosure or challenge Agent's deficiency claim after the Foreclosure if in fact any grounds exist.

**A. <u>An Investment Banker Is Not Required To Conduct A Foreclosure Sale</u>**

Plaintiff conflates the vastly different mechanisms employed by an involuntary foreclosure sale and a consensual sale of the company. Without any authority, Plaintiff asserts that a secured creditor cannot conduct a commercially reasonable foreclosure sale unless an investment banker is hired who creates a data room and takes the other steps typically associated with a voluntary sale of assets which a foreclosure sale is not. Most troubling about Plaintiff's argument is that Plaintiff fails to submit any evidence that there are any different values to be obtained through these two different sales processes which undermines the Plaintiff's contention that the Foreclosure is not commercially reasonable.

If the Court were to adopt Plaintiff's untenable position, no secured creditor could ever conduct a UCC foreclosure sale and any debtor would be able to thwart the non-judicial foreclosure process and mandate an investment banker be hired, that a data room be established and that a confidentiality agreement be signed before access to information be provided. Plaintiff lost the right to decide when and how a subset of its business assets are to be sold when it defaulted on the Loan Agreement and failed to pay the $43,000,000 Indebtedness now due and owing to Agent and Lenders.

///

**B. <u>Agent Has Invigorated The Marketing Process To Reach A Larger Audience And Provide Flexibility To Potential Bidders</u>**

The published Advertisement of Sale adopts a flexible approach designed to remove barriers that are commonly implemented at a foreclosure sale. The Application fails to address any of these accommodations that seek to encourage bidders to participate in the Foreclosure. For example:

- Rather than requiring bidders to pre-qualify, i.e., show proof of available funds in order to weed out non-bona fide bidders, Agent established a sale process to allow anyone who shows up to bid.
- Rather than setting a minimum bid amount which could potentially discourage potential bidders from showing up, no minimum bid was set.
- Rather than requiring an all-cash bid, Agent made it clear that if potential bidders were interested in bidding for the Collateral other than for cash, Agent was willing to discuss any alternate form of payment *prior to the scheduled sale*.
- Rather than being restricted to selling the Collateral in a single lot, Agent reserved the right to split up the Collateral into multiple lots so that if circumstances warranted, a greater price might be achieved.
- Rather than providing the Advertisement of Sale in just one publication, Agent published the Advertisement of Sale in both the San Francisco Chronicle where Plaintiff's principal place of business is listed at 535 Mission Street, Office 1920, San Francisco, California, and in the national edition of the Wall Street Journal, to attract potential bidders from outside the San Francisco area. Both are widely recognized and respected publications.

In addition to all of this, the Advertisement of Sale also clearly provided contact information so that any interested bidder could contact Agent's counsel to learn more about the Foreclosure and request more detailed information about the bidding procedures or Collateral. In the context of a distressed sale of assets with an uncooperative debtor such as Plaintiff, the process Agent established cannot plausibly be said to not be commercially reasonable.

**C. <u>The Advertisement Of Sale And The Notice Of Disposition Provides Adequate Description Of The Collateral To Potential Bidders</u>**

There is nothing confusing about the description of the Collateral in the Advertisement of Public Sale or the Notice of Disposition which provides the exact same information regarding the identification of the Collateral that is contained in the Loan Agreement. "Pursuant to the California Commercial Code, a description of collateral in a security agreement is sufficient if it 'reasonably identifies what is being described.'" <u>Gen. Elec. Capital Corp. v. Banc of Cal.</u>, 2014 WL 12696353, at *6 (C.D. Cal., Sept. 24, 2014) (citing Com. Code § 9108). "The collateral may be described in any of the following ways: (1) specific listing; (2) category; (3) a type of collateral defined in this code [with exceptions that are not applicable here]; (4) quantity; (5) computational or allocational formula or procedure; or (6) any other method provided that the identity of the collateral is 'objectively determinable.'" <u>Gen. Elec. Capital Corp. v. Banc of Cal.</u>, 2014 WL 12696353, at *6 (citing Cal Com. Code § 9108(a), (b)). Here, Agent has complied with this requirement in both the Advertisement of Sale and the Notice of Disposition.

Plaintiff's reference to a Google search which incorrectly summarizes the <u>*actual*</u> language in the Advertisement for Sale should not be imputed to Agent. Moreover, when Agent's counsel ran a Google search on September 19, 2026, using the same search parameters as Plaintiff's counsel represented he used, a different result was produced that does not mention the foreclosure sale or the Collateral subject thereto. (See concurrently filed Declaration of Steve Gasser ("**<u>Gasser Decl.</u>**") ¶ 11, Ex. 3.)

**D. <u>The Advertisement Of Sale Provided Adequate Time For Potential Bidders</u>**

Plaintiff offers the declaration of Pressa, LLC which confirms that notice was received by potentially interested bidders. It is unclear why Pressa, LLC contacted Plaintiff and not Agent given the contact information provided within the Advertisement of Sale. Instead of working with Pressa, LLC to provide it the information it sought to determine whether it would legitimately be interested in participating at the Foreclosure, or directing that Pressa, LLC contact Agent to engage in the foreclosure process. Instead of encouraging Pressa, LLC to engage in the bidding process, Plaintiff concealed Pressa, LLC's existence thinking it would be more beneficial to exploit Pressa,

LLC as a foil to challenge the foreclosure process than having it engage in a good faith effort to participate. Equitable relief should not be used to reward such gamesmanship.

**E. <u>Adequacy Of Information</u>**

At the beginning of the foreclosure process on September 10, 2026, Agent contacted Plaintiff and requested that Plaintiff provide detailed information as to each category of Collateral, but Plaintiff never did so. (Tse Decl. ¶ 13, Ex. 1.) Then again on September 11, 2026 and September 15, 2026, Agent's counsel made additional requests for such information, with the later request being made in connection with an inquiry from a prospective buyer. (Gasser Decl. ¶ 8, Exs. 1, 2.) Plaintiff refused to provide any information under the guise that it was not obligated to do so, and warned Agent that Plaintiff would seek to hold Agent accountable for any violations of the confidentiality provisions of the Loan Agreement if Agent provided confidential information to prospective bidders absent a nondisclosure agreement. (<u>See</u> Tse Decl., Ex. 1; Gasser Decl., Exs. 1, 2; V. Durrer Declaration in support of Application at Ex. K.) Agent's counsel also requested Plaintiff provide an acceptable form of non-disclosure agreement which Plaintiff also refused to do. (Gasser Decl. ¶ 8.) Plaintiff should not be permitted to benefit by withholding the very information that it now contends is needed for a commercially reasonable sale process.

**F. <u>Adequacy Of Inspection</u>**

Plaintiff's final basis for asserting that the foreclosure process is unreasonable is that potential buyers will not be able to inspect the Collateral prior to the sale, and that Agent instructing Plaintiff to have the Collateral assembled on the day after the scheduled foreclosure "underscores the absence of a coherent pre-sale diligence process." (<u>See</u> Application at 4:4.) That argument ignores the fact that this is how a foreclosure sale occurs in the ordinary course of business.

The Loan Agreement provides: "Borrower agrees to assemble the Collateral if Agent so requires, and to make the Collateral available to Agent as Agent may designate." (Compl., Ex. A at § 9.1(b).) The demand to have the Collateral assembled the day after the scheduled foreclosure sale was designed to minimize the disruption to Plaintiff's business prior to the sale actually occurring. Given Plaintiff's alleged concerns over confidentiality, it is doubtful it will allow Agent and any potential bidders to conduct an inspection. And, in fact, Plaintiff readily admitted that it

would not assemble the Collateral because to do so would be harmful to Plaintiff's business. (Application's Memorandum of Points and Authorities ("**MPA**") at 4:24-26, 5:8-9.)

Plaintiff also stresses that the foreclosure sale is scheduled to occur in Menlo Park but that the assets are to be assembled 35 miles away in San Francisco without disclosing to the Court that the San Francisco address is Plaintiff's address. Plaintiff would have the Court believe that Agent is requiring Plaintiff to shuttle the Collateral to a random location when such is simply not the fact. There is nothing commercially unreasonable with requiring Collateral to be assembled at Plaintiff's location, and Plaintiff is contractually obligated to do so.

This is just another breach by Plaintiff of a contractual obligation owed to Agent. As noted above, if a debtor could thwart the commercial reasonableness of a foreclosure sale by denying pre-sale inspection, then no secured creditor would be able to conduct a non-judicial foreclosure sale unless either the debtor consented or the secured creditor engaged in a lengthy and expensive judicial process to compel enforcement of its contractual and statutory rights.

## III.

## THE TEXAS LITIGATION IS IRRELEVANT TO THE AGENT'S FORECLOSURE

Plaintiff would have the Court believe that the Foreclosure will interfere with Plaintiff's ability to receive over $175 million dollars in connection with the Texas Litigation. What Plaintiff fails to disclose to the Court is that Plaintiff has little, if any, economic interest in any recovery at this point because Plaintiff's contingency fee lawyers and litigation funding partners have a secured claim that will account for all of those proceeds. (Tse Decl. ¶ 14.) If there were any excess value, Agent would be the party to benefit and Agent has no interest in delaying its Foreclosure to gamble on such a payment. The existence of the Texas Litigation and its potential proceeds should therefore have no bearing whatsoever on any so-called harm to Plaintiff.

///

///

///

///

## IV.

## PLAINTIFF PROVIDES NO EVIDENCE OF IRREPARABLE HARM OR THAT THERE WILL BE ANY GREATER VALUE OBTAINED IN A PRIVATE SALE AS COMPARED TO THE FORECLOSURE SALE

The Application is premised on a faulty narrative that Plaintiff is ***entitled*** to compel an investment banker-run marketing process in lieu of an Article 9 foreclosure sale. That's not true. Moreover, Plaintiff provides no evidence that the value to be obtained through the Foreclosure as noticed by Agent is less than or even different from the value to be obtained through an investment banker marketing process. So there is literally no evidence that the Foreclosure is not commercially reasonable, and Plaintiff's contentions are improperly speculative and uncertain. Moreover, an investment banker costs money to conduct a sale process and Plaintiff has provided no information whatsoever as to what this cost is or how it will get paid, or who will pay it.

Plaintiff admitted its default[4] on the Indebtedness owing to Defendants, and that admission dooms the requested extraordinary relief for a TRO and preliminary injunction to halt the Foreclosure because any putative damages stemming from Plaintiff's default are "self-inflicted," and even worse, entirely speculative. Having defaulted on the Loan Agreement, Plaintiff has no right to dictate what enforcement remedies the Lenders can pursue. Admitting that Defendants have "a security interest in substantially all of HouseCanary's operating assets"[5] but lacking any legal authority to infringe on those rights or to support the notion that a "competitive sale process" is a recognized substitute for an Article 9 foreclosure sale, Plaintiff seeks to compel a consensual marketing process with investment bankers and a data room in lieu of the scheduled Foreclosure. Plaintiff lost the right to have a "competitive sale process" when it defaulted on the Loan Agreement.

The Application is nothing more than a desperate delay tactic and not a legitimate challenge to the noticed public Foreclosure. Plaintiff's arguments are internally inconsistent where Mr.

[4] "HouseCanary did not repay the facility at maturity and is in default under the LSA. HouseCanary does not dispute the occurrence of a default, nor does it dispute Ocean II's ability to pursue remedies against collateral in which it holds a valid security interest." (See MPA at 3:2-4.)

[5] (Application at 3:6-7.)

Rediger contends that they are only seeking a "short preservation period"[6] but also HouseCanary must remain operational and staffed to obtain entry of that Texas Judgment pending post-trial motions, an appeal and prosecution of a further "related federal action."[7] This is all an irrelevant distraction because the Texas Judgment is not Agent's Collateral and Plaintiff has little, if any, economic interest in it, so it is immaterial how long it will take Plaintiff to monetize that potential asset, if ever. But however long it takes (and it has already been approximately 10 years since that litigation started), Agent cannot be enjoined from enforcing its legal remedies for an indefinite period of time, which Plaintiff seeks to do. That is not maintaining the status quo.

Plaintiff fails to show any irreparable harm and merely contends that without injunctive relief a "forced transfer of operating assets could impair the Company's ability to pursue and protect the Texas Litigation."[8] However, the use of the word "could" confirms that this is entirely speculative and does not provide a basis to deny Agent its right to collect what it is owed, exercising rights Plaintiff agreed to in the Loan Agreement. Rejecting this same type of unsupported speculation, the recent decision Xport Forwarding LLC v. Mesitis DWC LLC, 694 F.Supp.3d 1258, 1269-71 (C.D. Cal. 2023) is instructive. There, the court denied the debtor Xport's motion for preliminary injunction because, among other reasons, the debtor had not demonstrated irreparable harm because the "alleged loss of reputation and goodwill was the result of [the debtor's] own failure to pay its bills on time, giving [the creditor] really no choice but to foreclose on its lien in compliance with the California Commercial Code to recoup as much as possible the money it is owed for storing [the debtor's] goods. To the extent that [the debtor] has suffered a loss of reputation and goodwill, it has been self-inflicted." The Xport Court held that the foreclosure was the debtor's own fault, and that logic also applies with equal force here to the Plaintiff.

Here, the Foreclosure is the direct consequence of Plaintiff's failure to repay the Indebtedness since maturity in January 2026. (Compl. ¶ 17.) Plaintiff has had since then to find

---

[6] (Rediger Decl. ¶ 14.)

[7] (MPA at 3:6-28 [Section II. C].)

[8] (Rediger Decl. ¶ 12.)

other financing to pay off the Lenders or to conduct its own sale process to pay off the Lenders. Having failed in both efforts, time is now up and the Lenders are entitled to proceed with the Foreclosure. Plaintiff fails to offer any legally justifiable reason why it is not obligated to pay, or why Agent should be barred from enforcing its rights.

## V.

## PLANTIFF HAS NOT SATISFIED THE STANDARDS FOR ISSUANCE OF A TRO

### A. Plaintiff Cannot Prevail on Its Claims

"[T]rial courts should evaluate two interrelated factors when deciding whether or not to issue [a restraining order]. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the [restraining order] were denied as compared to the harm that the defendant is likely to suffer if the [order] were issued." Church of Christ in Hollywood v. Super. Ct., 99 Cal. App. 4th 1244, 1251-52 (2002). "A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim." Butt v. State, 4 Cal. 4th 668, 678 (1992). "Where there is indeed no likelihood that the plaintiff will prevail, an injunction favoring the plaintiff serves no valid purpose and can only cause needless harm." Am. Academy of Pediatrics v. Van de Kamp, 214 Cal. App. 3d 831, 838 (1989).

Such is the case here where Plaintiff admits that it has defaulted on the Loan Agreement, owes Agent and the Lenders the Indebtedness, that the Agent has a security interest in the Collateral and that it has the right to foreclose. Based on these fatal admissions, Plaintiff has no chance of prevailing on its claims and has not even alleged a wrongful foreclosure claim in the complaint. Instead, Plaintiff repeats the unsupported mantra that the Foreclosure is not commercially reasonable.

### B. Plaintiff Admits that Agent Has the Right to Foreclose

"[I]n order to obtain injunctive relief the plaintiff must ordinarily show that the defendant's **wrongful acts** threaten to cause *irreparable* injuries, **ones that cannot be adequately compensated in damages**. Intel Corp. v. Hamidi, 30 Cal.4th 1342, 1352 (2003) (emphasis added). California law is clear that "'the extraordinary remedy of injunction' cannot be invoked without

showing the likelihood of irreparable harm." Id. "[A] plaintiff must make some showing which would support the exercise of the rather extraordinary power to restrain the defendant's actions prior to a trial on the merits." Tahoe Keys Property Owners' Ass'n v. State Water Resources Control Bd., 23 Cal. App. 4th 1459, 1471 (1994). Here, Plaintiff cannot establish that Agent has engaged in any **wrongful** conduct where Plaintiff has admitted that the Agent has the right to foreclose.

**C. Plaintiff Has Unclean Hands**

In requesting the exceptional equitable remedy of a TRO, Plaintiff needs to have clean hands. Such is not the case here. Plaintiff has committed multiple breaches of the Loan Agreement in addition to not paying the Indebtedness at maturity. "The doctrine [of unclean hands] demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." Kendall-Jackson Winery, Ltd. v. Super. Ct., 76 Cal. App. 4th 970, 978 (1999). See also Fibreboard Paper Products Corp. v. East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO, 227 Cal. App. 2d 675, 727 (1964) ("[T]he doctrine of unclean hands is invoked when one seeking relief in equity has violated conscience, good faith or other equitable principles in his prior conduct. … Accordingly, **one who violates his contract cannot have recourse to equity to support that violation**") (emphasis added).

"The unclean hands doctrine protects judicial integrity and promotes justice. It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system. Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing party's, interests." Kendall-Jackson Winery, Ltd., 76 Cal. App. 4th at 978. **"The doctrine promotes justice by making a plaintiff answer for his own misconduct in the action. It prevents 'a wrongdoer from enjoying the fruits of his transgression.'"** Id. (emphasis added). As outlined below, Plaintiff has engaged in multiple breaches of the contracts, and has concealed and diverted Agent's Collateral which is the type of misconduct that bars Plaintiff from seeking any equitable relief.

In late May 2026, Plaintiff's counsel, James Irving, advised Agent's counsel of Plaintiff's

fraudulent conduct. Specifically, Mr. Irving advised that Plaintiff had been diverting and concealing the Collateral by establishing *at least* five secret bank accounts (two at JP Morgan Chase Bank and three at Vectra Bank) (the "**Secret Bank Accounts**") in a scheme designed so that those accounts would not be subject to a Control Agreement (as defined in the Loan Agreement) in violation of Sections 5.14, 6.21 and 7.11 of the Loan Agreement. In so doing, Plaintiff diverted funds and put them beyond the reach of the Agent and Lenders. (Gasser Decl. ¶ 4.)

As recently as June 24, 2026, without Agent's knowledge or consent, Plaintiff granted one of its litigation funding partners a security interest in certain of Plaintiff's intellectual property in violation of Section 7.4(a) of the Loan Agreement, as amended by the July 10, 2023 "Waiver, Consent, Forbearance, And Third Amendment To Loan And Security Agreement" ("**Third Amendment to Loan Agreement**"), thereby dissipating its assets to the detriment of Agent in violation of Plaintiff's obligations under the Loan Agreement, as amended by the Third Amendment to Loan Agreement. (Gasser Decl. ¶ 5; Tse Decl. ¶¶ 9, 10, Ex. 1.) At the same time, Plaintiff also granted other rights to that same litigation funding partner in direct violation of Section 7.4 of the Loan Agreement, as amended by the Third Amendment to Loan Agreement. (Gasser Decl. ¶¶ 5-7; Tse Decl. ¶¶ 9, 10, Ex. 1.)

As a consequence of Plaintiff's deceit, Agent is concerned that Plaintiff will continue to conceal and divert the Collateral and its other assets to the detriment of Agent and the Lenders. Such nefarious conduct is the textbook definition of a fraudulent transfer: engaging in conduct with the intent to hinder, delay or defraud one's creditor. Plaintiff is not eligible for or worthy of any equitable relief, much less the extraordinary remedy of a TRO or preliminary injunction.

## VI.

## PLAINTIFF SHOULD BE REQUIRED TO POST AT LEAST A $2,000,000 BOND

When issuing a preliminary injunction, the Court "must require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined any damages, not exceeding an amount to be specified, the party may sustain by reason of the injunction, if the court finally decides that the applicant was not entitled to the injunction." White v. Davis, 30 Cal.4th

528, 551 (2003). In other words, "the trial court's function is to estimate the harmful effect which the injunction is likely to have on the restrained party and to set the undertaking at that sum." Id. (quoting ABBA Rubber Co. v. Seaquist, 235 Cal. App. 3d 1, 14 (1991)).

By way of example, in Abba Rubber Co., 235 Cal. App. 3d at 14, the court held: "When an injunction restrains the operation of a business, foreseeable damages include 'the profits which [the operator] would have made had he not been prevented by the injunction from carrying on his business.' … Thus, the defendants correctly sought to have the undertaking include the losses which they will incur by reason of the prohibition against their continued solicitation of business from former customers of the plaintiff." Similarly, here, Agent seeks a bond in an amount sufficient to cover the interest charges on the unpaid Indebtedness as well as recovery of legal fees for this litigation and addressing the improper Application and potential investment banker marketing process.

**A. Recovery Of Attorney's Fees**

In determining the amount of a bond, there is "another type of damage which the undertaking must take into account: attorney's fees." Abba Rubber Co., 235 Cal. App. 3d at 15. Specifically, the Abba Rubber court reasoned:

> 'It is now well settled that reasonable counsel fees and expenses incurred in successfully procuring a final decision dissolving the injunction are recoverable as 'damages' within the meaning of the language of the undertaking, to the extent that those fees are for services that relate to such dissolution [citations].' … If the preliminary injunction is valid and regular on its face, requiring the defendant to defend against the main action in order to demonstrate that the injunction was wrongfully issued, the prevailing defendant may recover that portion of his attorney's fees attributable to defending against those causes of action on which the issuance of the preliminary injunction had been based.
>
> Thus, in calculating the amount of the undertaking to be required in this case, the trial court should have considered at least … the attorney's fees and expenses to be incurred in …. defending at trial against those causes of action upon which the preliminary injunctive relief had been granted. By setting that undertaking at $1,000, the trial court impliedly estimated that those two classes of damages would total no more than that sum.
>
> That estimation is not within the bounds of reason. **Even ignoring the lost profits, there is no reasonable possibility that the attorney's fees and expenses necessary to dissolve the injunction, either through appeal or trial, would not exceed $1,000. It is well known that litigation is extraordinarily expensive. That is especially true in commercial litigation such as this…**

Id. at 15-16 (emphasis added) (citations omitted).

**B. Interest On The Indebtedness**

Here, delaying the Foreclosure will result in Agent not being able to receive the proceeds that would be generated from the Foreclosure, which amount is indeterminate, and no information has been provided by Plaintiff in the Application. Agent knows that interest accrues at over $500,000 a month, and that legal fees will certainly be every bit of $200,000. (Tse Decl. ¶ 6.). Plaintiff should post a bond sufficient to compensate Agent for this reckless delay to the prejudice of Agent in its enforcement of its legal right to foreclose, especially where Plaintiff has admitted the default, the right to foreclose and has not offered any source of payment on the Indebtedness.

**VII.**

**CONCLUSION**

Plaintiff hired sophisticated bankruptcy counsel as early as April 10, 2026, if not before, realizing that it was in a difficult position with Agent and Lenders, having been in payment default since the end of January. Agent and Lenders had enough of Plaintiff's false promises, nefarious conduct and continued breaching of its obligations under the Loan Agreement, and exercised its contractual and statutory rights to begin the foreclose process on September 8, 2026. That Plaintiff chose to ignore its massive debt to Lenders for eight months and not take steps in advance of receiving the initial Notice of Disposition to protect its interests, does not constitute an emergency warranting this Court to intervene and postpone its day of reconning.

Plaintiff has a remedy at law available to it to protect its assets, which is to seek protection under the Bankruptcy Code. That process will frankly provide a more comprehensive framework to resolving matters than a temporary or extended stay of the foreclosure sale issued by this Court, and as such, Agent respectfully requests that this Court deny Plaintiff's request for a TRO.

Dated: September 21, 2026 LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P

By: */s/ Richard P. Steelman, Jr.*
Beth Ann R. Young
Richard P. Steelman, Jr.
Attorneys for Ocean II PLO LLC, solely in its capacity as administrative and collateral agent for the Lenders

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 2818 La Cienega Ave., Los Angeles, CA 90034.

On September 21, 2026, I served the foregoing document described as: **OPPOSITION BY DEFENDANT OCEAN II PLO LLC TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** on the interested parties listed below in the manner prescribed below:

<u>Email</u>
THOMAS J. D'ANTONIO (SBN 316472)
DENTONS US LLP
1999 Harrison Street
Suite 1210
Oakland, CA 94612
Telephone: (415) 882-5000
Email: thomas.dantonio@dentons.com

VAN C. DURRER, II (SBN 226693)
NICK JANDA (SBN 253610)
DENTONS US LLP
601 S. Figueroa Street Suite 2500
Los Angeles, CA 90017-5704
Telephone: (213) 623-9300
Email: van.durrer@dentons.com; nick.janda@dentons.com

*Attorneys for Plaintiff*
HOUSECANARY, INC.

☒ **BY ELECTRONIC MAIL:** By attaching an electronic copy of the document listed above to the email addresses as listed above. I did not receive, within a reasonable time after the email transmission, any electronic message, email, or other indication that the email transmission was unsuccessful. (Email service by Richard P. Steelman, Jr.)

☒ **STATE:** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 21, 2026, at Los Angeles County, California.

<u>*/s/ Richard P. Steelman, Jr.*</u>
Richard P. Steelman, Jr.

BETH ANN R. YOUNG (State Bar No. 143945)
RICHARD P. STEELMAN, JR. (State Bar No. 266449)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: BRY@LNBYG.COM; RPS@LNBYG.COM

Attorneys for Defendant Ocean II PLO LLC, solely in its capacity as administrative and collateral agent for the Lenders

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN MATEO**

HOUSECANARY, INC., a Delaware corporation;

Plaintiff,

v.

OCEAN II PLO LLC, a California limited liability company; STRUCTURAL CAPITAL INVESTMENTS III, LP, a Delaware limited partnership; SERIES STRUCTURAL DCO II SERIES OF STRUCTURAL CAPITAL DCO, LLC, a Delaware limited liability company; CEOF HOLDINGS, LP, a Delaware limited partnership; and DOES 1-10,

Defendants.

Case No. 26-CIV-07276

[Unlimited Jurisdiction]

**DECLARATION OF KAI TSE IN SUPPORT OF OPPOSITION BY DEFENDANT OCEAN II PLO LLC TO PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

[Filed Concurrently with Opposition to *Ex Parte* Application and Declaration of Steve Gasser]

Date: September 21, 2026
Time: 1:30 pm
Dept. 28

I, Kai Tse, do declare as follows:

1. I am the Managing Member of Structural Capital GP, LLC, the General Partner of Structural Capital Management Company II, LP, a Delaware limited partnership, the Manager of Ocean II PLO LLC, a California limited liability company, the Defendant in this Action who serves as the administrative agent and collateral agent for the Lenders ("**Agent**") in connection with the Loan Agreement, and I am authorized to submit this declaration on its behalf.

2. I submit this declaration in support of Agent's opposition to the Plaintiff's *Ex Parte* Application for Temporary Restraining Order ("**TRO**") and Order to Show Cause Re Preliminary Injunction (the "**Application**"). The facts stated herein are based upon my personal knowledge, my direct involvement in this matter, my communications with Plaintiff's counsel, and documents that I can authenticate. Except where stated on information and belief, I could and would testify competently to the matters stated herein if called as a witness.

3. Part of my responsibilities at for the Agent include overseeing the Loan made to Plaintiff which is the subject of this Action, and without limitation, the books and records maintained at all times in the ordinary course of business at Agent, as well as communications I have participated in with Plaintiff.

4. As admitted by Plaintiff in the Application, in January 2026, Plaintiff defaulted under the terms of the Loan Agreement by, *inter alia,* failing to pay all amounts due and owing to Lenders by the Maturity Date in violation of Sections 2.4(c) and 8.1 of the Loan Agreement[1] ("**Plaintiff's Admitted Default**").

5. As a consequence of the default, there is now due and owing the sum of at least $43,004,902.04 (the "**Indebtedness**") which is comprised of principal in the sum of $30,000,000.00 plus accrued interest that has been added to the principal in the sum of $4,327,148.54, plus late fees, costs and expense and other charges accrued under the Loan Documents in the sum of $8,478,510.36, plus, attorney's fees and costs incurred in the sum of $199,243.14. The Indebtedness continues to accrue interest, costs and fees until paid in full.

6. Between October 1, 2026 and December 31, 2026, interest will continue to accrue on the Indebtedness in the aggregate sum of $1,605,858 which is based upon the following monthly rates during October: $534,476; November: $523,693 and December $547,689. In addition to this, I estimate that Agent will incur attorneys' fees and costs over the next 90 days in excess of $200,000 relating to this litigation with Plaintiff, and a significant six figures expense if Agent is required to engage an investment banker and otherwise conduct its foreclosure sale as dictated by Plaintiff.

[1] The Loan Agreement is attached as Exhibit "A" to Plaintiff's filed Complaint in this Action.

7. In late May 2026, I was informed that Plaintiff had been diverting and concealing the Collateral by establishing five secret bank accounts (two at JP Morgan Chase Bank and three at Vectra Bank). That conduct contravenes the requirements of Sections 5.14, 6.21 and 7.11 of the Loan Agreement.

8. In late June 2026, without Agent's knowledge or consent, I am informed and believe that Plaintiff entered into that certain First Amendment to Amended and Restated Litigation Funding Agreement with Crane 2 FundingCo 23, LLC ("**Crane**") dated as of June 24, 2026 (the "**Crane First Amendment**"). The Crane First Amendment purports to amend that certain Amended and Restated Funding Agreement dated as of January 8, 2026, between Plaintiff and Crane (the "**A/R LFA**").

9. Pursuant to the Crane First Amendment, Plaintiff granted Crane a security interest in certain of Plaintiff's intellectual property in violation of Section 7.4(a) of the Loan Agreement, as amended by the July 10, 2023 "Waiver, Consent, Forbearance, And Third Amendment To Loan And Security Agreement" ("**Third Amendment to Loan Agreement**"), thereby dissipating its assets to the detriment of Agent in violation of Plaintiff's obligations under the Loan Agreement, as amended by the Third Amendment to Loan Agreement, to not grant a security interest in any of its intellectual property. A true and correct copy of the Third Amendment to Loan Agreement is attached hereto as **Exhibit 1**.

10. Plaintiff also breached its obligations under Section 7.4(b) of the Loan Agreement, as amended by the Third Amendment to Loan Agreement, by the execution of the Crane First Amendment where it agreed not to agree to any amendment or modification of Plaintiff's agreements with Agent without Crane's approval.

11. Given Plaintiff's duplicitous conduct referenced in the prior four paragraphs, Agent is concerned that Plaintiff will continue conceal and divert the Collateral and its other assets to the detriment of Agent and the Lenders.

12. During 2025 and throughout the greater part of 2026, including after Plaintiff's Admitted Default, I am informed and believe and thereon allege that Plaintiff retained an investment banker to sell Plaintiff without any success.

13. As a consequence of the Plaintiff's Admitted Default, the continuing unpaid Indebtedness and Plaintiff's unwillingness to pay the Indebtedness following the Plaintiff's Admitted Default, I caused the Agent to initiate the foreclosure process. In connection therewith, on September 10, 2026, I emailed a letter to Plaintiff through its representatives, Chris Rediger and Jeremy Sicklick, and requested that Plaintiff provide detailed information as to each category of Collateral and assemble the Collateral, but they did not do so. A true and correct copy of such letter is attached hereto as **Exhibit 2**.

14. As described to me in conversations with Jeremy Sicklick, HouseCanary's Co-Founder & former CEO, and Joseph Miller and Nate Redmond, Board Members of HouseCanary, I have an understanding of both the transaction relating to the Plaintiff's representation by counsel in the Texas Litigation as well as the transaction relating to the litigation funding for the Texas Litigation, all of which started approximately 10 years ago. Based on those representations made to me by these representatives of HouseCanary, I am informed and believe and thereon allege that Plaintiff has no economic interest in any recovery at this point because Plaintiff's contingency fee lawyers and litigation funding partners have a secured claim that will account for all of the proceeds of the Texas Litigation. If there were to be any remaining proceeds, I believe the amount would be insignificant and therefore not change Agent's decision to proceed with the Foreclosure.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 21, 2026 in Hong Kong, China.

Kai Tse

**KAI TSE**

# EXHIBIT 1

# WAIVER, CONSENT, FORBEARANCE AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT

This **WAIVER, CONSENT, FORBEARANCE AND THIRD AMENDMENT TO LOAN AND SECURITY AGREEMENT** (this "***Amendment***") is made as of July 10, 2023 (the "***Effective Date***") by and between HouseCanary, Inc., a Delaware corporation ("***Borrower***"), Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders ("***Agent***") and the Required Lenders identified on the signature page to this Amendment. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in that certain Loan and Security Agreement, dated as of March 25, 2021, by and among Borrower, Agent and the Lenders identified therein (the "***Original LSA***"), as amended pursuant to that certain First Amendment to Loan and Security Agreement, dated as of December 30, 2021 (the "***First Amendment***"), as amended pursuant to that certain Consent and Second Amendment to Loan and Security Agreement, dated as of March 29, 2023 (the "***Second Amendment***"), and as amended pursuant to this Amendment, and together with the Original LSA, the First Amendment and the Second Amendment, collectively, the "***Loan Agreement***".

## RECITALS

**WHEREAS**, Borrower desires to sell to accredited investors acceptable to the Company, including investors that are Affiliates of the Company a minimum of $11,750,000 and a maximum of $20,000,000 of notes and attached warrants for the Company's common stock in the form attached hereto as Exhibit A (the "**2023 Notes**");

**WHEREAS**, in connection with the above described financing, Borrower, Agent and Required Lenders desire to amend certain provisions of the Loan Agreement to, among other things, (i) adjust the Maturity Date, (ii) modify the Initial Advance Exit Fee and Subsequent Advance Exit Fee and include a new IRR fee, (iii) adjust the Cash Threshold of Unrestricted Cash required; and (iv) provide that the 2023 Notes and the obligation of the Borrower under the 2023 Notes shall be Permitted Indebtedness under the Loan Documents (collectively, the "***Amendments***");

**WHEREAS**, the Borrower advised Agent that it is default of the Loan Agreement for failing (a) to timely deliver its audited financial statements for fiscal 2020, 2021 and 2022 (the "***Financial Statement Default***"), (b) to provide a Control Agreement for account number 50019927529 and 50019866586 maintained at First Republic Bank (the "***DACA Default***"), and (c) to maintain Unrestricted Cash as required pursuant to Section 6.11(a) of the Loan Agreement during May 2023 and will be in default of Section 6.11(a) during June 2023 (the "***Minimum Cash Default***" and together with the Financial Statement Default and the DACA Default, the "***Defaults***");

**WHEREAS**, the Borrower desires for Agent and Required Lenders to waive the Event of Default resulting from the DACA Default, and to forbear from exercising their rights and remedies resulting from the Minimum Cash Default and the Financial Statement Default as provided herein;

**WHEREAS**, in connection with the Amendments and the other accommodations provided to Borrower in this Amendment, Agent and Required Lenders require an adjustment to the Warrants; and

**WHEREAS**, pursuant to Section 13.4 of the Loan Agreement, any amendments, modifications, discharges or waivers of, or consents to the Loan Agreement or other Loan Documents require the written consent of the Agent, the Required Lenders and Borrower, and the undersigned constitute the requisite parties to effectuate this Amendment.

**AGREEMENT**

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and agreeing to be bound by the terms hereof, the parties to this Amendment hereby agree as follows:

1. Recitals. The recitals set forth above are true and correct and are hereby incorporated by reference.

2. Definitions. Capitalized terms used but not defined herein shall have the meaning provided in the Loan Agreement, as amended by this Amendment. The following terms shall have the following meaning:

a. "*Commencement Date*" means the date that the last of the following conditions occur:

i. Borrower, Agent and Lenders shall have duly executed and delivered this Amendment;
ii. Borrower shall have received cash proceeds of not less than $10,250,000 from the sale of its Equity Interests after July 10, 2023, with evidence satisfactory to Agent have been provided no later than July 14, 2023;
iii. Agent shall have received amendments to Warrants previously issued to each Lender or its designees, in form and substance acceptable to Agent no later than July 10, 2023; and
iv. Borrower shall have paid all fees and all Lender Expenses (including all reasonable attorneys' fees and reasonable expenses) incurred as of the date hereof.

*b.* "*Forbearance Period*" means the period of time beginning on the Commencement Date and continuing through the date on which the earliest of the following occurs: (i) the occurrence of an Event of Default (other than the Defaults), (ii) Borrower's breach of any provision of this Amendment, (iii) the Maturity Date, and (iv) satisfaction of the Waiver Condition.

c. "*Waiver Condition*" means that to Agent's satisfaction (i) no Event of Default has occurred (other than the Defaults) during the Forbearance Period, (ii) Borrower is in full compliance with the terms of this Amendment, and (iii) either of the following two events occur (1) Borrower's receipt of at least $35,000,000 of cash proceeds from the sale of its capital stock after the Closing Date; or (2) all Obligations (other than inchoate indemnity obligations) have been paid in full in cash on or before the Maturity Date.

3. Amendment to Loan Agreement. From and after the Commencement Date, the Loan Agreement is hereby amended as follows:

a. The following definitions in Section 1.1 of the Loan Agreement are amended and restated or added, as applicable, in proper alphabetical order as follows:

"*2023 Notes*" shall have the meaning provided in the Third Amendment.

"*Amendment Fee*" means Four Hundred Fifty Thousand Dollars ($450,000).

"*Defaults*" shall have the meaning provided in the Third Amendment.

*"I/O Extension Conditions*" mean the satisfaction to Agent's determination that (i) no Event of Default has occurred and is continuing, and (ii) during the period beginning June 1, 2023 and ending on December 31, 2023, Borrower shall have received at least Fifteen Million Two Hundred Fifty Thousand Dollars ($15,250,000) from

the sale of Equity Interests, with evidence thereof satisfactory to Agent having been provided not later than January 31, 2024.

"*Initial Advance Exit Fee*" means a fee in an amount sufficient to increase the Initial Advance Minimum Return:

(a) to 1.35:1.00 if the Initial Advance is repaid prior to March 1, 2024; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.35:1.00 after repayment in full of the Initial Advance; or

(b) to 1.45:1.00 if the Initial Advance is repaid on or after March 1, 2024; provided, that, such Initial Advance Exit Fee shall only be due and payable to the extent the Initial Advance Minimum Return shall be less than 1.45:1.00 after repayment in full of the Initial Advance.

"*IRR Fee*" means the amount, if any, needed to increase the annual internal rate of return on the principal and interest paid in cash by Borrower to Agent hereunder to 13.8% using the "XIRR" function in Mircosoft's Excel software.

"*Maturity Date*" means, with respect to all Advances, August 1, 2024, provided however, that upon the satisfaction of the I/O Extension Conditions, Maturity Date shall mean December 31, 2025.

"*Subsequent Advance Exit Fee*" means a fee in an amount sufficient to increase the Subsequent Advance Minimum Return:

(a) to 1.35:1.00 if the Subsequent Advance is repaid prior to March 1, 2024; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent Advance Minimum Return shall be less than 1.35:1.00 after repayment in full of the Subsequent Advance; or

(b) to 1.45:1.00 if the Subsequent Advance is repaid on or after March 1, 2024; provided, that, such Subsequent Advance Exit Fee shall only be due and payable to the extent the Subsequent Advance Minimum Return shall be less than 1.45:1.00 after repayment in full of the Subsequent Advance.

"*Third Amendment*" means that certain Waiver, Consent and Third Amendment to Loan And Security Agreement dated as of the Third Amendment Effective Date by and among Borrower, Agent and Lender, as such agreement may be amended.

"*Third Amendment Effective Date*" means July 10, 2023.

*"Warrant"* means the Warrant (or Warrants) in favor of a Lender or one or more Affiliates of a Lender to purchase securities of Borrower issued to such Lender or its Affiliates on the Closing Date, substantially in the form of ***Exhibit C,*** as such Warrant may be amended, together with any additional warrant subsequently issued (including amendments thereto).

b. Clause (b) of the definition of "Permitted Indebtedness" is hereby amended and restated in its entirety as follows:

(b) Indebtedness (i) existing on the Closing Date and disclosed in the Disclosure Schedules, (ii) under the Crane 2 Litigation Funding Agreement, (iii) under the HC 1 Litigation Funding Agreement and (iv) under the 2023 Notes.

c. The following definitions in Section 1.1 of the Loan Agreement are deleted:

Amortization Date

Initial Amortization Date

Interest Extension Period

Interest Only Extension

I/O Extension Milestones

d. **Section 2.4(b)** of the Loan Agreement is amended and restated as follows:

(b) Reserved.

e. **Section 2.4(c)** of the Loan Agreement is amended and restated as follows:

(c) **Final Payment**. Unless an Advance is prepaid in full prior to the Maturity Date, Borrower shall pay the entire unpaid principal and accrued interest and all unpaid Obligations on the Maturity Date, including the Initial Advance Exit Fee, the Subsequent Advance Exit Fee, the IRR Fee and the Amendment Fee. Agent shall allocate and distribute all such payments to the Lenders based on each Lender's Pro Rata Percentage.

f. **Section 2.6** of the Loan Agreement is amended and restated as follows:

**2.6 Prepayments.**

(a) **Mandatory Prepayment Upon an Acceleration**. If repayment of the Advances is either automatically or at the election of Agent pursuant to the terms hereof accelerated following the occurrence and continuance of an Event of Default, then Borrower shall immediately pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to the date of prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Initial Advance Exit Fee, (iv) the Subsequent Advance Exit Fee, (v) the IRR Fee, (vi) the Amendment Fee, and (vii) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(b) **Mandatory Prepayment Upon a Liquidation Event**. If a Liquidation Event shall occur, then Borrower shall upon such Liquidation Event pay to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due prior to such Liquidation Event, (ii) the outstanding principal amount of the Advances, (iii) the Initial Advance Exit Fee, (iv) the Subsequent Advance Exit Fee, (v) the IRR FEE, (vi) the Amendment Fee, and (vii) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

(c) **Voluntary Prepayment**. Borrower may voluntarily prepay all, but not less than all, of the Advances at any time; provided that each of the following conditions is satisfied: Borrower pays to Agent for the benefit of Lenders (i) all accrued and unpaid payments of interest with respect to the Advances due up to and including the date of prepayment, (ii) the outstanding principal amount of the Advances, (iii) the Initial Advance Exit Fee, (iv) the Subsequent Advance Exit Fee, (v) the IRR Fee, (vi) the Amendment Fee, and (vii) all other sums, if any, that shall have become due and payable hereunder with respect to the Advances, including all Obligations due hereunder.

g. **Section 6.11** of the Loan Agreement is amended and restated as follows:

**6.11 Financial Covenants**. Borrower shall maintain at all times not less than $3,000,000 (the "**Cash Threshold**") of Unrestricted Cash, provided however, if no Event of Default (other than the Defaults) occurs from or after the Third Amendment Effective Date, Borrower shall not be required to maintain any minimum amount of Unrestricted Cash, provided further, that if Borrower receives at least

$35,000,000 of cash proceeds from the sale of its capital stock after the Closing Date and no Event of Default has occurred (other than the Defaults), then Borrower shall not be required to maintain any amount of Unrestricted Cash.

h. **Section 7.4** of the Loan Agreement is amended and restated as follows:

**7.4 Liens/Negative Pledge/Restrictive Covenants**.

(a) Create, incur, assume or suffer to exist any Lien with respect to any of Borrower's or any Subsidiary's property, including Intellectual Property and Inventory held at warehouse or fulfilment centers, or assign or otherwise convey any right to receive income, or permit any of its Subsidiaries to do so, except for Permitted Liens, or enter into any agreement with any Person other than (a) Lender or (b) the secured party in a Permitted Lien, in each case that prohibits Borrower from granting a security interest in, or otherwise encumbering, any of its property, or permit any Subsidiary to do so.

(b) Agree with any Person not to modify or amend any Loan Document.

i. **Section 7.5** of the Loan Agreement is amended and restated as follows:

7**.5 Indebtedness**.

(a) Create, incur, assume or suffer to exist any Indebtedness other than Permitted Indebtedness. Borrower shall not, nor shall it allow any Subsidiary to, to incur any CARES Debt without Agent's prior written consent.

(b) Make any payment on or in connection with the 2023 Notes to the holders thereof unless all Obligations (other than inchoate indemnity obligations) are simultaneously paid in full in cash.

4. **No Other Amendments**. Except as expressly provided in Paragraph 3 hereof, the execution of this Amendment shall not be deemed to constitute an amendment to the Loan Agreement, and all other terms and conditions of the Loan Agreement are hereby ratified, confirmed and approved and shall remain in full force and effect.

5. **Forbearance**.

A. Subject to the conditions contained herein, during the Forbearance Period, Agent and Lenders shall forbear from exercising any rights and remedies that they may have under any of the Loan Documents as a result of the Minimum Cash Default.

B. Agent and Lenders hereby agree to forbear from exercising any right or remedy arising from the Financial Statement Default prior to September 30, 2023, with respect to the delivery of Borrower's audited financial statements for fiscal years 2020 and 2021, and December 31, 2023 with respect to Borrower's delivery of audited financial statements for fiscal year 2022.

C. The forbearance provided in this Paragraph 5 does not constitute a waiver of the Minimum Cash Default, the Financial Statement Default or any other Event of Default, a continuing waiver, or a course of conduct of forbearing from exercising remedies.

6. **Waiver**.

A. At the request of and as an accommodation to the Loan Parties and subject to the terms and conditions set forth herein, Agent and Lenders hereby waive the Events of Default resulting from the DACA Default, and if the Borrower's audited financial statements for fiscal years 2020, 2021 and 2022 required pursuant to Section 6.3(b) are delivered to Agent by September 30, 2023, with respect to Borrower's audited financial statements for fiscal years 2020 and 2021,

and by December 31, 2023, with respect to Borrower's audited financial statements for fiscal year 2022, then Agent and Lenders shall also be deemed to waive any Events of Default resulting from the Financial Statement Default.

B. On the occurrence of the Waiver Condition, Agent and Lenders agree that the Minimum Cash Default shall be automatically fully waived and shall be deemed to no longer exist for all purposes under the Loan Agreement through the occurrence of the Waiver Condition.

C. In furtherance thereof, the waivers set forth in this Section 6 are effective solely for the purposes set forth herein and shall be limited precisely as written and shall not be deemed to except as expressly provided herein, (a) be a consent to any amendment, waiver or modification of any term or condition of the Loan Agreement or of any other Loan Document; (b) prejudice any right that Agent or the Lenders have or may have in the future under or in connection with the Loan Agreement, any Loan Document, or any other document or agreement with a Loan Party; (c) waive any other Default or Event of Default that may exist as of the date hereof; or (d) establish a custom or course of dealing among any of the Loan Parties, on the one hand, or Agent or any Lender, on the other hand.

7. **Costs and Expenses**. Borrower hereby reaffirms its agreement under the Loan Agreement to pay or reimburse Agent and Lender on demand for all Lender Expenses. Without limiting the generality of the foregoing, Borrower specifically agrees to pay the reasonable fees and disbursements of counsel to Agent or Lender for the services performed by such counsel in connection with the preparation of this Amendment and the documents and instruments incidental hereto. Borrower hereby agrees that Agent or Lender may, at any time or from time to time in its sole discretion and without further authorization by Borrower, make a loan to Borrower under the Loan Agreement, or apply the proceeds of any loan, for the purpose of paying any such fees, disbursements, costs and expenses.

8. **Release of Agent/Lender**.

A. Borrower, for itself and on behalf of its respective heirs, legal representatives, and successors and assigns, as applicable, hereby release Agent, Lender and all of their Affiliates, shareholders, partners, predecessors, employees, officers, directors, attorneys, parent corporations, subsidiaries, agents, participants, assignees, servicers and receivers (collectively, the "**Released Parties**"), except for claims, disputes, differences, liabilities and obligations arising under this Amendment, the Loan Agreement and the other Loan Documents after the date hereof, from any and all known and unknown claims, disputes, differences, liabilities and obligations of any and every nature whatsoever that Borrower or any of them may have or claim, as of the date hereof or as of any prior date, against any one or more of the Released Parties arising from, based upon or related to the Loan Documents, or any other agreement, understanding, action or inaction whatsoever with regard to the Loan Documents or any transaction or matter related thereto, including, without limitation, the origination and servicing of the loan made under the Loan Documents and the enforcement or attempted enforcement of any rights or remedies for default or asserted default under the Loan Documents (collectively, the "**Released Claims**").

B. Borrower further acknowledges and agrees that the Released Claims include, among other things, all claims arising out of or with respect to any and all transactions relating to the Loan Documents based on any fact, act, inaction, or other occurrence or nonoccurrence on or prior to the date hereof, including, without limitation, any breach of fiduciary duty or duty of fair dealing, breach of confidence, breach of loan commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of any other statute, ordinance or regulation, intentional or negligent infliction of mental or emotional distress, tortious interference with contractual relations or prospective business advantage, tortious interference with corporate governance, breach of contract, bad practices, unfair competition, libel, slander, conspiracy or any claim for wrongfully accelerating the loan made under the Loan Documents or attempting to

foreclose on, or obtain a receiver for, any collateral for the loan made under the Loan Documents and all statutory claims and causes of action of every nature.

C. In connection with the release contained in this Paragraph 8 (the "**Release**"), Borrower acknowledges that it is aware that it may hereafter discover facts in addition to or different from those that it now knows or believes to be true with respect to the Released Claims, but that it is Borrower's intention hereby fully, finally and forever to settle and release all claims, disputes, differences, liabilities and obligations, known or unknown, suspected or unsuspected, that now exist, may exist or heretofore have existed by Borrower against any one or more of the Released Parties. In furtherance of that intention, the Release contained in this Amendment shall be and remain in effect as a full and complete release notwithstanding the discovery of the existence of any such additional or different facts.

D. The Release contained in this Amendment shall be effective and irrevocable upon the execution of this Amendment by Agent, Lender and Borrower without any further documentation.

E. BORROWER AGREES AND ACKNOWLEDGES THAT THE RELEASED CLAIMS ARE NOT LIMITED TO MATTERS THAT ARE KNOWN OR DISCLOSED TO BORROWER AND THAT THE RELEASED CLAIMS INCLUDE ALL CLAIMS, DISPUTES, DIFFERENCES, LIABILITIES AND OBLIGATIONS THAT BORROWER DOES NOT KNOW OR SUSPECT TO EXIST AS OF THE DATE HEREOF. BORROWER UNDERSTANDS THAT IT IS GIVING UP ALL RIGHTS AND CLAIMS AGAINST AGENT AND LENDER AND THE OTHER RELEASED PARTIES, KNOWN OR UNKNOWN, THAT ARE IN ANY WAY RELATED TO THE COLLATERAL OR THE LOAN.

F. THE PARTIES SPECIFICALLY ALLOCATE THE RISK OF ANY MISTAKE IN ENTERING INTO THE RELEASE TO THE PARTY OR PARTIES CLAIMING TO HAVE BEEN MISTAKEN.

G. Borrower acknowledges having read and understood and hereby waives the benefits of Section 1542 of the California Civil Code, which provides as follows (and hereby waives the benefits of any similar law of the state that may be applicable):

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

9. **Miscellaneous**. This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same instrument. The provisions of Sections 12 and 13 of the Loan Agreement shall be deemed incorporated herein by reference, *mutatis mutandis*.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ______________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

DocuSign Envelope ID: D6C81F1D-31A5-4155-9043-63D18F9BA265

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ________________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

By: ___________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

DocuSigned by:
By: EC77AC48D9C844B...
Name: Daniel Friedman
Title: General Counsel

DocuSign Envelope ID: 782BE8BF-D873-4703-BC72-8D610B7E3D49

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Amendment as of the date first above written.

**AGENT:**

**OCEAN II PLO LLC**
By: Structural Capital Management Company II, LP
Its: Manager
By**:** Structural Capital GP, LLC, a Delaware limited liability company
Its General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**BORROWER:**

**HOUSECANARY, INC.**

DocuSigned by:
By: Jeremy Sicklick
F3483410B3446...
Name: Jeremy Sicklick
Title: Chief Executive Officer

**REQUIRED LENDERS:**

**STRUCTURAL CAPITAL INVESTMENTS III, LP**
**By: Structural Capital GP III, LLC,**
a Delaware limited liability company
Its: General Partner

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**Series Structural DCO II Series of Structural Capital DCO, LLC**
a Delaware limited liability company
**By: Structural Capital GP III, LLC**,
a Delaware limited liability company
its Manager

By: ______________________
Name: Lawrence Gross
Title: Managing Member

**CEOF HOLDINGS LP**
a Delaware limited partnership
**By:** CORBIN CAPITAL PARTNERS, L.P.
its Investment Manager

By: ______________________
Name:
Title:

**FORM OF 2023 NOTES**

(see attached)

# HOUSECANARY, INC.

# NOTE PURCHASE AGREEMENT

This NOTE PURCHASE AGREEMENT (this "***Agreement***") is made as of [___________], 2023 (the "***Effective Date***") by and among HouseCanary, Inc., a Delaware corporation (the "***Company***"), and the persons or entities set forth on the Schedule of Purchasers attached hereto as Schedule 1 (the "***Purchasers***").

## RECITAL

**WHEREAS**, to provide the Company with additional resources to conduct its business, the Purchasers are willing to loan to the Company in one or more disbursements up to an aggregate amount of $20,250,000, subject to the conditions specified herein (the "***Offering***").

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company and each Purchaser, intending to be legally bound, hereby agree as follows:

### 1. AMOUNT AND TERMS OF THE LOANS

Subject to the terms and conditions of this Agreement, the Company shall issue and sell to the Purchasers, and the Purchasers agree to purchase from the Company (a) one or more Convertible Promissory Notes, substantially in the form attached hereto as Exhibit A (each, a "***Note***" and collectively, the "***Notes***"), in the principal amount set forth opposite each Purchaser's name on Schedule 1 hereto, and (b) warrants to purchase such number of shares of voting common stock of the Company (the "***Common Stock***") as would equal the Loan Amount (as defined below) under the applicable Purchaser's Note divided by the Valuation Cap Price (as defined in the Notes), the exact number of which is as set forth opposite each Purchaser's name on Schedule 1 hereto (such number of shares of Common Stock, the "***Warrant Shares***"), substantially in the form attached hereto as Exhibit B (each a "***Warrant***" and collectively, the "***Warrants***", and together with the Notes and the Conversion Securities (as defined below), the "***Securities***"), at an exercise price per share as set forth in each such Warrant. Each Note shall be convertible into equity securities of the Company as provided in such Note. The original principal amount of each Note shall be equal to the purchase price paid by the Purchaser for such Note (each, a "***Loan Amount***" and collectively, the "***Loan***"). The obligations of the Purchasers to purchase Notes are several and not joint.

### 2. THE CLOSING

**2.1 Initial Closing.** The initial closing of the sale and purchase of one or more Notes having an aggregate principal amount of $10,250,000 (the "***Initial Closing***") shall be held on the date of this Agreement, or at such other time as the Company and the Purchasers participating in such closing shall agree, but in no event later than [June 7, 2023] (the "***Initial Closing Date***"). At the Initial Closing:

(a) Each Purchaser shall deliver to the Company the purchase price for the Note purchased at the Initial Closing by check or wire transfer of immediately available funds, cancellation of other indebtedness of the Company to such Purchaser, or any combination thereof, in the amount of the applicable Loan Amount; and the Company shall issue and deliver to such Purchaser (a) a Note in favor of such Purchaser payable in the principal amount of the applicable Loan Amount and (b) a Warrant to purchase the Warrant Shares, each duly executed by the Company (this Agreement, the Notes and the Warrants are referred to collectively as the "***Loan Documents***").

(b) Each outstanding Simple Agreement for Future Equity ("***SAFE***") of the Company held by each of Jeremy Sicklick, Jeffrey Somers and Christopher Stroud (each a "***Management SAFE Holder***", and each SAFE held thereby, a "***Management SAFE***") shall be cancelled and converted into (i) a Note in the principal amount equal to the purchase amount delivered in respect of the given Management SAFE, and (ii) a Warrant to purchase such number of Warrant Shares as would equal the purchase amount under the applicable Management SAFE divided by the Valuation Cap Price, and as shall be set forth opposite each Management SAFE Holder's name on Schedule 1 hereto. Upon the issuance of the Notes and Warrants to the Management SAFE Holders, each Management SAFE Holder shall acknowledge and agree that their respective Management SAFE shall be deemed terminated and that all obligations of the Company arising out of or related to their respective Management SAFE shall be cancelled and deemed satisfied in full, and each such Management SAFE Holder shall be deemed a Purchaser hereunder. For the avoidance of doubt, the conversion of the Management SAFEs shall be deemed to satisfy all Initial Closing obligations of the Management SAFE Holders.

(c) Each Purchaser's obligations at the Initial Closing are subject to the satisfaction of the following conditions (any of which may be waived by such Purchaser):

**(i)** the waiver, consent, forbearance and third amendment to the Senior Loan Agreement (as defined in the Note) ("**Third Amendment Agreement**") is duly executed and delivered by the parties thereto, and is in a form and substance satisfactory to the Lead Investor;

**(ii)** the Company having provided evidence satisfactory to the Lead Investor that the following conditions set out in the Third Amendment Agreement are fully satisfied or otherwise waived (and the waiver has not been revoked or amended) by the Senior Creditors:

(aa) Ocean II PLO LLC, (the "**Agent**") has received amendments to the warrants which were previously issued to each lender under the Senior Loan Agreement or its designees, in form and substance acceptable to the Agent no later than July [__], 2023; and

(bb) the Company has paid all fees and all Lender Expenses (as defined in the Third Amendment Agreement and including all reasonable attorneys' fees and reasonable expenses) incurred as of the date of the Third Amendment Agreement;

**(iii)** all representations and warranties of the Company in this Agreement shall be true and correct in all respects on the date of the Initial Closing as if made on such date;

**(iv)** the Company shall have complied with all covenants and agreements set forth in this Agreement and the other Loan Documents that are to be performed at or prior to the Initial Closing;

**(v)** no event, circumstance or development has occurred or arisen which would cause or is likely to cause a Material Adverse Effect (as defined below);

**(vi)** no Event of Default (as defined in the Notes) or any event or circumstance which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Loan Documents or any combination of any of the foregoing) be an Event of Default (a "***Potential Event of Default"*** *which together with an Event of Default, a* ***"Default"***) would occur or result from the proposed issue of the Notes;

**(vii)** Delivery to the Purchasers of, in each case, in the form and substance satisfactory to the Purchasers:

**(1)** copies of all necessary consents, approvals, authorisations and waivers (including but not limited to approvals by the board of directors and/or shareholders of the Company and such other approvals or waivers as may be required under the Company's Constitutional Documents (as defined below) to approve the execution of, and performance of the Company's obligations under, this Agreement and the other Loan Documents and the transactions contemplated thereunder (including but not limited to approving the issuance of the Notes and the Warrants);

**(2)** a copy of the register of shareholders of the Company, evidencing the shareholding structure of the Company immediately prior to the Initial Closing; and

**(3)** a copy of the current Constitutional Documents of the Company.

**(viii)** The Loan Documents having been executed.

**2.2 Subsequent Closing**.

(a) During the period following the Initial Closing Date until December 31,2023 (the "***Subsequent Closing Period***"), each outstanding SAFE of the Company (other than the Management SAFEs cancelled and converted pursuant to Section 2.1) having "most favored nations" rights thereunder may, at the election of the holder thereof (each, a "***SAFE Holder***"), be cancelled and converted into (i) a Note in the principal amount equal to the purchase amount delivered in respect of the given SAFE, and (ii) a Warrant to purchase such number of Warrant Shares as would equal the purchase amount under the applicable Purchaser's SAFE divided by the Valuation Cap Price, and as shall be set forth opposite each SAFE Holder's name on an amended Schedule 1 hereto. Upon the issuance of the Notes and Warrants to the SAFE Holders, each SAFE Holder shall acknowledge and agree that their respective SAFE shall be deemed terminated and that all obligations of the Company arising out of or related to their respective SAFE shall be cancelled and deemed satisfied in full, and each such SAFE Holder shall be deemed a Purchaser hereunder.

(b) Additionally, during the Subsequent Closing Period, the Company may issue and sell to one or more existing or additional Purchasers additional Notes and Warrants subject to the terms of this Agreement, provided that the aggregate Loan Amount of all Notes does not exceed $20,250,000 (including the conversion of the Management SAFEs, but expressly excluding the conversion of any other SAFEs); provided, however, if the Company (i) fails to raise at least $5,000,000 on or prior to the end of the Subsequent Closing Period (excluding any further commitment from Marbruck Investments Ltd. and its affiliates (the "***Lead Investor***") or the conversion of any SAFEs) and (ii) during the Subsequent Closing Period, has not achieved three consecutive months of positive Adjusted EBITDA (as defined below), the Company shall provide notice thereof to the Purchasers participating in the Initial Closing (other than the Lead Investor and its affiliates), which notice shall be provided not later than five (5) days following the last day of the Subsequent Closing Period, and within five (5) days of the delivery of such notice, each of the Management SAFE Holders shall purchase one or more additional Notes (and shall receive corresponding Warrants), on a pro-rata basis, in an aggregate principal amount equal to $1,500,000 Each closing of the sale and purchase of Notes pursuant to this Section 2.2 is referred to as a "***Subsequent Closing***." Each Subsequent Closing shall take place at such locations and at such times as shall be mutually agreed upon orally or in writing by the Company and the Purchasers participating in such Subsequent Closing. At each Subsequent Closing (i) each Purchaser purchasing a Note shall deliver to the Company such Purchaser's purchase price for the Note purchased at such Subsequent Closing by check or wire transfer of immediately available funds, cancellation of other indebtedness of the Company to such Purchaser, cancellation/conversion of any existing SAFE, or any combination thereof, in the amount of the applicable Loan Amount, and (ii) the Company shall issue and deliver to such Purchaser (a) a Note in favor of such Purchaser payable in the principal amount of the applicable Loan Amount, and (b) a Warrant to purchase the applicable number of Warrant Shares (calculated in the manner set forth in Section 1), each duly executed by the Company. The Initial Closing and each Subsequent Closing shall constitute a "***Closing***" and, collectively, the "***Closings***" for purposes of this Agreement. Following each Closing, the Schedule of Purchasers attached hereto as Schedule 1 (the "***Schedule of Purchasers***") will be amended (without any requirement for consent of the Purchasers to such amendment) to list the Purchasers purchasing Notes hereunder and the original principal amount of the Note and the number of Warrant Shares issued to each Purchaser hereunder at each such Closing. The Company will after each Closing and, upon request, furnish to each Purchaser copies of the amendments to the Schedule of Purchasers. For purposes of this Section 2.2, "***Adjusted EBITDA***" means, with respect to the Company for an applicable period, determined on a consolidated basis in accordance with United States generally accepted accounting principles, the net income for such period, *plus*, without duplication and to the extent deducted in determining the net income for such period, (a) an amount equal to any non-recurring or unusual loss plus any net loss realized in connection with a sale of assets outside of the ordinary course of business (and including, for the avoidance of doubt, all fees, costs and expenses arising from or in connection with the TSI Litigation (as defined in the Disclosure Schedule) (b) income taxes, (c) interest expense and (d) depreciation, amortization and other non-cash charges and expenses, *minus*, without duplication and to the extent included in determining net income for such period, (A) non-cash revenue, other than the accrual of revenue in the ordinary course of business, and (B) all extraordinary gains and all gains realized in connection with any sale of assets outside of the ordinary course of business

**2.3** The indebtedness evidenced by the Notes shall be expressly subordinated, to the extent and in the manner set forth in the Notes, in right of payment to the prior payment in full of

the Senior Indebtedness (as defined in the Notes), and each Purchaser hereby agrees to enter into such agreements and/or take such additional actions as may be reasonably requested by the Company from time to time (now or in the future) to evidence such subordination. The Company and each Purchaser agree that Senior Creditors (as defined in the Notes) are intended third party beneficiaries of this Agreement and shall be entitled to enforce the provisions thereof, and that the Company and Holder may not amend or waive any provision of this Section 2.3, Section 6.6, Section 6.12 without the prior written consent of Agent (as defined in the Notes), to be given or withheld in Agent's sole discretion.

**2.4** The Company undertakes that it shall deliver its audited financial statements for fiscal years 2020, 2021 and 2022 to the Agent in accordance with the Third Amendment Agreement (the "***Financial Statement Covenant***"); provided, however, in the event the Senior Creditors agree to a waiver or forbearance of the Financial Statement Covenant that (a) does not require any fee or payment in consideration for such waiver or forbearance, and (b) does not require the commencement of any payments of principal under the Senior Loan Agreement, then such waiver or forbearance shall not be treated as a breach of this Section 2.4.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

The Company hereby represents and warrants to the Purchasers that, except as set forth on the Disclosure Schedule attached as Exhibit C to this Agreement, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of this Agreement, the Initial Closing and shall be true and complete as the date of each Subsequent Closing, in each case, except as otherwise indicated. The Disclosure Schedule shall be arranged in sections corresponding to the numbered and lettered sections contained in this Section 3, and the disclosures in any section of the Disclosure Schedule shall qualify other sections in this Section 3 only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections.

**3.1 Organization, Good Standing and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has all requisite corporate power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on (a) the condition (financial or other), the properties, business, prospects or results of operations of the Company and each member of the Group or the Group as a whole whether or not arising in the ordinary course of business, (b) the ability of an Company to perform its obligations under the Notes and the Loan Documents, or (c) the validity or enforceability or priority of the obligations of the Company under Notes and the Loan Documents, subject to the subordination of the indebtedness evidenced by the Notes set out in Section 2.3, or (d) the ability of the Purchasers to enforce their rights and remedies under the Notes and the Loan Documents, subject to the subordination of the indebtedness evidenced by the Notes as set forth in Section 2.3 (each, a "***Material Adverse Effect***").

**3.2 Corporate Power**. The Company has all requisite corporate power to execute and deliver the Loan Documents, to issue each Note, each Warrant, and the Conversion Securities (as defined below) upon conversion of the Notes and/or the exercise of the Warrants in accordance with the terms thereof, and to carry out and perform its obligations under the terms of this Agreement and under the terms of each other Loan Document.

**3.3 Authorization.** All corporate action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution, delivery and performance of this Agreement by the Company and the performance of the Company's obligations under the Loan Documents, including the issuance and delivery of the Notes and the Warrants, and the reservation of the equity securities issuable upon conversion of the Notes and exercise of the Warrants (collectively, the "***Conversion Securities***") has been taken or will be taken prior to the issuance of such Conversion Securities. Each of the Loan Documents, when executed and delivered by the Company, shall constitute valid and binding obligations of the Company, enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws. The Conversion Securities, when issued in compliance with the provisions of this Agreement, the Notes and the Warrants will be validly issued, fully paid and nonassessable and free of any liens or encumbrances and issued in compliance with all applicable federal and state securities laws.

**3.4 Corporate Structure; Subsidiaries.** The Company does not presently have any subsidiaries other than those listed in Section 3.4 of the Disclosure Schedule (each, a "***Subsidiary***", and collectively with the Company, the "***Group***"). Section 3.4 of the Disclosure Schedule sets forth the name, jurisdiction of incorporation or organization, and all of the security holders of each subsidiary. The information relating to each subsidiary as set out in Section 3.4 of the Disclosure Schedule is true and accurate in all respects and there is no information the omission of which might make such information misleading or inaccurate in any respect. The entire share capital or registered capital of each Subsidiary is legally and beneficially owned by its relevant security holder(s) as set out in Section 3.4 of the Disclosure Schedule, and has been fully, validly and punctually paid-up in accordance with its Constitutional Documents and all applicable laws. Except as disclosed in the Disclosure Schedule, no Group Company (as defined below) is or was a participant in any joint venture, partnership or similar arrangement. No Group Company is obligated to make any investment in or capital contribution in or on behalf of any other Person.

**3.5 Pari Passu Ranking/Status of the Notes**. Subject to Section 2.3, the obligations of the Company under the Notes shall be unsecured obligations of the Company and the payment obligations of the Company under the Notes will at all times rank equally with all its other existing and future unsecured and unsubordinated obligations, save for such obligations that may be preferred by provisions of law that are mandatory and of general application. All the Notes shall rank equally in right of repayment. Any and all repayment or prepayments of the obligations under the Notes shall be made ratably to the holders of all Notes based on the sum of the outstanding principal balance and accrued unpaid interested owed with respect to each Note.

**3.6 No Other Securities/Rights**. Save as disclosed in the Disclosure Schedule, (1) there are no and at the Closing there shall be no other authorized or outstanding securities of the Company or any entity within the Group (each, a "***Group Company***"); (2) no securities of the

Company are subject to any preemptive rights, rights of first refusal (except to the extent required by applicable laws) or other rights to purchase such equity securities or any other rights with respect to such securities, and (3) a party or subject to any contract that affects or relates to the voting or giving of written consents with respect to, or the right to cause the redemption, or repurchase of, any security of the Company. Except as disclosed in the Disclosure Schedule, the Company has not granted any registration rights to any other Person, nor is the Company obliged to list, any of the securities of any Group Companies on any securities exchange. Except as expressly contemplated under the Loan Documents, there are no voting trusts, shareholder agreements, proxies or similar agreements or understandings which relate to the voting or transfer of the share capital or registered capital of the Company.

**3.7 Valid Issuance of Securities.** The Conversion Securities and the Warrant Shares, as applicable, when issued, allotted and paid for in accordance with the terms of the Notes or Warrants (as the case may be), will be duly and validly issued, fully paid and non-assessable, free from any liens (except for any restrictions on transfer under applicable laws and under the Loan Documents). The Conversion Securities have been reserved for issuance and, upon issuance in accordance with the terms of the certificate of incorporation of the Company (as amended, the "***Certificate***"), will be duly and validly issued, free from any liens or restrictions (except for any restrictions on transfer under applicable securities laws and under the Loan Documents). The issuance of the Notes, the Warrant and the Conversion Securities is not subject to any preemptive rights, rights of first refusal or similar rights that shall have not been waived prior to the Closing.

**3.8 Intellectual Property and Technology**

(a) All IP Rights used or required by the Group in connection with its Business, are in full force and effect and are solely vested in and beneficially owned by the Group (or if not beneficially owned, the Group owns or possesses sufficient legal rights to such IP Rights) free from encumbrances and, to the Company's knowledge after due and careful enquiry, the use of such rights or any part thereof does not infringe any patent, trade mark, registered design, trade name, copyright, industrial process or any other right owned by any third party relating to intellectual property (or in the case of third party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications, without any violation or infringement known to the Group) or involves the unlicensed use of IP Rights or confidential information disclosed to the Group by any person in circumstances which might entitle that person to a claim against the Group and, to the Company's knowledge after due and careful enquiry, none of the IP Rights are being used, claimed, opposed or attacked by any third party, other than any use that is licensed by the Company in the ordinary course of business.

(b) No act has been done or has been omitted to be done to entitle any authority or person to cancel, forfeit or modify any registered IP Rights.

(c) The Group is not aware of any infringement of the Group's IP Rights by any third party.

(d) There are no outstanding claims against the Group for infringement of any intellectual property used (or which has been used) by it and no such claims have been settled by the giving of any undertakings which remain in force.

(e) For the purposes of this Agreement, **"IP Rights"** means any and all intellectual property rights (anywhere in the world, whether statutory, common law or otherwise) including patents, utility models, copyright (including future copyright), trademarks, logos and design marks, service marks, trade names, business names, brand names, designs, know how, trade secrets, domain names, other names and locators associated with the world wide web, internet addresses, semiconductor or circuit layout rights, whether arising before, on or after the date of this deed, and including all applications and rights to apply for registration of such intellectual property rights.

**3.9 Transaction Warranties**

(a) There is no limit or other restriction under the Certificate, bylaws of the Company (the "***Bylaws***", and collectively with the Certificate, the "***Constitutional Documents***"), any material agreement or other material arrangement binding on it or its assets which affects its ability to issue such number of Conversion Securities as would be required to be issued on conversion of all the Notes.

(b) The issue of the Conversion Securities and Warrant Shares, as applicable, on conversion of the Notes or exercise of the Warrants will not violate the pre-emption or similar rights of any person or any options or rights granted under any employee, contractor or director incentive scheme (whether or not in existence as at the date of this deed).

(c) Save in respect of the waiver of anti-dilution adjustments and right of first offer from certain holders of securities as set out in the Disclosure Schedule, no action or thing is required to be taken, fulfilled or done (including without limitation the obtaining of any consent or license or the making of any filing or registration) by the Company for the issue of the Notes, Warrants and the Conversion Securities and Warrant Shares, as applicable, to be issued upon conversion of the Notes and exercise of the Warrants to the Purchasers under the Loan Documents, for carrying out of the other transactions contemplated by the Notes and the Loan Documents, or for the compliance by the Company with the terms of the Notes and the Loan Documents, as the case may be.

**3.10 Licenses and approvals**

(a) Each of the Company and each member of the Group possesses all necessary certificates, authorisations, licenses, orders, consents, approvals or permits (the "***Approvals***") issued by, and has made all declarations and filings with, all appropriate national, state, local and other governmental agencies or bodies, all exchanges and all courts and other tribunals, domestic or foreign, necessary to own or lease, as the case may be, and to operate its properties and to conduct the business now operated by them.

(b) Each of the Company and its Subsidiaries is in compliance with the terms and conditions of all such Approvals.

(c) All the Approvals are valid and in full force and effect.

(d) Neither the Company nor any of its Subsidiaries has received any notice of proceedings relating to the revocation or modification of any such Approvals or is otherwise aware that any such revocation or modification is contemplated or threatened.

**3.11 Borrowings and Financing**

(a) Save for the Notes and as disclosed by the Company in the Disclosure Schedule, neither the Company nor any of its Subsidiaries has or will have any financial indebtedness outstanding.

(b) Except as disclosed by the Company in the Disclosure Schedule, none of the Company or any of its subsidiaries is in default and no waiver of default is currently in effect, in the payment of any principal, interest or premium on any indebtedness of any of the Company or its Subsidiaries and no event or condition exists with respect to any indebtedness of any of the Company or its Subsidiaries that would permit (or that with notice or the lapse of time, or both, would permit) one or more persons to cause such indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

(c) Except as disclosed by the Company in the Disclosure Schedule, each of the Company and its Subsidiaries is currently in compliance with all financial covenants in its outstanding indebtedness and is not in breach or potential breach (which shall mean an event or circumstance which could, with the giving of notice, lapse of time, issue of a certificate and/or the fulfilment of any other requirement, become a breach) of any provision of such indebtedness.

**3.12 Event of Default**. No event has occurred, or circumstance arisen which, had the Notes already been issued, would (whether or not with the giving of notice and/or the passage of time and/or the fulfilment of any other requirement) constitute a Default.

**3.13 Taxation**

(a) The Company and each other member of the Group have duly filed on time all tax returns that are required to be filed in all jurisdictions or have duly requested extensions thereof and have paid all taxes required to be paid by any of them in all jurisdictions and any related assessments, fines or penalties.

(b) The Company and each other member of the Group is not currently involved in any dispute or disagreement with any tax authority in relation to tax or regarding the availability of the Company or each other member of the Group of any relief.

**3.14 Anti-Money Laundering and Anti-Terrorism Financing**. The operations of the Company and each of its Subsidiaries are and have been conducted at all times in compliance with all applicable anti-money laundering and anti-terrorism financing laws, regulations, rules and guidelines in its jurisdiction and in each other jurisdiction in which such entity, as the case may be, conducts business (collectively, the "***AMLCFT Laws***") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any member of the Group with respect to AMLCFT Laws is pending or threatened, and the Company and every other member of the Group have instituted and maintain policies and

procedures designed to ensure continued compliance with, and prevent violation of, such AMLCFT Laws.

**3.15 No Unlawful Payments**. Neither the Company nor any other member of the Group nor any director or officer or, to the best knowledge of the Company (after due and careful enquiry), any agent, affiliate, employee or other person acting on behalf of the Company or any other member of the Group, is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "***FCPA***"), or any other applicable anti-bribery or anti-corruption law or regulation similar to the FCPA (including but not limited to the United Kingdom Bribery Act of 2010), in Hong Kong, Singapore or any other jurisdiction in which the Company or any member of the Group operates including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorisation of the payment of any money, or other property, gift, promise to give, or authorisation of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA or any other similar applicable anti-bribery or anti-corruption law or regulation of any such other jurisdiction; and the Company and every other member of the Group has conducted their businesses in compliance with FCPA and any other similar applicable anti-bribery or anti-corruption law or regulation of any such other jurisdiction and have instituted and maintain policies and procedures designed to ensure continued compliance with, and prevent violation of, such laws, rules and regulations.

**3.16 Sanctions.** Neither the Company nor any other member of the Group nor any director or officer nor, to the best knowledge of the Company (after due and careful enquiry), any agent, employee, affiliate of or other person acting on behalf of the Company or any other member of the Group:

(a) is an individual or entity (a Person) currently the subject of any U.S. sanctions administered or enforced by the United States Government, including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the U.S. Trading With the Enemy Act, the U.S. International Emergency Economic Powers Act, the U.S. United Nations Participation Act, the Iran Sanctions Act, the Comprehensive Iran Sanctions, Accountability and Divestment Act of 2010, the U.S. Syria Accountability and Lebanese Sovereignty Act, the Iran Threat Reduction and Syria Human Rights Act, or the Iran Freedom and Counterproliferation Act, all as amended, or any of the foreign assets control regulations of the U.S. Department of the Treasury (including, without limitation, 31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, the United Nations Security Council, the European Union or Her Majesty's Treasury or other relevant sanctions authority (collectively, the "***Sanctions***");

(b) is located, organised or operating in a country or territory that is the subject of Sanctions (including, without limitation, the Crimea region of the Ukraine, Cuba, Iran, North Korea, Sudan and Syria);

(c) has engaged in, and is now engaged in any dealings or transactions with any government, person, entity or project targeted by, or located in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions;

(d) is or has been in violation of any Sanctions or subject to an investigation, action or proceeding relating to any Sanctions; and

(e) and except to the extent that the following is or would be unenforceable by reason of breach of:

(f) any provision of Council Regulation (EC) No 2271/96 of 22 November 1996 (or any law or regulation implementing such Regulation in any member state of the European Union); or

(g) Council Regulation (EC) No 2271/96 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018, and

(h) neither the Company nor any other member of the Group will directly or indirectly use the proceeds of the offering of the Notes hereunder, or lend, contribute or otherwise make available all or part of such proceeds to any subsidiary, joint venture partner or other Person, for the purpose of financing the activities of or business with any Person currently subject to any Sanctions or operating in any country or territory that is the subject of Sanctions where such operations are in violation of such Sanctions or in any other manner that would result in a violation by any Person (including any Person participating in the offering, whether as underwriter, adviser, investor or otherwise) of Sanctions, and

(i) the Company and its Subsidiaries have instituted and maintained policies and procedures designed to ensure continued compliance with, and prevent violation of, such Sanctions.

**3.17 No Litigation**. Except as disclosed by the Company in the Disclosure Schedule, there is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the Company's knowledge, currently threatened in writing (i) against the Company or any officer, director or key employee of the Company arising out of their employment or board relationship with the Company; or (ii) to the Company's knowledge, that questions the validity of this Agreement or the Notes or the right of the Company to enter into them, or to consummate the transactions contemplated by this Agreement or the Notes. Neither the Company nor, to the Company's knowledge, any of its officers, directors or key employees is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, directors or key employees, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate. The foregoing includes, without limitation, actions, suits, proceedings or investigations pending or threatened in writing (or any basis therefor known to the Company) involving the prior employment of any of the Company's employees, their services provided in connection with the Company's business, any information or techniques allegedly proprietary to any of their former employers or their obligations under any agreements with prior employers.

**3.18 Consents, No Conflicts**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority or any other persons, including but not limited to the waivers as set out in the Disclosure Schedule, required on the part of the Company in connection with the valid execution and delivery of this Agreement and the other Loan Documents, the offer, sale or issuance of the Notes, the Warrants and the Conversion Securities issuable upon conversion of the Notes, the exercise of the Warrants or the consummation of any other transaction contemplated hereby shall have been obtained and will be effective at the Closing. The execution, delivery and performance of each Loan Document by the Company do not, and the consummation by the Company of the transactions contemplated thereby will not, (i) result in any violation of, be in conflict with, or constitute a default under, require any consent under, or give any person rights of termination, amendment, acceleration or cancellation under, any governmental order, any provision of the Constitutional Documents of any Group Company, any applicable laws or any material contract to which a Group Company is a party, (ii) result in any termination, modification, cancellation, or suspension of any material right of, or any augmentation or acceleration of any material obligation of, any Group Company (including any indebtedness of such Group Company), or (iii) result in the creation of any lien upon any of the material properties or assets of any Group Company other than the liens set out in the Disclosure Schedule.

**3.19 Compliance with Laws**.

(a) The Company is not in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of the Company's business or the ownership of its properties, which violation of which would materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of the Company. None of the Group Companies is under investigation with respect to a violation of any applicable law. The Company has not made any filings with, been the subject of any inquiry, investigation, or review undertaken by, or received any communication from the Committee on Foreign Investment in the United States ("**CFIUS**"). In addition, no other investor has given written or oral notice to the Company indicating that it intends to notify CFIUS of their investment in the Company.

(b) As of the date of this Agreement, the US Company is not a TID U.S. business as defined by CFIUS in 31 C.F.R. § 800.248 and no Group Company is required to provide any notice or filing or submit any information to CFIUS under 31 C.F.R § 800.401 in connection with the execution, delivery and performance of the Loan Documents.

(c) No governmental consent in connection with or incidental to the business of the Group ("**Required Governmental Consent**") contains any materially burdensome restrictions or conditions, and each Required Governmental Consent is in full force and effect and will remain in full force and effect upon the consummation of the transactions contemplated hereby. None of the Group Companies is in default under any Required Governmental Consent. There is no reason to believe that any Required Governmental Consent which is subject to periodic renewal will not be granted or renewed. None of the Group Companies has received any letter or other written communication from any governmental authority threatening or providing notice of revocation of any Required Governmental Consent issued to such Group Company or the need for compliance or remedial actions in respect of the activities carried out by such Group Company.

**3.20 Compliance with Other Instruments**. The Company is not in violation or default of any term of the Constitutional Documents, or of any provision of any mortgage, indenture or contract to which it is a party and by which it is bound or of any judgment, decree, order or writ, other than such violation(s) that would not have a Material Adverse Effect on the Company. The execution, delivery and performance of the Loan Documents, and the consummation of the transactions contemplated hereby or thereby, will not result in any such violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to the Company, its business or operations or any of its assets or properties.

**3.21 Offering**. Assuming the accuracy of the representations and warranties of the Purchasers contained in Section 4 hereof, the offer, issue, and sale of the Notes, the Warrants and the Conversion Securities are and will be exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "***Act***"), and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws. No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**") is applicable to the Company or any "Company Covered Person", except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable.

**3.22 Use of Proceeds**. The proceeds of the Loan shall be used by the Company for the operations of the Company's business.

**3.23 Disclosure and Information.**

(a) All information set out in the Disclosure Schedule is accurate in all material respects and not misleading, and the opinions given in such information are honestly held and have been reached on a reasonable basis after having made all reasonable enquiries.

(b) All information supplied or disclosed in writing or orally including, without limitation, the answers and documents provided to given by or on behalf of the Company to the Purchasers or any of its officers, employees, agents or advisers during the negotiations leading to this agreement was when given and is now complete, true, accurate and not misleading in all material respects, and all forecasts and estimates supplied or disclosed or any opinions given in any information have been made after due, careful and proper consideration, are based on reasonable assumptions and represent reasonable and fair expectations honestly held based on facts known to such persons (or any of them), and no information has been withheld by the Company which might be material to a prospective purchaser of the Notes or Warrant.

## 4. REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

Each Purchaser hereby represents and warrants to the Company, severally and not jointly, that the following representations are true and complete as of the date of the applicable Closing.

**4.1 Authorization**. Such Purchaser has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Loan

Documents to which such Purchaser is a party, when executed and delivered by such Purchaser, shall constitute valid and binding obligations of such Purchaser, enforceable in accordance with their terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

**4.2 Purchase for Own Account**. Such Purchaser is acquiring the Securities solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Securities or any part thereof, has no present intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.

**4.3 Information and Sophistication**. Without lessening or obviating the representations and warranties of the Company set forth in Section 3, such Purchaser hereby, (i) represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment and (ii) acknowledges that, except as otherwise expressly set forth in the Loan Documents, such Purchaser is not relying on any statements or representations of the Company or its agents for legal, financial and tax advice with respect to this investment or the transactions contemplated by the Loan Documents.

**4.4 Ability to Bear Economic Risk**. Such Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

**4.5 Restricted Securities.** Such Purchaser understands that the Securities are characterized as "restricted securities" under federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that, under such laws and applicable regulations, the Securities may be resold without registration under the Act only in certain limited circumstances. Such Purchaser understands that the Securities have not been and will not be registered under the Act and have not been and will not be registered or qualified in any state in which they are offered and that such Purchaser will not be able to resell or otherwise transfer the Securities unless the Securities are registered under the Act and registered or qualified under applicable state securities laws, or an exemption from such registration or qualification is available.

**4.6 Accredited Investor Status.** Such Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**5. FURTHER AGREEMENTS**

**5.1 Limitations on Disposition**. Without in any way limiting the representations set forth in Section 4 above, each Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

(a) There is then in effect a registration statement under the Act covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b) Such Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144 promulgated under the Act, except in unusual circumstances.

Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to a parent, subsidiary, an affiliated venture fund, a partner (or retired partner), member (or retired member) or other equity owners of such Purchaser in accordance with partnership, limited liability company, or other equity interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were the Purchaser hereunder.

**5.2 Market Stand-Off**. If requested by the Company and an underwriter of common stock, (or other securities) of the Company, each Purchaser shall not sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any common stock (or other securities) of the Company held by such Purchaser (other than those included in the registration) during the one hundred eighty (180)-day period following the effective date of the Company's initial public offering filed under the Act, *provided* that if (i) during the last seventeen (17) days of the one hundred eighty (180)-day restricted period, the Company issues an earnings release or material news or a material event relating to the Company occurs or (ii) prior to the expiration of the one hundred eighty (180)-day restricted period, the Company announces that it will release earnings results during the seventeen (17)-day period beginning on the last day of the one hundred eighty (180)-day period, then the restrictions imposed by this market stand-off provision shall continue to apply until the expiration of the seventeen (17)-day period beginning on the issuance of such earnings release or the occurrence of a material news or material event. Each Purchaser agrees to enter into a written market stand-off agreement satisfactory to the Company and such underwriter, acting reasonably, to effect the intent of this Section 5.2. The obligations described in this Section 5.2 shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may stamp each such certificate with a legend with respect to the shares of common stock (or other securities) subject to the foregoing restriction until the end of such lock-up period.

**5.3 Usury Exemption**. The lending transactions contemplated by this Agreement are intended to be exempt from the constitutional usury provisions of the California Constitution by operation of Section 25118 of the California Corporations Code, and from the applicable provisions of Delaware law, it being expressly acknowledged by the Company and the Purchasers that each Purchaser has a preexisting personal or business relationship with the Company as such terms are used in Section 25118(f)(1) of the California Corporations Code.

**5.4 No Finder's Fees**. Each party represents that it neither is nor will be obligated for any finder's fee, broker's fee or commission in connection with the transactions contemplated by the Loan Documents. Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee, broker's fee or commission (and the costs and expenses of defending against such liability or asserted liability) for which such Purchaser or any of its officers, employees, or representatives is responsible. The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's fee, broker's fee or commission (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

**5.5 Further Assurances.** Each Purchaser agrees and covenants that at any time and from time to time it will promptly execute and deliver to the Company such further instruments and documents and take such further action as the Company may reasonably require in order to carry out the full intent and purpose of this Agreement and to comply with state or federal securities laws or other regulatory approvals.

**6. MISCELLANEOUS**

**6.1 Binding Agreement**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**6.2 Governing Law/WAIVER OF JURY TRIAL**

(a) This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents, made and to be performed entirely within the State of Delaware, without giving effect to conflicts of laws principles.

(b) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR ANY CONTEMPLATED TRANSACTION UNDER THIS AGREEMENT, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

**6.3 Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties to this Agreement, and an executed copy of this Agreement may be delivered by one or more parties to this Agreement by facsimile or similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen, and such execution and delivery shall be considered valid, binding and effective for all purposes.

**6.4 Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**6.5 Notices.** All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the Company at its principal executive offices, and to the Purchasers at the addresses set forth on the signature pages attached hereto or at such other addresses as the Company or the Purchaser may designate by ten (10) days advance written notice to the other parties hereto.

**6.6 Amendment; Modification; Waiver**. Except as provided in Section 2.3, any term of this Agreement and other Loan Documents may be amended or modified and the observance of any term of this Agreement or other Loan Documents may be waived (either generally or in a particular instance and either retroactively or prospectively) on a *pari passu* basis with respect to all Purchasers or holders of Notes, as applicable, with the written consent of the Company and the holders of Notes representing at least fifty percent (50%) of the aggregate principal amount of the Notes then outstanding (the "***Majority Holders***"), which may consist of one or more holders; *provided, however*, that no such amendment, waiver or consent shall reduce the principal amount of any Note without the affected Purchaser's written consent. Any amendment or waiver effected in accordance with this Section 6.6 shall be binding upon each holder of Notes then outstanding (including securities into which such Notes and/or Warrants have been converted or exchanged or for which such Notes and/or Warrants have been exercised, and each future holder of such Notes, Warrants or such equity securities) and the Company. Each Purchaser acknowledges that by the operation of this Section 6.6, the Majority Holders will have the right and power to diminish or eliminate the rights of such Purchaser under this Agreement, the Notes and the Warrants.

**6.7 Expenses.** Each of the Company and each Purchaser shall be solely responsible for its own expenses and legal fees incurred with respect to this Agreement and the transactions contemplated herein; provided, however, the Company shall reimburse the Lead Investor its reasonable legal fees and expenses incurred with respect to the transactions contemplated herein, in an amount not to exceed, in the aggregate, $50,000.

**6.8 Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to each Purchaser, upon any breach or default of the Company under this Agreement, any Note or any other Loan Documents shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by any Purchaser of any breach or default under this Agreement, or any waiver by any Purchaser of any provisions or conditions of this Agreement must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under this Agreement, or by law or otherwise afforded to the Purchaser, shall be cumulative and not alternative.

**6.9 Severability; Separability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms. The Company's agreement with each of the Purchasers is a separate agreement and the sale of the Notes to each of the Purchasers is a separate sale. Unless otherwise expressly provided herein or the Notes, the rights of each Purchaser hereunder are several rights, not rights jointly held with any of the other Purchasers.

**6.10 Entire Agreement.** This Agreement (including the Schedule of Purchasers and the exhibits attached hereto) constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and no party shall be liable or bound to any other party in any manner by any representations, warranties, covenants and agreements except as specifically set forth herein.

**6.11 Attorney's Fees.** The prevailing party in any litigation instituted under this Agreement shall, in addition to other remedies, be entitled to be reimbursed by the other party for all expenses of such litigation, including reasonable attorneys' fees and expenses.

**6.12 General Interpretation**. The terms of this Agreement have been negotiated by the parties hereto and the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Agreement shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under this Agreement. No rule of strict construction will be applied against any person or entity.

[*Signature Pages Follow*]

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the Effective Date.

**COMPANY:**

**HOUSECANARY, INC**

By: ___________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

Address: 535 Mission Street, Office #1920______
San Francisco, CA 94105____________

Email:

Date:

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the date set forth below.

**PURCHASER:**

**MARBRUCK INVESTMENTS LTD.**

By:_________________________________________
Name: __________________________________________
Title: __________________________________________

Address: ________________________________________

_______________________________________

Email:

Date:

**Amount of Note**: $_____[5,000,000]_____

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the date set forth below.

**PURCHASER:**
**[INDIVIDUAL]**

___________________________________
[NAME]

Address: [__________________________]

Email: [____________________________]

Date:

**Amount of Note**: $__[______]_____

**IN WITNESS WHEREOF,** the undersigned has executed this **NOTE PURCHASE AGREEMENT** as of the date set forth below.

**PURCHASER:**

**[ENTITY]**

By:________________________________________
Name: __________________________________________
Title: ___________________________________________

Address: _______________________________________

______________________________________

Email:

Date:

**Amount of Note**: $_____[__________]_____

**SCHEDULES AND EXHIBITS**

| | |
|---|---|
| Schedule 1: | Schedule of Purchasers |
| Exhibit A: | Form of Convertible Promissory Note |
| Exhibit B: | Form of Warrant |
| Exhibit C: | Disclosure Schedule |

***Schedule 1: Schedule of Purchasers***

**Initial Closing: [__________], 2023**

| **Name of Purchaser** | **Loan Amount (US$)** | **Number of Warrant Shares** |
|---|---|---|
| Marbruck Investments Limited | 5,000,000 | [●] |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total:** | | |

**Subsequent Closing: [_________], 2023**

| Name of Purchaser | Loan Amount (US$) | Number of Warrant Shares |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total:** | | |

# Exhibit A

## Form of Convertible Promissory Note

THIS NOTE AND THE SECURITIES INTO WHICH IT MAY BE CONVERTED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

THIS NOTE IS SUBORDINATED TO INDEBTEDNESS OWED TO THE COMPANY'S SENIOR CREDITORS AS PROVIDED IN SECTION 6 HEREOF.

**HOUSECANARY, INC.**

**CONVERTIBLE PROMISSORY NOTE**

**LOAN AMOUNT: [•]** **DATE: _______, 2023**

FOR VALUE RECEIVED, the undersigned, HouseCanary, Inc., a Delaware corporation (the "***Company***"), promises to pay to the order of [•], or its registered assigns (the "***Holder***"), the Loan Amount set forth above plus simple interest at a fixed rate equal to 10% per annum until this Convertible Promissory Note (this "***Note***") is paid in full. Provided, however, if the Company fails to pay any amount payable under this Note on the Maturity Date (as defined below), interest shall accrue on the outstanding amount from the due date to the date of actual payment at a rate equal to 12.0% per annum ("***Default Interest***"). Any Default Interest accruing pursuant to the preceding sentence shall be immediately payable by the Company on demand by the Holder. Interest shall be calculated on the basis of actual number of days elapsed over a year of 365 days and shall accrue from the date of this Note. All payments received by the Holder hereunder will be applied first to costs of collection, if any, then to interest and the balance to principal.

Unless converted pursuant to the provisions hereof, payments of principal, interest and other amounts due hereunder will be made by check or wire transfer in immediately available funds sent to the Holder at the address or account furnished to the Company for that purpose.

This is one of a series of the Company's Convertible Promissory Notes (together with this Note, collectively referred to herein as the "***Notes***") issued pursuant to that certain Note Purchase Agreement (the "***Purchase Agreement***") dated [___________], 2023 by and among the Company, the Holder and the other Purchasers of the Notes (together with the Holder, the "***Holders***"), all of like tenor, except as to the names of the Holders, the date of issuance, the Loan Amount thereof and other non-material details. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Purchase Agreement.

The following is a statement of the rights of the Holder of this Note and the conditions to which this Note is subject to and to which the Holder hereof, by the acceptance of this Note, agrees:

1. Maturity Date. Subject to the provisions of Sections 2 and 5 below, the principal and accrued interest on this Note shall be due and payable on the applicable date set out as follows (the **Maturity Date**):

(x) August 1, 2024, or

(y) in the event the aggregate Loan Amount of all Notes is equal to or greater than $15,250,000 as of December 31, 2023 (including, for the purpose hereof, any Loan Amount repaid by the Company prior to December 31, 2023) and the maturity date under the Senior Loan Agreement has been extended to December 31, 2025, the Maturity Date shall be December 31, 2025,

and in each case subject to the earlier consummation of a Liquidation Event.

2. Note Conversion.

2.1. General.

2.1.1 Automatic Conversion upon Qualified Financing. Upon the closing by the Company of a bona fide third-party preferred equity financing transaction pursuant to which the Company sells its shares of preferred stock (the "***Preferred Securities***") resulting in aggregate gross proceeds to the Company of at least $30,000,000 (excluding for these purposes conversion of the Notes, and any other convertible promissory notes and/or convertible instruments issued by the Company) (a "***Qualified Financing***"), then, subject to Section 2.2.2 below, the entire outstanding Loan Amount and accrued unpaid interest on this Note (the "***Note Balance***") shall automatically be converted, upon the date of the closing of such Qualified Financing, into a number of shares of Shadow Preferred Securities (as defined below), at a conversion price per share (the "***Conversion Price***") which shall be the lower of (i) the price equal to $3.0228 per share (the "***Valuation Cap Price***") and (ii) two-thirds (2/3) of the price per share paid by the other purchasers in a Qualified Financing. The issuance of Shadow Preferred Securities pursuant to the conversion of this Note shall be upon and subject to the same terms and conditions applicable to Preferred Securities sold in the Qualified Financing. For purposes of this Note, the term "***Shadow Preferred Securities***" shall mean shares of one or more series of preferred stock of the Company that are identical in substantially all respects to the Preferred Securities of the Company issued in the Qualified Financing, except that the liquidation preference and original issue price per share of the Shadow Preferred Securities shall equal the applicable Conversion Price with corresponding adjustments to any price-based antidilution and dividend rights provisions.

2.1.2 Voluntary Conversion at Maturity. If the Notes remain outstanding on the Maturity Date, then the outstanding Note Balance (calculated as of the Maturity Date) of each Note shall, (a) at the election of the Holder, for and on behalf of this Note, or (b) at the election of the Majority Holders, for and on behalf of all Holders of the Notes, be converted into (i) such number of shares of the most senior series of Preferred Securities of the Company as of the Maturity Date equal to the quotient of the Note Balance of each applicable Note divided by the Valuation Cap Price, and (ii) a warrant to purchase a number of shares of voting common stock of the Company equal to the quotient of (A) two (2) times the Note Balance of each applicable Note divided by (B) the Valuation Cap Price, at an exercise price per share equal to $0.01. The Holder or Majority Holders, as applicable, shall only be entitled to make such an election to convert the outstanding Note Balance during the thirty (30) day period immediately following the Maturity Date. In the event the Holder or Majority Holders, as applicable, do not elect to convert the outstanding Note Balance, then the right to convert as set forth in this Section 2.1.2 shall expire and no longer be exercisable, and the Company shall repay the outstanding Note Balance of all Notes (calculated as of the Maturity Date), on a pro-rata, pari passu basis in accordance with Section 7 hereof, upon written notice to all Holders who do not elect to convert pursuant to the terms of this Section 2.1.2. Upon the repayment of the Note by the Company pursuant to this Section 2.1.2, the Company shall be released from all of its obligations and liabilities under this Note.

2.2. Conversion Procedure.

2.2.1 Mechanics and Effect of Conversion. No fractional shares shall be issued upon conversion of this Note. In lieu of the Company issuing any fractional shares to the Holder upon the conversion of this Note, the Company shall pay to the Holder in cash the amount of outstanding Note Balance that is not so converted. Upon the conversion of this Note pursuant to Section 2.1, the Holder shall surrender this Note, duly endorsed, at the principal office of the Company or via electronic delivery, as applicable. The Company shall not be required to issue or deliver the capital stock into which this Note may convert until the Holder has surrendered this Note to the Company and delivered to the Company any such documentation. At the Company's expense, the Company shall, as soon as practicable thereafter, issue and deliver to such Holder at such Holder's address or if no such address appears or is given, at such principal office of the Company, a certificate or certificates (if certificated) for, and shall record on the Company's books and records, the capital stock to which the Holder shall be entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon conversion of this Note, including a check payable to the Holder for any cash amounts payable in lieu of fractional shares as described above. Upon conversion of this Note pursuant to Section 2.1, the Company shall be released from all its obligations and liabilities under this Note.

2.2.2 Documentation. Upon the conversion of this Note pursuant to Section 2.1, (a) the Holder agrees to surrender this Note for conversion at the closing of the Qualified Financing or on the Maturity Date, as applicable, and to execute all reasonably necessary documents in connection with the conversion of this Note (including any definitive purchase agreement) that are executed by the investors (or other applicable parties) in the Qualified Financing or on the Maturity Date, as applicable; and (b) the Company shall, at its sole cost and reasonably promptly following such delivery, issue and deliver certificates (if certificated) or such other instrument representing, and shall record on the Company's books and records, the number of shares of fully paid and non-assessable Shadow Preferred Securities. Upon the conversion of this Note into capital stock pursuant to the terms hereof, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this Note.

3. Liquidation Event. In the event that a Liquidation Event shall occur prior to the earlier of a Qualified Equity Financing or the Maturity Date, then upon and concurrently with the consummation of the transaction constituting a Liquidation Event, the Company shall pay to the Holder the greater of (a) the Exit Redemption Amount (as defined below) and (b) the amount the Holder would be entitled to receive in connection with such a Liquidation Event if the total Note Balance had been converted into shares of Preferred Securities at the per share price equal to the Valuation Cap Price. "***Liquidation Event***" means any of the following: (i) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred (except a bona fide capital raising transaction), (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity, (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company, (iv) a liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or any other event or series of related events resulting in the distribution of the Company's assets to its shareholders or creditors for the purpose of ceasing the Company's operation and existence, or (v) the completion of an initial public offering of the Company's securities. The "***Exit Redemption Amount***" means (A) if the Liquidation Event occurs on or before the twelve (12) month anniversary of the Initial Closing Date, an amount equal to two (2) times the Note Balance as of immediately prior to the consummation of the Liquidation Event; (B) if the Liquidation Event occurs after the twelve (12) month anniversary and on or before the twenty-four (24) month anniversary of the Initial Closing Date, an amount equal to two and one-half (2.5) times the Note Balance as of immediately prior to the consummation of the Liquidation Event or (C) if the Liquidation Event occurs after the twenty-four (24) month anniversary of the Initial Closing Date, an amount equal to

three (3) times the Note Balance as of immediately prior to the consummation of the Liquidation Event. Upon the repayment of the Note by the Company pursuant to this Section 3, the Company shall be released from all its obligations and liabilities under this Note.

4. Adjustment Event.

4.1. The Company shall, as soon as practicable prior to the prospective date of an Adjustment Event, give notice in writing to the Holder of any such Adjustment Event, stating (i) that it has resolved to implement an Adjustment Event, (ii) the prospective date of the Adjustment Event and (iii) the proposed terms of the Adjustment Event.

4.2. Following an Adjustment Event, the Company shall certify to the Holder in writing the adjustments to the number and nominal value of the Preferred Securities to be converted which they consider to be necessary so that, after such adjustment and on conversion, the Holder shall be entitled to receive the same percentage of the issued share capital of the Company carrying the same proportion of votes exercisable at a general meeting of shareholders and the same entitlement to participate in distributions of the Company, in each case as nearly as practicable, as would have been the case had no Adjustment Event occurred (and making such reduction or increase as is necessary to the premium arising on the issue and allotment of the Preferred Securities on conversion of the Notes).

4.3. For purposes of this Section 4, "***Adjustment Event***" means any or all of the following, at any time, or by reference to any record date, while the Notes remain outstanding, any sub-division or consolidation of equity securities of the Company.

5. Events of Default. Upon the occurrence and during the continuance of an Event of Default (as defined below), the Majority Holders shall be entitled, by written notice to the Company, to declare this Note and the other Notes to be, and upon such declaration this Note shall be and become, immediately due and payable, in addition to any other rights or remedies the Holder may have under applicable law or the provisions of this Note. The occurrence of any of the following events shall constitute an "***Event of Default***":

5.1. Default in the payment of principal of the Notes or accrued interest thereon when due; or

5.2. Any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary; or

5.3. The institution by the Company of proceedings to be adjudicated as bankrupt or insolvent, or the consent by the Company to institution of bankruptcy or insolvency proceedings against the Company under any federal or state law, or the consent by the Company to or acquiescence in the filing of any petition relating thereto, or the appointment of a receiver, liquidator, assignee, trustee or other similar official of the Company, or of any substantial part of its property, or the making by the Company of an assignment, for the benefit of creditors, or the admission by the Company in writing of its inability to pay its debts generally as such debts become due; or

5.4. Commencement of proceedings against the Company seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulations which proceedings shall not have been dismissed or stayed within thirty (30) days of commencement thereof, or the setting aside of any such stay of any such proceedings, or the appointment without the consent or acquiescence of the equity holders of the Company of any trustee, receiver or liquidator of the Company

or of all or any substantial portion of the properties of the Company which appointment shall not have been vacated within thirty (30) days thereof.

5.5. Failure by the Company to deliver the Preferred Securities as and when such Preferred Securities are required to be delivered following conversion of a Note.

5.6. Failure by the Company to make payment of the Exit Redemption Amount or any other amount in accordance with this Note.

5.7. A default is made by the Company in the performance or observance of any covenant, condition or provision contained in this Note, the Purchase Agreement or other Loan Documents (as defined in the Purchase Agreement), or in any other agreement relating to the issue of or subscription for the Notes and on its part to be performed or observed or a breach of any representation and warranty given by the Company is made and such default or breach continues for the period of 21 days following the earlier of (a) the Company becoming aware of such non-observance or breach and (b) the service by the Holder on the Company of notice requiring such default to be remedied.

5.8. An event or circumstance whereby: (i) a default is made by the Company or any of its subsidiaries in the performance or satisfaction of its obligations, undertakings and/or covenants under any Indebtedness for Borrowed Money, (ii) the lender under such Indebtedness for Borrowed Money (the "**Other Lender**") takes action to enforce the terms and conditions thereof or to accelerate the Company's payment obligations thereunder (the "**Lender Enforcement Action**"), and (iii) the Other Lender does not waive, rescind or dismiss the Lender Enforcement Action within five (5) business days thereof. For the purpose of this clause, "***Indebtedness for Borrowed Money***" means any indebtedness with a then-outstanding aggregate amount of $1,000,000 or more (whether being principal, premium, interest or other amounts) for or in respect of any notes, bonds, debentures, debenture stock, loan stock or other securities or any borrowed money or any liability under or in respect of any acceptance or acceptance credit, other than as disclosed in the Disclosure Schedule (as defined in the Purchase Agreement).

5.9. Any governmental authority or agency compulsorily purchases or expropriates all or, in the opinion of the Investor, any material part of the assets of the Company or any subsidiary without fair compensation.

5.10. Any amendment or modification of any provisions of the Senior Loan Agreement (as defined in the Purchase Agreement) or any other document related to or arising thereunder without the prior written consent of the Majority Holders; provided, however, any waiver of any conditions or covenants set forth in the Senior Loan Agreement by the Senior Creditors shall not be considered an amendment or modification hereunder.

6. Subordination.

6.1. Subject to and except as set forth in Section 6.2 below, all obligations of the Company to Holder under this Note, including without limitation, all principal, interest (including, without limitation, any interest accruing after the commencement of any insolvency, reorganization or any case or proceeding under any bankruptcy or insolvency law or laws relating to the relief of debtors (any of the foregoing, an "***Insolvency Event***"), premiums, fees and expenses (the "***Junior Obligation***") are subordinated in right of payment to all Senior Indebtedness (as defined in Section 6.2, below). Nothing herein shall be deemed to subordinate, waive or restrict the Company's ability to issue capital stock of the Company upon the conversion of this Note in accordance with its terms.

6.2. Notwithstanding Holder's entitlement to demand or receive payment pursuant to the other provisions of this Note and the other Loan Documents, Holder shall not, after the occurrence of an event of default under the Senior Loan Agreement (a "***Senior Default***"): (a) demand or receive from the Company (and the Company shall not pay to any Holder) all or any part of the Junior Obligations, by way of payment, prepayment, setoff, lawsuit or otherwise and the failure of the Company to pay the Junior Obligations shall not constitute a default by the Company in respect of the Junior Obligations under this Note, the Loan Documents or otherwise; (b) exercise any right or remedy, or take any enforcement action regarding any assets of the Company, in connection with the Junior Obligations; (c) commence, or cause to be commenced, prosecute or participate in any administrative, legal or equitable action against the Company or its assets in connection with the Junior Obligations, or (d) take any security for the Junior Obligations, including, without limitation, any security interest in any of the Company's assets, for such time as any payment obligations, now or hereafter existing, under the Senior Loan Agreement (defined below), whether for principal, interest (including, without limitation, any interest accruing after the filing of an Insolvency Event), premiums, fees, expenses or otherwise (the "***Senior Indebtedness***") remain outstanding. For purposes of this Note, the Senior Indebtedness shall not be deemed to have been paid in full until and unless the Senior Creditors (defined below) shall have ceased to have any obligation, whether actual or contingent, to make any credit accommodation to the Company under the Senior Loan Agreement and the Senior Creditors shall have received irrevocable and indefeasible payment of all amounts due or to become due in respect of the Senior Indebtedness in full in cash. For the purposes of this Note, "***Senior Loan Agreement***" means that certain Loan and Security Agreement dated as of March 25, 2021, by and among the Company, Ocean II PLO LLC, as administrative and collateral agent ("***Agent***"), and Structural Capital Investments III, LP, Series Structural DCO II series of Structural Capital DCO, LLC, CEOF Holdings LP and other person or entity from time to time party thereto as a lender (collectively with Agent, "***Senior Creditors***"), as such agreement has been amended to date, and as may be further amended, restated or supplemented from time to time.

6.3. Notwithstanding anything to the contrary in this Note, under applicable law or otherwise, Holder agrees not to directly or indirectly contest the validity, enforceability or priority of any lien securing the Senior Indebtedness. Any and all documents evidencing the Junior Obligation, including, without limitation, any purchase agreements and promissory notes, shall contain a legend stating that the Junior Obligation is subject to the terms of this Note.

6.4. Holder shall be entitled to receive, and the Company shall be entitled to issue, capital stock of the Company to repay or otherwise satisfy Junior Obligations as provided in this Note.

6.5. The Company expressly agrees that it shall not assert as a defense to the Junior Obligation, the passage of time, estoppel, laches or any statute of limitations to the extent that the exercise of any rights or remedies by Holder was precluded by the terms of this Section 6.

6.6. After the occurrence of a Senior Default or if Holder receives payment hereunder in violation of the Senior Loan Agreement, and continuing thereafter until the Senior Indebtedness is paid in full, the Holder shall promptly deliver to Agent for the benefit of Senior Creditors in the form received (except for endorsement or assignment by any Holder where required by Agent) for application to the Senior Indebtedness any payment, distribution, security or proceeds received by Holder with respect to the Junior Obligation other than in accordance with this Section 6 (and prior to such delivery shall not commingle such payments with holder's own assets but instead shall hold such payments, distributions, security or proceeds in trust for Agent for the benefit of Senior Creditors).

6.7. Senior Creditors may amend, restate or supplement the Senior Loan Agreement or any other document related to or arising thereunder without notice to or consent of Holder, and any such amendment, restatement or supplement shall not affect the enforceability by the Senior Creditors of this

Section 6, it being understood by all that any such amendment may result in an Event of Default hereunder pursuant to Section 5.10 hereof.

6.8. The terms and conditions of this Section 6 shall inure to the benefit of and be binding upon the respective successors and assigns of the Secured Parties. Holder agrees that any successors and assigns of the Senior Creditors are intended third party beneficiaries of the terms of this Note, and upon any assignment or transfer by a Senior Creditor under the Senior Loan Agreement, the assignee or transferee shall be entitled to the benefits of this Note.

6.9. The Company and Holder agree that Senior Creditors are intended third party beneficiaries of this Note and shall be entitled to enforce the provision of the legend affixed to this Note, Section 6, Section 10.6, and Section 10.13 of this Note, and that the Company and Holder may not amend or waive any provision of the legend affixed to this Note, Section 6, Section 10.6, or Section 10.13 in a way that would adversely affect Senior Creditors' rights without Agent's prior written consent, to be given or withheld in Agent's sole discretion.

7. Obligations Pari Passu. The obligations of the Company under this Note shall be unsecured obligations of the Company. All the Notes shall rank equally in right of repayment. Any and all repayment or prepayments of the obligations under the Notes shall be made ratably to the holders of all Notes based on the sum of the outstanding principal balance and accrued unpaid interested owed with respect to each Note.

8. No Prepayment. The Company may not prepay this Note (in whole or in part) without the prior written consent of the Majority Holders, which may be withheld or granted in the sole discretion of the Majority Holders.

9. Waiver of Notice; Fees. The Company hereby waives notice, presentment, protest and notice of dishonor. Other than pursuant to a writing by the Holder, no failure to exercise any right of the Holder with respect to this Note, nor any delay in, or waiver of, the exercise thereof, shall impair any such right or be deemed to be a waiver thereof. If the Holder is required to commence legal proceedings or incur any other cost to collect amounts due and payable hereunder or to enforce its rights under this Note, the Company shall be liable to pay or reimburse the Holder for all reasonable costs and expenses incurred in connection with the collection of such amounts and any such legal proceedings, including without limitation attorneys' fees.

10. Miscellaneous.

10.1. No Assignment by Company. The Company may not assign its rights or delegate any obligations hereunder without the prior written consent of the Majority Holders.

10.2. Transfers by Holder. With respect to any offer, sale or other disposition of this Note, the Holder will give written notice to the Company prior thereto, describing briefly the manner thereof, and any such proposed transfer shall be subject to the restrictions on transfer set forth in the Purchase Agreement.

10.3. Successors and Assigns. Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective executors, administrators, heirs, successors and assigns of the parties.

10.4. Loss or Mutilation of Note. Upon receipt by the Company of evidence satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably

satisfactory to the Company, in the case of loss, theft or destruction, or the surrender and cancellation of the Note, in the case of mutilation, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Principal is payable only to the registered Holder of the Note.

10.5. Note Holder Not Stockholder. This Note does not confer upon Holder any right to vote or to consent to or to receive notice as a stockholder of the Company, as such, in respect of any matters whatsoever, or any other rights or liabilities as a stockholder, prior to the conversion hereof.

10.6. Governing Law/WAIVER OF JURY TRIAL.

10.6.1 The terms of this Note shall be construed in accordance with the laws of the State of Delaware, as applied to contracts entered into by Delaware residents within the State of Delaware, which contracts are to be performed entirely within the State of Delaware.

10.6.2 TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HERETO WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS NOTE OR ANY CONTEMPLATED TRANSACTION UNDER THIS NOTE, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES TO ENTER INTO THIS NOTE. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.

10.7. Notices. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered personally or by email or shall be sent by a reputable express delivery service or by certified mail, postage prepaid with return receipt requested, addressed as set forth in the Purchase Agreement. Either party hereto may change the above specified recipient or mailing address or email address by notice to the other party given in the manner herein prescribed. All notices shall be deemed given on the day when actually delivered as provided above (if delivered personally or by email) or on the day shown on the return receipt (if delivered by mail or delivery service).

10.8. Attorneys' Fees. In addition to fees and expenses owed to the Holder pursuant to the terms of the Agreement, if any principal or interest represented by this Note or any part thereof is collected in bankruptcy, receivership or other judicial proceedings or if this Note is placed in the hands of attorneys for collection after default, the Company agrees to pay, in addition to the principal and interest payable hereunder, reasonable attorneys' fees and costs incurred by Holder.

10.9. Waiver and Amendment. Except as provide in Section 6, any term of this Note may be amended or terminated and the observance of any term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Holders (or in respect of this Note only, the Holder hereof). No waivers of or exceptions to any term, condition or provision of this Note, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision. Any waiver or amendment effected in accordance with this Section 10.9 shall be binding upon each Note holder at the time outstanding, each future holder of all such Notes, and the Company. Each Holder acknowledges that by the operation of this Section 10.9, the Majority Holders will have the right and power to diminish or eliminate the rights of such Holder under this Note.

10.10. Severability. If one or more provisions of this Note are held to be unenforceable under applicable law, such provision(s) shall be excluded from this Note, and the balance of this Note shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

10.11. Titles and Subtitles. The titles and subtitles of the sections of this Note are used for convenience only and shall not be considered in construing or interpreting this Note.

10.12. Most Favored Nations. While the Note remains outstanding, if the Company sells or issues any convertible notes and/or convertible securities ("***Subsequent Convertible Instruments***") that includes more favorable terms (other than the investment amount or principal amount of such Subsequent Convertible Instruments) which, if applied to the Note in appropriate fashion, would result in a (a) lower Conversion Price or higher interest rate than the Note, (b) higher payout amount, or more preferential payment, upon a Liquidity Event, (c) greater number of Shadow Preferred Securities issued to the Holder in connection with the conversion of the Note , (d) more restrictive covenants imposed on the Company than under the Loan Documents or (e) give the relevant investor greater rights than given to the Holders under the Loan Documents,, then the Company will promptly (and in any event within ten (10) business days) following the issuance of such Subsequent Convertible Instrument, provide the Holder with a written notice of such more favorable terms, and the Majority Holders shall have the option, exercisable within fifteen (15) business days of the receipt of such written notice, to elect to receive such more favorable terms. In the event that the Majority Holders elect to receive such more favorable terms, the parties shall promptly execute and deliver any such amendments to the Notes, Warrants, or Purchase Agreement in order to effectuate this Section 10.12. The parties agree that this Section 10.12 shall apply with respect to any other Notes issued pursuant to the Purchase Agreement regardless of whether such Note was issued prior to the Note.

10.13. General Interpretation. The terms of this Note have been negotiated by the parties hereto and the language used in this Note shall be deemed to be the language chosen by the parties hereto to express their mutual intent. This Note shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted, or in favor of the party receiving a particular benefit under this Note. No rule of strict construction will be applied against any person or entity.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the undersigned has caused this Convertible Promissory Note to be signed in its name as of the date first set forth above.

**HOUSECANARY, INC.**

By: ______________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

HOLDER:

[●]

By: ______________________________
Name: [●]
Title: Authorized Signatory

**Exhibit B**

**Form of Warrant**

THIS WARRANT AND THE UNDERLYING SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***ACT***"), OR UNDER THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IN ACCORDANCE WITH APPLICABLE REGISTRATION REQUIREMENTS OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE, TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. THIS WARRANT MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, TRANSFER, PLEDGE OR HYPOTHECATION OF ANY INTEREST IN ANY OF THE SECURITIES REPRESENTED HEREBY.

**WARRANT TO PURCHASE SHARES**
**of**
**HOUSECANARY, INC.**

**Dated as of July 10, 2023**
**Void after the date specified in Section 8**

**No. [●]**

**Warrant to Purchase**
**[●] Shares**
**(subject to adjustment)**

THIS CERTIFIES THAT, for value received, **[●]**, a **[●]** [corporation], or its registered assigns (the "***Holder***"), is entitled, subject to the provisions and upon the terms and conditions set forth herein, to purchase from HouseCanary, Inc., a Delaware corporation (the "***Company***"), Shares (as defined below) in the amounts, at such times and at the price per share set forth in Section 1. The term "***Warrant***" as used herein shall include this Warrant and any warrants delivered in substitution or exchange therefor as provided herein.

This Warrant is one in a series of warrants issued by the Company in connection with the transactions described in the Note Purchase Agreement, dated as of July 10, 2023, by and among the Company and the purchasers signatory thereto (the "***Purchase Agreement***").

The following is a statement of the rights of the Holder and the conditions to which this Warrant is subject, and to which Holder, by acceptance of this Warrant, agrees:

**1. Number and Price of Shares; Exercise Period.**

(a) ***Definition of Shares.*** "***Shares***" shall mean shares of Voting Common Stock of the Company, $0.00001 par value per share.

(b) ***Number of Shares.*** Subject to any previous exercise of the Warrant, the Holder shall have the right to purchase up to [●] ([●]) Shares, as may be adjusted pursuant hereto, prior to (or in connection with) the expiration of this Warrant as provided in Section 8.

(c) ***Exercise Price.*** The exercise price per Share shall be equal to [$●], subject to adjustment pursuant hereto (the "***Exercise Price***").

(d) ***Exercise Period.*** This Warrant shall be exercisable, in whole or in part, prior to (or in connection with) the expiration of this Warrant as set forth in Section 8.

**2. Exercise of the Warrant.**

(a) ***Exercise.*** The purchase rights represented by this Warrant may be exercised at the election of the Holder, in whole or in part, in accordance with Section 1, by:

(i) the tender to the Company at its principal office (or such other office or agency as the Company may designate) of a notice of exercise in the form of Exhibit A (the "***Notice of Exercise***"), duly completed and executed by or on behalf of the Holder, together with the surrender of this Warrant;

(ii) the payment to the Company of an amount equal to (x) the Exercise Price multiplied by (y) the number of Shares being purchased, by (a) wire transfer or certified, cashier's or other check acceptable to the Company and payable to the order of the Company; (b) surrender and cancellation of promissory notes or other instruments representing indebtedness of the Company to the Holder; or (c) a combination of (a) and (b); and

(iii) executing such agreements between the Company and certain or all of its stockholders (provided that all holders of at least one percent (1%) of the class of securities for which this Warrant is to be exercised are also parties to such agreements), in each case as may be reasonably requested by the Company.

(b) ***Net Issue Exercise.*** In lieu of exercising this Warrant pursuant to Section 2(a)(ii), if the fair market value of one Share is greater than the Exercise Price (at the date of calculation as set forth below), the Holder may elect to receive a number of Shares equal to the value of this Warrant (or of any portion of this Warrant being canceled) by surrender of this Warrant at the principal office of the Company (or such other office or agency as the Company may designate) together with a properly completed and executed Notice of Exercise reflecting such election, in which event the Company shall issue to the Holder that number of Shares computed using the following formula:

$$X = \frac{Y(A - B)}{A}$$

Where:

X = The number of Shares to be issued to the Holder

Y = The number of Shares purchasable under this Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being canceled (at the date of such calculation)

A = The fair market value of one Share (at the date of such calculation)

B = The Exercise Price (as adjusted to the date of such calculation)

For purposes of the calculation above, the fair market value of one Share shall For purposes of this Section 2, the fair market value of a Share shall mean the average of the closing bid and asked prices of

Shares quoted in the over-the-counter market in which the Shares are traded or the closing price quoted on any exchange on which the Shares are listed, whichever is applicable, as published in the Western Edition of The Wall Street Journal for the ten (10) trading days prior to the date of determination of fair market value (or such shorter period of time during which such stock was traded over-the-counter or on such exchange). If the Shares are not traded on the over-the-counter market or on an exchange, the fair market value shall be the price per Share that the Company could obtain from a willing buyer for Shares sold by the Company from authorized but unissued Shares, as such prices shall be determined in good faith by the Company's Board of Directors.

(c) ***Stock Certificates.*** The rights under this Warrant shall be deemed to have been exercised and the Shares issuable upon such exercise shall be deemed to have been issued immediately prior to the close of business on the date this Warrant is exercised in accordance with its terms, and the person entitled to receive the Shares issuable upon such exercise shall be treated for all purposes as the holder of record of such Shares as of the close of business on such date. As promptly as reasonably practicable on or after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate or certificates (or a notice of issuance of uncertificated shares, if applicable) for that number of shares issuable upon such exercise. In the event that the rights under this Warrant are exercised in part and have not expired, the Company shall execute and deliver a new Warrant reflecting the number of Shares that remain subject to this Warrant.

(d) ***No Fractional Shares or Scrip.*** No fractional shares or scrip representing fractional shares shall be issued upon the exercise of the rights under this Warrant. In lieu of such fractional share to which the Holder would otherwise be entitled, the Company shall make a cash payment equal to the Exercise Price multiplied by such fraction.

(e) ***Conditional Exercise.*** The Holder may exercise this Warrant conditioned upon (and effective immediately prior to) consummation of any transaction that would cause the expiration of this Warrant pursuant to Section 8 by so indicating in the notice of exercise.

(f) ***Automatic Exercise.*** If the Holder of this Warrant has not elected to exercise this Warrant prior to expiration of this Warrant pursuant to Section 8, then this Warrant shall automatically (without any act on the part of the Holder) be exercised pursuant to Section 2(b) effective immediately prior to the expiration of the Warrant to the extent such net issue exercise would result in the issuance of Shares pursuant to such Section 2(b), unless the Holder shall earlier provide written notice to the Company that the Holder desires that this Warrant expire unexercised. If this Warrant is automatically exercised, the Company shall notify the Holder of the automatic exercise as soon as reasonably practicable, and the Holder shall surrender the Warrant to the Company in accordance with the terms hereof.

(g) ***Reservation of Stock.*** The Company agrees during the term the rights under this Warrant are exercisable to take all reasonable action to reserve and keep available from its authorized and unissued Shares as shall from time to time be sufficient to effect the exercise of the rights under this Warrant; and if at any time the number of authorized but unissued Shares shall not be sufficient for purposes of the exercise of this Warrant in accordance with its terms and the conversion of the Shares, without limitation of such other remedies as may be available to the Holder, the Company will use all reasonable efforts to take such corporate action as may, in the opinion of counsel, be necessary to increase its authorized and unissued Shares to a number of Shares as shall be sufficient for such purposes. The Company represents and warrants that all Shares that may be issued upon the exercise of this Warrant will, when issued in accordance with the terms hereof, be duly authorized, validly issued, fully paid and nonassessable.

3. **Replacement of the Warrant.** Subject to the receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and substance to the Company or, in the case of mutilation, on surrender and cancellation of this Warrant, the Company at the expense of the Holder shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor and amount.

4. **Transfer of the Warrant.**

(a) ***Warrant Register.*** The Company shall maintain a register (the "***Warrant Register***") containing the name and address of the Holder or Holders. Until this Warrant is transferred on the Warrant Register in accordance herewith, the Company may treat the Holder as shown on the Warrant Register as the absolute owner of this Warrant for all purposes, notwithstanding any notice to the contrary. Any Holder of this Warrant (or of any portion of this Warrant) may change its address as shown on the Warrant Register by written notice to the Company requesting a change.

(b) ***Warrant Agent.*** The Company may appoint an agent for the purpose of maintaining the Warrant Register referred to in Section 4(a), issuing the Shares or other securities then issuable upon the exercise of the rights under this Warrant, exchanging this Warrant, replacing this Warrant or conducting related activities.

(c) ***Transferability of the Warrant.*** Subject to the provisions of this Warrant with respect to compliance with the Securities Act of 1933, as amended (the "***Securities Act***") and limitations on assignments and transfers, including without limitation compliance with the restrictions on transfer set forth in Section 5, title to this Warrant may be transferred by endorsement (by the transferor and the transferee executing the assignment form attached as Exhibit B (the "***Assignment Form***")) and delivery in the same manner as a negotiable instrument transferable by endorsement and delivery.

(d) ***Exchange of the Warrant upon a Transfer.*** On surrender of this Warrant (and a properly endorsed Assignment Form) for exchange, subject to the provisions of this Warrant with respect to compliance with the Securities Act and limitations on assignments and transfers, the Company shall issue to or on the order of the Holder a new warrant or warrants of like tenor, in the name of the Holder or as the Holder (on payment by the Holder of any applicable transfer taxes) may direct, for the number of shares issuable upon exercise hereof, and the Company shall register any such transfer upon the Warrant Register. This Warrant (and the securities issuable upon exercise of the rights under this Warrant) must be surrendered to the Company or its warrant or transfer agent, as applicable, as a condition precedent to the sale, pledge, hypothecation or other transfer of any interest in any of the securities represented hereby.

(e) ***Minimum Transfer.*** This Warrant may not be transferred in part unless such transfer is to a transferee who, pursuant to such transfer, receives the right to purchase at least Fifty Thousand (50,000) Shares hereunder (as adjusted from time to time in accordance with Section 6).

(f) ***Taxes.*** In no event shall the Company be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of any certificate, or a book entry, in a name other than that of the Holder, and the Company shall not be required to issue or deliver any such certificate, or make such book entry, unless and until the person or persons requesting the issue or entry thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company, acting reasonably, that such tax has been paid, to the extent such tax is required by the applicable laws, or is not payable.

5. **Restrictions on Transfer of the Warrant and Shares; Compliance with Securities Laws.** By acceptance of this Warrant, the Holder agrees to comply with the following:

(a) ***Restrictions on Transfers.*** Subject to Section 5(b), this Warrant may not be transferred or assigned in whole or in part without the Company's prior written consent (which shall not be unreasonably withheld)**,** and any attempt by Holder to transfer or assign any rights, duties or obligations that arise under this Warrant without such permission shall be void (other than upon the occurrence and during the continuance of an Event of Default (as defined in the Purchase Agreement), in which event the Holder shall be entitled to transfer or assign any rights, duties or obligations that arise under this Warrant without the permission of the Company) Any transfer of this Warrant or the Shares (collectively, the "***Securities***") must be in compliance with all applicable federal and state securities laws. The Holder agrees not to make any sale, assignment, transfer, pledge or other disposition of all or any portion of the Securities, or any beneficial interest therein, unless and until the transferee thereof has agreed in writing for the benefit of the Company to take and hold such Securities subject to, and to be bound by, the terms and conditions set forth in this Warrant to the same extent as if the transferee were the original Holder hereunder, and either:

(i) There is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with such registration statement, or an exemption from such registration or qualification is available; or

(ii) (A) such Holder shall have given prior written notice to the Company of such Holder's intention to make such disposition and shall have furnished the Company with a detailed description of the manner and circumstances of the proposed disposition, (B) the transferee shall have confirmed to the satisfaction of the Company in writing, substantially in the form of Exhibit A-1, that the Securities are being acquired (i) solely for the transferee's own account and not as a nominee for any other party, (ii) for investment and (iii) not with a view toward distribution or resale, and shall have confirmed such other matters related thereto as may be reasonably requested by the Company, and (C) if requested by the Company, such Holder shall have furnished the Company, with (i) an opinion of counsel, reasonably satisfactory to the Company, to the effect that such disposition will not require registration of such Securities under the Securities Act or (ii) a "no action" letter from the Securities and Exchange Commission to the effect that the transfer of such Securities without registration will not result in a recommendation by the staff of the Securities and Exchange Commission that action be taken with respect thereto, whereupon such Holder shall be entitled to transfer such Securities in accordance with the terms of the notice delivered by the Holder to the Company. It is agreed that the Company will not require opinions of counsel for transactions made pursuant to Rule 144 or pursuant to another exemption from registration under the Securities Act.

(b) ***Permitted Transfers.*** The transfer restrictions of Section 5(a) shall not apply to: (i) any transfer not involving a change in beneficial ownership; or (ii) transactions involving the distribution without consideration of Securities by the Holder to (x) a parent, subsidiary or other affiliate of the Holder, (y) any of the Holder's partners, members or other equity owners, or retired partners or members, or to the estate of any of its partners, members or other equity owners or retired partners or members, or (z) a venture capital fund that is controlled by or under common control with one or more general partners or managing members of, or shares the same management company with, the Holder; *provided*, in each case, that the Holder shall give written notice to the Company of the Holder's intention to effect such disposition and shall have furnished the Company with a description of the manner and circumstances of the proposed disposition to the extent required under Section 5(a).

(c) ***Investment Representation Statement.*** Unless the rights under this Warrant are exercised pursuant to an effective registration statement under the Securities Act that includes the Shares with respect to which the Warrant was exercised, it shall be a condition to any exercise of the rights under this Warrant that the Holder shall have confirmed to the Company in writing the matters set forth in Exhibit A-1.

(d) ***Securities Law Legend.*** Each certificate, instrument or book entry representing the Securities shall (unless otherwise permitted by the provisions of this Warrant) be notated with a legend substantially similar to the following (in addition to any legend required by state securities laws):

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS IN ACCORDANCE WITH APPLICABLE REGISTRATION REQUIREMENTS OR AN EXEMPTION THEREFROM. THE ISSUER OF THESE SECURITIES MAY REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER THAT SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION OTHERWISE COMPLIES WITH THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS. THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, TRANSFER, PLEDGE OR HYPOTHECATION OF ANY INTEREST IN ANY OF THE SECURITIES REPRESENTED HEREBY.

(e) ***Market Stand-off Legend.*** Each certificate, instrument or book entry representing the Shares issued upon exercise hereof shall also be notated with a legend in substantially the following form:

> THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE, INCLUDING A LOCK-UP PERIOD IN THE EVENT OF A PUBLIC OFFERING, AS SET FORTH IN THE WARRANT PURSUANT TO WHICH THESE SHARES WERE ISSUED, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY.

(f) ***Instructions Regarding Transfer Restrictions.*** The Holder consents to the Company making a notation on its records and giving instructions to any transfer agent in order to implement the restrictions on transfer established in this Section 5.

(g) ***Removal of Legend.*** The legend referring to federal and state securities laws identified in Section 5(d) notated on any certificate evidencing the Shares and the stock transfer instructions and record notations with respect to such securities shall be removed, and the Company shall issue a certificate without such legend to the holder of such securities (to the extent the securities are certificated), if (i) such securities are registered under the Securities Act, or (ii) such holder provides the Company with an opinion of counsel reasonably acceptable to the Company to the effect that a sale or transfer of such securities may be made without registration, qualification or legend.

(h) ***No Transfers to Bad Actors; Notice of Bad Actor Status.*** The Holder agrees not to sell, assign, transfer, pledge or otherwise dispose of any securities of the Company, or any beneficial

interest therein, to any person (other than the Company) unless and until the proposed transferee confirms to the reasonable satisfaction of the Company that neither the proposed transferee nor any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members nor any person that would be deemed a beneficial owner of those securities (in accordance with Rule 506(d) of the Securities Act) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2) (ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the transfer, in writing in reasonable detail to the Company. The Holder will promptly notify the Company in writing if the Holder or, to the Holder's knowledge, any person specified in Rule 506(d)(1) under the Securities Act becomes subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act.

6. **Adjustments.** Subject to the expiration of this Warrant pursuant to Section 8, the number and kind of shares purchasable hereunder and the Exercise Price therefor are subject to adjustment from time to time, as follows:

(a) ***Merger or Reorganization.*** If at any time there shall be any reorganization, recapitalization, merger or consolidation (a "***Reorganization***") involving the Company (other than as otherwise provided for herein or as would cause the expiration of this Warrant under Section 8) in which shares of the Company's stock are converted into or exchanged for securities, cash or other property, then, as a part of such Reorganization, lawful provision shall be made so that the Holder shall thereafter be entitled to receive upon exercise of this Warrant, the kind and amount of securities, cash or other property of the successor corporation resulting from such Reorganization, equivalent in value to that which a holder of the Shares deliverable upon exercise of this Warrant would have been entitled in such Reorganization if the right to purchase the Shares hereunder had been exercised immediately prior to such Reorganization. In any such case, appropriate adjustment (as determined in good faith by the Board of Directors of the successor corporation and subject to section 6(d)) shall be made in the application of the provisions of this Warrant with respect to the rights and interests of the Holder after such Reorganization to the end that the provisions of this Warrant shall be applicable after the event, as near as reasonably may be, in relation to any shares or other securities deliverable after that event upon the exercise of this Warrant.

(b) ***Reclassification of Shares.*** If the securities issuable upon exercise of this Warrant are changed into the same or a different number of securities of any other class or classes by reclassification, capital reorganization, conversion of all outstanding shares of the relevant class or series (other than as would cause the expiration of this Warrant pursuant to Section 8) or otherwise (other than as otherwise provided for herein) (a "***Reclassification***"), then, in any such event, in lieu of the number of Shares which the Holder would otherwise have been entitled to receive, the Holder shall have the right thereafter to exercise this Warrant for a number of shares of such other class or classes of stock that a holder of the number of securities deliverable upon exercise of this Warrant immediately before that change would have been entitled to receive in such Reclassification, all subject to further adjustment as provided herein with respect to such other shares.

(c) ***Subdivisions and Combinations.*** In the event that the outstanding shares are subdivided (by stock split, by payment of a stock dividend or otherwise) into a greater number of shares of such securities, the number of Shares issuable upon exercise of the rights under this Warrant immediately prior to such subdivision shall, concurrently with the effectiveness of such subdivision, be proportionately increased, and the Exercise Price shall be proportionately decreased, and in the event that the outstanding shares are combined (by reclassification or otherwise) into a lesser number of shares of such securities, the number of Shares issuable upon exercise of the rights under this Warrant immediately prior to such

combination shall, concurrently with the effectiveness of such combination, be proportionately decreased, and the Exercise Price shall be proportionately increased.

(d) ***Capitalisation of Profits or Reserves***. In the event the Company issues any Shares as fully paid to the Shareholders by way of capitalisation of profits or reserves (except any Scrip Dividend (as defined below)), the Exercise Price shall be adjusted by multiplying the existing Exercise Price by a fraction where the numerator is the aggregate number of issued Shares (on an as-diluted basis) immediately before the new issue, and the denominator is the aggregate number of issued Shares (on an as-diluted basis) immediately after such issue. "**Scrip Dividend**" means Shares issued in lieu of the whole or any part of any cash dividend.

(e) ***Notice of Adjustments.*** Upon any adjustment in accordance with this Section 6, the Company shall give notice thereof to the Holder, which notice shall state the event giving rise to the adjustment, the Exercise Price as adjusted and the number of securities or other property purchasable upon the exercise of the rights under this Warrant, setting forth in reasonable detail the method of calculation of each. The Company shall promptly upon the occurrence of any adjustment event set out in this Section 6,furnish or cause to be furnished to such Holder a certificate setting forth (i) such adjustments, (ii) the Exercise Price at the time in effect and (iii) the number of securities and the amount, if any, of other property that at the time would be received upon exercise of this Warrant. If there is any dispute by the Holder concerning an adjustment, including the method of adjustment or the adjusted Exercise Price, the matter shall be referred to an Independent Valuation Expert for determination that the adjustment was fair and reasonable, and in the event the adjustment was determined to be not fair and/or not reasonable, the Independent Valuation Expert shall propose the method of adjustment and the adjusted Exercise Price in accordance with the terms of this Warrant. The determination of the Independent Valuation Expert shall be final and binding on all parties. For the purposes of this Section 6(e), "**Independent Valuation Expert**" means a reputable internationally recognised accounting firm, investment bank or securities firm with expertise in valuing companies in the same or similar industry as the Company or expertise in determining value or price adjustments of instruments similar to the Warrant, which has no conflict of interest with either the Company or the warrant holders, selected with the consent of a majority of the warrant holders and the Company. The cost and expense of the Independent Valuation Expert shall be borne by the Company.

7. **Notification of Certain Events.** Prior to the expiration of this Warrant pursuant to Section 8, in the event that the Company shall authorize:

(a) the issuance of any dividend or other distribution on the capital stock of the Company (other than (i) dividends or distributions otherwise provided for in Section 6, (ii) repurchases of common stock issued to or held by employees, officers, directors or consultants of the Company or its subsidiaries upon termination of their employment or services pursuant to agreements providing for the right of said repurchase; (iii) repurchases of common stock issued to or held by employees, officers, directors or consultants of the Company or its subsidiaries pursuant to rights of first refusal or first offer contained in agreements providing for such rights; or (iv) repurchases of capital stock of the Company in connection with the settlement of disputes with any stockholder), whether in cash, property, stock or other securities;

(b) the voluntary liquidation, dissolution or winding up of the Company; or

(c) any transaction resulting in the expiration of this Warrant pursuant to Section 8;

the Company shall send to the Holder of this Warrant at least ten (10) days prior written notice of the date on which a record shall be taken for any such dividend or distribution specified in clause (a) or the expected effective date of any such other event specified in clause (b) or (c), as applicable. The notice provisions set forth in this section may be shortened or waived prospectively or retrospectively by the consent of the Holder of this Warrant.

8. **Expiration of the Warrant.** This Warrant shall expire and shall no longer be exercisable as of the earlier of:

(a) 5:00 p.m., Pacific time, on July 10, 2033; or

(b) (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions to which the Company is a party (including, without limitation, any stock acquisition, reorganization, merger or consolidation, but excluding any sale of stock for capital raising purposes and any transaction effected primarily for purposes of changing the Company's jurisdiction of incorporation) other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of transactions, as a result of shares in the Company held by such holders prior to such transaction or series of transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity (or if the Company or such other surviving or resulting entity is a wholly-owned subsidiary immediately following such acquisition, its parent), (ii) a sale, lease or other disposition of all or substantially all of the assets of the Company and its subsidiaries taken as a whole by means of any transaction or series of related transactions, except where such sale, lease or other disposition is to a wholly-owned subsidiary of the Company, (iii) a liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or any other event or series of related events resulting in the distribution of the Company's assets to its shareholders or creditors for the purpose of ceasing the Company's operation and existence, or (iv) the completion of an initial public offering of the Company's securities.

9. **No Rights as a Stockholder.** Nothing contained herein shall entitle the Holder to any rights as a stockholder of the Company or to be deemed the holder of any securities that may at any time be issuable on the exercise of the rights hereunder for any purpose nor shall anything contained herein be construed to confer upon the Holder, as such, any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value or change of stock to no par value, consolidation, merger, conveyance or otherwise) or to receive notice of meetings, or to receive dividends or subscription rights or any other rights of a stockholder of the Company until the rights under the Warrant shall have been exercised and the Shares purchasable upon exercise of the rights hereunder shall have become deliverable as provided herein.

10. **Representations and Warranties.**

(a) By acceptance of this Warrant, the Holder represents and warrants to the Company as follows:

(i) ***No Registration.*** The Holder understands that the Securities have not been, and will not be, registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Holder's representations as expressed herein or otherwise made pursuant hereto.

(ii) ***Investment Intent.*** The Holder is acquiring the Securities for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof. The Holder has no present intention of selling, granting any participation in, or otherwise distributing the Securities, nor does it have any contract, undertaking, agreement or arrangement for the same.

(iii) ***Investment Experience.*** The Holder has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company, and has such knowledge and experience in financial or business matters so that it is capable of evaluating the merits and risks of its investment in the Company and protecting its own interests.

(iv) ***Speculative Nature of Investment.*** The Holder is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself and can bear the economic risk of its investment and is able, without impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

(v) ***Access to Data.*** The Holder has had an opportunity to ask questions of officers of the Company, which questions were answered to its satisfaction. The Holder acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.

(vi) ***Accredited Investor.*** The Holder is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission.

(vii) ***Residency.*** The residency of the Holder (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the signature page hereto.

(viii) ***Restrictions on Resales.*** The Holder acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Holder is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. The Holder acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Holder wishes to sell the Securities and that, in such event, the Holder may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. The Holder acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities. The Holder understands that, although Rule 144 is not exclusive, the Securities and Exchange Commission has expressed its opinion that persons proposing to sell restricted securities received in a private offering other than in a registered offering or pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers who participate in the transactions do so at their own risk.

(ix) ***No Public Market.*** The Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

(x) ***Brokers and Finders.*** The Holder has not engaged any brokers, finders or agents in connection with the Securities, and the Company has not incurred nor will incur, directly or indirectly, as a result of any action taken by the Holder, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Securities.

(xi) ***Legal Counsel.*** The Holder has had the opportunity to review this Warrant, the exhibits and schedules attached hereto and the transactions contemplated by this Warrant with its own legal counsel. The Holder is not relying on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by this Warrant.

(xii) ***Tax Advisors.*** The Holder has reviewed with its own tax advisors the U.S. federal, state and local and non-U.S. tax consequences of this investment and the transactions contemplated by this Warrant. With respect to such matters, the Holder relies solely on any such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Holder understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment and the transactions contemplated by this Warrant.

(xiii) ***No "Bad Actor" Disqualification.*** Neither (i) the Holder, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by the Holder is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2) (ii) or (iii) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the acceptance of this Warrant, in writing in reasonable detail to the Company.

(b) The Company hereby represents and warrants to the Holder as follows:

(i) ***Organization and Qualification.*** The Company: (i) is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware; (ii) has the power and authority to own, lease and operate its properties and carry on its business as now conducted; and (iii) is duly qualified, licensed to do business and in good standing as a foreign corporation in each jurisdiction where the failure to be so qualified or licensed could reasonably be expected to have a material adverse effect on the Company.

(ii) ***Authority.*** The execution, delivery and performance by the Company of this Warrant and the consummation of the transactions contemplated hereby: (i) are within the corporate power of the Company; and (ii) have been duly authorized by all necessary actions on the part of the Company, including but not limited to obtaining requisite shareholders' approval.

*(iii)* ***Issuance of Warrant Shares***. The Shares issuable upon exercise of this Warrant will be validly issued and fully paid-up, and will be free of any taxes, liens, charges or encumbrances of any nature whatsoever; provided, however, that such Shares issuable pursuant to this Warrant may be subject to restrictions on transfer under state and/or securities laws. Upon exercise of the Warrant, the Company will issue to the Holder certificates for the Shares without withholding any tax, or charge other cost incurred by the Company in connection with such exercise and the related issuance of the

Shares, save as otherwise set out in this Warrant; provided, however, the Holder shall be solely responsible for any taxes incurred as a result of such issuance of Shares upon the exercise of this Warrant.

*(iv)* ***Consents and Approvals.*** No consent or approval of, giving of notice to, registration with, or taking of any other action in respect of any governmental authority or agency is required with respect to execution, delivery and the Company's performance of its obligations under this Warrant, except for the filing of any required notices pursuant to federa; and state securities laws, which filings will be effective by the times required thereby.

(v) ***Other Commitments to Register Securities.*** Except as set forth in this Warrant and save as disclosed in the Loan Documents, the Company is not, pursuant to the terms of any other agreement currently in existence, under any obligation to register under the Securities Act any of the Company's presently outstanding securities or any of the Company's securities which may hereafter be issued in respect of such presently outstanding securities of the Company.

*(vi)* ***Enforceability.*** This Warrant has been, or will be, duly executed and delivered by the Company and will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.

(vii) ***Non-Contravention.*** The execution and delivery by the Company of this Warrant and the performance and consummation of the transactions contemplated hereby do not and will not: (i) violate the Company's Certificate of Incorporation or Bylaws or any material judgment, order, writ, decree, statute, rule or regulation applicable to the Company; (ii) violate any provision of, or result in the breach or the acceleration of, or entitle any other person to accelerate (whether after the giving of notice or lapse of time or both), any material mortgage, indenture, agreement, instrument or contract to which the Company is a party or by which it is bound; or (iii) require the consent, notice, or other action by any person under any material contract to which the Company is a party or any of its properties or other assets is subject.

*(viii)* ***Exempt Transaction.*** The Shares to be issued upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the Securities Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.

*(ix)* ***Compliance with Rule 144.*** The Holder may sell the Warrant Shares issuable hereunder in compliance with Rule 144 promulgated by the Securities and Exchange Commission. Within ten (10) days of the Holder's request and, to the extent such requirements are met, the Company shall provide the Holder with a written statement confirming the Company's compliance with the filing requirements of the Securities and Exchange Commission as set forth in such Rule 144, as may be amended.

11. **Miscellaneous.**

(a) ***Amendments.*** Any term of this Warrant may be amended or terminated and the observance of any term of this Warrant may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the Majority Holders (as defined in the Purchase Agreement), or in respect of this Warrant only, the Holder hereof; *provided, however,* that no such amendment or waiver shall reduce the number of Shares or increase the Exercise Price under this Warrant without the affected Holder's written consent. Any waiver or amendment effected in accordance with this Section 11(a) shall be binding upon each warrant holder at the time outstanding,

each future holder of all such warrants, and the Company. Each Holder acknowledges that by the operation of this Section 11(a), the Majority Holders will have the right and power to diminish or eliminate the rights of such Holder under this Warrant.

(b) ***Waivers.*** No waiver of any single breach or default shall be deemed a waiver of any other breach or default theretofore or thereafter occurring.

(c) ***Notices.*** All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by electronic mail or otherwise delivered by hand, messenger or courier service addressed:

(i) if to the Holder, to the Holder at the Holder's address or electronic mail address as shown in the Company's records, as may be updated in accordance with the provisions hereof, or until any such Holder so furnishes an address or electronic mail address to the Company, then to and at the address or electronic mail address of the last holder of this Warrant for which the Company has contact information in its records; or

(ii) if to the Company, to the attention of the Chief Executive Officer of the Company at the Company's address as shown on the signature page hereto, or at such other current address as the Company shall have furnished to the Holder.

Each such notice or other communication shall for all purposes of this Warrant be treated as effective or having been given (i) if delivered by hand, messenger or courier service, when delivered (or if sent via a nationally-recognized overnight courier service, freight prepaid, specifying next-business-day delivery, one business day after deposit with the courier), or (ii) if sent via mail, at the earlier of its receipt or five days after the same has been deposited in a regularly-maintained receptacle for the deposit of the United States mail, addressed and mailed as aforesaid, or (iii) if sent via electronic mail, upon confirmation of delivery when directed to the relevant electronic mail address, if sent during normal business hours of the recipient, or if not sent during normal business hours of the recipient, then on the recipient's next business day. In the event of any conflict between the Company's books and records and this Warrant or any notice delivered hereunder, the Company's books and records will control absent fraud or error.

(d) ***Governing Law.*** This Warrant and all actions arising out of or in connection with this Warrant shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law provisions of the State of Delaware, or of any other state.

(e) ***Jurisdiction and Venue.*** Each of the Holder and the Company irrevocably consents to the exclusive jurisdiction and venue of any court within Delaware, in connection with any matter based upon or arising out of this Warrant or the matters contemplated herein, and agrees that process may be served upon them in any manner authorized by the laws of the State of Delaware for such persons.

(f) ***Titles and Subtitles.*** The titles and subtitles used in this Warrant are used for convenience only and are not to be considered in construing or interpreting this Warrant. All references in this Warrant to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

(g) ***Severability.*** If any provision of this Warrant becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Warrant, and such illegal, unenforceable or void provision shall be replaced with a valid and enforceable provision that will achieve, to the extent

possible, the same economic, business and other purposes of the illegal, unenforceable or void provision. The balance of this Warrant shall be enforceable in accordance with its terms.

(h) ***Waiver of Jury Trial.*** **EACH OF THE HOLDER AND THE COMPANY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS WARRANT.**

(i) ***Saturdays, Sundays and Holidays.*** If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a Saturday, Sunday or U.S. federal holiday, then such action may be taken or such right may be exercised on the next succeeding day that is not a Saturday, Sunday or U.S. federal holiday.

(j) ***Rights and Obligations Survive Exercise of the Warrant.*** Except as otherwise provided herein, the rights and obligations of the Company and the Holder under this Warrant shall survive exercise of this Warrant.

(k) ***Entire Agreement.*** Except as expressly set forth herein, this Warrant (including the exhibits attached hereto) and the other Loan Documents (as such term is defined in the Purchase Agreement) constitute the entire agreement and understanding of the Company and the Holder with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

(*signature page follows*)

The Company and the Holder sign this Warrant as of the date stated on the first page.

**HOUSECANARY, INC.**

By: ___________________________________________
Name: Jeremy Sicklick
Title: Chief Executive Officer

Address:

535 Mission Street, Office #1920
San Francisco, CA 94105

Email Address:

**AGREED AND ACKNOWLEDGED,**

**[•]**

By: ____________________________
Name: ___________________________
Title: ____________________________

Address:

[mailing address]

Email address: [insert email address]

# EXHIBIT A

# NOTICE OF EXERCISE

**TO:** **HouseCanary, Inc. (the "*Company*")**

**Attention:** **Chief Executive Officer**

(1) **Exercise.** The undersigned elects to purchase the following pursuant to the terms of the attached warrant:

Number of shares: ________________________________________

Type of security: ________________________________________

(2) **Method of Exercise.** The undersigned elects to exercise the attached warrant pursuant to:

☐ A cash payment or cancellation of indebtedness, and tenders herewith payment of the purchase price for such shares in full, together with all applicable transfer taxes, if any.

☐ The net issue exercise provisions of Section 2(b) of the attached warrant.

(3) **Conditional Exercise.** Is this a conditional exercise pursuant to Section 2(e):

☐ Yes ☐ No

If "Yes," indicate the applicable condition:

________________________________________

(4) **Stock.** Please make a book entry and, if the shares are certificated, issue a certificate or certificates representing the shares in the name of:

☐ The undersigned

☐ Other—Name: ________________________________________

Address: ________________________________________

________________________________________

(5) **Unexercised Portion of the Warrant.** Please issue a new warrant for the unexercised portion of the attached warrant in the name of:

☐ The undersigned

☐ Other—Name: ________________________________________

Address: ________________________________________

________________________________________

☐ Not applicable

(***Signature page to the Notice of Exercise***)

(6) **Investment Intent.** The undersigned represents and warrants that the aforesaid shares are being acquired for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and that the undersigned has no present intention of selling, granting any participation in, or otherwise distributing the shares, nor does it have any contract, undertaking, agreement or arrangement for the same, and all representations and warranties of the undersigned set forth in Section 10(a) of the attached warrant are true and correct as of the date hereof.

(7) **Investment Representation Statement and Market Stand-Off Agreement.** The undersigned has executed, and delivers herewith, an Investment Representation Statement and Market Stand-Off Agreement in a form substantially similar to the form attached to the warrant as Exhibit A-1.

________________________________________
(*Print name of the warrant holder*)

________________________________________
(*Signature*)

________________________________________
(*Name and title of signatory, if applicable*)

________________________________________
(*Date*)

________________________________________
(*Fax number*)

________________________________________
(*Email address*)]

**(*Signature page to the Notice of Exercise*)**

**EXHIBIT A-l**

**INVESTMENT REPRESENTATION STATEMENT
AND
MARKET STAND-OFF AGREEMENT**

INVESTOR: ____________________________________________________________

COMPANY: HouseCanary, Inc.

SECURITIES: THE WARRANT ISSUED ON JULY 10, 2023 (THE "***WARRANT***") AND THE SECURITIES ISSUED OR ISSUABLE UPON EXERCISE THEREOF (INCLUDING UPON SUBSEQUENT CONVERSION OF THOSE SECURITIES)

DATE: __________________________________

In connection with the purchase or acquisition of the above-listed Securities, the undersigned (the "**Investor**") represents and warrants to, and agrees with, the Company as follows:

1. **No Registration.** The Investor understands that the Securities have not been, and will not be, registered under the Securities Act of 1933, as amended (the "***Securities Act***"), by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the *bona fide* nature of the investment intent and the accuracy of the Investor's representations as expressed herein or otherwise made pursuant hereto.

2. **Investment Intent.** The Investor is acquiring the Securities for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, any distribution thereof. The Investor has no present intention of selling, granting any participation in, or otherwise distributing the Securities, nor does it have any contract, undertaking, agreement or arrangement for the same.

3. **Investment Experience.** The Investor has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company, and has such knowledge and experience in financial or business matters so that it is capable of evaluating the merits and risks of its investment in the Company and protecting its own interests.

4. **Speculative Nature of Investment.** The Investor is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself and can bear the economic risk of its investment and is able, without impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

5. **Access to Data.** The Investor has had an opportunity to ask questions of officers of the Company, which questions were answered to its satisfaction. The Holder acknowledges that any business plans prepared by the Company have been, and continue to be, subject to change and that any projections included in such business plans or otherwise are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results.

6. **Accredited Investor.** The Investor is an "accredited investor" within the meaning of Regulation D, Rule 501(a), promulgated by the Securities and Exchange Commission.

7. **Residency.** The residency of the Investor (or, in the case of a partnership or corporation, such entity's principal place of business) is correctly set forth on the signature page hereto.

8. **Restrictions on Resales.** The Investor acknowledges that the Securities must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available. The Investor is aware of the provisions of Rule 144 promulgated under the Securities Act, which permit resale of shares purchased in a private placement subject to the satisfaction of certain conditions, which may include, among other things, the availability of certain current public information about the Company; the resale occurring not less than a specified period after a party has purchased and paid for the security to be sold; the number of shares being sold during any three-month period not exceeding specified limitations; the sale being effected through a "broker's transaction," a transaction directly with a "market maker" or a "riskless principal transaction" (as those terms are defined in the Securities Act or the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder); and the filing of a Form 144 notice, if applicable. The Investor acknowledges and understands that the Company may not be satisfying the current public information requirement of Rule 144 at the time the Investor wishes to sell the Securities and that, in such event, the Investor may be precluded from selling the Securities under Rule 144 even if the other applicable requirements of Rule 144 have been satisfied. The Investor understands and acknowledges that, in the event the applicable requirements of Rule 144 are not met, registration under the Securities Act or an exemption from registration will be required for any disposition of the Securities.

9. **No Public Market.** The Holder understands and acknowledges that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Company's securities.

10. **Brokers and Finders.** The Investor has not engaged any brokers, finders or agents in connection with the Securities, and the Company has not incurred nor will incur, directly or indirectly, as a result of any action taken by the Investor, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with the Securities.

11. **Legal Counsel.** The Investor has had the opportunity to review the Warrant, the exhibits and schedules attached thereto and the transactions contemplated by the Warrant with its own legal counsel. The Investor is not relying on any statements or representations of the Company or its agents for legal advice with respect to this investment or the transactions contemplated by the Warrant.

12. **Tax Advisors.** The Investor has reviewed with its own tax advisors the U.S. federal, state and local and non-U.S. tax consequences of this investment and the transactions contemplated by the Warrant. With respect to such matters, the Investor relies solely on such advisors and not on any statements or representations of the Company or any of its agents, written or oral. The Investor understands that it (and not the Company) shall be responsible for its own tax liability that may arise as a result of this investment or the transactions contemplated by the Warrant.

13. **Market Stand-off.** If requested by the Company and an underwriter of common stock (or other securities) of the Company, the Investor shall not sell or otherwise transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any common stock (or other securities) of the Company held by the Investor (other than those included in the registration) during the one hundred eighty (180) day period following the effective date of the registration statement for the Company's initial public offering filed under the Securities Act, *provided* that all officers and directors of the Company and holders of at least one percent (1%) of the Company's voting securities are bound by and have entered into similar agreements. The obligations described in this section shall not apply to a registration relating solely to employee benefit plans on Form S-l or Form S-8 or similar forms that may be

promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future. The Company may impose stop-transfer instructions and may notate each such certificate, instrument or book entry with a legend with respect to the shares of common stock (or other securities) subject to the foregoing restriction until the end of such one hundred eighty (180) day (or other) period. The Investor agrees to execute a market stand-off agreement with the relevant underwriters in customary form consistent with the provisions of this section.

14. **No "Bad Actor" Disqualification.** Neither (i) the Investor, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's voting equity securities (in accordance with Rule 506(d) of the Securities Act) held by the Investor is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act, except as set forth in Rule 506(d)(2) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the purchase or acquisition of the Securities, in writing in reasonable detail to the Company.

(*signature page follows*)

The Investor is signing this Investment Representation Statement and Market Stand-Off Agreement on the date first written above.

**INVESTOR**

________________________________________
(*Print name of the investor*)

________________________________________
(*Signature*)

________________________________________
(*Name and title of signatory, if applicable*)

________________________________________
(*Street address*)

________________________________________
(*City, state and ZIP*)

**EXHIBIT B**

**ASSIGNMENT FORM**

ASSIGNOR: ________________________________________________

COMPANY: HouseCanary, Inc.

WARRANT: THE WARRANT TO PURCHASE SHARES OF VOTING COMMON STOCK ISSUED ON JULY 10, 2023 (THE "***WARRANT***")

DATE: ________________________

(1) **Assignment.** The undersigned registered holder of the Warrant ("***Assignor***") assigns and transfers to the assignee named below ("***Assignee***") all of the rights of Assignor under the Warrant, with respect to the number of shares set forth below:

Name of Assignee: ________________________________________________

Address of Assignee: ________________________________________________

________________________________________________

Number of Shares Assigned: ________________________________________________

and does irrevocably constitute and appoint the Chief Executive Officer of HouseCanary, Inc. as attorney-in-fact to make such transfer on the books of HouseCanary, Inc., with full power of substitution in the premises.

(2) **Obligations of Assignee.** Assignee agrees to take and hold the Warrant and any shares of stock to be issued upon exercise of the rights thereunder (and any shares issuable upon conversion thereof) (the "***Securities***") subject to, and to be bound by, the terms and conditions set forth in the Warrant to the same extent as if Assignee were the original holder thereof.

(3) **Investment Intent.** Assignee represents and warrants that the Securities are being acquired for investment for its own account, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and that Assignee has no present intention of selling, granting any participation in, or otherwise distributing the shares, nor does it have any contract, undertaking, agreement or arrangement for the same, and all representations and warranties set forth in Section 10(a) of the Warrant are true and correct as to Assignee as of the date hereof.

(4) **Investment Representation Statement and Market Stand-Off Agreement.** Assignee has executed, and delivers herewith, an Investment Representation Statement and Market Stand-Off Agreement in a form substantially similar to the form attached to the Warrant as Exhibit A-1.

(5) **No "Bad Actor" Disqualification.** Neither (i) Assignee, (ii) any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members, nor (iii) any beneficial owner of any of the Company's securities held or to be held by Assignee is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) through (viii) under the Securities Act of 1933, as amended (the "***Securities***

***Act***"), except as set forth in Rule 506(d)(2) or (d)(3) under the Securities Act and disclosed, reasonably in advance of the transfer of the Securities, in writing in reasonable detail to the Company.

Assignor and Assignee are signing this Assignment Form on the date first set forth above.

| **ASSIGNOR** | **ASSIGNEE** |
|---|---|
| ______________________________ | ______________________________ |
| (*Print name of Assignor*) | (*Print name of Assignee*) |
| ______________________________ | ______________________________ |
| (*Signature of Assignor*) | (*Signature of Assignee*) |
| ______________________________ | ______________________________ |
| (*Print name of signatory, if applicable*) | (*Print name of signatory, if applicable*) |
| ______________________________ | ______________________________ |
| (*Print title of signatory, if applicable*) | (*Print title of signatory, if applicable*) |
| Address: | Address: |
| ______________________________ | ______________________________ |
| ______________________________ | ______________________________ |

**Exhibit C**

**Disclosure Schedule**

**HOUSECANARY, INC.**
**DISCLOSURE SCHEDULE**
**TO**
**NOTE PURCHASE AGREEMENT**

**DATED JULY 10, 2023**

The following disclosure schedule (this "***Disclosure Schedule***") is being provided in connection with that certain Note Purchase Agreement, dated as of July 10, 2023 (the "***Agreement***"), by and between HouseCanary, Inc., a Delaware corporation (the "***Company***"), and the Purchasers signatory thereto. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Agreement.

This Disclosure Schedule is arranged in sections corresponding to the numbered and lettered sections and subsections contained in Section 3 of the Agreement, and the disclosures in any section or subsection of this Disclosure Schedule shall qualify other sections and subsections in Section 3 of the Agreement only to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other sections and subsections. This Disclosure Schedule is not intended to constitute, and shall not be construed or otherwise be deemed to constitute, separate representations or warranties of the Company or any other party except to the extent explicitly provided in the Agreement. Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be disclosed. Such additional matters are set forth for informational purposes only.

No reference to or disclosure of any item or other matter in this Disclosure Schedule (each a "***Section***") shall be construed as an admission, representation, or indication that such item or other matter is "material" or would have a "material adverse effect", unless the corresponding representation requires such disclosure. Without limiting the representations and warranties made by the Company to the Purchasers in the Agreement (as qualified by this Disclosure Schedule), no disclosure in this Disclosure Schedule (1) relating to any possible breach or violation of any law or contract shall be construed as an admission or indication that any such breach or violation exists or has actually occurred and nothing in this Disclosure Schedule shall constitute an admission of any liability or obligation of any Person or shall confer or give any third party any remedy, claim, liability, reimbursement, cause of action or any other right, (2) represents a determination that such item did not arise in the ordinary course of business, and (3) represents a determination that the transactions contemplated by the Agreement require the consent of third parties.

Each Purchaser acknowledges that it has reviewed and has had the opportunity to make inquiries regarding the information contained in this Disclosure Schedule.

The information contained in this Disclosure Schedule is confidential in all respects.

**Section 3.4 - Corporate Structure; Subsidiaries**

| Name of Subsidiary | Jurisdiction of Formation | Ownership |
|---|---|---|
| HouseCanary (CT), Inc. | Delaware | 51% owned by Tom Karras<br>49% owned by the Company |
| ComeHome, Inc | Delaware | 100% owned by the Company |
| acquisition Explorer, LLC | Delaware | 100% owned by the Company |
| HouseCanary Certified Analytics, Inc. | Delaware | 100% owned by the Company |
| HouseCanary R&D, LLC | Delaware | 100% owned by the Company |

HouseCanary (CT), Inc.'s ownership structure as a corporation trust company requires it to be owned 51% by the Company's registered and licensed broker in the State of Connecticut, Tom Karras ("***Karras***"), and 49% by the Company subject to the Company's right to purchase all of the shares owned by Karras for a nominal consideration of $1.00 pursuant to that certain Restricted Stock Purchase Agreement, dated November 21, 2019, by and between HouseCanary (CT), Inc., Karras and the Company (the "***RSPA***").

**Section 3.6 - No Other Securities/Rights**

**(1)** **Annex 3.6 – Capitalization Table**, attached hereto is hereby incorporated by reference as if fully set forth herein and sets forth the capitalization of the Company immediately prior to the Closing.

**(2)** The following agreements provide certain holders of securities of the Company with preemptive rights, rights of first refusal or other rights to purchase such equity securities, or any other rights with respect to such securities:

1. Second Amended and Restated Certificate of Incorporation of the Company, dated August 12, 2019 (the "***COI***").

2. Amended and Restated Investors' Rights Agreement, dated August 13, 2019, by and among the Company and the signatories thereto, which provides, among other things, registration rights to holders of certain securities of the Company.

3. Amended and Restated Right of First Refusal and Co-Sale Agreement, dated August 13, 2019, by and among the Company and the signatories thereto (the "***ROFR Agreement***").

4. Amended and Restated Voting Agreement, dated August 13, 2019, by and among the Company and the signatories thereto (the "***Voting Agreement***").

5. Side Letter, dated May 22, 2017, by and between the Company and HouseCan Investors, L.L.C.

6. Side Letter, dated January 9, 2020, by and between the Company and REach® Ventures LLC.

7. Class A Unit Contribution Agreement, dated February 14, 2017, by and among the Company, as successor-in-interest to Canary Analytics Holdings, LLC ("***CAH***"), and the signatories thereto; the Contribution Agreement, dated February 1, 2018, by and among the Company, as successor-in-interest to CAH, and the signatories thereto; Contribution Agreement, dated July 1, 2019, by and among the Company and the signatories thereto (collectively, the "***Contribution Agreement***").

8. The RSPA.

9. Warrant to Purchase Shares of the Company, dated September 30, 2021, by and between the Company and DataLoft Consulting Inc.

10. Warrant Purchase Agreement, dated April 19, 2017, by and between the Company and Reach® Ventures LLC (the "***Reach Ventures Warrant***").

11. Warrant to Purchase Units of Canary Analytics Holdings, LLC, dated February 2, 2018, by and between the Company (FKA Canary Analytics Holdings, LLC) and QED Partners IV, LLC.

12. Warrant to Purchase Units of Canary Analytics Holdings, LLC, dated January 16, 2019, by and between the Company (FKA Canary Analytics Holdings, LLC) and QED Partners IV, LLC.

13. Warrant to Purchase Stock of the Company, dated March 25, 2021, by and between the Company and CEOF Holdings LP.

14. Warrant to Purchase Stock of the Company, dated March 25, 2021, by and between the Company and Series Structural DCO II Series of Structural Capital DCO, LLC.

15. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Series HouseCanary Series of Structural Keystone VL LLC.

16. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Series HouseCanary Series of Structural Keystone VL LLC.

17. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Structural Capital Investments III, LP.

18. Warrant to Purchase Stock of the Company, dated March 31, 2021, by and between the Company and Structural Capital Holdings III, LP.

19. Simple Agreement for Future Equity, dated March 16, 2022, by and between the Company and Alpaca VC SPV #3 LLC.

20. Simple Agreement for Future Equity, dated March 16, 2022, by and between the Company and Alpaca Built World Fund I LP.

21. Simple Agreement for Future Equity, dated June 9, 2023, by and between the Company and Jeffrey Somers.

22. Simple Agreement for Future Equity, dated June 9, 2023, by and between the Company and Jeremy Sicklick.

23. Simple Agreement for Future Equity, dated June 22, 2023, by and between the Company and Jeffrey Somers.

24. Simple Agreement for Future Equity, dated June 22, 2023, by and between the Company and Jeremy Sicklick.

25. Simple Agreement for Future Equity, dated June 22, 2023, by and between the Company and Christopher Stroud.

**(3)** The following agreements affect or relate to the voting or giving of written consents with respect to, or the right to cause the redemption, or repurchase of, certain security of the Company:

**1.** The ROFR Agreement.

**2.** The Voting Agreement.

**3.** The Contribution Agreement.

**4.** The RSPA.

**5.** Reach Ventures Warrant.

**Section 3.8 - Intellectual Property and Technology**

**(c)**

1. The TSI Litigation (as defined below in Section 3.17).

2. The Quicken Loan Litigation (as defined below in Section 3.17).

**Section 3.9 – Transaction Warranties**

**(c)** The Company has obtained a waiver of anti-dilution adjustment and right of first offer with certain holders of securities of the Company in accordance with the COI and the IRA pursuant to that certain Waiver of Anti-Dilution Adjustment and Right of First Offer, dated June 28, 2023, by and among the Company and the signatories thereto.

**Section 3.11 – Borrowings and Financing**

**(a)**

1. Loan and Security Agreement, dated March 25, 2021, by and among the Company, Ocean II PLO LLC, a California limited liability company, as administrative and collateral agent for Lenders and Lenders identified therein (the "***Original LSA***"); First Amendment to Loan and Security Agreement, dated December 30, 2021 (the "***First Amendment***");Consent and Second Amendment to the Loan and Security Agreement, dated March 29, 2023 (the "***Second Amendment***" and collectively, with the Original LSA and the First Amendment, the "***Loan Agreement***"), pursuant to which the Lenders provided a loan facility in the principal amount of $30,000,000 to the Company.

2. Litigation Funding Agreement, dated as of June 6, 2018, by and among the Company, HC 1, LLC ("***HC 1***") and Security Finance 1 LLC, collateral agent for HC 1 (as amended by Amendment No. 1 to Litigation Funding Agreement, dated March 29, 2023), by and between the Company and HC 1 (the "***HC 1 Litigation Funding Agreement***"), pursuant to which HC 1 provided the Company non-recourse funding in the principal amount of $40,000,000 in exchange for receiving an Investment Return (as defined in the HC 1 Litigation Funding Agreement) for any Litigation Proceeds (as defined in the HC 1 Litigation Funding Agreement) and holds a lien on the Collateral (as defined in the HC 1 Litigation Funding Agreement).

3. Litigation Funding Agreement, dated March 29, 2023 (the "***Crane 2 Litigation Funding Agreement***"), by and between the Company and Crane 2 FundingCo 23, LLC ("***Crane 2***"), pursuant to which Crane 2 provided the Company non-recourse funding in the principal amount of $5,000,000 in exchange for receiving an Investment Return (as defined in the Crane 2 Litigation Funding Agreement), subject to the priority payment to HC 1 under the HC 1 Litigation Funding Agreement, for any Litigation Proceeds (as defined in the Crane 2 Litigation Funding Agreement) and holds a lien, subject to HC 1's first priority security interest, on the Collateral (as defined in the Crane 2 Litigation Funding Agreement).

**(b)** The Company is in default of the Loan Agreement for (i) failing to timely deliver its audited financial statements for fiscal year between 2020 and 2021 and fiscal year between 2021 and 2022 (the "***Financial Statement Default***"), and (ii) for failing to maintain the Cash Threshold (as defined in the Loan Agreement) (the "***Cash Threshold Default***" and collectively with the Financial Statement Default, the "***Loan Defaults***"). The Company will obtain a waiver for the Loan Defaults under that certain Waiver, Consent and Third Amendment to Loan and Security Agreement, dated July 10, 2023.

**(c)** The Loan Defaults.

**Section 3.17 – No Litigation**

**(i)**

1. Title Source, Inc. v. HouseCanary, Inc. f/k/a Canary Analytics, Inc., 73rd Judicial District Court, Bexar County, Texas, Trial Court No. 2016-CI-06300 (the "***TSI Litigation***").

The TSI Litigation involves (i) the claims of the Company against Title Source Inc. ("***TSI***"; subsequently renamed, Amrock, LLC) for trade secret misappropriation, breach of contract and fraud, and (ii) TSI's claims against the Company for breach of contract and fraud. The agreements between the Company and TSI that gave rise to the litigation called for the Company to provide a software-based appraisal application and granted TSI a limited license to use the Company's automated valuation model and related proprietary technologies. The agreements contained strict protections for the Company's intellectual property.

After a seven-week trial in 2018, a jury found that TSI had misappropriated the Company's trade secrets, breached the parties' agreements, and committed fraud. The jury also rejected all of TSI's affirmative claims. The jury awarded the Company $235.4 million in compensatory damages and $470.8 million in punitive damages for its fraud and trade secret misappropriation claims. As an alternative remedy, the jury awarded the Company $206 million in compensatory damages for its breach of contract claim. The Company elected judgment on its fraud and trade secret misappropriation claims. Following this election, the trial court entered judgment for the Company for $739,717,865.79, which included prejudgment interest and attorney's fees.

TSI appealed the judgment to the Court of Appeals for the Fourth District, San Antonio, Texas. In 2020, the Court of Appeals reversed the judgment of the trial court because it concluded that the trial court had erred in submitting jury instructions on trade secret misappropriation that tracked the language of the Texas Uniform Trade Secrets Act. The Court of Appeal also held that TSI did not improperly acquire the trade secrets because of the parties' contractual relationship. At the same time, the Court of Appeals affirmed the jury's finding that TSI should recover nothing on its claims from the Company. The Court of Appeals also affirmed the jury's findings that the Company owned valid and valuable trade secrets. The Court of Appeals remanded the case for retrial on the fraud and misappropriation claims, but gave the Company the alternative of electing judgment on its breach of contract claim instead of its fraud and trade secret misappropriation claims.

The Company and TSI each filed petitions with the Texas Supreme Court seeking review of the Court of Appeals' decision. On June 17, 2022, the Texas Supreme Court denied both petitions and affirmed the decision of the Court of Appeals. The Company then filed a motion for reconsideration with the Texas Supreme Court, which denied the motion.

Following the Texas Supreme Court's decision, The Company has elected to retry its fraud, misappropriation and breach of contract claims against TSI in the 73rd Judicial District Court, Bexar County, Texas. Judge Canales, the judge who presided over the original trial, will also preside over the re-trial. The re-trial is scheduled to occur in October 2023.

2. HouseCanary, Inc. v. Quicken Loans, Inc., One Reverse Mortgage, LLC, and In-House Realty, LLC, United States District Court for the Western District of Texas, San Antonio Division, Civil Action No. 5:18-CV-00519-FB (the "***Quicken Loans Litigation***").

On May 25, 2018, the Company filed suit against TSI affiliates Quicken Loans, Inc., One Reverse Mortgage, LLC, and In-House Realty, LLC in the United States District Court for Western District of Texas,

asserting claims for trade secret misappropriation under both state and federal law, conspiracy to misappropriate trade secrets, conspiracy to commit fraud, joint enterprise liability, and breach of contract. The Company's complaint requested for damages in the amount to be proved at trial. The court stayed the Quicken Loans Litigation pending resolution of the TSI Litigation.

**Section 3.18 - Consents, No Conflicts**

(iii) None.

**Section 3.20 - Compliance with Other Instruments**

1. The Loan Defaults.

# EXHIBIT 2

Docusign Envelope ID: EC0F678C-A367-898B-8063-F3B93F8C6CF4


# Ocean II PLO LLC

3555 Alemeda De Las Pulgas, Suite 201
Menlo Park, CA 94025


***Via Facsimile*** (jeremy@housecanary.com and crediger@housecanary.com)

September 10, 2026

Jeremy Sicklick
Chris Rediger
HouseCanary, Inc.
535 Mission Street, Office 1920
San Francisco, CA 94105

Re: Public Sale Of Assets

Dear Messrs. Sicklick and Rediger:

Reference is made to that certain Loan and Security Agreement dated as of March 25, 2021, by and among HouseCanary, Inc. ("Debtor"), Ocean II PLO LLC ("Agent") and the various lenders party thereto, as amended from time to time (the "LSA"). Capitalized terms used but not defined in this letter shall have the meaning provided in the LSA.

In connection with the proposed public sale of the Collateral schedule to occur on September 22, 2026 (the "Public Sale"), and pursuant to Section 6.12 of the LSA, please provide as soon as possible, a detailed list of each various component of the Collateral (e.g., all equipment, Accounts, etc.) including any indication of value (cost, book value, account aging) so that Agent can respond to requests for information from potential bidders of the Collateral at the Public Sale. Failure to provide such information will constitute a further breach of the LSA and may adversely affect the price obtained for the Collateral at the Public Sale.

Pursuant to Section 9.1(b) of the LSA, demand is also made for Debtor to assemble all Collateral wherever located at Debtor's premises located at 535 Mission Street, Office 1920, San Francisco, CA (the "Premises") no later than September 23, 2026 beginning at 10:00 Pacific time. Demand is also made pursuant to Section 9.1(b) of the LSA to allow Agent or its designee access to Premises beginning at that time in order to collect and remove the Collateral, it being anticipated that access shall be required for several hours to complete the removal of the Collateral, and that may access may be needed beyond September 23, 2026.

Very Truly Yours,

Ocean II PLO LLC
By: Structural Capital Management Company II, LP,
a Delaware limited partnership
Its Manager

By: Structural Capital GP, LLC,
a Delaware limited liability company
Its General Partner

By: DocuSigned by: Kai Tse
00DF39B80B68460...
Name: Kai Tse
Title: Managing Member

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 2818 La Cienega Ave., Los Angeles, CA 90034.

On September 21, 2026, I served the foregoing document described as: **DECLARATION OF STEVE GASSER IN SUPPORT OF OPPOSITION BY DEFENDANT OCEAN II PLO LLC TO PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** on the interested parties listed below in the manner prescribed below:

Email
THOMAS J. D'ANTONIO (SBN 316472)
DENTONS US LLP
1999 Harrison Street
Suite 1210
Oakland, CA 94612
Telephone: (415) 882-5000
Email: thomas.dantonio@dentons.com

VAN C. DURRER, II (SBN 226693)
NICK JANDA (SBN 253610)
DENTONS US LLP
601 S. Figueroa Street Suite 2500
Los Angeles, CA 90017-5704
Telephone: (213) 623-9300
Email: van.durrer@dentons.com; nick.janda@dentons.com

*Attorneys for Plaintiff*
HOUSECANARY, INC.

☒ **BY ELECTRONIC MAIL:** By attaching an electronic copy of the document listed above to the email addresses as listed above. I did not receive, within a reasonable time after the email transmission, any electronic message, email, or other indication that the email transmission was unsuccessful. (Email service by Richard P. Steelman, Jr.)

☒ **STATE:** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 21, 2026, at Los Angeles County, California.

*/s/ Richard P. Steelman, Jr.*
Richard P. Steelman, Jr.

# <u>EXHIBIT J</u>

## Computer Inventory

| Device Name | Model Name | Display OS Version | Device Serial Number | Device User | Status |
|---|---|---|---|---|---|
| **ajoshi** | MacBook Pro (16-inch, 2019) | 26.7 | C02C107SMD6P | Aadish Joshi | Employee |
| **awoodhams** | MacBook Air (M1, 2020) | 27 | FVFFH2BLQ6LW | Andrea Woodhams | Employee |
| **asantiago** | MacBook Air (M1, 2020) | 14.8.9 | FVFHK1C2Q6LX | Ayleen Santiago | Employee |
| **bandrews** | MacBook Pro (14-inch, 2024) | 15.8 | DKY3QHPH6D | Bill Andrews | Employee |
| **bpalluck** | MacBook Air (M2, 2022) | 15.8 | DJ7TDW1244 | Bryan Palluck | Employee |
| **cduquette** | MacBook Pro (14-inch, 2021) | 15.8 | T6WQNPF9FH | Chris Duquette | Employee |
| **cduquette** | MacBook Pro (15-inch, 2018/2019) | 14.7.6 | C02Z20LGLVDQ | Chris Duquette | Employee |
| **crediger** | MacBook Pro (14-inch, 2021) | 15.7.7 | RYYPJ2DW0H | Chris Rediger | Employee |
| **cstroud** | MacBook Pro (14-inch, 2021) | 14.8.9 | LVVKD6Q7KR | Chris Stroud | Employee |
| **csloan** | MacBook Pro (14-inch, 2024) | 27 | H74C326RT6 | Christine Sloan | Employee |
| **drutkowski** | MacBook Air (M2, 2022) | 15.8 | JT6JF0XJ2P | Darla Rutkowski | Employee |
| **emajcher** | MacBook Pro (13-inch, M1, 2020) | 14.8.7 | C02F81QQQ05R | Ed Majcher | Consultant |
| **egaxha** | MacBook Pro (14-inch, 2024) | 26.7 | FPWDJJK4D1 | Ernesto Gaxha | Employee |
| **eyaremenko** | MacBook Pro (14-inch, 2021) | 27 | TH22YXRPX4 | Eugene Yaremenko | Employee |
| **eturnaev** | MacBook Pro (16-inch, 2019) | 26.7 | C02GC0J7MD6R | Evgeny Turnaev | Employee |
| **flin** | MacBook Air (15-inch, M4, 2025) | 26.7 | MLXD6PJ17M | Fraser Lin | Employee |
| **gmoon** | MacBook Air (M1, 2020) | 15.3.1 | FVFGR2Y0Q6LT | Grant Moon | Consultant |
| **jnettleman** | MacBook Pro (14-inch, 2021) | 26.7 | H6097NXCR4 | Jared Nettleman | Employee |
| **jsicklick** | MacBook Pro (16-inch, 2019) | 26.7 | C02C40BSMD6P | Jeremy Sicklick | Employee |
| **jgust** | MacBook Pro (14-inch, 2021) | 26.7 | XJV7GTVFQK | Jolee Gust | Employee |
| **jroe** | MacBook Air (13-inch, M5) | 26.7 | D2R492R6FL | Jordan Roe | Employee |
| **jbarnett** | MacBook Pro (14-inch, 2024) | 15.8 | LXLJF7VGH2 | Julian Barnett | Employee |
| **kdavis** | MacBook Pro (15-inch, 2018/2019) | 14.8.3 | C02XC37DJG5L | Katiera Davis | Employee |
| **lsylak** | MacBook Pro (15-inch, 2018/2019) | 15.8.1 | C02X50Q7JG5H | Leona Sylak | Employee |
| **mfalatic** | MacBook Pro (14-inch, M5) | 27 | DY32M4PPXW | Marty Falatic | Employee |
| **mfalatic** | MacBook Pro (16-inch, 2019) | 26.7 | C02G3B8GMD6M | Marty Falatic | Employee |
| **mo'grady** | MacBook Pro (14-inch, 2023) | 14.8.7 | GYF3695WNY | Matt O'Grady | Consultant |
| **mczokoly** | MacBook Air (M1, 2020) | 26.7 | FVFHT1ZCQ6L8 | Melanie Czokoly | Employee |
| **mpoindexter** | MacBook Pro (16-inch, 2021) | 26.7 | KXV7T23PY4 | Mike Poindexter | Consultant |
| **ngarcia** | MacBook Pro (14-inch, 2021) | 26.7 | YPCG295JCD | Nick Garcia | Employee |
| **obiteryakov** | MacBook Air (M1, 2020) | 26.7 | FVFGJ2HHQ6LT | Oleg Biteryakov | Employee |
| **obiteryakov** | MacBook Pro (15-inch, 2018/2019) | 15.7.3 | C02XG1DWJGH5 | Oleg Biteryakov | Employee |
| **obiteryakov** | MacBook Air (M1, 2020) | 15.7.2 | FVFH10ZLQ6LX | Oleg Biteryakov | Employee |
| **sfeher** | MacBook Pro (14-inch, 2021) | 14.8.9 | TT4PJQF72L | Sam Feher | Employee |
| **sorozco** | MacBook Pro (14-inch, Nov 2023) | 26.7 | M9GYQX5QGQ | Samuel Orozco | Employee |
| **skruse** | MacBook Air (M2, 2022) | 15.8 | T694L4TF6V | Sarah Kruse | Employee |
| **squinnan** | MacBook Air (15-inch, M4, 2025) | 27 | FX14W7PV7X | Sean Quinnan | Employee |
| **so'brien** | MacBook Pro (13-inch, M1, 2020) | 15.8 | FVFGK5VLQ05P | Steve O'Brien | Employee |
| **tkung** | MacBook Air (M2, 2022) | 14.8.9 | CN4Q353WR2 | Talesa Kung | Employee |
| **tdepp** | MacBook Pro (13-inch, M2, 2022) | 27 | L3R7DJJCPW | Tod Depp | Employee |
| **tkarras** | MacBook Pro (16-inch, 2019) | 26.7.1 | C02FN32XMD6M | Tom Karras | Employee |
| **tkarras** | MacBook Air (M1, 2020) | 15.2 | FVFFJ0G3Q6LW | Tom Karras | Employee |
| **uismail** | MacBook Pro (14-inch, M5) | 26.7 | H402YR94FF | Umar Ismail | Employee |
| **vyuan** | MacBook Air (M1, 2020) | 26.7 | FVFFJ20RQ6LR | Victoria Yuan | Employee |

| | | | | | |
|---|---|---|---|---|---|
| **vlipchenko** | MacBook Air (M2, 2022) | 14.8.9 | JKXVJYC4PH | Viktor Lipchenko | Consultant |
| **xyang** | MacBook Pro (14-inch, 2021) | 15.8 | X4NWWVJ475 | Xiaobin Yang | Employee |
| **zteters** | MacBook Air (M1, 2020) | 14.8.9 | FVFGH3DCQ6LT | Zach Teters | Employee |

| Serial | Device Type | Model | Model Detail | Color | Computer Status | Inventory Status | Locker Group | Last Checked | Warranty End Date |
|---|---|---|---|---|---|---|---|---|---|
| MG77JC61GP | Laptop | MacBook Pro (14-inch, M3 Pro or M3 Max, Nov 2023 | A2992 | SILVER | Wiped | In Inventory | Group B | 7/28/2026 | 8/14/2027 |
| MC2MH7LQLX | Laptop | MacBook Air (13-inch, M3, 2024) | 15.5, M3 Chip, 8C CPU/8C GPU | SILVER | Wiped | In Inventory | Group A | 7/24/2026 | 8/13/2027 |
| KF2Y7W6YXN | Laptop | MacBook Pro (14-inch, 2023) | A2779 | SILVER | Wiped | In Inventory | Group A | 8/6/2026 | 7/28/2026 |
| WWWGHQJ426 | Laptop | MacBook Pro (14-inch, 2023) | Apple M2 Pro | SILVER | Wiped | In Inventory | Group C | 7/24/2026 | 3/16/2026 |
| V7GVH6QCGG | Laptop | MacBook Pro (13-inch, M2, 2022) | MBP 14.7 Silver/8C CPU/8C GPU M2 Chip | SILVER | Wiped | In Inventory | Group A | 7/24/2026 | 6/25/2025 |
| QHFVMYVYGJ | Laptop | MacBook Pro (13-inch, M2, 2022) | 14.7.5, M2 Chip, 8C CPU/8C GPU | SILVER | Wiped | In Inventory | Group A | 7/24/2026 | 6/25/2025 |
| FVFHF3FLQ6LT | Laptop | MacBook Air | MBA 13.3 SPG/8C CPU/8C GPU | SILVER | Wiped | In Inventory | Group C | 7/24/2026 | 3/22/2025 |
| FVFHF3J5Q6LT | Laptop | MacBook Air | MBA 13.3 SPG/8C CPU/8C GPU | SILVER | Wiped | In Inventory | Group A | 7/24/2026 | 3/22/2025 |
| M92V2WX91G | Laptop | MacBook Pro (14-inch, 2021) | MBP 15.5, M1 Chip 10C CPU/10C GPU | SILVER | Wiped | In Inventory | Group C | 7/24/2026 | 11/29/2024 |
| HWWRPF4JGF | Laptop | MacBook Pro (14-inch, 2023) | A2779 | SILVER | Wiped | In Inventory | Group A | 8/6/2026 | 8/11/2024 |
| C02ZR1GWMD6P | Laptop | MacBook Pro (16-inch, 2019) | MBP 16.0 SL/2.6G 6C/16GB/5300M/512GB-USA | SILVER | Wiped | In Inventory | Group B | 7/24/2026 | 12/10/2019 |
| DMPS28QKG5WQ | Tablet | iPad Air 2 Wi-Fi + Cellular | A1550 | SILVER | Wiped | In Inventory | Group E | 8/25/2026 | 10/18/2017 |
| DLXR80A1GHMG | Tablet | iPad mini 4 Wi-Fi + Cellular | A1567 | SILVER | Wiped | In Inventory | Group E | 8/25/2026 | 4/4/2017 |
| | Phone | iPhone 6s plus | A1634 | SILVER | Wiped | In Inventory | Group E | 8/25/2026 | |
| C02YR0PALVCH | Laptop | MacBook Pro (15-inch, 2018/2019) | A1990 | SILVER | Wiped | In Inventory | Group B | 9/4/2026 | 6/26/2020 |